To: CLERK OF COURTS
   100 FEDERAL PLAZA
   CENTRAL ISLIP, NY 11722

FROM: ERIC SMITH, PRO SE LITIGANT
   #89280-053
   U.S.P. LEE COUNTY
   P.O. BOX 305
   JONESVILLE, VA 24263

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 28 2022 ★

LONG ISLAND OFFICE

2/17/2022

RE: REQUESTING CONFIRMATION FROM
THE U.S. DISTRICT COURT CLERK THAT
MY 2255 MOTION WAS RECEIVED AND FILED ON DOCKET # CR14-264(JS) & CR13-428(JS).

   I'm sending this notice, to the court to receive confirmation that my 2255 motion has been filed on docket #'s cr14-264(JS) & CR13-428(JS) and the necessary parties in regards to those case #'s receive their copies of the motion. Thank you in advance for ya time, I await your confirmation.

              Respectfully Submitted,
                   Eric Smith, PRO SE
                   #89280-053

P.S. W.I.T THIS NOTICE IS
THE ORIGINAL MOTION, AND THE
OTHER COPIES ARE IN A SEPERATE
MANILLA ENVELOPE WHICH HAS BEEN
CERTIFIED AS WELL AS THIS ONE.

**Motion to Vacate, Set Aside, or Correct a Sentence By a Person in Federal Custody**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★    FEB 28 2022    ★
LONG ISLAND OFFICE

## (Motion Under 28 U.S.C. § 2255)

**Instructions** 1.    To use this form, you must be a person who is serving a sentence under a judgment against you in a federal court. You are asking for relief from the conviction or the sentence. This form is your motion for relief.

2.    You must file the form in the United States district court that entered the judgment that you are challenging. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file the motion in the federal court that entered that judgment.

3.    Make sure the form is typed or neatly written.

4.    You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5.    Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a brief or arguments, you must submit them in a separate memorandum.

6.    If you cannot pay for the costs of this motion (such as costs for an attorney or transcripts), you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you.

7.    In this motion, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different judge or division (either in the same district or in a different district), you must file a separate motion.

8.    When you have completed the form, send the original and two copies to the Clerk of the United States District Court at this address:

Clerk, United States District Court for EASTERN DISTRICT OF NEW YORK
Address    100 FEDERAL PLAZA
City, State Zip Code    CENTRAL ISLIP, N.Y. 11722

9.    <u>**CAUTION:**</u> **You must include in this motion** <u>**all**</u> **the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this motion, you may be barred from presenting additional grounds at a later date.**

10.    <u>**CAPITAL CASES:**</u> **If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District | |
|---|---|---|
| Name (under which you were | | Docket or |

410cr

1

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

convicted): *6/15/2017*      Case No.: *CR14-264(JS) & CR15-428(JS)*
Place of
Confinement: *U.S.P LEE COUNTY*      Prisoner
No.:

UNITED STATES OF      Movant (include
AMERICA      name under which
convicted)

v.      *ERIC SMITH*

**MOTION 1.**    (a) Name and location of court that entered the judgment of conviction you are challenging: *UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK 100 FEDERAL PLAZA CENTRAL ISLIP, NY 11722*

(b) Criminal docket or case number (if you know): *CR14-264(JS) & CR15-428(JS)*

2.    (a) Date of the judgment of conviction (if you know): *6/15/2017*

(b) Date of sentencing: *6/13/2018*

3.    Length of sentence: *FOUR LIFE TERMS PLUS 30 YEAR'S*

4.    Nature of crime (all counts): *C1. RICO  C2. RICO CONSPIRACY, C3. HOBBS ACT ROBBERY CONSPIRACIES C4 & 7. HOBBS ACT ROBBERIES  & C.6 C5. POSSESSING & BRANDISHING FIREARM DURING CRIMES OF VIOLENCE: HOBBS ACT ROBBERY CONSPIRACY, C8. POSSESSING AND BRANDISHING FIREARM DURING CRIMES OF VIOLENCE: HOBBS ACT ROBBERY CONSPIRACY AND ROBBERY, C9. MURDER IN AID OF RACKETEERING, C10. FIREARM-RELATED MURDER, C11. CONSPIRACY TO MURDER & ASSAULT RIVAL GANG MEMBERS*

5.    (a) What was your plea? (Check one)    *WIT DEADLY WEAPONS*

(1) ✓ Not guilty    (2) Guilty    (3) Nolo contendere (no contest)

(b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to? _____

_____
_____
_____
_____

6.    If you went to trial, what kind of trial did you have? (Check one)    Jury ✓    Judge only

7.    Did you testify at a pretrial hearing, trial, or post-trial hearing?    Yes    (No)

8.    Did you appeal from the judgment of conviction?    Yes    (No)

9.    If you did appeal, answer the following:

(a) Name of court: _____

(b) Docket or case number (if you know): _____

(c) Result: _____

(d) Date of result (if you know): _____

(e) Citation to the case (if you know): _____

(f) Grounds raised: _____

_____
_____
_____
_____
_____

(g) Did you file a petition for certiorari in the United States Supreme Court?    Yes    (No)

If "Yes," answer the following:

410cr      2

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

(1) Docket or case number (if you know): _____
(2) Result: _____

_____
(3) Date of result (if you know): _____
(4) Citation to the case (if you know): _____
(5) Grounds raised: _____

_____
_____
_____
_____

_____

10.    Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?
Yes  No

11.    If your answer to Question 10 was "Yes," give the following information:
(a)(1) Name of court: _____
(2) Docket or case number (if you know): _____
(3) Date of filing (if you know): _____
(4) Nature of the proceeding: _____
(5) Grounds raised: _____

_____
_____
_____
_____
_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?
Yes  No
(7) Result: _____
(8) Date of result (if you know): _____

(b) If you filed any second motion, petition, or application, give the same information:
(1) Name of court: _____
(2) Docket or case number (if you know): _____
(3) Date of filing (if you know): _____
(4) Nature of the proceeding: _____
(5) Grounds raised: _____

_____
_____
_____
_____
_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?
Yes  No
(7) Result: _____

410cr                                     3

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

(8) Date of result (if you know): _____

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition: Yes (No)

(2) Second petition: Yes (No)

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

_____
_____
_____

12.    For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the <u>facts</u> supporting each ground.

**GROUND ONE:** Basis of the 924(c) offenses based on VICAR CHARGES ARE NOT SERVED AS VIOLENT CRIMES

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): Since the arizona and utah state crimes could be comitted with a men's era (or mental state) of rechkare that they could not serve as violent crimes for purposes of VICAR. And since the offense is no longer a crime of violence to serve as the basis for VICAR can't serve as violent crimes, and that 924(c) offenses has to fall because there is no longer a crime of violence to serve as the backbone either. A 924(c) can be comitted by possession/brandishing/discharging a firearm in furtherence of a crime of violence, so if you have no crime

(b) **Direct Appeal of Ground One:** of violence then you have no 924(c)

(1) If you appealed from the judgment of conviction, did you raise this issue? Yes (No)

(2) If you did not raise this issue in your direct appeal, explain why: Early feb, 2022 SUPREME COURT RULED VICAR offenses thew 924(c) are unconsitional and was made retro-active

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application? Yes (No)

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

Docket or case number (if you know): _____

410cr                                4

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion, petition, or application?

Yes (No)

(4) Did you appeal from the denial of your motion, petition, or application?

Yes (No)

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes (No)

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

_____

**GROUND TWO:** RICO conspiracy count does not constitute such a crime of violence

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): The district court had erroneously instructed the jury that the defendant's RICO conspiracy count was a crime of violence on which a section 924(j) violation could be predicated, explaining that RICO Conspiracy does not constitute such a crime of violence because it does not categorically have as an element the use, attempted use, or threatening use of physical force.

(b) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes (No)

(2) If you did not raise this issue in your direct appeal, explain why: Direct appeal wasn't raised at the time due to me not having grounds to challenge until 2021 when RICO conspiracy was deemed unconstitutional and no longer a crime of violence

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes (No)

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

410cr                                         5

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

Docket or case number (if you know): _____
Date of the court's decision: _____
Result (attach a copy of the court's opinion or order, if available): _____
_____
_____

(3) Did you receive a hearing on your motion, petition, or application?
Yes No

(4) Did you appeal from the denial of your motion, petition, or application?
Yes No

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?
Yes No

(6) If your answer to Question (c)(4) is "Yes," state:
Name and location of the court where the appeal was filed: _____

Docket or case number (if you know): _____
Date of the court's decision: _____
Result (attach a copy of the court's opinion or order, if available): _____
_____
_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____
_____
_____
_____

**GROUND THREE:** 924(c) offenses are no longer a crime of violence which makes conspiracy hobbs act robbery

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): unconstitutional. VICAR convictions for crimes that can be committed recklessly cannot satisfy 924(c)'s elements-clause definition of a crime of violence. Those convictions also cannot qualify as valid 924 (c) predicates under the unconstitutional residual clause the trial court erred when it instructed the jury otherwise, moreover the trial courts error had a "substantial and injurious effect or influence in determining the jury's verdict.

(b) **Direct Appeal of Ground Three:**
(1) If you appealed from the judgment of conviction, did you raise this issue?
Yes No

(2) If you did not raise this issue in your direct appeal, explain why: Because conspiracy hobbs act robbery was not deemed unconstitutional untill recently.

(c) **Post-Conviction Proceedings:**
(1) Did you raise this issue in any post-conviction motion, petition, or application?
Yes No

410cr                                    6

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion, petition, or application?
Yes  (No)

(4) Did you appeal from the denial of your motion, petition, or application?
Yes  (No)

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?
Yes  (No)

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

**GROUND FOUR:** Newly discovered evidence

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Main Witness for counts 9 and 10, bryan W. henry filed a affidavit stating that he was coerced and forced to testify at my trial from threats by A.U.S.A nicole boeckmann and federal agent derrick Acker together with his attorney Mr. Geduldig and among other prosecutors and defense attorney's Pressed out the Pressure of serving the rest of his life in prison, he agreed to testify despite the fact of not knowing anything about the murder for the

(b) **Direct Appeal of Ground Four:** about the murder for be

(1) If you appealed from the judgment of conviction, did you raise this issue? a material witness.
Yes  (No).

(2) If you did not raise this issue in your direct appeal, explain why: Newly discovered evidence obtained on Jan, 18 2022

_____

410cr                                                    7

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

**(c) Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes (No)

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion, petition, or application?

Yes (No)

(4) Did you appeal from the denial of your motion, petition, or application?

Yes (No)

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes (No)

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

_____13.    Is there any ground in this motion that you have not previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: _____

_____

_____

_____

_____

_____

14.    Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the judgment you are challenging? Yes (No)

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____

_____

_____

_____

410cr                                    8

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

_____
_____
_____
_____
_____
_____
_____

Therefore, movant asks that the Court grant the following relief: Vacate all counts/verdict/ sentences and to be immediate released.

or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion Under 28 U.S.C. § 2255 was placed in the prison mailing system on _____ 2/18/2022 (month, date, year).
Executed (signed) on 2/18/2022 (date).

_Eric Smith_
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion. _____
_____
_____

State of Virginia
County of Lee

The foregoing istrument was acknowledged before me this 17th day of February, 2022 by Eric Smith.

_signature_

My commission expires December 31, 2025.

ISAAC RAY CALFEE
NOTARY PUBLIC
MY COMMISSION NUMBER
7930544
COMMONWEALTH OF VIRGINIA

410cr                    **10**

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

15.    Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: *Gary Schoer, esq.*
*6800 Jericho turnpike, Syosset, N.Y. 11791*

(b) At arraignment and plea: *Gary Schoer, esq*
*6800 Jericho turnpike, Syosset, N.Y. 11791*

(c) At trial: *Anthony M. Labinto, esq*
*260 Vanderbilt Motor Parkway suite c-17 Hauppauge N.Y. 11788*

(d) At sentencing: *PRO SE*

(e) On appeal: *PRO SE*

(f) In any post-conviction proceeding: _____

(g) On appeal from any ruling against you in a post-conviction proceeding: _____
_____

16.    Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time? (Yes) No

17.    Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? Yes (No)

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:
_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?  Yes (No)

18.    TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion. *

*Because case law and newly discovered evidence was just recently obtained between the past year from today. Direct appeal was not filed because, I had no grounds to challenge at the time of my one year statue of limitations on either remedie.*

_____
_____
_____
_____
_____
_____

410cr                                    9

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

---

**CHARLES BORDEN, Jr., Petitioner v. UNITED STATES**
**SUPREME COURT OF THE UNITED STATES**
**141 S. Ct. 1817; 210 L. Ed. 2d 63; 2021 U.S. LEXIS 2990; 28 Fla. L. Weekly Fed. S 835**
**No. 19-5410.**
**June 10, 2021, Decided**
**November 3, 2020, Argued**

---

**Notice:**

**The LEXIS pagination of this document is subject to change pending release of the final published version.**

**Editorial Information: Subsequent History**

On remand at, Remanded by United States v. Borden, 2021 U.S. App. LEXIS 20687 (6th Cir., July 12, 2021)

**Editorial Information: Prior History**

{2021 U.S. LEXIS 1}ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUITUnited States v. Borden, 769 Fed. Appx. 266, 2019 U.S. App. LEXIS 12625 (6th Cir.), 2019 WL 1856417 (6th Cir. Tenn., Apr. 25, 2019)

**Disposition:**
769 Fed. Appx. 266, reversed and remanded.Summary

**Overview:** HOLDINGS: [1]-In an action concerning petitioner's sentence as a career offender where one of the three convictions alleged as predicates was for reckless aggravated assault in violation of Tennessee law, four justices held that offenses with a mens rea of recklessness did not qualify as violent felonies under the Armed Career Criminal Act (ACCA), 18 U.S.C.S. § 924(e), because they did not require, as ACCA did, the active employment of force against another person, and they were not the stuff of armed career criminals. A fifth justice concurred in the judgment based on the justice's conclusion that the particular provision at issue did not encompass petitioner's conviction for reckless aggravated assault.
**Outcome:** Judgment reversed and remanded. 5-4 decision; 1 concurrence in the judgment; 1 dissent.

**CASE SUMMARY**Four justices held that offenses with a mens rea of recklessness did not qualify as violent felonies under the ACCA because they did not require, as ACCA did, the active employment of force against another person, and they were not the stuff of armed career criminals. Petitioner's sentence as a career offender was reversed and remanded.

**OVERVIEW:** HOLDINGS: [1]-In an action concerning petitioner's sentence as a career offender where one of the three convictions alleged as predicates was for reckless aggravated assault in violation of Tennessee law, four justices held that offenses with a mens rea of recklessness did not qualify as violent felonies under the Armed Career Criminal Act (ACCA), 18 U.S.C.S. § 924(e), because they did not

SCTHOT                                    1

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

require, as ACCA did, the active employment of force against another person, and they were not the stuff of armed career criminals. A fifth justice concurred in the judgment based on the justice's conclusion that the particular provision at issue did not encompass petitioner's conviction for reckless aggravated assault.

**OUTCOME:** Judgment reversed and remanded. 5-4 Decision; 1 concurrence in the judgment; 1 dissent.

**LexisNexis Headnotes**

### Syllabus

{141 S. Ct. 1819}The Armed Career Criminal Act (ACCA) mandates a 15-year minimum sentence for persons found guilty of illegally possessing a firearm {210 L. Ed. 2d 66}who have three or more prior convictions for a ``violent felony.'' An offense qualifies as a violent felony under ACCA's elements clause if it necessarily involves ``the use, attempted use, or threatened use of physical force against the person of another.'' 18 U. S. **C**. §**924**(e)(2)(B)(i). In *Leocal* v. *Ashcroft*, 543 U. S. 1, 125 S. Ct. 377, 160 L. Ed. 2d 271, the Court held that offenses requiring only a negligent *mens rea* fall outside a relevantly identical definition. *Id.,* at 9, 125 S. Ct. 377, 160 L. Ed. 2d 271. The ``critical aspect'' in determining the relevant *mens rea*, the Court explained, was the statute's demand that the perpetrator use physical force ``*against the person or property of another*.'' *Ibid* (emphasis in original). Then in *Voisine* v. *United States*, 579 U. S. 686, 136 S. Ct. 2272, 195 L. Ed. 2d 736, the Court held that reckless crimes fall within a different statutory definition--this one requiring the ``use of physical force,'' but lacking the ``against'' phrase *Leocal* deemed ``critical.'' In both decisions, the Court left open whether reckless offenses would satisfy ACCA's elements clause.

Petitioner Charles Borden, Jr., pleaded guilty to a felon-in-possession charge, and the Government{2021 U.S. LEXIS 2} sought an enhanced sentence under ACCA. One of the three convictions alleged as predicates was for reckless aggravated assault in violation of Tennessee law. Borden argued that this offense is not a violent felony under ACCA's elements clause because a mental state of recklessness suffices for conviction. In his view, only purposeful or knowing conduct satisfies the clause's demand for the use of force ``against the person of another.'' The District Court disagreed and sentenced Borden as a career offender. The Sixth Circuit affirmed.

*Held:* The judgment is reversed, and the case is remanded.

769 Fed. Appx. 266, reversed and remanded.

{141 S. Ct. 1820}Justice Kagan, joined by Justice Breyer, Justice Sotomayor, and Justice Gorsuch, concluded that a criminal offense with a *mens rea* of recklessness does not qualify as a ``violent felony'' under ACCA's elements clause. Pp. ___ - ___, 210 L. Ed. 2d, at 70-82.

(a) That conclusion follows from the statutory text. The phrase ``against another,'' when modifying a volitional action like the ``use of force,'' demands that the perpetrator direct his force at another individual. Reckless conduct is not aimed in that prescribed manner. *Leocal* confirms that conclusion. When read against the words ``use of force,'' the Court{2021 U.S. LEXIS 3} explained, the ``against'' phrase--the definition's ``critical aspect''--``suggests a higher degree of intent'' than (at least) negligence. 543 U. S., at 9, 125 S. Ct. 377, 160 L. Ed. 2d 271. That understanding of ``against'' contradicts the Government's view that the phrase here does not incorporate a *mens rea* requirement. Pp. ___ - ___, 210 L. Ed. 2d, at 72-77.

SCTHOT                                                    2

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(b) The ordinary meaning of the term ``violent felony''--which the elements clause defines--also informs this construction. As *Leocal* explained, ``we cannot forget that we ultimately are determining the meaning of the term 'crime of violence.' '' 543 U. S., at 11, 125 S. Ct. 377, 160 L. Ed. 2d 271. The Court said the same in *Johnson* v. *United States*, 559 U. S. 133, 130 S. Ct. 1265, 176 L. Ed. 2d 1, {**210 L. Ed. 2d 67**}when construing language in ACCA's definition of ``violent felony.'' *Id.,* at 139-140. With that focus in place, both decisions construed the definitions at issue to mark out a narrow ``category of violent, active crimes.'' *Id.,* at 140, 130 S. Ct. 1265, 176 L. Ed. 2d 1; 543 U. S., at 11, 125 S. Ct. 377, 160 L. Ed. 2d 271. And those crimes are best understood to involve a purposeful or knowing mental state--a deliberate choice of wreaking harm on another, rather than mere indifference to risk. P. ___, 210 L. Ed. 2d, at 77.

(**c**) Classifying reckless crimes as ``violent felonies'' would also conflict with ACCA's purpose. Congress enacted ACCA to address ``the special danger created when a particular type of offender--a violent criminal[ ]--possesses a gun.'' *Begay* v. *United States*, 553 U. S. 137, 146, 128 S. Ct. 1581, 170 L. Ed. 2d 490. An offender who has repeatedly committed{**2021 U.S. LEXIS 4**} ``purposeful, violent, and aggressive'' crimes poses an uncommon danger of ``us[ing a] gun deliberately to harm a victim.'' *Id.,* at 145, 128 S. Ct. 1581, 170 L. Ed. 2d 490. But that is not so of someone convicted of a crime, like a DUI offense, revealing only a ``degree of callousness toward risk.'' *Id.,* at 146, 128 S. Ct. 1581, 170 L. Ed. 2d 490. However blameworthy, the reckless (or negligent) conduct involved in such a crime is ``far removed'' from the ``deliberate kind of behavior associated with violent criminal use of firearms.'' *Id.,* at 147, 128 S. Ct. 1581, 170 L. Ed. 2d 490. The Government's contrary view would label as ACCA predicates a range of common offenses--like reckless driving--that Congress did not mark ``for heightened punishment.'' 543 U. S., at 11, 125 S. Ct. 377, 160 L. Ed. 2d 271. Pp. ___ - ___, 210 L. Ed. 2d, at 78-80.

(d) The Government's main response is this Court's decision in *Voisine*, which interpreted the phrase ``use of force'' in defining a ``misdemeanor crime of domestic violence'' to cover reckless conduct. But that argument ignores the textual difference between the two statutes--the ``against'' clause. That phrase, as *Leocal* recognized, is not window dressing: It is the ``critical'' text for deciding the level of *mens rea* needed. 543 U. S., at 9, 125 S. Ct. 377, 160 L. Ed. 2d 271. And as the Court has explained, ``against the person of another,'' when modifying the ``use of physical force,'' introduces that action's conscious object. So too,{**2021 U.S. LEXIS 5**} the Government's argument and purpose of the statute in *Voisine* diverge from those of ACCA's{**141 S. Ct. 1821**} elements clause. The provision in *Voisine* defines not a ``violent felony'' but a ``misdemeanor crime of domestic violence.'' It focuses on those convicted not of serious felony offenses, but instead of ``garden-variety assault or battery misdemeanors.'' 579 U. S., at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 745. And it captures not ``violent, active'' conduct alone, but also ``acts that one might not characterize as 'violent' in a nondomestic context.'' *United States* v. *Castleman*, 572 U. S. 157, 165, 134 S. Ct. 1405, 188 L. Ed. 2d 426. Given those surrounding differences in coverage, it makes sense that the domestic violence provision would include reckless behavior when ACCA's elements clause does not. Pp. ___ - ___, 210 L. Ed. 2d, at 80-82.

Justice Thomas concluded that ACCA's elements clause does not encompass Borden's conviction for reckless aggravated assault for the reasons stated in his dissenting opinion in *Voisine*, 579 U. S., at ___, 136 S. Ct. 2272, {**210 L. Ed. 2d 68**} 195 L. Ed. 2d 736, 741. A crime that can be committed through mere recklessness does not have as an element the ``use of physical force'' because that phrase ``has a well-understood meaning applying only to intentional acts designed to cause harm.'' *Id.,* at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 756. Borden's reckless offense would fall within ACCA's residual{**2021 U.S. LEXIS 6**} clause had that provision not been declared unconstitutional in *Johnson* v. *United States*, 576 U. S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569. Though *Johnson* was wrongly decided, it must be accepted in this case because to do otherwise would create further confusion and division about whether

SCTHOT                                                    3

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

state laws prohibiting reckless assault satisfy the elements clause. Pp. ___-___, 210 L. Ed. 2d, at 82-85.

**Counsel**                         **Kannon K. Shanmugam** argued the cause for petitioner.
                                    **Eric J. Feigin** argued the cause for respondent.
**Judges:** Roberts, Thomas, Breyer, Alito, Sotomayor, Kagan, Gorsuch, Kavanaugh, Barrett.

### Opinion

**Opinion by:**              KAGAN

### Opinion

Justice Kagan announced the judgment of the Court and delivered an opinion, in which Justice Breyer, Justice Sotomayor, and Justice Gorsuch join.

**{210 L. Ed. 2d LEdHR1}** The Armed Career Criminal Act (ACCA), 18 U. S. **C**. §924(e), mandates a 15-year minimum sentence for persons found guilty of illegally possessing a gun who have three or more prior convictions for a ``violent felony.'' The question here is whether a criminal offense can count as a ``violent felony'' if it requires only a *mens rea* of recklessness-a less culpable mental **{141 S. Ct. 1822}** state than purpose or knowledge. We hold that a reckless offense cannot so qualify.**{2021 U.S. LEXIS 7}**

I

Congress enacted ACCA, as its full name makes clear, to address the ``special danger'' associated with ``armed career criminals.'' *Begay* v. *United States*, 553 U. S. 137, 146, 128 S. Ct. 1581, 170 L. Ed. 2d 490 (2008). A ``small percentage of repeat offenders,'' Congress found, commit a ``large percentage'' of all violent crimes. *Taylor* v. *United* States, 495 U. S. 575, 581, 110 S. Ct. 2143, 109 L. Ed. 2d 607 (1990) (quoting H. R. Rep. No. 98-1073, p. 1 (1984)). And when such a habitual violent offender carries a gun, he poses a serious risk of wreaking harm. As his prior convictions reveal, he is ``the kind of person who,'' when armed, ``might deliberately point the gun and pull the trigger.'' *Begay*, 553 U. S., at 146, 128 S. Ct. 1581, 170 L. Ed. 2d 490.

To allay that danger, **{210 L. Ed. 2d LEdHR2}** ACCA enhances the sentence of anyone convicted under 18 U. S. **C**. §922(g) of being a felon in possession of a firearm if he has three or more prior convictions (whether state or federal) for a ``violent felony.'' The increase in penalty is severe: A 10-year maximum sentence turns into a 15-year minimum one. See §924(a)(2), (e)(1). And because that is so, the scope of the statute is closely confined. See *Begay*, 553 U. S., at 146, 128 S. Ct. 1581, 170 L. Ed. 2d 490 (Congress did not provide for ``a 15-year mandatory prison term where th[e] increased likelihood [of gun violence] does not exist''). The **{210 L. Ed. 2d 69}** penalty enhancement kicks in only when a defendant has committed no fewer than three offenses meeting the statute's definition of ``violent felony.'' That**{2021 U.S. LEXIS 8}** definition, in addition to ticking off several specific crimes (for example, burglary and arson), includes the so-called elements clause, relevant here. An offense qualifies as a violent felony under that clause if it ``has as an element the use, attempted use, or threatened use of physical force against the person of another.'' §924(e)(2)(B)(i).

**{210 L. Ed. 2d LEdHR3}** To decide whether an offense satisfies the elements clause, courts use the categorical approach. See *Stokeling* v. *United States*, 586 U. S. ___, ___, 139 S. Ct. 544, 202 L. Ed. 2d 512, 517 (2019). Under that by-now-familiar method, applicable in several statutory contexts, the facts of a given case are irrelevant. The focus is instead on whether the elements of the statute of

SCTHOT                                    4

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

conviction meet the federal standard. Here, that means asking whether a state offense necessarily involves the defendant's ``use, attempted use, or threatened use of physical force against the person of another.'' §924(e)(2)(B)(i); see *Shular* v. *United States*, 589 U. S. ___, ___-___, 40 S. Ct. 779, 783-84, 206 L. Ed. 2d 81, 88-91 (2020). If any-even the least culpable-of the acts criminalized do not entail that kind of force, the statute of conviction does not categorically match the federal standard, and so cannot serve as an ACCA predicate. See *Johnson* v. *United States*, 559 U. S. 133, 137, 130 S. Ct. 1265, 176 L. Ed. 2d 1 (2010).

In this case, petitioner Charles Borden, Jr., pleaded guilty to a felon-in-possession charge, and the Government sought{2021 U.S. LEXIS 9} an enhanced sentence under ACCA. One of the three convictions alleged as predicates was for reckless aggravated assault in violation of Tennessee law. The relevant statute defines that crime as ``[r]ecklessly commit[ting] an assault'' and either ``caus[ing] serious bodily injury to another'' or ``us[ing] or display[ing] a deadly weapon.'' Tenn. Code Ann. §39-13-102(a)(2) (2003); see §39-13-101(a)(1). Borden argued that this offense is not a violent felony under ACCA's elements clause because a mental state of recklessness suffices for conviction. In his view, only purposeful or knowing conduct satisfies the clause's demand {141 S. Ct. 1823} for the use of force ``against the person of another.'' The District Court disagreed, holding that reckless offenses qualify as violent felonies and sentencing Borden as a career offender. The Court of Appeals for the Sixth Circuit affirmed that decision based on circuit precedent-though noting that Borden was ``not alone'' in viewing the precedent as ``wrongly decided.'' 769 Fed. Appx. 266, 268 (2019) (citing *United States* v. *Verwiebe*, 874 F. 3d 258 (CA6 2017)).

The circuit courts have indeed differed in addressing the question Borden raises. Some have held, as in this case, that a statute covering reckless conduct qualifies as a violent felony under ACCA.1 Others have concluded that only a statute confined{2021 U.S. LEXIS 10} to purposeful or knowing conduct can count {210 L. Ed. 2d 70} as such a felony.2 The dispute turns on the definition of ``violent felony'' in ACCA's elements clause-more specifically, on how different mental states map onto the clause's demand that an offense entail the ``use . . . of physical force against the person of another.'' §924(e)(2)(B)(i). We granted certiorari to resolve the issue. 589 U. S. ___, 40 S. Ct. 779, 206 L. Ed. 2d 81, 88 (2020).

II

Two pieces of background should ease the way. We begin by setting out four states of mind, as described in modern statutes and cases, that may give rise to criminal liability. Those mental states are, in descending order of culpability: purpose, knowledge, recklessness, and negligence. We then discuss two prior decisions of this Court addressing questions similar to the one here. In each, the Court considered how a certain mental state relates to a statutory definition marking out a category of crimes. One of those definitions is almost identical to the elements clause; the other appropriates only the clause's first half. The Court's analyses-about both the statute more like and the statute less like the elements clause-help frame today's decision.

Purpose and knowledge are the most culpable levels in the criminal law's mental-state{2021 U.S. LEXIS 11} ``hierarchy.'' *United States* v. *Bailey*, 444 U. S. 394, 404, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980). A person acts purposefully when he ``consciously desires'' a particular result. *Ibid.* (internal quotation marks omitted); see ALI, Model Penal Code §2.02(2)(a) (1985). He acts knowingly when ``he is aware that [a] result is practically certain to follow from his conduct,'' whatever his affirmative desire. *Bailey*, 444 U. S., at 404, 100 S. Ct. 624, 62 L. Ed. 2d 575 (internal quotation marks omitted); see Model Penal Code §2.02(2)(b)(ii). We have characterized the distinction between the two as ``limited,'' explaining that it ``has not been considered important'' for many crimes. *Bailey*, 444 U. S., at 404, 100 S. Ct. 624, 62 L. Ed. 2d 575 (internal quotation marks omitted); see Model Penal Code,

SCTHOT                                          5

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Comment 2, pp. 233-234 (calling the distinction ``narrow'' and often ``inconsequential''). A person who injures another knowingly, even though not affirmatively wanting the result, still makes a deliberate choice with full awareness of consequent harm. See *Bailey*, 444 U. S., at 403-404, 100 S. Ct. 624, 62 L. Ed. 2d 575.3

**{141 S. Ct. 1824}** Recklessness and negligence are less culpable mental states because they instead involve insufficient concern with a risk of injury. A person acts recklessly, in the most common formulation, when he ``consciously disregards a substantial and unjustifiable risk'' attached to his conduct, in ``gross deviation'' from accepted standards. **{210 L. Ed. 2d 71}** Model Penal Code §2.02(2)(c); see *Voisine* v. *United States*, 579 U. S. 686, ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 743 (2016) That risk need not come anywhere close to a likelihood. Speeding through a crowded area may**{2021 U.S. LEXIS 12}** count as reckless even though the motorist's ``chances of hitting anyone are far less [than] 50%.'' 1 W. LaFave, Substantive Criminal Law §5.4(f ) (2018) (citing cases involving low-probability events). Similarly (though one more step down the mental-state hierarchy), a person acts negligently if he is not but ``should be aware'' of such a ``substantial and unjustifiable risk,'' again in ``gross deviation'' from the norm. Model Penal Code §2.02(2)(d). There, the fault lies in the person's simple ``failure to perceive'' the possible consequence of his behavior. *Ibid.*

In *Leocal* v. *Ashcroft*, 543 U. S. 1, 125 S. Ct. 377, 160 L. Ed. 2d 271 (2004), this Court held that offenses requiring only a negligent *mens rea* fall outside a statutory definition relevantly identical to ACCA's elements clause. That definition, codified at 18 U. S. C. §16(a), is for the term ``crime of violence,'' which appears in many federal criminal and immigration laws. Section 16(a) states, in language that should by now sound familiar, that a ``crime of violence'' means ``an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another.'' (In case you missed it, the sole difference between §16(a) and the elements clause is the phrase ``or property,'' which brings property crimes within the former statute's ambit.) The question presented**{2021 U.S. LEXIS 13}** was whether that definition covers DUI offenses-for driving under the influence of alcohol and causing serious bodily injury-that require only a negligent mental state. In addressing that issue, the parties had debated whether ``the word 'use' alone supplies a *mens rea* element.'' 543 U. S., at 9, 125 S. Ct. 377, 160 L. Ed. 2d 271. But the Court thought the focus on that one word ``too narrow.'' *Ibid.* Rather, we said, the ``critical aspect'' of §16(a) is its demand that the perpetrator use physical force ``*against the person or property of another*.'' *Ibid.* (emphasis in original). As a matter of ``ordinary or natural meaning,'' we explained, that ``key phrase . . . most naturally suggests a higher degree of intent than negligent'' conduct. *Ibid.* (internal quotation marks omitted). And confirmation of that view came from the defined term itself. The phrase ``crime of violence,'' we reasoned, ``suggests a category of violent, active crimes that cannot be said naturally to include'' negligent offenses. *Id.*, at 11, 125 S. Ct. 377, 160 L. Ed. 2d 271. All that sufficed to resolve the status of the DUI offense at issue. The Court thus reserved the question whether an offense with a *mens rea* of recklessness likewise fails to qualify as a crime of violence. *Id.*, at 13, 125 S. Ct. 377, 160 L. Ed. 2d 271.

More recently, the Court held that reckless offenses**{2021 U.S. LEXIS 14}** fall within a different statutory definition-this one lacking the ``against another'' phrase *Leocal* deemed ``critical.'' *Id.*, at 9, 125 S.Ct. 377. The law at issue in *Voisine* v. *United States* bars persons convicted **{141 S. Ct. 1825}** of a ``misdemeanor crime of domestic violence'' from possessing firearms. 18 U. S. C. §922(g)(9). That phrase is defined to mean a misdemeanor, committed by a person in a specified domestic relationship with the victim, that ``has, as **{210 L. Ed. 2d 72}** an element, the use or attempted use of physical force.'' §921(a)(33)(A). In that truncated definition, the only language anyone could ``think[ ] relevant'' was the word ``use'' (the word *Leocal*, in construing a longer definition, deemed not the right focus). *Voisine*, 579 U. S., at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 740. The Court

SCTHOT                                   6

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

understood ``use" as demanding volition-the ``active employment" of force. *Id.*, at ___-___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 740-41. But we thought that lone word ``indifferent" to whether an actor choosing to employ force had a mental state of recklessness, knowledge, or purpose. *Id.*, at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 744. And that reading of ``use," we continued, is the only one consistent with the statute's history and purpose. Congress enacted §922(g)(9), we explained, to prevent domestic abusers convicted of ``garden-variety [misdemeanor] assault" from owning guns-and most such misdemeanors**{2021 U.S. LEXIS 15}** cover reckless conduct. *Id.*, at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 745. At each step of the analysis, then, our decision was statute-specific. We made clear that other statutory definitions-whether the one in *Leocal* or the near-identical one in ACCA's elements clause-might exclude reckless offenses. See *id.*, at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 745.

III

Today, we reach the question we reserved in both *Leocal* and *Voisine*. We must decide whether **{210 L. Ed. 2d LEdHR4}** the elements clause's definition of ``violent felony"-an offense requiring the ``use of physical force against the person of another"-includes offenses criminalizing reckless conduct.4 We hold that it does not. The phrase ``against another," when modifying the ``use of force," demands that the perpetrator direct his action at, or target, another individual. Reckless conduct is not aimed in that prescribed manner. Our reading of the relevant text finds support in its context and purpose. The treatment of reckless offenses as ``violent felonies" would impose large sentencing enhancements on individuals (for example, reckless drivers) far afield from the ``armed career criminals" ACCA addresses-the kind of offenders who, when armed, could well ``use [the] gun deliberately to harm**{2021 U.S. LEXIS 16}** a victim." *Begay*, 553 U. S., at 145, 128 S. Ct. 1581, 170 L. Ed. 2d 490. And contra the Government (and dissent), *Voisine* says nothing to the contrary.

A

1

The parties here dispute the meaning of the phrase ``use of physical force against the person of another." They start in the same place, as they must: The ``use of physical force," as *Voisine* held, means the ``volitional" or ``active" employment of force. 579 U. S., at ___-___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 740). The fight begins with the word ``against." According to Borden, that word means ``in opposition to," and so ``introduces the target of the preceding action." Brief for Petitioner 19 (citing dictionaries). Examples are easy to muster: The general deployed his forces against a rival regiment, or the chess master played the Queen's **{210 L. Ed. 2d 73}** Gambit against her opponent. The Government responds that ``against" instead means ``mak[ing] contact with," and so introduces the mere recipient of force rather than its ``intended target." **{141 S. Ct. 1826}** Brief for United States 23-24 (also citing dictionaries). As examples, the Government offers: ``waves crashing against the shore or a baseball hitting against the outfield fence." *Id.*, at 23 (internal quotation marks omitted). The difference in meaning, both parties agree, matters for this case. Brief for Petitioner 19-21; Brief for United**{2021 U.S. LEXIS 17}** States 23-24. If ``against," as used here, expresses a kind of directedness or targeting, then recklessness-as even the Government concedes-falls outside the elements clause. See *id.*, at 26 (noting that the oppositional definition of ``against" would exclude ``a defendant who recklessly causes injury"). Only if the ``against" phrase lacks that connotation-if, as the Government argues, it is indifferent to whether the conduct is directed at another-can the elements clause include reckless offenses. *Id.*, at 23.

Borden's view of ``against," as introducing the conscious object (not the mere recipient) of the force, is the right one given the rest of the elements clause. Dictionaries offer definitions of ``against" consistent with both parties' view: The word can mean either ``[i]n opposition to" or ``in contact with,"

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

depending on the context. See, *e.g.*, Webster's New International Dictionary 46 (2d ed. 1957) (giving both definitions). The critical context here is the language that ``against another'' modifies-the ``use of physical force.'' As just explained, ``use of force'' denotes volitional conduct. And the pairing of volitional action with the word ``against'' supports that word's oppositional, or{2021 U.S. LEXIS 18} targeted, definition. Look once more at the examples offered in the last paragraph. Borden's involve volitional conduct, by the general or chess master-essentially, each actor's ``use of force.'' There, the ``against'' phrase reveals at whom the conduct is consciously directed: the rival army or player. In contrast, the Government's examples do not involve volitional conduct, because ``waves'' and ``baseballs'' have no volition-and indeed, cannot naturally be said to ``use force'' at all. There, an ``against'' clause merely names a thing with which the subject came into contact.5 For our purpose, the more apt examples are Borden's. As in those examples, {210 L. Ed. 2d LEdHR5} ACCA's ``against'' phrase modifies volitional conduct (*i.e.*, the use of force). So that phrase, too, refers to the conduct's conscious object. Indeed, the Court has made a similar point before, in an opinion by one of its great wordsmiths. When citizens ``bear [a]rms against'' some entity, Justice Scalia wrote, what follows the word ``against'' is ``the target of the hostilities.'' *District of Columbia* v. *Heller*, 554 U. S. 570, 586, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008) (internal quotation marks omitted). That is just {210 L. Ed. 2d 74} as true when someone, as in the elements clause, actively employs physical force.

On that understanding, the clause covers{2021 U.S. LEXIS 19} purposeful and knowing acts, but excludes reckless conduct (as, once again, the Government concedes). See Brief for United States 26; see *supra,* at ___-___, 210 L. Ed. 2d, at 72. Purposeful conduct is obvious. Suppose a person drives his car straight at a reviled neighbor, desiring to hit him. The driver has, in the statute's words, ``use[d] . . . physical force against the person of another.'' {141 S. Ct. 1827} The same holds true for knowing behavior. Say a getaway driver sees a pedestrian in his path but plows ahead anyway, knowing the car will run him over. That driver, too, fits within the statute: Although he would prefer a clear road, he too drives his car straight at a known victim. Or said otherwise, both drivers (even though for different reasons) have consciously deployed the full force of an automobile at another person. See *United States* v. *United States Gypsum*, 438 U. S. 422, 445, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978) (explaining that the law thus views both as ``intend[ing]'' the result). But that is not so of a reckless (or a negligent) actor. Imagine a commuter who, late to work, decides to run a red light, and hits a pedestrian whom he did not see. The commuter has consciously disregarded a real risk, thus endangering others. And he has ended up making contact with another person, as the Government emphasizes.{2021 U.S. LEXIS 20} See Brief for United States 23. But as the Government just as readily acknowledges, the reckless driver has not directed force at another: He has not trained his car at the pedestrian understanding he will run him over. See *id.,* at 26. To the contrary, his fault is to pay insufficient attention to the potential application of force. Because that is so-because his conduct is not opposed to or directed at another-he does not come within the elements clause. He has not used force ``against'' another person in the targeted way that clause requires.

*Leocal* confirms our conclusion. Although the Court reserved the question we decide today, its reasoning all but precludes the Government's answer. Recall that *Leocal* held that negligent conduct falls outside a statutory definition much like the elements clause-one requiring the use of physical force ``against the person or property of another.'' 18 U. S. C. §16(a); see 543 U. S., at 9, 125 S. Ct. 377, 160 L. Ed. 2d 271; *supra,* at ___-___, 210 L. Ed. 2d, at 70-71. In thus excluding crimes with a negligent *mens rea*, the Court reasoned just as we have today. When read against the words ``use of force,'' the ``against'' phrase-the definition's ``critical aspect''-``suggests a higher degree of intent'' than (at least) negligence. 543 U. S., at 9, 125 S. Ct. 377, 160 L. Ed. 2d 271. That view of §16(a)'s ``against''{2021 U.S. LEXIS 21} phrase-as incorporating a *mens rea* requirement-contradicts the

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

Government's (and dissent's) view here that a materially identical phrase is ``not a roundabout way'' of . . . incorporating a *mens rea* requirement. Brief for United States 9. The Government thus asks us to read ACCA's elements clause-specifically, its ``against'' phrase, modifying the ``use of force''-contrary to how we have read near-identical words before.

Even the single difference between the two statutes works against the Government: On its reading, §16(a)'s **{210 L. Ed. 2d 75}** two added words would turn that provision's ``against'' phrase into surplusage. The problem begins with the Government's attempt to give ACCA's own ``against'' phrase meaning. If not to incorporate an intent requirement, what function does that phrase serve? The Government's theory is that the phrase limits the elements clause to crimes involving force against people, as opposed to property. See *id.*, at 23. That would give the clause some work to do in ACCA. But as noted earlier, the statute at issue in *Leocal* does not make that distinction: To repeat, §16(a)'s ``against'' phrase refers to uses of force ``against the person *or property* of another.'' §16(a) (emphasis added); see *supra*, at ___, 210 L. Ed. 2d, at 71. In other words,**{2021 U.S. LEXIS 22}** §16(a) lists *both* of the two (and only two) plausible objects of force. So the Government's intent-less reading would leave the ``against'' phrase in §16(a) without any function; it would render the phrase surplusage. Far from **{141 S. Ct. 1828}** thinking such a thing possible, the *Leocal* Court considered §16(a)'s ``against'' phrase ``key'' and ``critical''-again, because it (in combination with the ``use of force'' language) defines the requisite ``degree of intent.'' 543 U. S., at 9, 125 S. Ct. 377, 160 L. Ed. 2d 271. Unlike the Government, we favor a construction consonant with that view. The ``against'' phrase indeed sets out a *mens rea* requirement-of purposeful or knowing conduct.

2

The dissent offers up two ``alternative''-really, mutually inconsistent-counter-arguments about the elements clause's text. In the first, the dissent claims to find a ``term of art'' in the clause-implicitly admitting that the language, as ordinarily understood, excludes reckless conduct. See *West Virginia Univ. Hospitals, Inc.* v. *Casey*, 499 U. S. 83, 92, n. 5, 111 S. Ct. 1138, 113 L. Ed. 2d 68 (1991) (noting that terms of art ``*depart* from ordinary meaning''). Here, the dissent is all on its own: Neither the Government nor any of the many courts that have looked at this issue has advanced this term-of-art theory. In the second, the dissent goes more conventional, essentially repeating what the Government says, though**{2021 U.S. LEXIS 23}** with a distinctively question-begging quality. The term-of-art claim fails because the dissent's proposed term does not appear in-and indeed differs in critical ways from-the elements clause's text. The ordinary-meaning claim fails for reasons already familiar.

The dissent tries to sidestep the parties' dispute over ordinary meaning by depicting the ``against'' phrase as a ``term of art'' having ``zero to do with *mens rea*.'' *Post*, at ___, ___, 210 L. Ed. 2d, at 87, 92 (opinion of Kavanaugh, J.). In the dissent's words: ``[W]e should not disregard the longstanding meaning of a criminal-law term of art-namely, offenses against the person-to smuggle'' a *mens rea* requirement into the elements clause. *Post*, at ___, 210 L. Ed. 2d, at 92. The dissent here relies on the appearance in many state criminal codes of headings and captions using the phrase ``Offenses Against the Person.'' *Post*, at ___, 210 L. Ed. 2d, at 88; see, *e.g.,* La. Rev. Stat. Ann., Tit. 14, ch. 1, pt. 2 (West 2016) (listing offenses-spanning homicide, negligent DUI, and defamation-under the chapter heading ``offenses against the person'').

But note how this argument breaks down at its first move: The dissent offers up a ``term of art'' that is nowhere **{210 L. Ed. 2d 76}** in the statute the dissent is supposed to be construing. The dissent does not pretend that the statutory**{2021 U.S. LEXIS 24}** phrase ``use of physical force against the person of another'' is a term of art; there is not, even in the dissent's imagining, any historical or distinctly legal meaning associated with that language. The dissent instead insists on reading into

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

ACCA a term-of-art meaning for a phrase-``offenses against the person''-that makes no appearance there. That is no way to do statutory construction. {210 L. Ed. 2d LEdHR6} The first precondition of any term-of-art reading is that the term be present in the disputed statute. Here, it is not. See *Food Marketing Institute* v. *Argus Leader Media*, 588 U. S. ___, ___, 139 S. Ct. 2356, 204 L. Ed. 2d 742, 752 (2019) (similarly rejecting an attempt to ``rearrang[e]'' statutory text to create a ``term of art'' that ``does not appear in the statute'').

And indeed, the dissent's extra-statutory term differs in a critical way from the actual language of the actual elements clause. As discussed above, the ``against'' phrase in that clause modifies the ``use of physical force''-language this Court has held (and the dissent concedes) denotes volitional conduct. It is, as explained above, the pairing of volitional action with the word ``against'' that produces its oppositional or directed meaning-and excludes recklessness from the statute. {141 S. Ct. 1829} See *supra*, at ___-___, 210 L. Ed. 2d, at 73-74. Nor is that only our explanation:{2021 U.S. LEXIS 25} As noted earlier, *Leocal* said the identical thing about nearly identical statutory language, focusing on the interplay of ``use'' and ``against'' to conclude that the language had everything-not ``zero''-to do with *mens rea*. See 543 U. S., at 9, 125 S. Ct. 377, 160 L. Ed. 2d 271 (holding that the whole phrase ``most naturally suggests a higher degree of intent''); *supra*, at ___, 210 L. Ed. 2d, at 74. So it is no small thing that the dissent, in its term-of-art machinations, removes the verb phrase ``use of physical force'' and substitutes the simple noun ``offenses.'' In so doing, it has replaced the very thing that shapes the ``against'' phrase's meaning. Once again, statutory construction does not work that way: A court does not get to delete inconvenient language and insert convenient language to yield the court's preferred meaning.

Finally, consider where the dissent looks for its supposed ``offenses against the person'' term of art. Not to any statute defining crimes or setting penalties (as ACCA does). Rather to headings and captions designed to cover a myriad of offenses, from homicide through defamation. They are umbrella terms used for cataloguing crimes-nothing more. That is why the dissent cites no judicial decision construing the term, much less saying anything{2021 U.S. LEXIS 26} about what it means for *mens rea*. The term cannot have a traditional or commonplace meaning in statutes specifying criminal conduct: It does not appear in them in the first place.

In a nutshell, the dissent's ``term of art'' theory goes as follows: Congress took an umbrella term (``offenses against the person'') used to organize a broad set of crimes (some not even conceivably ACCA predicates); plucked out three words (``against the person''); appended them to a statutory phrase (``use of physical force'') with which they are not often associated; put the combination into a substantive criminal statute-all to signify, contra *Leocal*, a term of art indifferent to *mens rea*. No wonder {210 L. Ed. 2d 77} the dissent is the first to make the argument. See *supra*, at ___, 210 L. Ed. 2d, at 75. It fails at every turn.

And so the dissent must proceed to its ordinary-meaning claim, reprising (if at higher volume) the Government's flawed argument about what the ``against'' phrase is most naturally read to encompass. Here, the dissent insists that because reckless force can make contact with a person-*e.g.*, because a reckless driver can run over a pedestrian-the statute must encompass that conduct. See *post*, at ___-___, 210 L. Ed. 2d, at 96-98. But that just assumes the conclusion:{2021 U.S. LEXIS 27} The very question here is whether the statutory language Congress enacted requires that force be directed at, rather than just happen to hit, an object. As to that issue, the dissent asserts that ``[s]tate and federal reporters'' are ``replete with references to individuals recklessly using force against others.'' *Post*, at ___, 210 L. Ed. 2d, at 95-96, and n. 15 (quoting, for example, a decision saying that a ``jury found that Arton did not intentionally or recklessly use excessive force against Cook''). But once again, the dissent is putting the rabbit in the hat. If Congress had used the word ``recklessly'' in the elements clause, we would have to interpret that clause to cover reckless

SCTHOT                                                                      10

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

offenses, even though the best reading of the clause without that word goes the other way. But Congress did not say ``recklessly.'' And we must construe the elements clause as it is-without first inserting the word that will (presto!) produce the dissent's reading.6

{141 S. Ct. 1830} B

Were there any doubt about the elements clause's meaning, context and purpose would remove it.

The elements clause defines a ``violent felony,'' and that term's ordinary meaning informs our construction. *Leocal* well expressed this idea: In interpreting §16(a), ``we cannot{2021 U.S. LEXIS 28} forget that we ultimately are determining the meaning of the term 'crime of violence.''' 543 U. S., at 11, 125 S. Ct. 377, 160 L. Ed. 2d 271. Quoting that statement, *Johnson* v. *United States* said the same thing when construing language (there, the term ``physical force'') in ACCA's definition of ``violent felony.'' 559 U. S., at 140, 130 S. Ct. 1265, 176 L. Ed. 2d 1. {210 L. Ed. 2d LEdHR7} ``Ultimately, context determines meaning,'' we wrote, and ``[h]ere we are interpreting'' a phrase ``as used in defining'' the term ``*violent* felony.'' *Id.,* at 139-140, 130 S. Ct. 1265, 176 L. Ed. 2d 1. With that focus in place, both decisions construed the definitions at issue to mark out a narrow ``category of violent, active crimes.'' *Id.,* at 140, 130 S. Ct. 1265, 176 L. Ed. 2d 1; 543 U. S., at 11, 125 S. Ct. 377, 160 L. Ed. 2d 271. And those crimes are best understood to involve not only a substantial degree of force, but also a purposeful or knowing mental state-a deliberate {210 L. Ed. 2d 78} choice of wreaking harm on another, rather than mere indifference to risk. As *Leocal* explained: The term ``crime of violence'' in §16(a) ``cannot be said naturally to include DUI offenses''-typically crimes of recklessness or negligence. *Ibid.* In a case like this one, then-Judge Alito reiterated the point. He wrote that ``[t]he quintessential violent crimes,'' like murder or rape, ``involve the intentional use'' of force. *Oyebanji* v. *Gonzales,* 418 F. 3d 260, 264 (CA3 2005). By contrast, drunk driving and other crimes of recklessness, though ``moral[ly] culpab[le],''{2021 U.S. LEXIS 29} do not fit within ``the ordinary meaning of the term 'violent' crime.'' *Ibid.*

Nor does the classification of reckless crimes as ``violent felonies'' comport with ACCA's purpose. Congress enacted ACCA, as noted earlier, to address ``the special danger created when a particular type of offender-a violent criminal[ ]-possesses a gun.'' *Begay,* 553 U. S., at 146, 128 S. Ct. 1581, 170 L. Ed. 2d 490; see *supra,* at ___-___, 210 L. Ed. 2d, at 68-69. In keeping with that concern, {210 L. Ed. 2d LEdHR8} ACCA sets out to identify, for sentencing purposes, the eponymous ``armed career criminal''-the sort of offender who, when armed, ``might deliberately point the gun and pull the trigger.'' *Begay,* 553 U. S., at 145-146, 128 S. Ct. 1581, 170 L. Ed. 2d 490. The Act discharges that goal by looking to a person's criminal history. An offender who has repeatedly committed ``purposeful, violent, and aggressive'' crimes, we have explained, poses an uncommon danger of ``us[ing a] gun deliberately to harm a victim.'' *Id.,* at 145, 128 S. Ct. 1581, 170 L. Ed. 2d 490. But that is not so-as this Court has recognized-of someone convicted of a crime, like a DUI offense, revealing only a ``degree of callousness toward risk.'' *Id.,* at 146, 128 S. Ct. 1581, 170 L. Ed. 2d 490. However blameworthy, the reckless (or negligent) conduct involved in such a crime is ``far removed'' from the ``deliberate kind of behavior associated with violent criminal use of firearms.'' *Id.,* at 147, 128 S. Ct. 1581, 170 L. Ed. 2d 490. So there is no reason, consistent{2021 U.S. LEXIS 30} with ACCA's focus on armed career criminals, for reckless offenses to precipitate the statute's enhanced {141 S. Ct. 1831} sentences.7

Consider the kinds of crimes-the too-common stuff of ordinary offenders-that would trigger ACCA's 15-year minimums if we adopted the Government's (or dissent's) position. Many convictions for reckless crimes result from unsafe driving. Under the same Tennessee reckless-assault law applied to Borden, people have been convicted for injuries attributable to running a stop sign or veering onto the sidewalk. See *State* v. *Graham,* 2008 Tenn. Crim. App. LEXIS 39, 2008 WL 199851, *2-*4 (Tenn.

SCTHOT                                   11

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

Crim. **{210 L. Ed. 2d 79}** App., Jan. 24, 2008); *State* v. *Gillon*, 15 S. W. 3d 492, 496-497 (Tenn. Crim. App. 1997). In States with similar statutes requiring only a reckless *mens rea*, many individuals have been convicted for accidents resulting from text messaging or, of course, drunk driving. See, *e.g., State* v. *Belleville*, 166 N. H. 58, 63-64, 88 A. 3d 918, 922 (2014); *State* v. *Reando*, 313 S. W. 3d 734, 740 (Mo. App. 2010). In one case, even a police officer was convicted of a reckless assault for speeding to a crime scene without his siren on and hitting another patrol car. See *Seaton* v. *State*, 385 S. W. 3d 85, 88-89 (Tex. Crim. App. 2012). Or take some real-life non-driving examples. A shoplifter jumps off a mall's second floor balcony while fleeing security only to land on a customer. See *Craver* v. *State*, 2015 Tex. App. LEXIS 6569, 2015 WL 3918057, *2 (Tex. App., June 25, 2015). An experienced skier heads straight down a steep, mogul-filled slope, ``back on his skis, arms out to his sides, off-balance''-until he careens into someone**{2021 U.S. LEXIS 31}** else on the hill. *People* v. *Hall*, 999 P. 2d 207, 211 (Colo. 2000). Or a father takes his two-year-old go-karting without safety equipment, and injures her as he takes a sharp turn. See *State* v. *Gimino*, 2015 WL 13134204, *1 (Wis. App., Apr. 15, 2015).

Are these really ACCA predicates? All the defendants in the cases just described acted recklessly, taking substantial and unjustified risks. And all the defendants hurt other people, some seriously, along the way. But few would say their convictions were for ``violent felonies.'' See *Leocal*, 543 U. S., at 4, 125 S. Ct. 377, 160 L. Ed. 2d 271 (holding that a ``DUI causing serious bodily injury'' is not a ``crime of violence''). Few would think their offenses of a kind ``typically committed by'' armed career criminals. *Begay*, 553 U. S., at 146, 128 S. Ct. 1581, 170 L. Ed. 2d 490. And few would believe those defendants to pose an exceptional danger of doing harm were they to possess a gun. See *id.*, at 145-146, 128 S. Ct. 1581, 170 L. Ed. 2d 490. Extending the elements clause to reckless offenses would thus do exactly what *Leocal* decried: ``blur the distinction between the 'violent' crimes Congress sought to distinguish for heightened punishment and [all] other crimes.'' 543 U. S., at 11, 125 S. Ct. 377, 160 L. Ed. 2d 271.8

**{141 S. Ct. 1832}** The Government's response (echoed in the dissent)-that statutes covering reckless conduct can also ``cover[ ] classically violent crimes''-has no purchase given ACCA's categorical approach. Brief for United States 41; **{210 L. Ed. 2d 80}** see *post*, at ___-___, 210 L. Ed. 2d, at 105-107. The Government**{2021 U.S. LEXIS 32}** lists, for example, several prosecutions for serious beatings brought under the Tennessee law prohibiting reckless aggravated assault. See Brief for United States 42 (describing cases in which a defendant ``slamm[ed] his fist into the face of a man'' and another defendant ``looked the victim directly in the eye'' and kicked her). In those cases, the State presumably decided to charge a defendant with reckless (rather than purposeful or knowing) assault because of some problem or idiosyncrasy in the case. (In the two cases described, for instance, one of the defendants was high on drugs, and the other had a plausible self-defense claim.) But under the categorical approach, the existence of such cases is neither here nor there. **{210 L. Ed. 2d LEdHR9}** An offense does not qualify as a ``violent felony'' unless the *least* serious conduct it covers falls within the elements clause. See *Moncrieffe* v. *Holder*, 569 U. S. 184, 190-191, 133 S. Ct. 1678, 185 L. Ed. 2d 727 (2013) (``Because we examine what the state conviction necessarily involved, not the facts underlying the case, we must presume that the conviction rested upon nothing more than the least of the acts criminalized'' (alterations and internal quotation marks omitted)); *supra,* at ___-___, 210 L. Ed. 2d, at 68-69. That approach is under-inclusive by design: It *expects* that some**{2021 U.S. LEXIS 33}** violent acts, because charged under a law applying to non-violent conduct, will not trigger enhanced sentences. So what matters are not the convictions the Government offers, but those for, say, running a stop sign or skiing too wildly. Because a law criminalizing recklessness covers-indeed, was likely designed for-that kind of conduct, the offense cannot count as a violent felony.

SCTHOT                                                    12

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

## C

To all of this, the Government offers one main response: this Court's decision in *Voisine*. (And again, the dissent reiterates the Government's arguments. See *post*, at \_\_\_-\_\_\_, 210 L. Ed. 2d, at 98-103.) As described earlier, *Voisine* held that the definition of ``misdemeanor crime of domestic violence''-featuring the simple phrase ``use of physical force''-includes reckless conduct. 18 U. S. **C**. §§922(g)(9), 921(a)(33)(A); see *supra*, at \_\_\_-\_\_\_, 210 L. Ed. 2d, at 71-72. The Government acknowledges that *Voisine* expressly left open the question presented here. See 579 U. S., at \_\_\_, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 742. But in the Government's view, the ``logic'' of that decision establishes that ACCA's elements clause, too, covers reckless offenses. Brief for United States 14. ``*Voisine*'s key insight,'' the Government says, ``is that the word 'use' refers to the 'act of employing **{141 S. Ct. 1833}** something' and does not require a purposeful or knowing state of mind.'' *Ibid*. (internal**{2021 U.S. LEXIS 34}** quotation marks omitted). That insight, the Government concludes, ``applies equally to the ACCA's elements clause.'' *Id.*, at 8. But the Government's argument ignores the textual difference between the two statutes-not the word ``use'' (which is indeed the same), but the ``against'' phrase on which our holding is based. And so too, the argument disregards how the context and purpose **{210 L. Ed. 2d 81}** of the statute in *Voisine* diverge from those of ACCA's elements clause.

Most important, the two statutes' texts, when read in their entirety, refute the Government's (and the dissent's) position. The domestic violence definition in *Voisine* refers only to offenses involving the ``use of physical force''; it lacks the ensuing phrase ``against the person of another.'' *Voisine* thus focused exclusively on the word ``use''-as the Court noted, ``[t]he only statutory language either party [thought] relevant.'' 579 U. S., at \_\_\_, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 743. That word, the Court explained, requires a volitional act, but not a purposeful or knowing *mens rea*. See *id.*, at \_\_\_-\_\_\_, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 755-56. And so we would say again today. For the *mens rea* requirement we find in ACCA's elements clause does not come from the word ``use.'' It instead comes from modifying**{2021 U.S. LEXIS 35}** language that is missing in the domestic-violence provision (and missing, too, in the Government's argument): ``against the person of another.'' That phrase, as *Leocal* recognized, is not window dressing: It is the ``critical'' text for deciding the level of *mens rea* needed. 543 U. S., at 9, 125 S. Ct. 377, 160 L. Ed. 2d 271. As we have explained, ``against the person of another,'' when modifying the ``use of physical force,'' introduces that action's conscious object. See *supra*, at \_\_\_-\_\_\_, 210 L. Ed. 2d, at 73-74. So it excludes conduct, like recklessness, that is not directed or targeted at another. Because *Voisine* construed a statutory provision without that intent-laden language, the decision cannot tell us what ACCA's elements clause requires. See *Walker* v. *United States*, 931 F. 3d 467, 469-470 (CA6 2019) (Kethledge, J., dissenting from denial of reh'g en banc) (``*Voisine* tells us what 'use' means, not what 'against the person of another' means''). Thus does a ``difference in text yield[ ] a difference in meaning.'' *Id.*, at 468.9

**{141 S. Ct. 1834}** Likewise, context and purpose distinguish the two statutes. The provision in *Voisine* defines not a ``violent **{210 L. Ed. 2d 82}** felony'' but a ``misdemeanor crime of domestic violence.'' It focuses on those convicted not of serious felony offenses, but instead of ``garden-variety**{2021 U.S. LEXIS 36}** assault or battery misdemeanors.'' 579 U. S., at \_\_\_, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 745). And it captures not ``violent, active'' conduct alone, see *supra*, at \_\_\_-\_\_\_, 210 L. Ed. 2d, at 71-72, but also ``acts that one might not characterize as 'violent' in a nondomestic context.'' *United States* v. *Castleman*, 572 U. S. 157, 165, 134 S. Ct. 1405, 188 L. Ed. 2d 426 (2014) (referring to ``[m]inor uses of force'' like ``grabbing [and] pinching''). Given those surrounding differences in coverage, it is hardly remarkable that the domestic violence provision

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

would include reckless behavior when ACCA's elements clause does not. And relatedly, the two statutes accomplish dissimilar things. The provision in *Voisine* adds misdemeanant domestic abusers to a long list of people (including felons, substance abusers, and the mentally ill) disqualified from possessing a gun. See §922(g)(1)-(9); *Castleman*, 572 U. S., at 166-167, 134 S. Ct. 1405, 188 L. Ed. 2d 426. The recidivist offenders to whom ACCA applies are already subject to that disability. The statute additionally imposes on them-precisely because they are ``armed career criminals,'' not ordinary offenders-greatly enhanced prison sentences. So again, we see nothing surprising-rather, the opposite-in the two statutes' dissimilar treatment of reckless crimes.

IV

**{210 L. Ed. 2d LEdHR10}** Offenses with a *mens rea* of recklessness do not qualify as violent felonies under ACCA. They do not require, as ACCA does, the active employment**{2021 U.S. LEXIS 37}** of force against another person. And they are not the stuff of armed career criminals. The judgment below is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**Concur**

**Concur by:**        THOMAS

Justice Thomas, concurring in the judgment.

This case forces us to choose between aggravating a past error and committing a new one. I must choose the former. Although I am ``reluctant to magnify the burdens that our [erroneous] jurisprudence imposes,'' *Ring* v. *Arizona*, 536 U. S. 584, 610, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002) (Scalia, J., concurring), I conclude that the particular provision at issue here does not encompass petitioner's conviction for reckless aggravated assault, even though the consequences of today's judgment are at odds with the larger statutory scheme. The need to make this choice is yet another consequence of the Court's vagueness-doctrine cases like *Johnson* v. *United States*, 576 U. S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015).

The Armed Career Criminal Act provides enhanced penalties for criminals convicted of certain firearms offenses who have at least ``three previous convictions . . . for a violent felony or a serious drug offense.'' 18 U. S. <u>C</u>. <u>§924</u>(e)(1). As relevant here, the Act defines a ``violent felony'' as a ``crime punishable by imprisonment **{210 L. Ed. 2d 83}** for a term exceeding one year'' that either ``has as an element the use, attempted use,**{2021 U.S. LEXIS 38}** or **{141 S. Ct. 1835}** threatened use of physical force against the person of another'' (the elements clause) or ``involves conduct that presents a serious potential risk of physical injury to another'' (the residual clause). <u>§924</u>(e)(2)(B).1 The question presented here is whether the elements clause encompasses petitioner's conviction under Tennessee law for reckless aggravated assault. It does not. The plurality focuses on the latter part of the operative language: ``against the person of another.'' I rest my analysis instead on a separate phrase: ``use of physical force.'' As I have explained before, a crime that can be committed through mere recklessness does not have as an element the ``use of physical force'' because that phrase ``has a well-understood meaning applying only to intentional acts designed to cause harm.'' *Voisine* v. *United States*, 579 U. S. 686, ___, ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 756 (Thomas, J., dissenting). The elements clause does not encompass petitioner's conviction because the statute under which he was convicted could be violated through mere recklessness.

But although the Court's conclusion that petitioner's conviction does not satisfy the elements clause is sound, the implication that he is something other than an ``armed career criminal'' is not. The state law**{2021 U.S. LEXIS 39}** here prohibits ``[r]ecklessly . . . [c]aus[ing] serious bodily injury to another.''

SCTHOT                                14

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Tenn. Code Ann. §39-13-102(a)(2)(A) (2003). That offense would satisfy the residual clause because it ``involves conduct that presents a serious potential risk of physical injury to another.'' §924(e)(2)(B)(ii). So although the elements clause does not make petitioner an armed career criminal, the residual clause would.

The problem is that *Johnson* held that the residual clause is ``unconstitutionally vague'' and thus unenforceable. 576 U. S., at 597, 135 S. Ct. 2551, 192 L. Ed. 2d 569. This left prosecutors and courts in a bind. Many offenders had committed violent felonies, but *Johnson* foreclosed invoking the residual clause to establish that fact. The workaround was to read the elements clause broadly. But the text of that clause cannot bear such a broad reading.

There is a straightforward solution to this dilemma-overrule *Johnson.*2 *Johnson* declared the residual clause not just too vague as applied in that case but also facially vague-meaning that the residual clause could never be employed consistent with the Constitution. That decision was wrong for at least two reasons.

First, to ``pronounce that the statute is unconstitutional in *all* applications . . . seems to me no more than an advisory opinion-which**{2021 U.S. LEXIS 40}** a federal court should never issue at all.'' *Chicago* v. *Morales,* 527 U. S. 41, 77, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) **{210 L. Ed. 2d 84}** (Scalia, J., dissenting). Courts have no authority to ``'strik[e] down''' statutory text. See *United States* v. *Sineneng-Smith,* 590 U. S. ___, ___, 140 S. Ct. 1575, 206 L. Ed. 2d 866 (2020) (Thomas, J., concurring); see also Mitchell, The Writ-of-Erasure Fallacy, 104 Va. L. Rev. 933, 936 (2018). Nor may courts resolve ``general questions of legality'' by ``provid[ing] relief **{141 S. Ct. 1836}** beyond the parties to the case.'' *Trump* v. *Hawaii,* 585 U. S. ___, ___, ___, 138 S. Ct. 2392, 201 L. Ed. 2d 775 (2018) (Thomas, J., concurring). A court may only ``'adjudge the legal rights of litigants in actual controversies.''' *United States* v. *Raines,* 362 U. S. 17, 21, 80 S. Ct. 519, 4 L. Ed. 2d 524 (1960). When faced with a criminal statute too vague for the case at hand, the right answer likely is to apply the rule of lenity and ``declin[e] to apply [the statute] on a case-by-case basis.'' *Sessions* v. *Dimaya,* 584 U. S. ___, ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549, 591 (2018) (Thomas, J., dissenting). By, instead, purporting to decide theoretical cases for theoretical parties not before the Court, *Johnson* departed from foundational limits on the judicial power.

Second, even assuming that the petitioner's plea for facial relief was cognizable, *Johnson* deviated from the usual legal standard. To obtain facial relief, a plaintiff normally ``must establish that no set of circumstances exists under which the Act would be valid.'' *E.g., United States* v. *Salerno,* 481 U. S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). That is because a facial challenge, if successful, has the**{2021 U.S. LEXIS 41}** same effect as ``nullify[ing]'' a statute. *Ayotte* v. *Planned Parenthood of Northern New Eng.,* 546 U. S. 320, 329, 126 S. Ct. 961, 163 L. Ed. 2d 812 (2006). The petitioner in *Johnson* did not satisfy that standard. Indeed, the *Johnson* majority acknowledged that ``there will be straightforward cases under the residual clause, because some crimes clearly pose a serious potential risk of physical injury to another.'' 576 U. S., at 602, 135 S. Ct. 2551, 192 L. Ed. 2d 569.

These errors show that this Court in *Johnson* not only misapplied the Due Process Clause but also exercised the legislative role. Legislatures alone have authority ``to prescribe general rules for the government of society.'' *Fletcher* v. *Peck,* 10 U.S. 87, 6 Cranch 87, 136, 3 L. Ed. 162 (1810). Courts, by contrast, have authority to provide only those ``remed[ies that are] tailored to redress the plaintiff 's particular injury.'' *Gill* v. *Whitford,* 585 U. S. ___, ___, 138 S. Ct. 1916, 1934, 201 L. Ed. 2d 313 (2018). Simply put, where enforcement of a law would conflict with the Constitution, a court has authority under the Supremacy Clause to enjoin enforcement, but a court cannot, consistent with separation of powers, enjoin enforcement of a statute where enforcement would be lawful. *Johnson,* however, conducted the ``quintessentially legislative work'' of altering the legal rules that would apply in cases where the residual clause could lawfully be enforced. See *Planned Parenthood of Northern New Eng.,* 546 U. S., at 329-330, 126 S. Ct. 961, 163 L. Ed. 2d 812.

SCTHOT                                          15

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

I hesitate to give petitioner the benefit of *Johnson*, because his crime is a ``violent felony"{2021 U.S. LEXIS 42} as Congress defined the term. Indeed, in other contexts, I have resisted exacerbating similar errors. See *Pepper* v. *United States*, 562 U. S. 476, 518-520, {210 L. Ed. 2d 85} 131 S. Ct. 1229, 179 L. Ed. 2d 196 (2011) (dissenting opinion) (declining to apply this Court's erroneous holding that the Sentencing Guidelines are never mandatory). Yet I reluctantly conclude that I must accept *Johnson* in this case because to do otherwise would create further confusion and division about whether state laws prohibiting reckless assault satisfy the elements clause.3 See {141 S. Ct. 1837}*Vance* v. *Ball State Univ.*, 570 U. S. 421, 450-451, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013) (Thomas, J., concurring). I therefore concur in the judgment.

**Dissent**

**Dissent by:**       KAVANAUGH

Justice Kavanaugh, with whom The Chief Justice, Justice Alito, and Justice Barrett join, dissenting. In 1984, Congress passed and President Reagan signed the Armed Career Criminal Act, known as ACCA. That Act seeks to prevent individuals with a serious record of violent crimes from unlawfully possessing firearms and committing additional violent crimes. As amended in 1986, the Act generally mandates a minimum 15-year prison sentence for any felon who has amassed at least three prior convictions for a ``violent felony" and then commits a fourth felony by unlawfully possessing firearms.

ACCA defines the predicate ``violent felony" offenses to cover, among other things, an offense punishable by a prison{2021 U.S. LEXIS 43} term exceeding one year that ``has as an element the use, attempted use, or threatened *use of physical force against the person of another*." 18 U. S. C. §924(e)(2)(B)(i) (emphasis added). By defining violent felony in that manner, Congress ensured that the prototypical felonies involving physical force against a person-in particular, assault, homicide, rape, and robbery-would qualify as predicate offenses under ACCA.

ACCA does not ensnare low-level offenders or small-time criminals. Rather, as relevant here, ACCA applies only to individuals who have been previously convicted of *three* separate violent felonies committed on different occasions, and who then proceed to commit a *fourth* felony by unlawfully possessing firearms. Congress determined that those serial violent felons pose serious risks of harm to American communities and warrant a 15-year mandatory minimum sentence under ACCA.1
1
ACCA also includes serious drug offenses as qualifying predicates. 18 U. S. C. §924(e)(2)(A). That aspect of ACCA is not at issue here.

In this case, Charles Borden was convicted in 2018 for unlawfully possessing a firearm in violation of §922(g)(1). The District Court concluded that Borden was subject to ACCA because of his three prior convictions in 2002, 2003, and 2007 for aggravated assault under Tennessee law.2
2
Tennessee's aggravated assault statute provides: ``A person commits aggravated assault who:

``(1) Intentionally or knowingly commits an assault as defined{2021 U.S. LEXIS 44} in §39-13-101 and:

``(A) Causes serious bodily injury to another; or

``(B) Uses or displays a deadly weapon; or

``(2) Recklessly commits an assault as defined in §39-13-101(a)(1), and:

``(A) Causes serious bodily injury to another; or

SCTHOT                                    16

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

``(B) Uses or displays a deadly weapon.'' Tenn. Code Ann. §39-13-102 (2003).

Borden does not dispute that his 2002 and 2003 Tennessee felony convictions**{210 L. Ed. 2d 86}** -which were for *intentional or knowing* aggravated assault-constituted violent felonies for purposes of ACCA. But he challenges the classification of his 2007 Tennessee felony conviction-which was for *reckless* aggravated assault. Borden argues that reckless felonies do not qualify as predicate offenses under ACCA. According to Borden, a crime committed recklessly, such as reckless assault or reckless homicide, does not entail the ``use of physical force against the person of another.'' Instead, Borden contends, only intentional or knowing felonies satisfy that statutory definition.

Most States criminalize reckless assault and reckless homicide. And the Model Penal Code and most States provide that recklessness as to the consequences of one's **{141 S. Ct. 1838}** actions generally suffices for criminal liability. Importantly, moreover, Borden does not dispute that ACCA's phrase ``use of physical**{2021 U.S. LEXIS 45}** force'' *on its own* would include reckless offenses, such as reckless assault or reckless homicide. But Borden nonetheless contends that ACCA's phrase ``use of physical force *against the person of another*'' somehow excludes those same reckless offenses, including reckless assault and reckless homicide.

To put Borden's argument in real-world terms, suppose that an individual drives a car 80 miles per hour through a neighborhood, runs over a child, and paralyzes her. He did not intend to run over and injure the child. He did not know to a practical certainty that he would run over and injure the child. But he consciously disregarded a substantial and unjustifiable risk that he would harm another person, and he is later convicted in state court of reckless assault. Or suppose that an individual is in a dispute with someone in the neighborhood and begins firing gunshots at the neighbor's house to scare him. One shot goes through the window and hits the neighbor, killing him. The shooter may not have intended to kill the neighbor or known to a practical certainty that he would do so. But again, he consciously disregarded a substantial and unjustifiable risk that he would harm someone, and he**{2021 U.S. LEXIS 46}** is later convicted in state court of reckless homicide.

Surprisingly, the Court today holds that those kinds of reckless offenses such as reckless assault and reckless homicide do not qualify as ACCA predicates under the use-of-force clause. The plurality does not dispute that those offenses involve the ``use of physical force,'' but concludes that those offenses do not involve the ``use of physical force *against the person of another*.'' The plurality reaches that rather mystifying conclusion even though someone who acts recklessly, as those examples show, has made a ``deliberate decision to endanger another,'' *Voisine* v. *United States*, 579 U. S. 686, ___, 36 S. Ct. 2272, 195 L. Ed. 2d 736, 745 (2016), and even though an **{210 L. Ed. 2d 87}** individual who commits a reckless assault or a reckless homicide generally inflicts injury or death on another person. The plurality reaches that conclusion even though most States (both as of 1986 and today) criminalize reckless assault and reckless homicide as offenses against the person, and even though Congress enacted ACCA's use-of-force clause in 1986 to cover the prototypical violent crimes, such as assault and homicide, that can be committed with a *mens rea* of recklessness. And the plurality reaches that conclusion even though the Court**{2021 U.S. LEXIS 47}** concluded just five years ago (when interpreting a similarly worded domestic violence statute) that reckless offenses such as reckless assault and reckless homicide *do* entail the use of physical force against another person-there, ``against a domestic relation'' or ``victim.'' See *id.,* at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 747; 18 U. S. <u>C</u>. §921(a)(33)(A).

In my view, the Court's decision disregards bedrock principles and longstanding terminology of criminal law, misconstrues ACCA's text, and waves away the Court's own recent precedent. The Court's decision overrides Congress's judgment about the danger posed by recidivist violent felons who unlawfully possess firearms and threaten further violence. I respectfully dissent.3

3

Just to explain today's lineup: Four Justices form the plurality. Justice Thomas concurs in the

SCTHOT                                    **17**

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

judgment. He agrees with the plurality's result but not its reasoning, and concludes that the phrase ``use of physical force'' *alone* excludes reckless offenses such as reckless assault or reckless homicide. The Court reached a different conclusion in interpreting a similarly worded statute in *Voisine* v. *United States*, 579 U. S. 686, 136 S. Ct. 2272, 195 L. Ed. 2d 736 (2016). But Justice Thomas indicates that he will not follow that precedent in this case. (Importantly, unlike the plurality, Justice Thomas does not rely on the phrase ``against the person of another.'')
Justice Thomas further explains that reckless offenses *were* covered by ACCA under the residual clause. But that clause was declared unconstitutional in *Johnson* v. *United States*, 576 U. S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). Although Justice Thomas disagrees with *Johnson*, he indicates that he will today follow the Court's *Johnson* precedent, albeit not the *Voisine* precedent. So we find ourselves in an unusual situation. In *Voisine*, seven Justices agreed that the phrase ``use of physical force'' in a similarly worded statute covers reckless offenses. And eight Justices today accept that the phrase ``use of physical force'' covers reckless offenses. Moreover, five Justices today agree that ACCA's text, properly interpreted, would cover reckless offenses. And only four Justices conclude that the phrase ``against the person of another'' addresses *mens rea* and excludes reckless offenses. Yet despite all of that, Borden prevails, and reckless offenses are now *excluded* from ACCA's scope. That outcome is anomalous.**{141 S. Ct. 1839}** I
The Court holds that the phrase ``use of physical force against the person of another'' in ACCA's violent felony definition applies only to crimes that entail an intentional or knowing use of force against another person, not to crimes that entail a reckless use of force against another person. In reaching that conclusion, the plurality does not dispute that the statutory phrase ``use of physical force'' on its own would encompass reckless offenses such as reckless**{2021 U.S. LEXIS 48}** assault and reckless homicide. See *ante*, at \_\_\_-\_\_\_, 210 L. Ed. 2d, at 71-72; see also *Voisine* v. *United States*, 579 U. S. 686, 136 S. Ct. 2272, 195 L. Ed. 2d 736 (2016). But the plurality seizes on the additional phrase ``against the person of another.'' According to the plurality, the combined statutory phrase ``use of physical force against the person of another'' excludes reckless offenses such as reckless assault and reckless homicide.
**{210 L. Ed. 2d 88}** As a matter of textual interpretation, that analysis is seriously flawed for two independent reasons, either of which suffices to defeat the plurality's conclusion. First, the phrase ``against the person of another'' in criminal statutes like ACCA has zero to do with *mens rea*. That phrase instead reflects a centuries-old term of art in the criminal law that distinguishes offenses against the person from offenses against property. Second, even if the phrase ``against the person of another'' did not reflect a longstanding term of art, the ordinary meaning of the statutory phrase ``use of physical force against the person of another''-just like the phrase ``use of physical force''-encompasses reckless offenses such as reckless assault and reckless homicide.A
*First*, and most fundamentally, the phrase ``against the person of another'' in ACCA has zero to do with the required**{2021 U.S. LEXIS 49}** *mens rea* for predicate violent felonies. That phrase simply incorporates established nomenclature for classifying crimes and reflects a longstanding criminal-law term of art that distinguishes offenses against the *person* from offenses against *property*. As the Government explains, that phrase simply ``limits the scope'' of the use-of-force clause to ``crimes involving force applied to another person, thereby excluding many property crimes, like arson.'' Brief for United States 23.
When Congress ``borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice,'' we generally assume that Congress ``knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'' **{141 S. Ct. 1840}** *Morissette* v. *United States*, 342 U. S. 246, 263, 72 S. Ct. 240, 96 L. Ed. 288 (1952); see also *Air Wisconsin Airlines Corp.* v. *Hoeper*, 571 U. S. 237, 248, 134 S. Ct. 852, 187 L. Ed. 2d 744 (2014); *Sekhar* v. *United States*, 570 U. S. 729, 733, 133 S. Ct. 2720, 186 L. Ed. 2d 794 (2013); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 73-77, 305 (2012).

SCTHOT                                                                18

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

So it is here. For centuries, criminal offenses have typically been broken down into categories-including, most prominently, offenses against the person and offenses against property. An offense against the person is often defined as a ``crime against the body of another human being.'' Black's Law Dictionary 1302 (11th ed. 2019) (``offense**{2021 U.S. LEXIS 50}** against the person''). The object of the offense is a person. Those offenses include, for example, assault, homicide, rape, and robbery.

An offense against property is often defined as a ``crime against another's personal property.'' *Ibid.* (``offense against property''). The object of the offense is property. Those offenses include, for example, burglary, arson, extortion, fraud, and destruction of property.

That nomenclature has a long historical pedigree originating in the common law. Blackstone, for example, sets forth various categories of ``Public Wrongs,'' which include ``Offences *against* the Persons of Individuals'' and ``Offences *against* Private Property.'' 4 Commentaries on the Laws of England, chs. 15, 17 (1769) (emphasis in original); see also H. Stephen, Summary of the Criminal Law (1834) **{210 L. Ed. 2d 89}** (setting forth categories of criminal offenses including ``Offences against the Person'' and ``Larceny and Other Offences against Property''); W. Auckland, Principles of Penal Law (2d ed. 1771) (setting forth categories of criminal offenses including ``[o]ther Crimes relative to the Persons of Individuals'' and ``Crimes relative to Property'').

Those classifications remain prevalent today. Like Blackstone,**{2021 U.S. LEXIS 51}** most state criminal codes categorize criminal offenses and employ the terminology of offenses against the person and offenses against property.[4]

[4]

See Ala. Code, Tit. 13A, chs. 6, 7 (2015); Alaska Stat., Tit. 11, chs. 41, 46 (2018); Ark. Code Ann., Tit. 5, subds. 2, 4 (1983); Cal. Penal Code Ann., pt. 1, Tits. 8, 13 (West Cum. Supp. 2021); Colo. Rev. Stat., Tit. 18, Arts. 3, 4 (2019); Del. Code Ann., Tit. 11, pt. I, ch. 5, subchs. II, III (2021); Ga. Code Ann., Tit. 16, chs. 5, 7 (2019); Haw. Rev. Stat., Tit. 37, chs. 707, 708 (2014); Ill. Comp. Stat., ch. 720, Act 5, Tit. III, pts. B, C (West 2018); Ind. Code, Tit. 35, Arts. 42, 43 (2020); Kan. Stat. Ann., ch. 21, Arts. 54, 58 (2020); La. Rev. Stat. Ann., Tit. 14, ch. 1, pts. 2, 3 (2016); Me. Rev. Stat. Ann., Tit. 17-A, pt. 2, ch. 9 (2006); Md. Crim. Law Code Ann., Tits. 3, 6 (2012); Mass. Gen. Laws, pt. IV, Tit. 1, chs. 265, 266 (2017); Minn. Stat., ch. 609 (2020); Miss. Code Ann., Tit. 97, chs. 3, 17 (2020); Mo. Rev. Stat., Tit. 38, ch. 565 (2016); Mont. Code Ann., Tit. 45, chs. 5, 6 (2020); Neb. Rev. Stat., ch. 28, Arts. 3, 5 (2021); Nev. Rev. Stat., Tit. 15, chs. 200, 205 (2017); N. J. Stat. Ann., Tit. 2C, subd. 2, pts. 1, 2 (2019); N. Y. Penal Law Ann., ch. 40, pt. 3, Tits. H, I (2009); N. C. Gen. Stat. Ann., ch. 14, subchs. III, V (2019); N. D. Cent. Code Ann., Tit. 12, pts. V, VI (2012); Okla. Stat., Tit. 21, pts. III, VII (2011); Ore. Rev. Stat., Tit. 16, chs. 163, 164 (2019); S. C. Code Ann., Tit. 16, chs. 3, 11 (2015); Tenn. Code Ann., Tit. 39, chs. 13, 14 (2020); Tex. Penal Code Ann., Tits. 5, 7 (West 2021); Utah Code Ann., Tit. 76, chs. 5, 6 (2017); Va. Code Ann., Tit. 18.2, chs. 4, 5 (2014); W. Va. Code Ann., ch. 61, Arts. 2, 3 (2020); Wis. Stat., chs. 940, 943 (2016); Wyo. Stat. Ann., Tit. 6, chs. 2, 3 (2019).

That was also true back in 1986 when Congress amended ACCA to include the use-of-force clause. Tennessee's criminal code illustrates the point. As of 1986, criminal offenses under Tennessee law fell under one of several chapter headings, including ``Offenses Against the Person'' and ``Offenses Against Property,'' among others. See Tenn. Code. Ann., Tit. 39, chs. 2, 3 (1982). At least 32 other state criminal **{141 S. Ct. 1841}** codes employed similar nomenclature at the time of ACCA's amendment in 1986.[5]

[5]

See Ala. Code, Tit. 13A, chs. 6, 7 (1982); Alaska Stat., Tit. 11, chs. 41, 46 (1983); Ark. Code Ann., Tit. 41, Arts. 5, 6 (Cum. Supp. 1985); Cal. Penal Code Ann., pt. 1, Tits. 8, 13 (1984); Colo. Rev. Stat., Tit. 18, Arts. 3, 4 (1986); Del. Code Ann., Tit. 11, pt. 1, ch. 5, subchs. II, III (1979); Ga. Code Ann., Tit. 16, chs. 5, 7 (1984); Haw. Rev. Stat., Tit. 37, chs. 707, 708 (1985); Ill. Ann. Stat., Tit. III,

SCTHOT                                    19

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

pts. B, **C** (West 1980); Ind. Stat. Ann., Tit. 35, Arts. 42, 43 (1985); Kan. Stat. Ann., ch. 21, Arts. 34, 37 (1981); La. Rev. Stat. Ann., Tit. 14, ch. 1, pts. 2, 3 (West 1986); Me. Rev. Stat. Ann., Tit. 17-A, ch. 9 (1983); Mass. Gen. Laws, chs. 265, 266 (1986); Minn. Stat., ch. 609 (1986); Miss. Code Ann., Tit. 97, chs. 3, 17 (1973); Mo. Rev. Stat., Tit. 38, ch. 565 (1986); Mont. Code Ann., Tit. 45, chs. 5, 6 (1985); Neb. Rev. Stat., ch. 28, Arts. 3, 5 (1979); Nev. Rev. Stat., Tit. 15, chs. 200, 205 (1986); N. J. Stat. Ann., Tit. 2C, subd. 2, pts. 1, 2 (1982); N. Y. Penal Law Ann., ch. 40, pt. 3, Tits. H, I (West 1975); N. **C**. Gen. Stat. Ann., ch. 14, subchs. III, V (1981); Okla. Stat., Tit. 21, pts. III, VII (1983); Ore. Rev. Stat., Tit. 16, chs. 163, 164 (1985); Pa. Stat. Ann., Tit. 18, pt. II, Arts. B, **C** (Purdon 1983); S. **C**. Code Ann., Tit. 16, chs. 3, 11 (1985); Tex. Penal Code Ann., Tits. 5, 7 (West 1984); Utah Code Ann., Tit. 76, chs. 5, 6 (Cum. Supp. 1986); Va. Code Ann., Tit. 18.2, chs. 4, 5 (1982); W. Va. Code Ann., ch. 61, Arts. 2, 3 (1984); Wis. Stat., chs. 940, 943 (1982); Wyo. Stat. Ann., Tit. 6, chs. 2, 3 (1983).

The Model Penal Code, which was adopted in 1962, likewise uses that nomenclature. The Code identifies two broad categories of crimes as ``Offenses Involving Danger to the Person'' and ``Offenses Against Property.'' ALI, Model Penal Code, pt. II (1980).

Leading treatises on criminal law **{210 L. Ed. 2d 90}** similarly group most offenses into those two broad categories: ``Offenses Against the Person'' and ``Offenses Against Property.'' 2-3 W. LaFave, Substantive Criminal Law, pts. III, IV (3d ed. 2018); 2 **C**. Torcia, Wharton's Criminal Law, pt. II (15th ed. 1994); 3 *id.*, pt. V (1995); see also 2 W. LaFave & A. Scott, Substantive Criminal**{2021 U.S. LEXIS 52}** Law, chs. 7, 8 (1986) (``Crimes Against the Person'' and ``Crimes Relating to Property''); 2 Torcia, Wharton's Criminal Law, pt. II (14th ed. 1979) (``Offenses Against the Person''); 3 *id.*, pt. V (1980) (``Offenses Against Property'').

As those many examples show, the phrase ``offenses against the person'' may be worded in slightly different ways, but each variation serves to distinguish offenses against the person from other kinds of offenses, including offenses against property. Cf. Black's Law Dictionary, at 1302 (cross-referencing definition of ``offense against the person'' with ``crimes against persons'').

In 1986, Congress amended ACCA to cover violent felonies. Not surprisingly, ACCA's definition of ``violent felony'' tracks that historically rooted and still common nomenclature. The definition provides in relevant part:

> ``[T]he term 'violent felony' means any *crime* punishable by imprisonment for a term exceeding one year . . . that-

> ``(i) has as an element the use, attempted use, or threatened *use of physical force against the person of another*; or

``(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical**{2021 U.S. LEXIS 53}** injury to another.'' 18 U. S. **C**. §**924**(e)(2)(B) (emphases added).

The first clause of the violent felony definition (the use-of-force clause) encompasses offenses involving force *against the person*-and thus necessarily includes assault, homicide, rape, and robbery.6 The second **{141 S. Ct. 1842}** clause of that definition (the enumerated-offenses clause) lists certain physically risky offenses *against property*-in particular, burglary, arson, extortion, and offenses involving the use of explosives. See *Taylor* v. *United States*, 495 U. S. 575, 584-587, 110 S. Ct. 2143, 109 L. Ed. 2d 607 (1990).

6

The words ``of another'' in the use-of-force clause exclude crimes involving harm to oneself, as opposed to others, and reflect common phraseology in state criminal statutes covering offenses against the person, such as assault. See, *e.g.,* Tenn. Code Ann. §39-13-102 (aggravated assault is an assault that, among other things, ``[c]auses serious bodily injury to another'').

SCTHOT                                         20

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

This Court's precedents have drawn that same distinction when analyzing ACCA's violent felony definition. In *Begay* v. *United States*, for example, the Court stated that violent felonies under ACCA ``include both crimes against the person (clause (i)) and certain physically risky crimes against property (clause (ii))." 553 U. S. 137, 144, 128 S. Ct. 1581, 170 L. Ed. 2d 490 (2008).

The statutory history further illustrates the distinction. When originally enacted in 1984, ACCA covered only robbery (an offense against the person) and burglary (an offense against property). 18 U. S. **C**. App. §1202(a) (1982 ed., Supp. II). In 1986, Congress expanded the scope of violent crimes covered under ACCA. Congress added the use-of-force clause so as to encompass not just **{210 L. Ed. 2d 91}** robbery but also additional offenses against the person, such**{2021 U.S. LEXIS 54}** as assault, homicide, and rape. And Congress added the second clause to encompass not just burglary but also some additional physically risky offenses against property, including arson, extortion, and use of explosives.7

7

That understanding of offenses against the person and offenses against property also helps make more sense of the now-defunct residual clause. See *Johnson*, 576 U. S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569. The residual clause was tacked onto the clause enumerating the covered offenses against property (burglary, arson, extortion, and use of explosives). The residual clause covered crimes that ``otherwise involv[e] conduct that presents a serious potential risk of physical injury to another." 18 U. S. **C**. §924(e)(2)(B)(ii). When still extant, the residual clause could have been read in one of two ways. On one reading, given its placement with offenses against property, the residual clause could have been read to encompass other physically risky offenses against property similar to burglary, arson, extortion, and use of explosives. A second possible reading (and the common reading when the residual clause was still in effect) was that the residual clause also covered some offenses against the person, not just offenses against property. But even assuming that second reading was correct, and that there was potential overlap between the use-of-force clause and the residual clause, the solution was not to read the use-of-force clause contrary to its terms. No one disputes that the use-of-force clause generally covers assault and homicide, among other crimes. The residual clause was merely residual-a catchall. Therefore, as relevant here, even if assault and homicide could theoretically have fit under the old residual clause, that would not negate coverage of assault and homicide under the use-of-force clause.

In short, the phrase ``against the person of another" in ACCA specifies the category of crimes to which the use-of-force clause applies and limits the reach of the clause by excluding other categories of crimes-in particular, crimes against property.

That understanding of the phrase ``against the person of another" also helps to make sense of other, similarly worded statutory definitions. Take 18 U. S. **C**. §16(a), which defines the term ``crime of violence" for purposes of many other federal criminal and immigration laws. That definition includes any ``offense that has as an element the use, attempted use, or threatened use of physical force *against the person or property of another*." *Ibid.* (emphasis added). Like ACCA's use-of-force clause, §16(a)'s ``against" phrase simply specifies the category of offenses to which the statute applies, using established **{141 S. Ct. 1843}** nomenclature. The only difference between the two definitions is that §16(a) covers crimes ``against property" in addition to crimes ``against the person."**{2021 U.S. LEXIS 55}**8

8

The plurality says that reading ACCA's ``against" phrase to refer to the category of covered offenses would leave the broader language in statutes like §16(a) ``without any function." *Ante,* at 12. That is incorrect. The ``against" phrase in statutes like §16(a) clarifies that the statutory definition encompasses *both* of those traditional categories of offenses: offenses against the person *and* offenses against property.

Finally, state practice confirms that the phrase ``against the person of another" in ACCA reflects a

SCTHOT                                    21

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

longstanding term of art and is not an oblique and novel way of excluding reckless offenses. As of 1986, when Congress amended ACCA to include the use-of-force clause, 28 States had reckless assault statutes, and more than 30 States had statutes that covered reckless homicide. See Brief for United States 19-21, and nn. 4-7. Most of those States classified those crimes as offenses against the person, see n. 5, *supra*- even though those crimes only required a *mens rea* of recklessness. Congress legislated against the backdrop of those state criminal laws. {210 L. Ed. 2d 92} It strains credulity to say that in ACCA, Congress both (i) mirrored the traditional ``against the person'' terminology from those state criminal codes that included reckless assault and reckless homicide, but (ii) nonetheless silently intended that common and traditional language to take on a novel and obscure meaning that would exclude reckless assault and reckless homicide. As the Court has stated before, we ``should not lightly conclude that Congress enacted a self-defeating statute.'' *Quarles* v. *United States*, 587 U. S. ___, ___, 139 S. Ct. 1872, 204 L. Ed. 2d 200 (2019); see also *Stokeling* v. *United States*, 586 U. S. ___, ___, 139 S. Ct. 544, 202 L. Ed. 2d 512 (2019){2021 U.S. LEXIS 56}. If Congress in 1986 wanted to exclude from ACCA's scope all of those state criminal laws covering reckless crimes against the person-including reckless assaults and reckless homicides-Congress easily could have said (and surely would have said) that only ``intentional or knowing'' uses of force were covered. It did not. And we should not disregard the longstanding meaning of a criminal-law term of art-namely, offenses against the person-to smuggle into ACCA a new and unusual *mens rea* requirement that Congress did not see fit to include.

The plurality claims that the exact words ``offense against the person'' or ``crime against the person'' do not appear in ACCA's use-of-force clause. *Ante,* at ___-___, 210 L. Ed. 2d, at 75-77. But in fact, Congress used the phrase ``against the person of another'' in the use-of-force clause to describe the ``crime[s]'' that are covered by ACCA. §924(e)(2)(B). By using that language, Congress incorporated a historically rooted and widely used nomenclature for classifying crimes, and thus narrowed the *category* of offenses to which that clause applies-namely, to offenses *against the person.*

To sum up: The plurality does not dispute that reckless offenses entail the ``use of physical force.'' The plurality{2021 U.S. LEXIS 57} argues, however, that reckless offenses do not entail the ``use of physical force against the person of another.'' But the phrase ``against the person of another'' reflects longstanding criminal-law nomenclature-a term of art-that specifies the *category* of covered predicate offenses that involve the use of force, such as assault, homicide, rape, and robbery. That language has zero to do with the *mens rea* required for predicate offenses under ACCA. That conclusion should end this case given that the plurality acknowledges that the phrase {141 S. Ct. 1844} ``use of physical force'' otherwise encompasses reckless offenses such as reckless assault and reckless homicide.B

*Second*, in the alternative, even if we divorce the phrase ``against the person of another'' from its term-of-art usage in criminal law, as the plurality mistakenly does, that phrase as a matter of ordinary meaning still does not speak to *mens rea* and cannot reasonably be read to exclude reckless offenses such as reckless assault and reckless homicide. Instead, as the Court recognized in *Voisine* v. *United States* in interpreting a ``similarly worded'' statute covering the ``use of physical force,'' ACCA's use-of-force clause is ``indifferent as to whether{2021 U.S. LEXIS 58} the actor has the mental state of intention, knowledge, or recklessness'' with respect to the consequences of using force. 579 U. S., at ___, ___, n. 4, 136 S. Ct. 2272, 195 L. Ed. 2d 736).

{210 L. Ed. 2d 93} To understand the ordinary meaning of the phrase ``use of physical force against the person of another,'' first consider that the criminal law ordinarily imposes criminal liability when the defendant acts with intent, knowledge, or recklessness as to the consequences of his actions. A person acts intentionally (or said otherwise, purposefully) with respect to the harmful consequences of his actions if he has those consequences as his ``conscious object.'' Model Penal Code §2.02(2)(a)(i) (1985). A person acts knowingly with respect to the harmful consequences of his actions if he is ``aware that it is practically certain that his conduct will cause'' those consequences.

SCTHOT                                                      22

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*Id.,* §2.02(2)(b)(ii). And a person acts recklessly ``when he consciously disregards a substantial and unjustifiable risk'' that his conduct will result in harm to another person. *Id.,* §2.02(2)(<u>c</u>).

The line between knowing and reckless crimes is thin. The difference between (i) conduct with knowledge as to the consequences on the one hand and (ii) conduct with recklessness as to the consequences on the other hand is that the risk of harm associated with knowledge**{2021 U.S. LEXIS 59}** is somewhat higher than the risk of harm associated with recklessness. In particular, to act with knowledge that harm will occur, a defendant must know that harm is ``practically certain'' to occur. *Id.,* §2.02(2)(b)(ii). To act with recklessness as to whether harm will occur, a defendant need not know with practical certainty that harm will occur-but he still must *know* that he is disregarding a substantial and unjustifiable risk that harm will occur. *Id.,* §2.02(2)(<u>c</u>). In other words, he must make a ``deliberate decision to endanger another.'' *Voisine,* 579 U. S., at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736. As has long been recognized, the difference between knowledge and recklessness as to the consequences of one's actions is one of degree, not of kind.9

9

Indeed, a study published in 2011 concluded that individuals had difficulty ``differentiat[ing] between knowing and reckless conduct, even with the benefit of jury instructions.'' Shen, et al., Sorting Guilty Minds, 86 N. Y. U. L. Rev. 1306, 1309 (2011). The authors suggested possibly ``abandoning'' the distinction because of the inability of most people to distinguish the two categories with respect to particular fact patterns. *Ibid.*

Reckless conduct is not benign. Reckless conduct ``involves conscious risk creation,'' Model Penal Code §2.02, Comment 3, p. 236 (1985)-a ``deliberate decision to endanger another,'' *Voisine,* 579 U. S., at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736. And a person who engages in, for example, reckless assault or reckless homicide generally injures or kills another person.10

10

If a state offense labeled as assault did not require that the defendant cause sufficient contact with or injury or death to another person, such an offense presumably would not involve a ``use of physical force'' under ACCA. Of course, it could still constitute a violent felony under ACCA if the offense entailed the threatened or attempted use of physical force.

**{141 S. Ct. 1845}** Because the line between knowledge and recklessness can be thin and because reckless crimes such as reckless assault and reckless homicide involve a ``deliberate decision to endanger another'' that results in injury or death to another person, *ibid.***{2021 U.S. LEXIS 60}**, the criminal law ordinarily does not draw the line for criminal liability between intent and knowledge on the one hand and recklessness on the other. On the contrary, as the Model Penal Code **{210 L. Ed. 2d 94}** explains, ``[n]o one has doubted'' that a reckless mental state is ``properly the basis for criminal liability.'' §2.02, Comment 4, at 243; see generally Turner, The Mental Element in Crimes at Common Law, 6 Camb. L. J. 31 (1936).

Recognizing that basic principle, the Model Penal Code establishes recklessness as the default minimum *mens rea* for criminal offenses when a mental state is not specified. §2.02, Comment 5, at 244. If a more culpable mental state, such as intent or knowledge, is required for a criminal offense, ``it is conventional to be explicit.'' *Ibid.* Keep that last sentence in mind when we return to ACCA's text.

Like the Model Penal Code, many States establish recklessness as a default minimum *mens rea* for criminal offenses.11 And like the Model Penal Code, most States' criminal laws in 1986 provided (and today still provide) that recklessness as to the consequences of a defendant's conduct often suffices to impose criminal liability, including as to assault and homicide. See, *e.g.,* Brief for United States 19-20, and nn. 4-5 (state reckless assault**{2021 U.S. LEXIS 61}** statutes); 2 LaFave, Substantive Criminal Law §15.4(a), and p. 712, n. 19 (2018) (manslaughter). As of 1986, when Congress amended ACCA to include the use-of-force clause, 28 States had reckless assault statutes, and more than 30 States had statutes that covered some form of reckless homicide. See

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

Brief for United States 19-21, and nn. 4-7.
11
See, *e.g.*, Alaska Stat. §11.81.610(b) (1983); Ark. Stat. §41-204(2) (1977); Del. Code Ann., Tit. 11, §251(b) (1979); Haw. Rev. Stat. §702-204 (1985); 2 Ill. Rev. Stat., ch. 38, ¶¶4-3(a), 4-6 (1985); Kan. Stat. Ann. §21-5202(a) (2011); N. D. Cent. Code Ann., §12.1-02-02(1)(e), (2) (1985); Ohio Rev. Code Ann. §2901.21(B) (Lexis 2014); Pa. Stat. Ann., Tit. 18, §302 (Purdon 1983); Tenn. Code Ann. §39-11-301(<u>c</u>) (Cum. Supp. 1990); Tex. Penal Code Ann. §6.02(<u>c</u>) (West 1974); Utah Code Ann. §76-2-102 (Cum. Supp. 1989).
Importantly, nothing in ACCA's text or context (or its history, for that matter) states or even hints that Congress sought to exclude reckless offenses against the person, such as reckless assault and reckless homicide, from the use-of-force clause. Recall that the Model Penal Code says that ``it is conventional to be explicit'' when a legislature wants to exclude reckless offenses from criminal liability. §2.02, Comment 5, at 244. ACCA contains no such explicit language excluding reckless offenses. The text of ACCA should not be read to *silently* exclude reckless offenses such as reckless assault and reckless homicide.12
12
ACCA's statutory history further supports that conclusion. In 1984, in the original version of ACCA, Congress included only one offense against the person: robbery. 18 U. S. <u>C</u>. App. §1202(a) (1982 ed., Supp. II). ACCA expressly defined robbery as a felony that involves the ``taking of the property of another from the person or presence of another by force or violence.'' §1202(<u>c</u>)(8). At the time, as had been true at common law, see 4 W. Blackstone, Commentaries on the Laws of England 241-242 (1769), many state statutes defined robbery in a way that did not require that the defendant have intent or knowledge that his conduct would cause bodily injury. In 1986, when Congress expanded the number of violent offenses against the person so as to include crimes such as assault, rape, and homicide in addition to robbery, Congress did not suggest that it suddenly wanted to require intent or knowledge for robbery offenses. If Congress understood reckless robbery as a taking by force under the 1984 language, it follows that Congress would naturally also have understood reckless robbery as the use of physical force against the person of another under the 1986 statute. And there is no good reason (textual or otherwise) to think that Congress wanted to include reckless robbery but to exclude reckless assault and reckless homicide from the use-of-force clause.
{141 S. Ct. 1846} In short, in enacting ACCA, ``Congress must have known it was sweeping in some persons who had engaged {210 L. Ed. 2d 95} in reckless conduct.'' *Voisine*, 579 U. S., at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736 (citing *United States* v. *Bailey*, 34 U.S. 238, 9 Pet. 238, 256, 9 L. Ed. 113 (1835) (Story, J.)).
Consistent with those background principles of *mens rea*, the ordinary meaning of the phrase ``use of physical force{2021 U.S. LEXIS 62} against the person of another'' in ACCA encompasses reckless offenses such as reckless assault or reckless homicide.
The plurality today acknowledges that the phrase ``use of physical force'' would include reckless offenses. But according to the plurality, ACCA's phrase ``use of physical force against the person of another'' does not include reckless offenses. To distinguish the two, the plurality emphasizes the word ``against.'' As the plurality acknowledges, however, the word ``against'' is often defined to mean ``'mak[ing] contact with.''' *Ante*, at ___, 210 L. Ed. 2d, at 73. That is the logical meaning of ``against'' in the context of ACCA's use-of-force clause, and that meaning would encompass reckless assaults and reckless homicides.
The plurality disagrees, and stresses that the word ``against'' in isolation can mean *either* ``'in contact with''' *or* ``'[i]n opposition to,''' depending on context. *Ante*, at ___, 210 L. Ed. 2d, at 73. The plurality contends that the meaning of ``against'' in the context of the phrase ``use of physical force against the person of another'' carries the word's ``oppositional'' definition and thus excludes reckless offenses.13

SCTHOT                                    24

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

13

The plurality also equates ``in opposition to'' with ``targeting.'' *Ante,* at ___-___, 210 L. Ed. 2d, at 72-74. But the plurality cites no dictionaries or similarly authoritative support for that subtle move in its analysis. The plurality's equating of ``in opposition to'' with ``targeting'' is seemingly woven out of whole cloth.

The plurality chooses the ``in opposition to'' definition because it says, in essence, that it would{**2021 U.S. LEXIS 63**} be incoherent or gibberish to say that someone *recklessly* used force against another person. But the plurality is wrong about that. As a matter of ordinary meaning, it is perfectly natural to say that someone *recklessly* used force against another person.14 State and federal reporters, for example, are replete with references to individuals recklessly using force against others. See, *e.g.,* {**141 S. Ct. 1847**}*Neil* v. *Warden, Noble Correctional Inst.,* 2020 U.S. Dist. LEXIS 15359, 2020 WL 489326, *30 (SD Ohio, Jan. 30, 2020) (``The indictments also charged that in attempting or committing a theft offense or in fleeing immediately after the attempt {**210 L. Ed. 2d 96**} or offense, appellant recklessly used or threatened the immediate use of force against another'').15

14

Indeed, the plurality eventually seems to acknowledge that point. After dedicating pages to asserting that the ordinary meaning of the phrase ``use of physical force against the person of another'' *necessarily* requires conduct that is intentionally or knowingly directed at another person, the plurality concedes that if the word ``recklessly'' appeared in ACCA's use-of-force clause, then that clause would in fact ``cover reckless offenses.'' *Ante,* at ___, 210 L. Ed. 2d, at 77. That is a surprising acknowledgment. It is hard to square with the plurality's suggestion that it is not possible for one to *recklessly* use physical force against another person. After all, if the plurality's ordinary meaning argument were correct, adding the word ``recklessly'' to the front of the use-of-force clause would seem to render that clause nonsensical. My reading of the statute avoids that incongruity in the plurality's interpretation by recognizing that the phrase ``use of physical force against the person of another'' encompasses reckless offenses.

15

For just a few examples, see *Almonte* v. *Hines,* 2020 U.S. Dist. LEXIS 43205, 2020 WL 1164657, *2 (SDNY, Mar. 11, 2020) (``Plaintiff had not proved by a preponderance of the evidence that Hines intentionally or recklessly used excessive force against Almonte during the arrest''); *Evanston Ins. Co.* v. *Break I, Inc.,* 2019 U.S. Dist. LEXIS 113109, 2019 WL 2995507, *7 (ND Ala., July 9, 2019) (``The security guard intentionally or recklessly used force against a person without her consent by shooting a gun at the male patron and hitting Ms. Beasley''); *O'Hara* v. *New York,* 570 Fed. Appx. 21, 24 (CA2 2014) (``[A] jury could have reasonably found'' ``that McAvoy intentionally or recklessly used excessive force against O'Hara''); *Whitlock* v. *Jackson,* 754 F. Supp. 1394, 1400 (SD Ind. 1991) (``[T]he due process claim required a finding that the defendants 'unreasonably and recklessly used excessive force' against Gaisor''); *State* v. *Tyson,* 2011-Ohio-4981, 2011 WL 4488955, *6 (Ohio App., Sept. 29, 2011) (``[T]he State was required to prove that appellant recklessly used or threatened the immediate use of force against Mr. Carter''); *State* v. *Adams,* 2010-Ohio-1942, 2010 WL 1757931, *2 (Ohio App., May 3, 2010) (``[T]he State was required to prove that appellant 'recklessly used or threatened the immediate use of force' against Stoops''); *Cook* v. *State,* 2005-0475, p. 3 (La. App. 1 Cir., 2/10/06), 928 So. 2d 589, 591 (``The jury found that Arton did not intentionally or recklessly use excessive force against Cook''); *David* v. *State,* 123 P. 3d 1099, 1103 (Alaska App. 2005) (``[A] jury could not convict him of second-degree murder without also finding that he had used reckless or criminally negligent force against the victim'').

Most tellingly, if one wants to find a really good example of the ordinary meaning, look no further than the Court's opinion in *Voisine* five years ago. There, the Court stated twice in its opinion-in the first and last paragraphs-that the use-of-force statute at issue there covered offenses where an individual *recklessly* used physical force ``against a domestic relation.'' 579 U. S., at ___, 136 S. Ct.

SCTHOT                                                    25

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

2272, 195 L. Ed. 2d 736; see also *id.,* at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736. The *Voisine* Court found it entirely ordinary to employ the phrase `` 'use . . . of physical force' against a domestic relation"-in other words, use{2021 U.S. LEXIS 64} of physical force against another person-to describe reckless assaults. *Id.,* at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736.

If the plurality today were correct that a use of force ``against" another can only be intentional or knowing, then the Court in *Voisine* surely would not have adopted the *exact formulation* of recklessly using force ``against a domestic relation." *Res ipsa loquitur.*

The plurality today simply shrugs off the language from *Voisine. Ante,* at ___-___, n. 9, 210 L. Ed. 2d, at 81-82. But the plurality cannot rewrite ordinary meaning. And as *Voisine*'s choice of language demonstrates, the ordinary meaning of the phrase ``use of physical force against the person of another," such as against a domestic relation, easily encompasses reckless offenses, including reckless assault and reckless homicide. (More on *Voisine* later.)

More generally, the plurality's linguistic efforts to seize on the word ``against" to scale back ACCA do not make a lot of sense. Consider two points. First, a use of force must be against someone or something. And second, as *Voisine* stated and Borden acknowledges, you can *recklessly* use force. Put those two points together and the resulting conclusion is irrefutable: One can recklessly use force against the{2021 U.S. LEXIS 65} person of another (or against the property of another). As relevant here, the ordinary meaning {210 L. Ed. 2d 97} of the phrase ``use of physical force against the person of another" thus covers reckless offenses such as reckless assault and reckless homicide.

{141 S. Ct. 1848} Lest there be any doubt, keep in mind that we are talking about reckless offenses such as reckless assault or reckless homicide where a defendant made a *deliberate* decision to endanger another by using force, *and as a result injured or killed someone.* Applying ordinary meaning and employing a modicum of common sense, one would say that such a defendant used force against the victim. If an individual fires a gun recklessly at a house and injures someone inside, that individual has used force against the victim. If an individual recklessly throws bricks off an overpass and kills a driver passing underneath, that individual has used force against the victim. If an individual recklessly drives 80 miles per hour through a neighborhood and kills a child, that individual has used force against the child. It defies common sense and the English language to suggest otherwise.

To appreciate the ordinary meaning of the phrase ``use of physical force against the{2021 U.S. LEXIS 66} person of another," look also at some of the cases cited by the plurality today. See *ante,* at ___, 210 L. Ed. 2d, at 78. In *People* v. *Hall,* a highly experienced skier careened down a slope at dangerously high speeds, out of control, until he crashed into an unsuspecting skier. See 999 P. 2d 207 (Colo. 2000). The ``force of the impact" when Hall collided with the victim was so great that it ``fractured the thickest part of the victim's skull" and caused traumatic brain injuries, resulting in the victim's death. *Id.,* at 211.

The fleeing shoplifter in *Craver* v. *State* leapt over the second-floor railing in a mall during normal business hours, while people were milling about in the area below. See 2015 Tex. App. LEXIS 6569, 2015 WL 3918057, *1 (Tex. Crim. App., June 25, 2015). The shoplifter landed directly on top of an elderly woman, breaking her back. 2015 Tex. App. LEXIS 6569, [WL]at *2.

And in *Seaton* v. *State,* a police officer blew through a red light without braking or activating his lights or sirens, collided with another car at a speed of about 100 miles per hour, ricocheted into another person who was standing nearby, and killed that bystander. See 385 S. W. 3d 85, 88 (Tex. Crim. App., 2012).

All of those offenses entail the use of physical force *against another person.* True, the skier who crashed into an innocent bystander on the slopes did not intend or know with practical certainty that he would{2021 U.S. LEXIS 67} hit that bystander with such force that it would crack his skull. The shoplifter who vaulted himself over a second-floor railing may not have intended or known with practical certainty that he would slam into an unsuspecting shopper below. And the officer who drove

SCTHOT                                    26

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

through the red light at 100 miles per hour may not have intended or known with practical certainty that he would lose control and kill another person.

But the defendants in those cases did not merely ``pay insufficient attention to the potential application of force.'' *Ante,* at \_\_\_, 210 L. Ed. 2d, at 74. Instead, each of those defendants acted recklessly and thus made ``a deliberate decision to endanger another.'' *Voisine,* 579 U. S., at \_\_\_, 136 S. Ct. 2272, 195 L. Ed. 2d 736. Each of them consciously disregarded the obvious dangers that their volitional {210 L. Ed. 2d 98} conduct-high-speed skiing, jumping off a second-floor railing, or speeding at 100 miles per hour in a car without lights or sirens-posed to anyone unfortunate enough to cross their paths. See *id.,* at \_\_\_, 136 S. Ct. 2272, 195 L. Ed. 2d 736. Each of those defendants knew that the people around them would have to be really lucky to get out of the way. And in ordinary parlance, each of those defendants used force against their victims when they made physical *contact* with those victims{2021 U.S. LEXIS 68} as a direct result of their reckless behavior-that is, of their deliberate decision to endanger another.\* \* \*

{141 S. Ct. 1849} To sum up, the plurality's reading of the statutory phrase ``against the person of another'' fails for two alternative and independent reasons. First, that phrase is a term of art that limits the category of offenses covered by ACCA's use-of-force clause to those involving force against the person rather than against property. It does not serve as a roundabout way of heightening the *mens rea* requirement for violent felonies to intent or knowledge. Second, and in the alternative, even if the phrase ``against the person of another'' is not a term of art, the ordinary meaning of that phrase encompasses reckless offenses such as reckless assault and reckless homicide.16
16

The plurality asserts that my two alternative and independent interpretations of the use-of-force clause are ``mutually inconsistent.'' *Ante,* at \_\_\_, 210 L. Ed. 2d, at 75. But the point of alternative arguments is to explain that there may be two different ways of looking at an issue (which may differ from one another in certain respects), but that both ways of looking at the issue lead to the same bottom line. So it is here.II

All of that is more than enough to resolve this case. But in addition to all of that, the Court's recent precedent in *Voisine* v. *United States* convincingly demonstrates that ACCA covers reckless offenses such as reckless assault and reckless homicide.

As noted above, the Court in *Voisine* concluded that the phrase ``use of physical force'' in a similarly worded statutory provision encompasses reckless offenses, as{2021 U.S. LEXIS 69} well as intentional or knowing offenses. 579 U. S. 686, 136 S. Ct. 2272, 195 L. Ed. 2d 736 (2016). *Voisine* established two key points. First, *Voisine* confirmed that reckless offenses such as reckless assault and reckless homicide entail the use of physical force against another person-there, against a domestic relation or victim. Second, contrary to the plurality's analysis today, *Voisine* explained that the Court's prior decision in *Leocal* v. *Ashcroft,* 543 U. S. 1, 125 S. Ct. 377, 160 L. Ed. 2d 271 (2004), meant simply that *negligent* offenses do not involve the use of physical force for purposes of statutes such as ACCA.

*First, Voisine* confirmed that reckless offenses involve the use of physical force against another person-in that case, against a ``domestic relation'' or ``victim.'' In *Voisine,* the Court addressed a subsection of §922(g) that bars individuals from possessing firearms if they have been convicted of a misdemeanor crime of domestic violence. See 18 U. S. <u>C</u>. §922(g)(9). The statute defines ``misdemeanor crime of domestic violence'' as a misdemeanor that ``has, as an element, the use or attempted use of physical force'' and was committed against a ``victim'' who was in a domestic relationship {210 L. Ed. 2d 99} with the defendant. §921(a)(33)(A); see also *Voisine,* 579 U. S., at \_\_\_, 136 S. Ct. 2272, 195 L. Ed. 2d 736.17
17

Section 921(a)(33)(A) provides in relevant part: ``[T]he term 'misdemeanor crime of domestic violence' means an offense that-

SCTHOT                                          27

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

``(i) is a misdemeanor under Federal, State, or Tribal law; and

``(ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim." (Footnote omitted.)

The question in *Voisine* was whether that statutory definition ``applies to reckless assaults, as{2021 U.S. LEXIS 70} it does to knowing or intentional ones." *Id.,* at ___, 136 S.Ct. {141 S. Ct. 1850} 2272, 195 L. Ed. 2d 736. The Court held that the statute applied to reckless assaults.

The Court in *Voisine* began by describing bedrock criminal law principles. Pointing to the Model Penal Code, the Court explained that a person acts recklessly with regard to the consequences of his actions if he ``'consciously disregard[s]' a substantial risk that the conduct will cause harm to another." *Ibid.* (quoting Model Penal Code §2.02(2)(<u>c</u>)). The Court stated that even though such a person does not intend or know to a practical certainty that harm will result, he nonetheless makes ``a deliberate decision to endanger another." *Voisine,* 579 U. S., at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736. And the Court noted that recklessness as to the consequences of one's actions ordinarily suffices for criminal liability.

The Court then concluded that the phrase ``use of physical force" in §921(a)(33)(A) does not require that a defendant *intend* or *know* that his conduct will cause harm. Instead, it is enough that he *recklessly* employs force-that is, acts in ``conscious disregard" of a ``substantial risk of causing harm." *Id.,* at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736. For example, a man who ``throws a plate in anger against the wall near where his wife is standing" has used{2021 U.S. LEXIS 71} force against his wife even if the man ``did not know for certain (or have as an object)" that ``a shard from the plate would ricochet and injure his wife." *Ibid.* It suffices that the man ``recognized a substantial risk" that his forceful act would harm his wife. *Ibid.* That example, the Court explained, illustrated that the statute was ``indifferent as to whether the actor has the mental state of intention, knowledge, or recklessness with respect to the harmful consequences of his volitional conduct." *Ibid.*

In *Voisine,* to have committed a qualifying misdemeanor crime of domestic violence, the defendant must have used force against a ``victim," to use the statute's term, often against the defendant's spouse or partner. As the *Voisine* Court stated, reckless assault in the domestic violence context entails ``the 'use . . . of physical force' *against a domestic relation*" even though a defendant who acts recklessly does not intend or know to a practical certainty that his use of force will harm that domestic relation. *Id.,* at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736 (emphasis added). In other words, the Court agreed that a reckless assault entails the use of physical force *against the person of another* (there, ``against{2021 U.S. LEXIS 72} a domestic relation" or ``victim").

{210 L. Ed. 2d 100} *Voisine*'s conclusion applies equally to ACCA's violent felony definition. The two definitions share critical features. Both definitions apply in the context of §922(g)'s ban on possession of firearms by individuals convicted of certain offenses. Both definitions apply to offenses that have as an element the ``use of physical force."

The only distinction between those two definitions is that ACCA employs the phrase ``use of physical force against the person of another" while §921(a)(33)(A) employs the phrase ``use of physical force" and then makes clear that force must be used against a ``victim" who is a domestic relation. But that distinction makes no difference for *mens rea* purposes. The Court in *Voisine* took as a given that the object of the reckless conduct would be another person-the ``victim" as the statute describes it. See *id.,* at ___, ___, ___, ___, ___, ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736. Indeed, given that *Voisine* involved a domestic violence statute, it would have been unnecessary or even redundant to add the words ``against the person of another" to the statute. After all, a domestic violence offense, such as assault, is necessarily an offense against {141 S. Ct. 1851} the person{2021 U.S. LEXIS 73} of another. Recognizing that reality, the *Voisine* Court explicitly stated that the ``federal ban on firearms

SCTHOT                                    28

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

possession applies to any person with a prior misdemeanor conviction for the 'use . . . of physical force' *against a domestic relation.*" *Id.,* at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736 (quoting §921(a)(33)(A); emphasis added); see also *id.,* at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736. Contrary to what the plurality today seems to think, *Voisine* did not create some imaginary world where one could recklessly use force, but one could not recklessly use force against another person. On the contrary, *Voisine* explicitly recognized that one could recklessly use force ``*against* a domestic relation''-that is, against another person.18

18

To be sure, to avoid a Second Amendment problem, the defendant in *Voisine* also argued that the statute at issue there should not be interpreted to prohibit the possession of firearms by someone who had committed a single reckless *misdemeanor* offense. See 579 U. S., at ___, n. 6, 136 S. Ct. 2272, 195 L. Ed. 2d 736); see also *id.,* at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736 (Thomas, J., dissenting). But there is no such constitutional issue lurking in this case. This case involves a sentencing enhancement, not primary liability, and applies only when the defendant has been convicted of three prior ACCA violent felonies committed on different occasions and has then committed a fourth felony by unlawfully possessing firearms.

*Voisine* alone should have made this case very straightforward. In the wake of *Voisine*, most Courts of Appeals to consider the issue certainly thought it was. They responded to *Voisine* by applying its analysis to ACCA's violent felony definition.19 As Chief Judge Sutton cogently explained in relying on *Voisine* to interpret the phrase ``use of physical force against the person of another'': ``*Voisine*'s key insight is that the word 'use' refers to 'the act of employing something' and does not require{2021 U.S. LEXIS 74} a purposeful or knowing state of mind. That insight does not change if a statute says that the '*use* of physical force' must be 'against' a person, property, or for that matter anything else. . . Sometimes the simplest explanation is the best explanation.'' *United {210 L. Ed. 2d 101} States* v. *Verwiebe*, 874 F. 3d 258, 262-263 (CA6 2017) (citations omitted).

19

See, *e.g., United States* v. *Burris,* 920 F. 3d 942, 951 (CA5 2019); *United States* v. *Haight,* 892 F. 3d 1271, 1280-1281, 436 U.S. App. D.C. 273 (CADC 2018); *United States* v. *Pam,* 867 F. 3d 1191, 1207-1208 (CA10 2017); *United States* v. *Fogg,* 836 F. 3d 951, 956 (CA8 2016).

But today, the plurality tries to disappear *Voisine*'s use of the phrase ``against a domestic relation'' from the U. S. Reports. Seeking to erase that phrase from *Voisine* with a footnoted ``*mea culpa,*'' the plurality today concludes that the additional phrase ``against the person of another'' in ACCA means that ACCA's use-of-force clause does not cover reckless crimes, even though the statute at issue in *Voisine* did. *Ante,* at 20-23, and n. 9. The plurality's attempt to rewrite *Voisine* does not persuade. As noted above, *Voisine* held that reckless offenses such as reckless assault and reckless homicide entail the ``use of physical force,'' and the *Voisine* opinion further explained that those reckless offenses entail the use of physical force against the person of another-namely, ``against a domestic relation'' or ``victim.''

*Second,* as *Voisine* fully explained, the Court's prior decision in *Leocal* concluded only that negligent{2021 U.S. LEXIS 75} offenses do not involve the use of physical force for purposes of ACCA. *Leocal,* 543 U. S., at 9, 13, 125 S. Ct. 377, 160 L. Ed. 2d 271; see also *Voisine,* 579 U. S., at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736. *Leocal* addressed whether a driving-under-the-influence offense that required only a *negligent* mental state fell within §16(a)'s definition of ``crime of violence.'' The *Leocal* Court held that it did not. The phrase ``use . . . of physical {141 S. Ct. 1852} force against the person or property of another,'' the Court reasoned, is ``most naturally'' read to suggest ``a higher degree of intent than negligent or merely accidental conduct.'' 543 U. S., at 9, 125 S. Ct. 377, 160 L. Ed. 2d 271 (internal quotation marks omitted). As the Court explained: ``While one may, in theory, actively employ *something* in an accidental manner, it is much less natural to say that a person actively employs physical force against another person by accident.'' *Ibid.*

SCTHOT                                                             29

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

The *Leocal* Court took care, however, to reserve the question we confront today-namely, whether offenses requiring ``proof of the *reckless* use of force against the person or property of another'' would qualify under a statutory definition like §16(a). *Id.,* at 13, 125 S. Ct. 377, 160 L. Ed. 2d 271 (emphasis in original).

As *Voisine* later explained, the critical *mens rea* dividing line in statutes requiring the use of force is the line ``between accidents and recklessness''-a{2021 U.S. LEXIS 76} distinction that ``*Leocal* itself recognized.'' 579 U. S., at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736. Accidents or negligence do not involve the *use of force* because such conduct is not volitional. *Ibid.* But reckless behavior, like throwing a plate against a wall or firing a gun at a house, is different and does involve the *use of force*. After all, the ``harm such conduct causes is the result of a deliberate decision to endanger another-no more an 'accident' than if the 'substantial risk' were 'practically certain.''' *Ibid.*

As a matter of history, theory, and practice in criminal law, the line drawn by *Voisine* and *Leocal* between recklessness and negligence is much more salient than the line drawn by the plurality today between knowledge and recklessness. An individual who consciously disregards a substantial risk of a harmful result has a culpable state of mind and has made a deliberate decision to endanger another, even if it is not practically certain {210 L. Ed. 2d 102} the harmful result will occur. And for that reason, to reiterate, the Model Penal Code and most States draw the ordinary line of criminal culpability between recklessness and negligence, not between knowledge and recklessness.

Rather than acknowledge *Leocal*'s narrow holding{2021 U.S. LEXIS 77} on negligence as distinct from recklessness, knowledge, and intent, the plurality today focuses on *Leocal*'s observation that the ``critical aspect'' of §16(a)'s ``crime of violence'' definition is that it requires the ```use . . . of physical force *against the person or property of another*.''' 543 U. S., at 9, 125 S. Ct. 377, 160 L. Ed. 2d 271 (quoting §16(a); emphasis in original). By the plurality's account today, *Leocal*'s analysis of §16(a)'s ``against'' phrase-which was missing from the statute at issue in *Voisine*-confirms that ACCA's materially similar ``against'' phrase is the ``critical text for deciding the level of *mens rea* needed.'' *Ante,* at ___, 210 L. Ed. 2d, at 80-81 (internal quotation marks omitted).

But *Leocal* never focused on the term ``against the person or property of another'' in isolation. It focused on the full phrase ``use of physical force against the person or property of another.'' 543 U. S., at 9, 125 S. Ct. 377, 160 L. Ed. 2d 271. And *Leocal* said that negligence does not entail such a use of force.

Indeed, the Court in *Voisine* already made that same point about *Leocal*. *Voisine* recognized that the statute in *Leocal*, like the ``similarly worded'' statute in *Voisine*, ``hing[ed] on the 'use' of force.'' 579 U. S., at ___, n. 4, 136 S. Ct. 2272, 195 L. Ed. 2d 736. The *Voisine* Court distinguished *Leocal* solely on the ground that an accident or negligence cannot be considered an{2021 U.S. LEXIS 78} ```active employment''' of force, whereas reckless assault does entail an active employment of force. 579 U. S., at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736. As Chief Judge Sutton correctly {141 S. Ct. 1853} pointed out, *Voisine* ``tellingly placed no weight on the absence of 'against the person or property of another''' in distinguishing the statute at issue in *Voisine* from the statute at issue in *Leocal*. *Verwiebe*, 874 F. 3d, at 263. All of *Voisine*'s lengthy analysis of *Leocal* would have been entirely unnecessary if the *Voisine* Court actually thought that the phrase ``against the person or property of another'' in the *Leocal* statute distinguished the statute in *Leocal* from the statute in *Voisine*.

Put simply, if the phrase ``against the person . . . of another'' from the statute in *Leocal* were actually the ``Rosetta Stone'' of *mens rea* as the plurality today seems to think, *Voisine* would have mentioned that point. *Verwiebe*, 874 F. 3d, at 263. But that distinction is nowhere to be found in *Voisine*. For *mens rea* purposes, *Voisine* treated a statute that covered the ``use of physical force'' the exact same as a statute that covered the ``use of physical force against the person of another.'' The plurality's double-barreled effort today to (i) erase *Voisine*'s use of the phrase ``against a domestic relation'' and{2021 U.S. LEXIS 79} also (ii) sweep away *Voisine*'s analysis of *Leocal* is

SCTHOT                                              30

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

something to behold. In my view, the plurality's opinion today cannot be squared with what the Court stated just five years ago in *Voisine*.

If this Court were to faithfully apply *Voisine*'s language and reasoning to this case, as almost all courts of {210 L. Ed. 2d 103} appeals to consider the issue have done in the wake of *Voisine*, that would be the end of the matter. The plurality's decision to rewrite *Voisine* today is not convincing, especially when considered together with the other textual arguments in favor of the Government's position here. 20

20

To reiterate, Justice Thomas declines to follow *Voisine* and, in doing so, provides the fifth vote for the Court's decision today.III

To support its analysis, the plurality also relies on ACCA's ``context and purpose.'' *Ante,* at ___, 210 L. Ed. 2d, at 77. That argument is likewise unpersuasive, in my respectful view.

Start with context. The plurality focuses on the supposed ordinary meaning of the term ``violent felony'' in isolation. The plurality maintains that ACCA's definition of violent felony should be construed to ``mark out a narrow category of violent, active crimes.'' *Ibid.* (internal quotation marks omitted).

To begin with, when a statute explicitly defines a term, we generally follow that statutory definition. See *Digital Realty Trust, Inc.* v. *Somers*, 583 U. S. ___, ___, 138 S. Ct. 767, 776, 200 L. Ed. 2d 15 (2018). In ACCA, Congress{2021 U.S. LEXIS 80} defined the term ``violent felony'' to include offenses that involve the ``use of physical force against the person of another.'' And as explained above, that definition encompasses reckless offenses like reckless assault and reckless homicide. Moreover, reckless assaults and reckless homicides *are* violent crimes, as a matter of ordinary meaning. Recklessly firing a weapon and injuring an unsuspecting victim is violent. Recklessly throwing bricks off an overpass and killing a driver passing underneath is violent. Recklessly driving 80 miles per hour through a neighborhood and killing a child is violent.

The plurality also refers to the phrase ``armed career criminal'' (the statutory title) in a way that seems to suggest that an ACCA defendant's predicate violent felonies must be committed with firearms. See *ante,* at ___, 210 L. Ed. 2d, at 78, 81. That is incorrect. The three predicate felonies must be {141 S. Ct. 1854} ``violent'' as defined in the statute but can be committed with or without firearms. Contrary to the plurality's intimations, the statute penalizes ``career criminals'' who then unlawfully arm themselves with firearms. The plurality's subtle reconfiguration of the statutory title for contextual support is off base.

The{2021 U.S. LEXIS 81} plurality's related reliance on ACCA's supposed purpose is similarly misplaced. The plurality speculates that Congress designed ACCA to cover those offenders ``who, when armed, 'might deliberately point the gun and pull the trigger.''' *Ante,* at ___, 210 L. Ed. 2d, at 78 (quoting *Begay* v. *United States*, 553 U. S. 137, 145-146, 128 S. Ct. 1581, 170 L. Ed. 2d 490 (2008)). But even assuming that was Congress's *only* goal in enacting ACCA (recall that ACCA also covers those whose predicate offenses were serious drug crimes), the statute expressly defines the offenders who fit into that dangerous category-namely, those who have been convicted of three violent felonies and then unlawfully possess firearms. Congress's goal of preventing further violence by recidivist violent felons {210 L. Ed. 2d 104} does not support drawing a distinction between reckless assault and knowing assault, or between reckless homicide and knowing homicide.

The plurality also says that Congress did not seek to ensnare low-level or ordinary criminals. True. But again, ACCA's 15-year mandatory minimum sentence is triggered only after a defendant is convicted of not one, not two, but *three* violent felonies committed on separate occasions-and then proceeds to commit a *fourth* felony by unlawfully possessing firearms. Such repeated violent conduct is{2021 U.S. LEXIS 82} not the stuff of low-level or ordinary criminals. Even assuming the plurality's premise that a driver who recklessly kills a pedestrian or a parent who recklessly inflicts abuse on her children is not dangerous the first time around-a doubtful premise that would be news to many

SCTHOT                                                     31

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

victims-that assumption surely falls apart after the second and third reckless felony convictions. At that point, the individual has demonstrated a consistent willingness to deliberately engage in dangerous behavior that poses an obvious risk of physical harm to others. And someone who has been convicted of three reckless assaults or homicides committed on different occasions-and then unlawfully possesses firearms-is not a low-level or ordinary criminal, but is someone who Congress might have reasonably feared would commit further violence.

The plurality expresses particular concern over the notion that interpreting ACCA to cover reckless offenses would sweep in ordinary reckless driving offenses, like ``running a stop sign or veering onto the sidewalk.'' *Ante*, at ___, 210 L. Ed. 2d, at 78. But the plurality does not cite a single case where a reckless driving offense not involving injury to others has been counted as an ACCA predicate.{2021 U.S. LEXIS 83} That is not surprising because routine reckless driving statutes often do not require injury to others and thus would not qualify as a ``use of physical force'' under ACCA. It is only when the reckless driver causes harm to another and is convicted of an offense akin to reckless assault or reckless homicide that the offense typically would come within ACCA.

Notably, in citing what it implies are benign reckless driving offenses, the plurality fails to mention that the driver who blew through a stop sign in *State* v. *Gillon* collided with another vehicle, killing one person and injuring two others. See 15 S. W. 3d 492, 496-497 (Tenn. Crim. App. 1997). And the driver who erratically veered onto a sidewalk in *State* v. *Graham* drove ``straight toward'' another vehicle and crashed into it, leaving the driver of the vehicle ``lying face first outside of the {141 S. Ct. 1855} passenger side of his vehicle'' ``screaming in pain.'' 2008 Tenn. Crim. App. LEXIS 39, 2008 WL 199851, *2 (Tenn. Crim. App., Jan. 24, 2008). The accident left the victim ``unable to walk for three months'' after the crash. *Ibid.* As with the other sanitized examples the plurality cites today, it strains credulity to suggest that the drivers in either of those cases did not use force *against their victims*-or that they could not fairly be considered ``career criminals'' if convicted{2021 U.S. LEXIS 84} of those kinds of violent felonies on *three* separate occasions.

In discussing context and purpose, the plurality also tries to further distinguish *Voisine* by saying that *Voisine* involved a prior offense of domestic violence, whereas this case involves prior offenses of assault. *Ante*, at ___, 210 L. Ed. 2d, at 81. But {210 L. Ed. 2d 105} Congress wanted to prohibit thrice-convicted violent criminals from unlawfully possessing firearms at least as much as it wanted to prohibit misdemeanor domestic violence offenders from unlawfully possessing firearms. *Voisine* cannot be distinguished on purposive grounds.

Finally, in discussing context and purpose, the plurality alludes several times to the 15-year mandatory minimum sentence in ACCA. (The mandatory minimum seems to loom very large as an influence on the plurality's overall analysis here.) But that mandatory minimum sentence comes into play only after four separate felony convictions, three of them for violent felonies and a fourth for unlawfully possessing firearms. ACCA's mandatory minimum sentence is not a basis for interpreting the statute contrary to its best reading. Moreover, Congress is attuned to the issue and has taken many steps in recent years to recalibrate sentencing,{2021 U.S. LEXIS 85} address mandatory minimums, and target those who most deserve substantial sentences. It is not our role to rewrite Congress's sentencing laws just because we might disagree with Congress or think that Congress is not moving quickly enough to enact new sentencing laws.

In short, ACCA's context and purpose, properly read, strongly support what the statutory text and precedent already establish: An individual who commits three reckless assaults or homicides and then unlawfully possesses firearms falls well within the class of people that ACCA encompasses.IV

The Court's decision today will generate a variety of serious collateral effects that further underscore the implausibility of the plurality's statutory interpretation.

*First*, because the States define reckless assault and reckless homicide to cover a range of conduct, the Court's decision will exclude from ACCA many defendants who have committed serious violent offenses. Consider just a few examples, but keep in mind that there are thousands more:

SCTHOT                                                                                      32

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

During the course of a fight, a defendant shot another man in the chest and killed him. A jury found the defendant guilty of second-degree reckless homicide. *State* v. *Jackson*, 2012 WI App 132, 345 Wis. 2d 62, 823 N.W.2d 840, 2012 Wisc. App. LEXIS 1031, 2012 WL 4799459, *1 (Wis. App., Oct. 10, 2012).

A defendant had been drinking**{2021 U.S. LEXIS 86}** in a parking lot with several others and then attacked another person with a knife. The knife attack resulted in a ``ten-inch long, 'gaping' laceration'' that ``went down to the depth of the victim's ribs, through two layers of muscle and through his interior abdominal wall.'' The defendant was convicted of reckless aggravated assault. *State* v. *Farrar*, 2002 Tenn. Crim. App. LEXIS 337, 2002 WL 560959, *1-*2 (Tenn. Crim. App., Apr. 16, 2002).

At a party, a defendant picked up a friend's gun, pointed it directly at **{141 S. Ct. 1856}** another person's head, and pulled the trigger. The evidence adduced at trial established that the defendant had recklessly disregarded a known risk that the gun was loaded. The defendant was convicted of reckless homicide. *State* v. **{210 L. Ed. 2d 106}** *Gough*, 2009-Ohio-322, 2009 WL 180298, *1-*2 (App., Jan. 26, 2009).

A defendant savagely beat his victim ``without provocation,'' causing the victim to suffer ``hearing loss, missing teeth, impaired vision and impaired memory.'' The defendant was convicted of reckless aggravated assault. *State* v. *McAmis*, 2010 Tenn. Crim. App. LEXIS 449, 2010 WL 2244124, *4 (Tenn. Crim. App., June 4, 2010).In each of the above examples, the defendant's mental state for the state-law offense was determined to be recklessness. Under the Court's decision today, however, not one of those defendants committed a ``violent felony'' for purposes of ACCA because they supposedly did not commit an offense that necessarily entailed the use of force *against the{2021 U.S. LEXIS 87} person of another*.

And it gets worse. Under the Court's decision, even second-degree murder and some forms of manslaughter may be excluded from ACCA. That is because, in many States, some forms of second-degree murder and manslaughter do not require intent or knowledge. The idea that those offenses would fall outside of ACCA's scope is, as one judge aptly put it, ``'glaringly absurd.'" *United States* v. *Begay*, 934 F. 3d 1033, 1047 (CA9 2019) (N. R. Smith, J., dissenting in part). Something has gone badly astray when this Court is suggesting that second-degree murder and manslaughter might not involve the ``use of physical force against the person of another."21

21

As the plurality notes, today's decision should not be construed to express any view on the application of the use-of-force clause to crimes requiring a mental state of *extreme* recklessness. See *ante*, at ___, n. 4, 210 L. Ed. 2d, at 72. In my view, crimes committed with extreme recklessness, such as depraved-heart murder, should obviously still qualify as predicate offenses under ACCA, even after today's decision. And indeed, counsel for Borden forthrightly acknowledged at oral argument that extreme recklessness crimes, such as depraved-heart murder, can still suffice under ACCA. See Tr. of Oral Arg. 14–15, 19. But the plurality, for some reason, refuses to even acknowledge that depraved-heart murder is a violent felony. The plurality's reticence is telling, and that reticence shows just how far the plurality's interpretation of this statute has strayed from the statutory text and basic common sense.

*Second*, the Court's decision will exclude even some convictions for intentional and knowing assaults. That is because several States criminalize felony assault in a single, indivisible provision that can be satisfied by intent, knowledge, or recklessness.22 Because courts use the categorical approach when applying ACCA's violent felony definition, the Court's decision today will thus exclude many intentional and knowing felony assaults from those States.

22

SCTHOT                     33

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

See Me. Rev. Stat. Ann., Tit. 17-A, §208 (Cum. Supp. 2021) (aggravated assault); R. I. Gen. Laws §11-5-2 (Supp. 2020) (felony assault); Utah Code Ann. §76-5-103 (Supp. 2019) (aggravated assault); see also *United States* v. *Rose*, 896 F. 3d 104, 114 (CA1 2018) (although Rhode Island case law is inconclusive, ``it appears possible'' that ordinary recklessness suffices for felony assault under R. I. Gen. Law §11-5-2); *State* v. *Seach*, 2021 UT App 22, ¶18, 483 P. 3d 1265, 1271 (Utah Code Ann. §76-5-103 requires the State to prove that a defendant acted ``intentionally, knowingly, or recklessly'').

Consider just one example. In *United States* v. *Esparza-Herrera*, a defendant broke into the house of a woman he had previously{2021 U.S. LEXIS 88} dated, tied her up, and beat her over a four-hour period, leaving blood on her hands and face, her eyes swollen shut, {141 S. Ct. 1857} and bite marks all over her body. 557 F. 3d 1019, 1021, n. 2 (CA9 2009). The defendant {210 L. Ed. 2d 107} was convicted under a state statute that proscribed ``'intentionally, knowingly or recklessly''' causing ``'temporary but substantial disfigurement.''' *Id.*, at 1021. Under the Court's decision today, that offense would not qualify as a violent felony under ACCA.

*Third*, after today's decision, attempted and threatened assaults and homicides will be covered under ACCA as violent felonies. But *actual* assaults and *actual* homicides that were committed recklessly will not be covered under ACCA. It seems incongruous to conclude that ACCA covers attempts or threats to injure others that never get completed or carried out, but does not cover situations where an individual carries through with reckless conduct and leaves a victim in a hospital or graveyard.

As those points indicate, the Court's decision today will undermine Congress's sentencing policy. In particular, today's decision will mean that some defendants otherwise subject to ACCA will leave prison much earlier than Congress dictated, or avoid ACCA altogether.23 To some, that may seem costless{2021 U.S. LEXIS 89} or even beneficial. Indeed, the plurality, in places, seems to doubt the use of the 15-year mandatory minimum sentence-even for someone convicted of three separate violent felonies and then a fourth for unlawfully possessing firearms. But Congress, not this Court, sets national sentencing policy for violent crimes. Today's decision overrides Congress's policy judgment about the risk posed by serial violent felons who unlawfully possess firearms. And today's decision will have significant real-world consequences. After all, as the U. S. Sentencing Commission recently reported, there is a very high rate of violent crime recidivism for ACCA defendants released from federal prison. According to that Sentencing Commission report, 59% of ACCA defendants released between 2009 and 2011 were re-arrested within eight years of their release from federal prison, most commonly for assault and most commonly within 18 months of release. See Federal Armed Career Criminals: Prevalence, Patterns, and Pathways 43-45 (2021). There is no reason to believe that the would-be ACCA defendants who will receive a lighter sentence after the Court's decision today will produce significantly different recidivism{2021 U.S. LEXIS 90} statistics. Those alarming statistics cannot be ignored, and they portend some of the human costs of the Court's erroneous decision today.

23

That is to say nothing of the collateral review petitions that will likely inundate courts in the circuits that relied on *Voisine* to hold that ACCA covers reckless offenses. See n. 19, *supra*. To be clear, defendants who received an ACCA enhancement based on a reckless felony conviction may not necessarily prevail on collateral review. For example, many petitions may fall outside §2255's 1-year statute of limitations. But there can be little question that many such petitions will be filed.* * *

In sum, the text of ACCA's use-of-force clause encompasses reckless offenses, such as reckless assault and reckless homicide. Contrary to the plurality's conclusion today, the phrase ``against the person of another'' reflects a centuries-old term of art for classifying crimes and has zero to do with *mens rea*. Even setting aside that longstanding usage, the plurality's interpretation of the phrase ``use of physical force against the person of another'' fails as a matter of ordinary meaning and precedent. I respectfully dissent.

SCTHOT                                                    34

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**Footnotes**

1

See *United States* v. *Burris*, 920 F. 3d 942, 951 (CA5 2019); *United States* v. *Haight*, 892 F. 3d 1271, 1281, 436 U.S. App. D.C. 273 (CADC 2018); *United States* v. *Pam*, 867 F. 3d 1191, 1207-1208 (CA10 2017); *United States* v. *Fogg*, 836 F. 3d 951, 956 (CA8 2016).

2

See *United States* v. *Begay*, 934 F. 3d 1033, 1039 (CA9 2019); *United States* v. *Moss*, 920 F. 3d 752, 756 (CA11 2019), vacated pending reh'g en banc.

3

The difference between purpose and knowledge matters for certain ``classes of crimes,'' where ``heightened culpability has been thought to merit special attention.'' *United States* v. *Bailey*, 444 U. S. 394, 405, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980). The most typical examples are inchoate crimes (conspiracy or attempts) and accessory liability (aiding and abetting). There, a purposeful mental state may help separate criminal conduct from innocent behavior. See *ibid.*; *United States* v. *Falcone*, 109 F. 2d 579, 581 (CA2 1940) (L. Hand, J.); Model Penal Code, Comment 2, p. 234. We have no occasion to address those offenses, nor the relationship more generally between purpose and knowledge.

4

Some States recognize mental states (often called ``depraved heart'' or ``extreme recklessness'') between recklessness and knowledge. We have no occasion to address whether offenses with those mental states fall within the elements clause.

5

In similar manner, the examples that dictionaries give of the ``in contact with'' meaning of ``against'' all involve non-volitional conduct. See, *e.g.*, American Heritage Dictionary 23 (1981) (those same big ``waves dashing against the shore''); Webster's New International Dictionary, at 46 (``hail beats against the roof ''); Webster's Third New International Dictionary 39 (1981) (``the fighter was knocked back against the ropes''). By contrast, when the dictionaries discuss the ``in opposition to'' meaning, their examples turn volitional. See *id.*, at 39 (``a successful campaign against the enemy''); American Heritage Dictionary, at 23 (a ``struggle against fate'').

6

The dissent also goes through a complicated counting exercise about how different Justices have divided in this and two other cases, apparently to show how unfair it is that the dissent's view has not prevailed here. See *post,* at ___, n. 3, 210 L. Ed. 2d, at 87. But there is nothing particularly unusual about today's line-up. Four Justices think that the ``use'' phrase, as modified by the ``against'' phrase, in ACCA's elements clause excludes reckless conduct. One Justice thinks, consistent with his previously stated view, that the ``use'' phrase alone accomplishes that result. See *post,* at ___, 210 L. Ed. 2d, at 83 (Thomas, J., concurring in judgment). And that makes five to answer the question presented. Q: Does the elements clause exclude reckless conduct? A: Yes, it does.

7

The dissent would upend our consistent view of Congress's purpose by treating as ACCA predicates not just ``purposeful, violent, and aggressive'' crimes but the disregard-of-risk offenses we have found ``far removed.'' *Begay*, 553 U. S., at 145, 147, 128 S. Ct. 1581, 170 L. Ed. 2d 490. The ``line

SCTHOT                                              35

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

for criminal liability," the dissent argues, is generally drawn at recklessness, and so the Model Penal Code ``establishes recklessness as the default minimum *mens rea*." *Post*, at ___, ___, 210 L. Ed. 2d, at 93, 94. But we have never suggested that the threshold for criminal liability is the threshold for ACCA, or that ACCA is about offenders who meet ``minimum" requirements. To the contrary. As just noted, we have insisted on a higher threshold: ACCA predicates are the crimes ``typically committed by those whom one normally labels 'armed career criminals'"-whose very possession of a gun poses a ``special danger." *Begay*, 553 U. S., at 146, 128 S. Ct. 1581, 170 L. Ed. 2d 490.
8

The dissent-once again, contrary to the statute's design-would blur that distinction, on the ground that crimes like reckless driving can cause great harm. See *post*, at ___-___, 210 L. Ed. 2d, at 103-105. Of course they can. But in viewing that fact as controlling, the dissent runs into not just ACCA but pretty much all of sentencing law. That law almost invariably turns on mental state as well as harm. Consider the Tennessee statute giving rise to this case. Borden's reckless assault conviction carried a sentence of two to twelve years; but had he been convicted of purposeful or knowing assault, the sentencing range would have been three to fifteen years. Compare Tenn. Code Ann. §§39-13-102(a)(2), 40-35-111(b)(4), with §§39-13-102(a)(1), 40-35-111(b)(3). In imposing lesser penalties for recklessness, Tennessee-like the mine run of States with similar penalty schemes-is not suggesting that such offenses are ``benign." *Post*, at ___, 210 L. Ed. 2d, at 93. They are recognizing, though, that mental state matters to culpability-and more, that an act done recklessly often should not receive as harsh a punishment as the same act done purposefully or knowingly, even when the two cause the same harm. That approach is the one ACCA takes in reserving enhanced penalties for multiple instances of purposeful and knowing, but not reckless, conduct. The dissent would write a different statute, based on a different theory of criminal punishment. But the dissent's preferred approach is not the one Congress enacted into law. And the dissent does not get to tell Congress that, in writing the statute it wrote, it failed to enhance penalties for gun possession enough.
9

In one paragraph of its brief, the Government tries to erase this textual difference by invoking a sentence in *Voisine* that uses the word ``against." See Brief for United States 24. (The dissent does the same, if at greater length. See *post*, at ___-___, ___-___, 210 L. Ed. 2d, at 96-97, 100-101.) Recall that the domestic violence statute bars someone from owning a gun if he has been convicted of a misdemeanor that has, as an element, the ``use" of physical force ``committed by a current or former spouse, parent, or guardian of the victim" or by a person in another of three specified relations with the victim. §921(a)(33)(A); see *supra*, at ___-___, 210 L. Ed. 2d, at 71-72. Rather than echo that awkward construction, the Court used shorthand, describing the statute as applying to a person with a ``misdemeanor conviction for the 'use . . . of physical force' against a domestic relation." 579 U. S., at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 747. In the Government's view, that line shows that we ``treated the statute *as if* it contained a prepositional phrase similar to the ACCA's" (and still found it to include reckless conduct). Brief for United States 24. We think that a stretch. The locution shows only that sometimes we do not paraphrase complex statutory language as well as we might. (*Mea culpa*.) What matters in *Voisine* is not a one-line description, but a pages-long analysis of the statutory text-and that discussion gives no support to the Government. Rather than imply an ``against" clause, *Voisine* focused like a laser on the meaning of ``use"-because we understood the statute to say nothing else. See, *e.g.*, 579 U. S., at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 743 (``Nothing in the word 'use'-which is the only statutory language either party thinks relevant-indicates that §922(g)(9) applies exclusively to knowing or intentional domestic assaults."); *id.*, at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736, 744 (citing examples to show ``the ordinary meaning of the word 'use'"). ``[T]he language of an opinion," we have stated, ``is not always to be parsed as though we were dealing with language of a statute." *Reiter* v. *Sonotone Corp.*, 442 U.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

S. 330, 341, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979). And that is most obviously true when an opinion's language revises (for easier reading) the statute's own. Better to heed the statutory language proper.

1

The definition also covers any felony that ``is burglary, arson, or extortion'' or ``involves use of explosives.'' §**924**(e)(2)(B)(ii).

2

*Johnson* has already upended many statutes. *United States* v. *Davis*, 588 U. S. ___, 139 S. Ct. 2319, 204 L. Ed. 2d 757 (2019); *Sessions* v. *Dimaya*, 584 U. S. ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018); *Welch* v. *United States*, 578 U. S. 120, 136 S. Ct. 1257, 194 L. Ed. 2d 387 (2016) (making *Johnson* retroactive). And the parties agree that more are likely to follow.

3

Voting to affirm petitioner's sentence here would lead to a 5 to 4 judgment that petitioner's sentence is correct even though five Justices conclude that Tennessee reckless aggravated assault does not satisfy the elements clause. That kind of fractured reasoning would be difficult for lower courts to apply.

1

ACCA also includes serious drug offenses as qualifying predicates. 18 U. S. **C**. §**924**(e)(2)(A). That aspect of ACCA is not at issue here.

2

Tennessee's aggravated assault statute provides: ``A person commits aggravated assault who:

> ``(1) Intentionally or knowingly commits an assault as defined**{2021 U.S. LEXIS 44}** in §39-13-101 and:

> ``(A) Causes serious bodily injury to another; or

> ``(B) Uses or displays a deadly weapon; or

> ``(2) Recklessly commits an assault as defined in §39-13-101(a)(1), and:

> ``(A) Causes serious bodily injury to another; or

``(B) Uses or displays a deadly weapon.'' Tenn. Code Ann. §39-13-102 (2003).

3

Just to explain today's lineup: Four Justices form the plurality. Justice Thomas concurs in the judgment. He agrees with the plurality's result but not its reasoning, and concludes that the phrase ``use of physical force'' *alone* excludes reckless offenses such as reckless assault or reckless homicide. The Court reached a different conclusion in interpreting a similarly worded statute in *Voisine* v. *United States*, 579 U. S. 686, 136 S. Ct. 2272, 195 L. Ed. 2d 736 (2016). But Justice Thomas indicates that he will not follow that precedent in this case. (Importantly, unlike the plurality, Justice Thomas does not rely on the phrase ``against the person of another.'')

Justice Thomas further explains that reckless offenses *were* covered by ACCA under the residual clause. But that clause was declared unconstitutional in *Johnson* v. *United States*, 576 U. S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). Although Justice Thomas disagrees with *Johnson*, he indicates that he will today follow the Court's *Johnson* precedent, albeit not the *Voisine* precedent. So we find ourselves in an unusual situation. In *Voisine*, seven Justices agreed that the phrase ``use of physical force'' in a similarly worded statute covers reckless offenses. And eight Justices today accept that the phrase ``use of physical force'' covers reckless offenses. Moreover, five Justices today agree that ACCA's text, properly interpreted, would cover reckless offenses. And only four Justices conclude that the phrase ``against the person of another'' addresses *mens rea* and excludes reckless offenses. Yet despite all of that, Borden prevails, and reckless offenses are now *excluded*

SCTHOT                                   37

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

from ACCA's scope. That outcome is anomalous.

4

See Ala. Code, Tit. 13A, chs. 6, 7 (2015); Alaska Stat., Tit. 11, chs. 41, 46 (2018); Ark. Code Ann., Tit. 5, subds. 2, 4 (1983); Cal. Penal Code Ann., pt. 1, Tits. 8, 13 (West Cum. Supp. 2021); Colo. Rev. Stat., Tit. 18, Arts. 3, 4 (2019); Del. Code Ann., Tit. 11, pt. I, ch. 5, subchs. II, III (2021); Ga. Code Ann., Tit. 16, chs. 5, 7 (2019); Haw. Rev. Stat., Tit. 37, chs. 707, 708 (2014); Ill. Comp. Stat., ch. 720, Act 5, Tit. III, pts. B, **C** (West 2018); Ind. Code, Tit. 35, Arts. 42, 43 (2020); Kan. Stat. Ann., ch. 21, Arts. 54, 58 (2020); La. Rev. Stat. Ann., Tit. 14, ch. 1, pts. 2, 3 (2016); Me. Rev. Stat. Ann., Tit. 17-A, pt. 2, ch. 9 (2006); Md. Crim. Law Code Ann., Tits. 3, 6 (2012); Mass. Gen. Laws, pt. IV, Tit. 1, chs. 265, 266 (2017); Minn. Stat., ch. 609 (2020); Miss. Code Ann., Tit. 97, chs. 3, 17 (2020); Mo. Rev. Stat., Tit. 38, ch. 565 (2016); Mont. Code Ann., Tit. 45, chs. 5, 6 (2020); Neb. Rev. Stat., ch. 28, Arts. 3, 5 (2021); Nev. Rev. Stat., Tit. 15, chs. 200, 205 (2017); N. J. Stat. Ann., Tit. 2C, subd. 2, pts. 1, 2 (2019); N. Y. Penal Law Ann., ch. 40, pt. 3, Tits. H, I (2009); N. **C**. Gen. Stat. Ann., ch. 14, subchs. III, V (2019); N. D. Cent. Code Ann., Tit. 12, pts. V, VI (2012); Okla. Stat., Tit. 21, pts. III, VII (2011); Ore. Rev. Stat., Tit. 16, chs. 163, 164 (2019); S. **C**. Code Ann., Tit. 16, chs. 3, 11 (2015); Tenn. Code Ann., Tit. 39, chs. 13, 14 (2020); Tex. Penal Code Ann., Tits. 5, 7 (West 2021); Utah Code Ann., Tit. 76, chs. 5, 6 (2017); Va. Code Ann., Tit. 18.2, chs. 4, 5 (2014); W. Va. Code Ann., ch. 61, Arts. 2, 3 (2020); Wis. Stat., chs. 940, 943 (2016); Wyo. Stat. Ann., Tit. 6, chs. 2, 3 (2019).

5

See Ala. Code, Tit. 13A, chs. 6, 7 (1982); Alaska Stat., Tit. 11, chs. 41, 46 (1983); Ark. Code Ann., Tit. 41, Arts. 5, 6 (Cum. Supp. 1985); Cal. Penal Code Ann., pt. 1, Tits. 8, 13 (1984); Colo. Rev. Stat., Tit. 18, Arts. 3, 4 (1986); Del. Code Ann., Tit. 11, pt. 1, ch. 5, subchs. II, III (1979); Ga. Code Ann., Tit. 16, chs. 5, 7 (1984); Haw. Rev. Stat., Tit. 37, chs. 707, 708 (1985); Ill. Ann. Stat., Tit. III, pts. B, **C** (West 1980); Ind. Stat. Ann., Tit. 35, Arts. 42, 43 (1985); Kan. Stat. Ann., ch. 21, Arts. 34, 37 (1981); La. Rev. Stat. Ann., Tit. 14, ch. 1, pts. 2, 3 (West 1986); Me. Rev. Stat. Ann., Tit. 17-A, ch. 9 (1983); Mass. Gen. Laws, chs. 265, 266 (1986); Minn. Stat., ch. 609 (1986); Miss. Code Ann., Tit. 97, chs. 3, 17 (1973); Mo. Rev. Stat., Tit. 38, ch. 565 (1986); Mont. Code Ann., Tit. 45, chs. 5, 6 (1985); Neb. Rev. Stat., ch. 28, Arts. 3, 5 (1979); Nev. Rev. Stat., Tit. 15, chs. 200, 205 (1986); N. J. Stat. Ann., Tit. 2C, subd. 2, pts. 1, 2 (1982); N. Y. Penal Law Ann., ch. 40, pt. 3, Tits. H, I (West 1975); N. **C**. Gen. Stat. Ann., ch. 14, subchs. III, V (1981); Okla. Stat., Tit. 21, pts. III, VII (1983); Ore. Rev. Stat., Tit. 16, chs. 163, 164 (1985); Pa. Stat. Ann., Tit. 18, pt. II, Arts. B, **C** (Purdon 1983); S. **C**. Code Ann., Tit. 16, chs. 3, 11 (1985); Tex. Penal Code Ann., Tits. 5, 7 (West 1984); Utah Code Ann., Tit. 76, chs. 5, 6 (Cum. Supp. 1986); Va. Code Ann., Tit. 18.2, chs. 4, 5 (1982); W. Va. Code Ann., ch. 61, Arts. 2, 3 (1984); Wis. Stat., chs. 940, 943 (1982); Wyo. Stat. Ann., Tit. 6, chs. 2, 3 (1983).

6

The words ``of another'' in the use-of-force clause exclude crimes involving harm to oneself, as opposed to others, and reflect common phraseology in state criminal statutes covering offenses against the person, such as assault. See, *e.g.,* Tenn. Code Ann. §39-13-102 (aggravated assault is an assault that, among other things, ``[**c**]auses serious bodily injury to another'').

7

That understanding of offenses against the person and offenses against property also helps make more sense of the now-defunct residual clause. See *Johnson,* 576 U. S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569. The residual clause was tacked onto the clause enumerating the covered offenses against property (burglary, arson, extortion, and use of explosives). The residual clause covered crimes that ``otherwise involv[e] conduct that presents a serious potential risk of physical injury to another.'' 18 U. S. **C**. §§924(e)(2)(B)(ii). When still extant, the residual clause could have been read in one of two ways. On one reading, given its placement with offenses against property, the residual

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

clause could have been read to encompass other physically risky offenses against property similar to burglary, arson, extortion, and use of explosives. A second possible reading (and the common reading when the residual clause was still in effect) was that the residual clause also covered some offenses against the person, not just offenses against property. But even assuming that second reading was correct, and that there was potential overlap between the use-of-force clause and the residual clause, the solution was not to read the use-of-force clause contrary to its terms. No one disputes that the use-of-force clause generally covers assault and homicide, among other crimes. The residual clause was merely residual-a catchall. Therefore, as relevant here, even if assault and homicide could theoretically have fit under the old residual clause, that would not negate coverage of assault and homicide under the use-of-force clause.

8

The plurality says that reading ACCA's ``against'' phrase to refer to the category of covered offenses would leave the broader language in statutes like §16(a) ``without any function.'' *Ante,* at 12. That is incorrect. The ``against'' phrase in statutes like §16(a) clarifies that the statutory definition encompasses *both* of those traditional categories of offenses: offenses against the person *and* offenses against property.

9

Indeed, a study published in 2011 concluded that individuals had difficulty ``differentiat[ing] between knowing and reckless conduct, even with the benefit of jury instructions.'' Shen, et al., Sorting Guilty Minds, 86 N. Y. U. L. Rev. 1306, 1309 (2011). The authors suggested possibly ``abandoning'' the distinction because of the inability of most people to distinguish the two categories with respect to particular fact patterns. *Ibid.*

10

If a state offense labeled as assault did not require that the defendant cause sufficient contact with or injury or death to another person, such an offense presumably would not involve a ``use of physical force'' under ACCA. Of course, it could still constitute a violent felony under ACCA if the offense entailed the threatened or attempted use of physical force.

11

See, *e.g.,* Alaska Stat. §11.81.610(b) (1983); Ark. Stat. §41-204(2) (1977); Del. Code Ann., Tit. 11, §251(b) (1979); Haw. Rev. Stat. §702-204 (1985); 2 Ill. Rev. Stat., ch. 38, ¶¶4-3(a), 4-6 (1985); Kan. Stat. Ann. §21-5202(a) (2011); N. D. Cent. Code Ann., §12.1-02-02(1)(e), (2) (1985); Ohio Rev. Code Ann. §2901.21(B) (Lexis 2014); Pa. Stat. Ann., Tit. 18, §302 (Purdon 1983); Tenn. Code Ann. §39-11-301(<u>c</u>) (Cum. Supp. 1990); Tex. Penal Code Ann. §6.02(<u>c</u>) (West 1974); Utah Code Ann. §76-2-102 (Cum. Supp. 1989).

12

ACCA's statutory history further supports that conclusion. In 1984, in the original version of ACCA, Congress included only one offense against the person: robbery. 18 U. S. <u>C</u>. App. §1202(a) (1982 ed., Supp. II). ACCA expressly defined robbery as a felony that involves the ``taking of the property of another from the person or presence of another by force or violence.'' §1202(<u>c</u>)(8). At the time, as had been true at common law, see 4 W. Blackstone, Commentaries on the Laws of England 241-242 (1769), many state statutes defined robbery in a way that did not require that the defendant have intent or knowledge that his conduct would cause bodily injury. In 1986, when Congress expanded the number of violent offenses against the person so as to include crimes such as assault, rape, and homicide in addition to robbery, Congress did not suggest that it suddenly wanted to require intent or knowledge for robbery offenses. If Congress understood reckless robbery as a taking by force under the 1984 language, it follows that Congress would naturally also have understood reckless robbery as the use of physical force against the person of another under the 1986 statute. And there is no good reason (textual or otherwise) to think that Congress wanted to include reckless robbery but to exclude reckless assault and reckless homicide from the use-of-force clause.

SCTHOT                                        39

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

13

The plurality also equates "in opposition to" with "targeting." *Ante,* at \_\_\_-\_\_\_, 210 L. Ed. 2d, at 72-74. But the plurality cites no dictionaries or similarly authoritative support for that subtle move in its analysis. The plurality's equating of "in opposition to" with "targeting" is seemingly woven out of whole cloth.

14

Indeed, the plurality eventually seems to acknowledge that point. After dedicating pages to asserting that the ordinary meaning of the phrase "use of physical force against the person of another" *necessarily* requires conduct that is intentionally or knowingly directed at another person, the plurality concedes that if the word "recklessly" appeared in ACCA's use-of-force clause, then that clause would in fact "cover reckless offenses." *Ante,* at \_\_\_, 210 L. Ed. 2d, at 77. That is a surprising acknowledgment. It is hard to square with the plurality's suggestion that it is not possible for one to *recklessly* use physical force against another person. After all, if the plurality's ordinary meaning argument were correct, adding the word "recklessly" to the front of the use-of-force clause would seem to render that clause nonsensical. My reading of the statute avoids that incongruity in the plurality's interpretation by recognizing that the phrase "use of physical force against the person of another" encompasses reckless offenses.

15

For just a few examples, see *Almonte* v. *Hines,* 2020 U.S. Dist. LEXIS 43205, 2020 WL 1164657, *2 (SDNY, Mar. 11, 2020) ("Plaintiff had not proved by a preponderance of the evidence that Hines intentionally or recklessly used excessive force against Almonte during the arrest"); *Evanston Ins. Co.* v. *Break I, Inc.,* 2019 U.S. Dist. LEXIS 113109, 2019 WL 2995507, *7 (ND Ala., July 9, 2019) ("The security guard intentionally or recklessly used force against a person without her consent by shooting a gun at the male patron and hitting Ms. Beasley"); *O'Hara* v. *New York,* 570 Fed. Appx. 21, 24 (CA2 2014) ("[A] jury could have reasonably found" "that McAvoy intentionally or recklessly used excessive force against O'Hara"); *Whitlock* v. *Jackson,* 754 F. Supp. 1394, 1400 (SD Ind. 1991) ("[T]he due process claim required a finding that the defendants 'unreasonably and recklessly used excessive force' against Gaisor"); *State* v. *Tyson,* 2011-Ohio-4981, 2011 WL 4488955, *6 (Ohio App., Sept. 29, 2011) ("[T]he State was required to prove that appellant recklessly used or threatened the immediate use of force against Mr. Carter"); *State* v. *Adams,* 2010-Ohio-1942, 2010 WL 1757931, *2 (Ohio App., May 3, 2010) ("[T]he State was required to prove that appellant 'recklessly used or threatened the immediate use of force' against Stoops"); *Cook* v. *State,* 2005-0475, p. 3 (La. App. 1 Cir., 2/10/06), 928 So. 2d 589, 591 ("The jury found that Arton did not intentionally or recklessly use excessive force against Cook"); *David* v. *State,* 123 P. 3d 1099, 1103 (Alaska App. 2005) ("[A] jury could not convict him of second-degree murder without also finding that he had used reckless or criminally negligent force against the victim").

16

The plurality asserts that my two alternative and independent interpretations of the use-of-force clause are "mutually inconsistent." *Ante,* at \_\_\_, 210 L. Ed. 2d, at 75. But the point of alternative arguments is to explain that there may be two different ways of looking at an issue (which may differ from one another in certain respects), but that both ways of looking at the issue lead to the same bottom line. So it is here.

17

Section 921(a)(33)(A) provides in relevant part: "[T]he term 'misdemeanor crime of domestic violence' means an offense that-

"(i) is a misdemeanor under Federal, State, or Tribal law; and

"(ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has

**SCTHOT**                                    **40**

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim." (Footnote omitted.)

18

To be sure, to avoid a Second Amendment problem, the defendant in *Voisine* also argued that the statute at issue there should not be interpreted to prohibit the possession of firearms by someone who had committed a single reckless *misdemeanor* offense. See 579 U. S., at ___, n. 6, 136 S. Ct. 2272, 195 L. Ed. 2d 736); see also *id.*, at ___, 136 S. Ct. 2272, 195 L. Ed. 2d 736 (Thomas, J., dissenting). But there is no such constitutional issue lurking in this case. This case involves a sentencing enhancement, not primary liability, and applies only when the defendant has been convicted of three prior ACCA violent felonies committed on different occasions and has then committed a fourth felony by unlawfully possessing firearms.

19

See, *e.g.*, *United States* v. *Burris*, 920 F. 3d 942, 951 (CA5 2019); *United States* v. *Haight*, 892 F. 3d 1271, 1280-1281, 436 U.S. App. D.C. 273 (CADC 2018); *United States* v. *Pam*, 867 F. 3d 1191, 1207-1208 (CA10 2017); *United States* v. *Fogg*, 836 F. 3d 951, 956 (CA8 2016).

20

To reiterate, Justice Thomas declines to follow *Voisine* and, in doing so, provides the fifth vote for the Court's decision today.

21

As the plurality notes, today's decision should not be construed to express any view on the application of the use-of-force clause to crimes requiring a mental state of *extreme* recklessness. See *ante*, at ___, n. 4, 210 L. Ed. 2d, at 72. In my view, crimes committed with extreme recklessness, such as depraved-heart murder, should obviously still qualify as predicate offenses under ACCA, even after today's decision. And indeed, counsel for Borden forthrightly acknowledged at oral argument that extreme recklessness crimes, such as depraved-heart murder, can still suffice under ACCA. See Tr. of Oral Arg. 14-15, 19. But the plurality, for some reason, refuses to even acknowledge that depraved-heart murder is a violent felony. The plurality's reticence is telling, and that reticence shows just how far the plurality's interpretation of this statute has strayed from the statutory text and basic common sense.

22

See Me. Rev. Stat. Ann., Tit. 17-A, §208 (Cum. Supp. 2021) (aggravated assault); R. I. Gen. Laws §11-5-2 (Supp. 2020) (felony assault); Utah Code Ann. §76-5-103 (Supp. 2019) (aggravated assault); see also *United States* v. *Rose*, 896 F. 3d 104, 114 (CA1 2018) (although Rhode Island case law is inconclusive, ``it appears possible'' that ordinary recklessness suffices for felony assault under R. I. Gen. Law §11-5-2); *State* v. *Seach*, 2021 UT App 22, ¶18, 483 P. 3d 1265, 1271 (Utah Code Ann. §76-5-103 requires the State to prove that a defendant acted ``intentionally, knowingly, or recklessly'').

23

That is to say nothing of the collateral review petitions that will likely inundate courts in the circuits that relied on *Voisine* to hold that ACCA covers reckless offenses. See n. 19, *supra*. To be clear, defendants who received an ACCA enhancement based on a reckless felony conviction may not necessarily prevail on collateral review. For example, many petitions may fall outside §2255's 1-year statute of limitations. But there can be little question that many such petitions will be filed.

SCTHOT                                    **41**

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

United States v. Keitt, 21 F.4th 67 (2d Cir. 2021). The Second Circuit affirmed the district court's denial of the defendant's motion for compassionate release under 18 U.S.C. Section 3582 (c) (1) (A), holding, among other things, that when a district court denies a motion for compassionate release on the sole ground that the 18 U.S.C. Section 3553 (a) factors weigh against a sentence reduction, it does not need to determine whether extraordinary and compelling reasons exist that might otherwise justify a sentence reduction.

United States v. Capers, 20 F.4th 105 (2d Cir. 2021). Among other things, the Second Circuit vacated the defendant's conviction for "murder through the use of a firearm during and in relation to a crime of violence or a narcotics offense," in violation of 18 U.S.C. Section 924 (j). The court found that the district court had erroneously instructed the jury that the defendant's RICO conspiracy count was a crime of violence on which a section 924 (j) violation could be predicated, explaining that RICO conspiracy does not constitute such a crime of violence because it does not categorically have as an element the use, attempted use, or threatened use of physical force.

United States v. Nasir, 17 F.4th 459 (3d Cir. 2021). Following remand from the Supreme Court after a grant of the government's writ of certiorari on a Rehaif v. United States, 139 S. Ct. 2191 (2019) issue, the Third Circuit affirmed the defendant's convictions but reiterated that the career offender enhancement was improperly applied because it was based in part on a prior conviction for an inchoate offense. Five judges joined the concurring opinion authored by Judge Bibas in the original case, which asserted the importance of the rule of lenity in statutory construction and criticized the deference given to their commentary in the Guidelines Manual.

United States v. Quinnones, 16 F.4th 414 (3d Cir. 2021). The Third Circuit vacated the defendant's sentence under the career offender guideline, Section 4B1.1, and remanded for resentencing. Applying the categorical approach, the court held that assault by a prisoner under a provision of a Pennsylvania statute that criminalizes " 'caus[ing] another to come into contact with [bodily] fluid' when the prisoner knew or should have known the fluid came from someone with a communicable disease" is not a "crime of violence." The court explained that a defendant could violate this provision by "spitting or expelling fluid," an action that, in its least culpable form, does not involve the use of force because it is not capable of causing physical pain or injury. Further, the court held that the assault provision lacks the mens rea element required to constitute a "crime of violence" because a defendant could violate the provision with only a negligent state of mind as to whether the fluid came from an infected person.

United States v. McKinnie, No. 19-4888, 2021 WL 6110290 (4th Cir. Dec. 27, 2021). The Fourth Circuit affirmed the defendant's above-guidelines sentence for distribution of fentanyl, holding, as a matter of first impression and among other things, that an upward variance under 18 U.S.C. Section 3553 (a) for a fentanyl buyer's death does not require a finding that the defendant's drugs were the but for cause of the death. Noting that the text of section 3553 (a) has no but-for causation requirement, the court rejected the defendant's attempts to read in such a requirement based on the text of a Chapter Two enhancement and a separate statute.

United States v. Lewis, 18 F.4th 743 (4th Cir. 2021). The Fourth Circuit vacated the defendant's sentence and remanded for resentencing, holding that the district court erroneously applied a "bodily injury" sentencing enhancement under Section 2B3.1 (b) (3) (A). Noting the guidelines' definition of "bodily injury" as "any significant injury" and the court's precedent, the court explained that a "significant injury" requires showing that a victim's injuries lasted for a meaningful period and were more than trivial. The court held that the district court, which stated that merely getting an injury examined at a hospital satisfied the enhancement, applied the incorrect legal standard and that this error was not harmless.

United States v. Muhammad, 16 F.4th 126 (4th Cir. 2021). The Fourth Circuit vacated the district court's dismissal of the defendant's motion seeking compassionate release under 18 U.S.C. Section 3582 (c) (1) (A), making two holdings. First, the court held that section 3582 (c) (1) (A)'s threshold requirement for defendant-filed motions is non-jurisdictional and thus subject to waiver or forfeiture, joining the Second, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits. Second, the court joined the Third, Fifth, and Sixth Circuits and held that the threshold requirement "outlines two routes [for satisfaction] one of which does not require exhaustion of administrative remedies."

United States v. Okulaja, No. 20-20101, 2021 WL 6111712 (5th Cir. Dec. 27, 2021). Among other things, the Fifth Circuit

> ## 204 LED2D 757, _ US _  UNITED STATES v. DAVIS

### UNITED STATES, Petitioner
*vs.*
### MAURICE LAMONT DAVIS AND ANDRE LEVON GLOVER

## 588 US ___, 139 S Ct ___, 204 L Ed 2d 757, 2019 US LEXIS 4210

### [No. 18-431]

### Argued April 17, 2019.

### Decided June 24, 2019.

### DECISION

18 U.S.C.S. § 924(c)(3)(B) was held as unconstitutionally vague as it was impossible to say that Congress intended statute to impose additional punishment or that law gave defendants fair warning that mandatory penalties of § 924(c) would apply to their conduct.

*Prior history:* ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT, 903 F.3d 483, 2018 U.S. App. LEXIS 25486

### SUMMARY

*Overview:* HOLDINGS: [1]-18 U.S.C.S. § 924(c)(3)(B) commanded the categorical approach because legislatures knew how to write risk-based statutes that required a case-specific analysis, and § 924(c)(3)(B) was not a statute like that. The case-specific reading would cause the penalties to apply to conduct they had not previously been understood to reach: categorically nonviolent felonies committed in violent ways; [2]-The term ``offense'' carried the same ``generic'' meaning throughout the statute since it spoke of an offense that, ``by its nature,'' involved a certain type of risk; [3]-18 U.S.C.S. § 924(c)(3)(B) was unconstitutionally vague since even if it was possible to read the statute to impose additional punishment, it was impossible to say that Congress intended that result or that the law gave defendants fair warning that the mandatory penalties of § 924(c) would apply to their conduct.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280055

*Outcome:* Judgment affirmed in part, vacated in part, and remanded for further proceedings; 5-4 decision; 1 dissent.

## RESEARCH REFERENCES

18 U.S.C.S. § 924

26 Moore's Federal Practice § 632.20 (Matthew Bender 3d ed.)

L Ed Digest, Statutes §§ 17, 18.9

L Ed Index, Weapons and Firearms

## ANNOTATION REFERENCES

Supreme Court's views as to the ``rule of lenity'' in the construction of criminal statutes. 62 L. Ed. 2d 827.

Indefiniteness of language as affecting validity of criminal legislation or judicial definition of common-law crime-Supreme Court cases. 96 L. Ed. 374, 16 L. Ed. 2d 1231.

## HEADNOTES

Classified to U.S. Supreme Court Digest, Lawyers' Edition

**Constitutionality - vagueness**

### *L Ed Digest: Statutes § 17*

1. In our constitutional order, a vague law is no law at all. Only the people's elected representatives in Congress have the power to write new federal criminal laws. And when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them. Vague laws transgress both of those constitutional requirements. They hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct. When Congress passes a vague law, the role of courts under the Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again.

**Use in connection with other crimes**

2LED2D                                                        2

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

### *L Ed Digest: Weapons and Firearms § 2*

2. 18 U.S.C.S. § 924(c) threatens long prison sentences for anyone who uses a firearm in connection with certain other federal crimes. The statute's residual clause points to those felonies that by their nature, involve a substantial risk that physical force against the person or property of another may be used in the course of committing the offense. 18 U.S.C.S. § 924(c)(3)(B). (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Use during and in relation to other crimes**

### *L Ed Digest: Weapons and Firearms § 2*

3. 18 U.S.C.S. § 924(c) authorizes heightened criminal penalties for using or carrying a firearm during and in relation to or possessing a firearm in furtherance of, any federal crime of violence or drug trafficking crime. 18 U.S.C.S. § 924(c)(1)(A). The statute proceeds to define the term ``crime of violence'' in two subparts, the first known as the elements clause, and the second the residual clause. According to § 924(c)(3), a crime of violence is an offense that is a felony and (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense. Violators of § 924(c) face a mandatory minimum sentence of five years in prison, over and above any sentence they receive for the underlying crime of violence or drug trafficking crime. The minimum sentence rises to 7 years if the defendant brandishes the firearm and 10 years if he discharges it. Certain types of weapons also trigger enhanced penalties, for example, a defendant who uses a short-barreled shotgun faces a minimum sentence of 10 years. And repeat violations of § 924(c) carry a minimum sentence of 25 years. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Due process - vague laws**

### *L Ed Digest: Statutes § 17*

4. The doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers. Vague laws contravene the first essential of due process of law that statutes must give people of common intelligence fair notice of what the law demands of them. Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect. Only the people's elected representatives in the legislature are authorized to make an act a crime. Vague statutes threaten to hand responsibility

2LED2D                                                                     3

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Sentencing**

### *L Ed Digest: Criminal Law § 69*

5. The imposition of criminal punishment can't be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined ordinary case. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Use - offense - retained meaning**

### *L Ed Digest: Statutes § 103.5; Weapons and Firearms § 2*

6. The statutory text of 18 U.S.C.S. § 924(c)(3)(B) commands the categorical approach. Consider the word ``offense." In ordinary speech, this word can carry at least two possible meanings. It can refer to a generic crime, say, the crime of fraud or theft in general, or it can refer to the specific acts in which an offender engaged on a specific occasion. But the word ``offense" appears just once in § 924(c)(3), in the statute's prefatory language. In connection with the elements clause, the term ``offense" carries the first, ``generic" meaning. So reading this statute most naturally, it would be expected ``offense" retains that same meaning in connection with the residual clause. After all, in all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Use - nature of offense - construction**

### *L Ed Digest: Statutes § 103.5; Weapons and Firearms § 2*

7. The language of the residual clause itself reinforces the conclusion that the term ``offense" carries the same ``generic" meaning throughout the statute. 18 U.S.C.S. § 924(c)(3)(B), just like 18 U.S.C.S. § 16(b), speaks of an offense that, by its nature, involves a certain type of risk. And that would be an exceedingly strange way of referring to the circumstances of a specific offender's conduct. The ``nature" of a thing typically denotes its normal and characteristic quality, or its basic or inherent features. So in plain English, when the courts speak of the nature of an offense, they are talking about what an offense normally or ``ordinarily" entails, not what happened to occur on one occasion. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Use - nature of offense**

2LED2D                                              4

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

### *L Ed Digest: Weapons and Firearms § 2*

8. Even without the words ``by its nature,'' nothing in 18 U.S.C.S. § 924(c)(3)(B) remotely suggests that courts are allowed to consider character evidence, a type of evidence usually off-limits during the guilt phase of a criminal trial. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Same language**

### *L Ed Digest: Statutes § 134*

9. The language of 18 U.S.C.S. § 924(c)(3)(B) is almost identical to the language of 18 U.S.C.S. § 16(b), which mandates a categorical approach. And the courts normally presume that the same language in related statutes carries a consistent meaning. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Same command**

### *L Ed Digest: Statutes § 134*

10. 18 U.S.C.S. § 924(c)(3)(B) carries the same categorical-approach command as 18 U.S.C.S. § 16(b).

**Statutory construction**

### *L Ed Digest: Statutes § 128*

11. Usually when statutory language is obviously transplanted from other legislation, the court has reason to think it brings the old soil with it. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Upholding validity - avoiding constitutional doubt**

### *L Ed Digest: Statutes § 106, 107*

12. The presumption of constitutionality holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional, and it is distinct from the more modern (and more debated) constitutional doubt canon, which suggests courts should construe ambiguous statutes to avoid the need even to address serious questions about their

2LED2D                                                5

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

constitutionality. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Due process - conduct not clearly proscribed**

### L Ed Digest: Statutes § 18

13. Respect for due process and the separation of powers suggests a court may not, in order to save Congress the trouble of having to write a new law, construe a criminal statute to penalize conduct it does not clearly proscribe. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Lenity - ambiguity - criminal law**

### L Ed Digest: Statutes § 18, 188

14. The rule of lenity teaches that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor. That rule is perhaps not much less old than the task of statutory construction itself. And much like the vagueness doctrine, it is founded on the tenderness of the law for the rights of individuals to fair notice of the law and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. Applying constitutional avoidance to narrow a criminal statute accords with the rule of lenity. By contrast, using the avoidance canon instead to adopt a more expansive reading of a criminal statute would place these traditionally sympathetic doctrines at war with one another. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Use - analysis**

### L Ed Digest: Weapons and Firearms § 2

15. Legislatures know how to write risk-based statutes that require a case-specific analysis, and 18 U.S.C.S. § 924(c)(3)(B) is not a statute like that. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Use - residual and elements clauses**

### L Ed Digest: Weapons and Firearms § 2

16. The residual clause, 18 U.S.C.S. § 924(c)(3)(B), read categorically, sweeps more broadly than the elements clause, § 924(c)(3)(A), potentially reaching offenses, like burglary, that do not have violence as an element but that arguably create a substantial risk of violence. (Gorsuch, J.,

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Invalid conviction - vacation of sentence**

### *L Ed Digest: Criminal Law § 74*

17. When a defendant's 18 U.S.C.S. § 924(c) conviction is invalidated, courts of appeals ``routinely'' vacate the defendant's entire sentence on all counts so that the district court may increase the sentences for any remaining counts if such an increase is warranted. (Gorsuch, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**Firearms - residual clause - vagueness**

### *L Ed Digest: Statutes § 18.9*

18. 18 U.S.C.S. § 924(c)(3)(B) is unconstitutionally vague.

## SYLLABUS

Respondents Maurice Davis and Andre Glover were charged with multiple counts of Hobbs Act robbery and one count of conspiracy to commit Hobbs Act robbery. They were also charged under 18 U.S.C. § 924(c), which authorizes heightened criminal penalties for using, carrying, or possessing a firearm in connection with any federal ``crime of violence or drug trafficking crime.'' § 924(c)(1)(A). ``Crime of violence'' is defined in two subparts: the elements clause, § 924(c)(3)(A), and the residual clause, § 924(c)(3)(B). The residual clause in turn defines a ``crime of violence'' as a felony ``that by its nature, involves a substantial risk that **<*pg. 762>** physical force against the person or property of another may be used in the course of committing the offense.'' Ibid. A jury convicted the men on most of the underlying charges and on two separate § 924(c) charges for brandishing a firearm in connection with their crimes. The Fifth Circuit initially rejected their argument that § 924(c)'s residual clause is unconstitutionally vague, but on remand in light of Sessions v. Dimaya, 584 U.S. ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549, the court reversed course and held § 924(c)(3)(B) unconstitutional. It then held that Mr. Davis's and Mr. Glover's convictions on the § 924(c) count charging robbery as the predicate crime of violence could be sustained under the elements clause, but that the other count-which charged conspiracy as a predicate crime of violence-could not be upheld because it depended on the residual clause.

*Held:*

Section 924(c)(3)(B) is unconstitutionally vague. Pp. ___ - ___, 204 L. Ed. 2d, at 766-778.

2LED2D                                       7

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(a) In our constitutional order, a vague law is no law at all. The vagueness doctrine rests on the twin constitutional pillars of due process and separation of powers. This Court has recently applied the doctrine in two cases involving statutes that bear more than a passing resemblance to § 924(c)(3)(B)'s residual clause-Johnson v. United States, 576 U.S. ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569, which addressed the residual clause of the Armed Career Criminal Act (ACCA), and Sessions v. Dimaya, which addressed the residual clause of 18 U.S.C. § 16. The residual clause in each case required judges to use a ``categorical approach'' to determine whether an offense qualified as a violent felony or crime of violence. Judges had to disregard how the defendant actually committed the offense and instead imagine the degree of risk that would attend the idealized `` 'ordinary case' '' of the offense. Johnson, 576 U.S., at ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569. The Court held in each case that the imposition of criminal punishments cannot be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined ``ordinary case.'' The government and lower courts have long understood § 924(c)(3)(B) to require the same categorical approach. Now, the government asks this Court to abandon the traditional categorical approach and hold that the statute commands a case-specific approach that would look at the defendant's actual conduct in the predicate crime. The government's case-specific approach would avoid the vagueness problems that doomed the statutes in Johnson and Dimaya and would not yield to the same practical and Sixth Amendment complications that a case-specific approach under the ACCA and § 16 would, but this approach finds no support in § 924(c)'s text, context, and history. Pp. ___ - ___, 204 L. Ed. 2d, at 766-768.

(b) This Court has already read the nearly identical language of § 16(b) to mandate a categorical approach. See Leocal v. Ashcroft, 543 U.S. 1, 7, 125 S. Ct. 377, 160 L. Ed. 2d 271. And what is true of § 16(b) seems at least as true of § 924(c)(3)(B). The government claims that the singular term ``offense'' carries the ``generic'' meaning in connection with the elements clause but a ``specific act'' meaning in connection with the residual clause, but nothing in § 924(c)(3)(B) rebuts <*pg. 763> the presumption that the single term ``offense'' bears a consistent meaning. This reading is reinforced by the language of the residual clause itself, which speaks of an offense that, ``by its nature,'' involves a certain type of risk. Pp. ___ - ___, 204 L. Ed. 2d, at 768-770.

(c) The categorical reading is also reinforced by § 924(c)(3)(B)'s role in the broader context of the federal criminal code. Dozens of federal statutes use the phrase ``crime of violence'' to refer to presently charged conduct. Some cross-reference § 924(c)(3)'s definition, while others are governed by the virtually identical definition in § 16. The choice appears completely random. To hold that § 16(b) requires the categorical approach while § 924(c)(3)(B) requires the case-specific approach would make a hash of the federal criminal code. Pp. ___ - ___, 204 L. Ed. 2d, at 770-771.

(d) Section 924(c)(3)(B)'s history provides still further evidence that it carries the same

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

categorical-approach command as § 16(b). When Congress enacted the definition of ``crime of violence'' in § 16 in 1984, it also employed the term in numerous places in the Act, including § 924(c). The two statutes, thus, were originally designed to be read together. And when Congress added a definition of ``crime of violence'' to § 924(c) in 1986, it copied the definition from § 16 without making any material changes to the language of the residual clause, which would have been a bizarre way of suggesting that the two clauses should bear drastically different meanings. Moreover, § 924(c) originally prohibited the use of a firearm in connection with any federal felony, before Congress narrowed § 924(c) in 1984 by limiting its predicate offenses to ``crimes of violence.'' The case-specific reading would go a long way toward nullifying that limitation and restoring the statute's original breadth. Pp. ___ - ___, 204 L. Ed. 2d, at 771-773.

(e) Relying on the canon of constitutional avoidance, the government insists that if the case-specific approach does not represent the best reading of the statute, it is nevertheless the Court's duty to adopt any ``fairly possible'' reading to save the statute from being unconstitutional. But it is doubtful the canon could play a proper role in this case even if the government's reading were ``possible.'' This Court has sometimes adopted the narrower construction of a criminal statute to avoid having to hold it unconstitutional if it were construed more broadly, but it has not invoked the canon to expand the reach of a criminal statute in order to save it. To do so would risk offending the very same due process and separation of powers principles on which the vagueness doctrine itself rests and would sit uneasily with the rule of lenity's teaching that ambiguities about a criminal statute's breadth should be resolved in the defendant's favor. Pp. ___ - ___, 204 L. Ed. 2d, at 773-775.

903 F.3d 483, affirmed in part, vacated in part, and remanded.

Gorsuch, J., delivered the opinion of the Court, in which Ginsburg, Breyer, Sotomayor, and Kagan, JJ., joined. Kavanaugh, J., filed a dissenting opinion, in which Thomas and Alito, JJ., joined, and in which Roberts, C. J., joined as to all but Part II-C.

### APPEARANCES OF COUNSEL ARGUING CASE

*Eric J. Feigin* argued the cause for petitioner.

*Brandon E. Beck* argued the cause for respondents.

### OPINION<*pg. 764>

Justice *Gorsuch* delivered the opinion of the Court.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

**[1]** In our constitutional order, a vague law is no law at all. Only the people's elected representatives in Congress have the power to write new federal criminal laws. And when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them. Vague laws transgress both of those constitutional requirements. They hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct. When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again.

Today we apply these principles to 18 U.S.C. § 924(c). **[2]** That statute threatens long prison sentences for anyone who uses a firearm in connection with certain other federal crimes. But which other federal crimes? The statute's residual clause points to those felonies ``that by [their] nature, involv[e] a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.'' § 924(c)(3)(B). Even the government admits that this language, read in the way nearly everyone (including the government) has long understood it, provides no reliable way to determine which offenses qualify as crimes of violence and thus is unconstitutionally vague. So today the government attempts a new and alternative reading designed to save the residual clause. But this reading, it turns out, cannot be squared with the statute's text, context, and history. Were we to adopt it, we would be effectively stepping outside our role as judges and writing a new law rather than applying the one Congress adopted.

**I**

After Maurice Davis and Andre Glover committed a string of gas station robberies in Texas, a federal prosecutor charged both men with multiple counts of robbery affecting interstate commerce in violation of the Hobbs Act, 18 U.S.C. § 1951(a), and one count of conspiracy to commit Hobbs Act robbery. The prosecutor also charged Mr. Davis with being a felon in possession of a firearm. In the end, a jury acquitted Mr. Davis of one robbery charge and otherwise found the men guilty on all counts. And these convictions, none of which are challenged here, authorized the court to impose prison sentences of up to 70 years for Mr. Davis and up to 100 years for Mr. Glover.

But that was not all. This appeal concerns additional charges the government pursued against the men under § 924(c). **[3]** That statute authorizes heightened criminal penalties for using or carrying a firearm ``during and in relation to,'' or possessing a firearm ``in furtherance of,'' any federal ``crime of violence or drug trafficking crime.'' § 924(c)(1)(A). The statute proceeds to define the term ``crime of violence'' in two subparts-the first known as the elements clause, and

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

the second the residual clause. According to § 924(c)(3), a crime of violence is ``an offense that is a felony'' and<*pg. 765>

``(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

``(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.''

Violators of § 924(c) face a mandatory minimum sentence of five years in prison, over and above any sentence they receive for the underlying crime of violence or drug trafficking crime. The minimum sentence rises to 7 years if the defendant brandishes the firearm and 10 years if he discharges it. Certain types of weapons also trigger enhanced penalties-for example, a defendant who uses a short-barreled shotgun faces a minimum sentence of 10 years. And repeat violations of § 924(c) carry a minimum sentence of 25 years.[1]

At trial, the government argued that Mr. Davis and Mr. Glover had each committed two separate § 924(c) violations by brandishing a short-barreled shotgun in connection with their crimes. Here, too, the jury agreed. These convictions yielded a mandatory minimum sentence for each man of 35 years, which had to run consecutively to their other sentences. Adding the § 924(c) mandatory minimums to its discretionary sentences for their other crimes, the district court ultimately sentenced Mr. Glover to more than 41 years in prison and Mr. Davis to more than 50 years.

On appeal, both defendants argued that § 924(c)'s residual clause is unconstitutionally vague. At first, the Fifth Circuit rejected the argument. United States v. Davis, 677 Fed. Appx. 933, 936 (2017) (per curiam). But after we vacated its judgment and remanded for further consideration in light of our decision in Sessions v. Dimaya, 584 U.S. ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018), striking down a different, almost identically worded statute, the court reversed course and held § 924(c)(3)(B) unconstitutional. 903 F.3d 483, 486 (2018) (per curiam). It then held that Mr. Davis's and Mr. Glover's convictions on one of the two § 924(c) counts, the one that charged robbery as a predicate crime of violence, could be sustained under the elements clause. But it held that the other count, which charged conspiracy as a predicate crime of violence, depended on the residual clause; and so it vacated the men's convictions and sentences on that count.

Because the Fifth Circuit's ruling deepened a dispute among the lower courts about the constitutionality of § 924(c)'s residual clause, we granted certiorari to resolve the question. 586 U.S. ___, 139 S. Ct. 782, 202 L. Ed. 2d 511 (2018).[2]  <*pg. 766>

## II

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

[4] Our doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers. See Dimaya, 584 U.S., at ___ - ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (plurality opinion); id., at ___ - ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (Gorsuch, J., concurring in part and concurring in judgment). Vague laws contravene the ``first essential of due process of law'' that statutes must give people ``of common intelligence'' fair notice of what the law demands of them. Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926); see Collins v. Kentucky, 234 U.S. 634, 638, 34 S. Ct. 924, 58 L. Ed. 1510 (1914). Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect. Only the people's elected representatives in the legislature are authorized to ``make an act a crime.'' United States v. Hudson, 7 Cranch 32, 34, 3 L. Ed. 259 (1812). Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide. See Kolender v. Lawson, 461 U.S. 352, 357-358, and n. 7, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983); United States v. L. Cohen Grocery Co., 255 U.S. 81, 89-91, 41 S. Ct. 298, 65 L. Ed. 516 (1921); United States v. Reese, 92 U.S. 214, 221, 23 L. Ed. 563 (1876).

In recent years, this Court has applied these principles to two statutes that bear more than a passing resemblance to § 924(c)(3)(B)'s residual clause. In Johnson v. United States, 576 U.S. ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015), the Court addressed the residual clause of the Armed Career Criminal Act (ACCA), which defined a ``violent felony'' to include offenses that presented a ``serious potential risk of physical injury to another.'' § 924(e)(2)(B)(ii). The ACCA's residual clause required judges to use a form of what we've called the ``categorical approach'' to determine whether an offense qualified as a violent felony. Following the categorical approach, judges had to disregard how the defendant actually committed his crime. Instead, they were required to imagine the idealized `` 'ordinary case' '' of the defendant's crime and then guess whether a `` 'serious potential risk of physical injury to another' '' would attend its commission. Id., at ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569. Johnson held this judicial inquiry produced ``more unpredictability and arbitrariness'' when it comes to specifying unlawful conduct than the Constitution allows. Id., at ___ - ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569.

Next, in Sessions v. Dimaya, we considered the residual clause of 18 U.S.C. § 16, which defines a ``crime of violence'' for purposes of many federal statutes. Like § 924(c)(3), § 16 contains an elements clause and a residual clause. The only difference is that § 16's elements clause, unlike § 924(c)(3)'s elements clause, isn't limited to felonies; but there's no material difference in the language or scope of the statutes' residual <*pg. 767> clauses.[3] As with the ACCA, our precedent under § 16's residual clause required courts to use the categorical approach to determine whether an offense qualified as a crime of violence. Dimaya, 584 U.S., at ___ - ___,

2LED2D                                   12

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

138 S. Ct. 1204, 200 L. Ed. 2d 549; see Leocal v. Ashcroft, 543 U.S. 1, 7, 10, 125 S. Ct. 377, 160 L. Ed. 2d 271 (2004). And, again as with the ACCA, we held that § 16's residual clause was unconstitutionally vague because it required courts ``to picture the kind of conduct that the crime involves in the ordinary case, and to judge whether that abstraction presents some not-well-specified-yet-sufficiently-large degree of risk.'' Dimaya, 584 U.S., at ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (internal quotation marks omitted).

What do Johnson and Dimaya have to say about the statute before us? Those decisions teach that [5] the imposition of criminal punishment can't be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined ``ordinary case.'' But does § 924(c)(3)(B) require that sort of inquiry? The government and lower courts have long thought so. For years, almost everyone understood § 924(c)(3)(B) to require exactly the same categorical approach that this Court found problematic in the residual clauses of the ACCA and § 16.[4] Today, the government acknowledges that, if this understanding is correct, then § 924(c)(3)(B) must be held unconstitutional too.

But the government thinks it has now found a way around the problem. In the aftermath of our decisions holding the residual clauses of the ACCA and § 16(b) unconstitutionally vague, the government ``abandon[ed] its longstanding position'' that § 924(c)(3)(B) requires a categorical analysis and began urging lower courts to ``adopt a new 'case specific' method'' that would look to ``the 'defendant's actual conduct' in the predicate offense.'' 903 F.3d, at 485. Now, the government tries the same strategy in this Court, asking us to abandon the traditional categorical approach and hold that the statute actually commands the government's new case-specific approach. So, while the consequences in this case may be of constitutional dimension, the real question before us turns out to be one of pure statutory interpretation.

In approaching the parties' dispute over the statute's meaning, we begin by acknowledging that the government is right about at least two <*pg. 768> things. First, a case-specific approach would avoid the vagueness problems that doomed the statutes in Johnson and Dimaya. In those cases, we recognized that there would be no vagueness problem with asking a jury to decide whether a defendant's `` 'real-world conduct' '' created a substantial risk of physical violence. Dimaya, 584 U.S., at ___ - ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549; see Johnson, 576 U.S., at ___, ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569. Second, a case-specific approach wouldn't yield the same practical and Sixth Amendment complications under § 924(c) that it would have under the ACCA or § 16. Those other statutes, in at least some of their applications, required a judge to determine whether a defendant's prior conviction was for a ``crime of violence'' or ``violent felony.'' In that context, a case-specific approach would have entailed ``reconstruct[ing], long after the original conviction, the conduct underlying that conviction.'' Id., at ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569. And having a judge, not a jury, make findings about that underlying conduct

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

would have ``raise[d] serious Sixth Amendment concerns.'' Descamps v. United States, 570 U.S. 254, 269-270, 133 S. Ct. 2276, 186 L. Ed. 2d 438 (2013). By contrast, a § 924(c) prosecution focuses on the conduct with which the defendant is currently charged. The government already has to prove to a jury that the defendant committed all the acts necessary to punish him for the underlying crime of violence or drug trafficking crime. So it wouldn't be that difficult to ask the jury to make an additional finding about whether the defendant's conduct also created a substantial risk that force would be used.

But all this just tells us that it might have been a good idea for Congress to have written a residual clause for § 924(c) using a case-specific approach. It doesn't tell us whether Congress actually wrote such a clause. To answer that question, we need to examine the statute's text, context, and history. And when we do that, it becomes clear that the statute simply cannot support the government's newly minted case-specific theory.

### III

### A

Right out of the gate, the government faces a challenge. This Court, in a unanimous opinion, has already read the nearly identical language of 18 U.S.C. § 16(b) to mandate a categorical approach. And, importantly, the Court did so without so much as mentioning the practical and constitutional concerns described above. Instead, the Court got there based entirely on the text. In Leocal, the Court wrote:

``In determining whether petitioner's conviction falls within the ambit of § 16, the statute directs our focus to the 'offense' of conviction. See § 16(a) (defining a crime of violence as 'an offense that has as an element the use . . . of physical force against the person or property of another' (emphasis added)); § 16(b) (defining the term as 'any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense' (emphasis added)). This language requires us to look to the elements and the <*pg. 769> nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime.'' 543 U.S., at 7, 125 S. Ct. 377, 160 L. Ed. 2d 271.

Leocal went on to suggest that burglary would always be a crime of violence under § 16(b) ``because burglary, by its nature, involves a substantial risk that the burglar will use force against a victim in completing the crime,'' regardless of how any particular burglar might act on a specific occasion. Id., at 10, 125 S. Ct. 377, 160 L. Ed. 2d 271 (emphasis added); see also Dimaya, 584 U.S., at ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (plurality opinion) (reaffirming that ``§ 16(b)'s

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

text . . . demands a categorical approach"). And what was true of § 16(b) seems to us at least as true of § 924(c)(3)(B): It's not even close; **[6]** the statutory text commands the categorical approach.

Consider the word ``offense." It's true that ``in ordinary speech," this word can carry at least two possible meanings. It can refer to ``a generic crime, say, the crime of fraud or theft in general," or it can refer to ``the specific acts in which an offender engaged on a specific occasion." Nijhawan v. Holder, 557 U.S. 29, 33-34, 129 S. Ct. 2294, 174 L. Ed. 2d 22 (2009). But the word ``offense" appears just once in § 924(c)(3), in the statute's prefatory language. And everyone agrees that, in connection with the elements clause, the term ``offense" carries the first, ``generic" meaning. Cf. id., at 36, 129 S. Ct. 2294, 174 L. Ed. 2d 22 (similar language of the ACCA's elements clause ``refers directly to generic crimes"). So reading this statute most naturally, we would expect ``offense" to retain that same meaning in connection with the residual clause. After all, ``[i]n all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning." Cochise Consultancy, Inc. v. United States ex rel. Hunt, 587 U.S. ___, ___, 139 S. Ct. 1507, 203 L. Ed. 2d 791 (2019).

To prevail, the government admits it must persuade us that the singular term ``offense" bears a split personality in § 924(c), carrying the ``generic" meaning in connection with the elements clause but then taking on the ``specific act" meaning in connection with the residual clause. And, the government suggests, this isn't quite as implausible as it may sound; sometimes the term ``offense" can carry both meanings simultaneously. To illustrate its point, the government posits a statute defining a ``youthful gun crime" as ``an offense that has as an element the use of a gun and is committed by someone under the age of 21." Tr. of Oral Arg. 16. This statute, the government suggests, would leave us little choice but to understand the single word ``offense" as encompassing both the generic crime and the manner of its commission on a specific occasion. To which we say: Fair enough. It's possible for surrounding text to make clear that ``offense" carries a double meaning. But absent evidence to the contrary, we presume the term is being used consistently. And nothing in § 924(c)(3)(B) comes close to rebutting that presumption.

Just the opposite. **[7]** The language of the residual clause itself reinforces the conclusion that the term ``offense" carries the same ``generic" meaning throughout the statute. Section 924(c)(3)(B), just like § 16(b), speaks of an offense that, ``by its nature," involves a certain type of risk. And **<\*pg. 770>** that would be an exceedingly strange way of referring to the circumstances of a specific offender's conduct. As both sides agree, the ``nature" of a thing typically denotes its `` 'normal and characteristic quality,' " Dimaya, 584 U.S., at ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (quoting Webster's Third New International Dictionary 1507 (2002)), or its `` 'basic or inherent features,' " United States v. Barrett, 903 F.3d 166, 182 (CA2 2018) (quoting Oxford Dictionary of English 1183 (A. Stevenson ed., 3d ed. 2010)). So in plain English,

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

when we speak of the nature of an offense, we're talking about ``what an offense normally-or, as we have repeatedly said, 'ordinarily'-entails, not what happened to occur on one occasion.'' Dimaya, 584 U.S., at ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549; see Leocal, 543 U.S., at 7, 125 S. Ct. 377, 160 L. Ed. 2d 271 (contrasting the ``nature of the offense'' with ``the particular facts [of] petitioner's crime'').[5]

Once again, the government asks us to overlook this obvious reading of the text in favor of a strained one. It suggests that the statute might be referring to the ``nature'' of the defendant's conduct on a particular occasion. But while this reading may be linguistically feasible, we struggle to see why, if it had intended this meaning, Congress would have used the phrase ``by its nature'' at all. The government suggests that ``by its nature'' keeps the focus on the offender's conduct and excludes evidence about his personality, such as whether he has violent tendencies. But **[8]** even without the words ``by its nature,'' nothing in the statute remotely suggests that courts are allowed to consider character evidence-a type of evidence usually off-limits during the guilt phase of a criminal trial. Cf. Fed. Rule Evid. 404.

**B**

Things become clearer yet when we consider § 924(c)(3)(B)'s role in the broader context of the federal criminal code. As we've explained, **[9]** the language of § 924(c)(3)(B) is almost identical to the language of § 16(b), which this Court has read to mandate a categorical approach. And we normally presume that the same language in related statutes carries a consistent meaning. See, e.g., Sullivan v. Stroop, 496 U.S. 478, 484, 110 S. Ct. 2499, 110 L. Ed. 2d 438 (1990).

This case perfectly illustrates why we do that. There are dozens of federal statutes that use the phrase ``crime of violence'' to refer to presently charged conduct rather than a past conviction. Some of those statutes cross-reference the definition of ``crime of violence'' in § 924(c)(3), while others are governed by the virtually identical definition in § 16. The choice appears completely random. Reading the similar language in § 924(c)(3)(B) and § 16(b) similarly yields sensibly congruent applications across all these other statutes. But if we accepted the government's invitation to reinterpret § 924(c)(3)(B) as alone endorsing a case-specific ap-<*pg. 771> proach, we would produce a series of seemingly inexplicable results.

Take just a few examples. If the government were right, Congress would have mandated the case-specific approach in a prosecution for providing explosives to facilitate a crime of violence, 18 U.S.C. § 844(o), but the (now-invalidated) categorical approach in a prosecution for providing information about explosives to facilitate a crime of violence, § 842(p)(2). It would have mandated the case-specific approach in a prosecution for using false identification documents in connection with a crime of violence, § 1028(b)(3)(B), but the categorical approach in a

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

prosecution for using confidential phone records in connection with a crime of violence, § 1039(e)(1). It would have mandated the case-specific approach in a prosecution for giving someone a firearm to use in a crime of violence, § 924(h), but the categorical approach in a prosecution for giving a minor a handgun to use in a crime of violence, § 924(a)(6)(B)(ii). It would have mandated the case-specific approach in a prosecution for traveling to another State to acquire a firearm for use in a crime of violence, § 924(g), but the categorical approach in a prosecution for traveling to another State to commit a crime of violence, § 1952(a)(2). And it would have mandated the case-specific approach in a prosecution for carrying armor-piercing ammunition in connection with a crime of violence, § 924(c)(5), but the categorical approach in a prosecution for carrying a firearm while ``in possession of armor piercing ammunition capable of being fired in that firearm'' in connection with a crime of violence, § 929(a)(1).

There would be no rhyme or reason to any of this. Nor does the government offer any plausible account why Congress would have wanted courts to take such dramatically different approaches to classifying offenses as crimes of violence in these various provisions. To hold, as the government urges, that § 16(b) requires the categorical approach while § 924(c)(3)(B) requires the case-specific approach would make a hash of the federal criminal code.

## C

Section 924(c)(3)(B)'s history provides still further evidence that **[10]** it carries the same categorical-approach command as § 16(b). It's no accident that the language of the two laws is almost exactly the same. The statutory term ``crime of violence'' traces its origins to the Comprehensive Crime Control Act of 1984. There, Congress enacted the definition of ``crime of violence'' in § 16. § 1001(a), 98 Stat. 2136. It also ``employed the term 'crime of violence' in numerous places in the Act,'' Leocal, 543 U.S., at 6, 125 S. Ct. 377, 160 L. Ed. 2d 271, including in § 924(c). § 1005(a), 98 Stat. 2138. At that time, Congress didn't provide a separate definition of ``crime of violence'' in § 924(c) but relied on § 16's general definition. The two statutes, thus, were originally designed to be read together.

Admittedly, things changed a bit over time. Eventually, Congress expanded § 924(c)'s predicate offenses to include drug trafficking crimes as well as crimes of violence. §§ 104(a)(2)(B)-(C), 100 Stat. 457. When it did so, Congress added a subsection-specific definition of ``drug trafficking crime'' in § 924(c)(2)-and, perhaps thinking that both terms should be defined in the same place, it also added a subsection-specific defi-<*pg. 772> nition of ``crime of violence'' in § 924(c)(3). § 104(a)(2)(F), id., at 457. But even then, Congress didn't write a new definition of that term. Instead, it copied and pasted the definition from § 16 without making any material changes to the language of the residual clause. The government suggests that, in doing so, Congress ``intentionally separated'' and ``decoupled'' the two definitions. Brief for United

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

States 34, 37. But importing the residual clause from § 16 into § 924(c)(3) almost word for word would have been a bizarre way of suggesting that the two clauses should bear drastically different meanings. **[11]** Usually when statutory language `` 'is obviously transplanted from . . . other legislation,' " we have reason to think `` 'it brings the old soil with it.' " Sekhar v. United States, 570 U.S. 729, 733, 133 S. Ct. 2720, 186 L. Ed. 2d 794 (2013).

What's more, when Congress copied § 16(b)'s language into § 924(c) in 1986, it proceeded on the premise that the language required a categorical approach. By then courts had, as the government puts it, ``beg[u]n to settle" on the view that § 16(b) demanded a categorical analysis. Brief for United States 36-37. Of particular significance, the Second Circuit, along with a number of district courts, had relied on the categorical approach to hold that selling drugs could never qualify as a crime of violence because ``[w]hile the traffic in drugs is often accompanied by violence," it can also be carried out through consensual sales and thus ``does not by its nature involve substantial risk that physical violence will be used." United States v. Diaz, 778 F.2d 86, 88 (1985). Congress moved quickly to abrogate those decisions. But, notably, it didn't do so by directing a case-specific approach or changing the language courts had read to require the categorical approach. Instead, it accepted the categorical approach as given and simply declared that certain drug trafficking crimes automatically trigger § 924 penalties, regardless of the risk of violence that attends them. §§ 104(a)(2)(B)-(C), 100 Stat. 457.

The government's reply to this development misses the mark. The government argues that § 16(b) had not acquired such a well-settled judicial construction by 1986 that the reenactment of its language in § 924(c)(3)(B) should be presumed to have incorporated the same construction. We agree. See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L. P. A., 559 U.S. 573, 590, 130 S. Ct. 1605, 176 L. Ed. 2d 519 (2010) (interpretations of three courts of appeals ``may not have 'settled' the meaning" of a statute for purposes of the reenactment canon). But Congress in 1986 did more than just reenact language that a handful of courts had interpreted to require the categorical approach. It amended § 924(c) specifically to abrogate the results of those decisions, without making any attempt to overturn the categorical reading on which they were based. And that would have been an odd way of proceeding if Congress had thought the categorical reading erroneous.

There's yet one further and distinct way in which § 924(c)'s history undermines the government's case-specific reading of the residual clause. As originally enacted in 1968, § 924(c) prohibited the use of a firearm in connection with any federal felony. § 102, 82 Stat. 1224. The 1984 amendments narrowed § 924(c) by limiting its predicate offenses to ``crimes of <*pg. 773> violence." But the case-specific reading would go a long way toward nullifying that limitation and restoring the statute's original breadth. After all, how many felonies don't involve a substantial risk of physical force when they're committed using a firearm-let alone when the defendant brandishes

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

or discharges the firearm?

Recognizing this difficulty, the government assures us that a jury wouldn't be allowed to find a felony to be a crime of violence solely because the defendant used a firearm, although it could consider the firearm as a ``factor.'' Tr. of Oral Arg. 8. But the government identifies no textual basis for this rule, and exactly how it would work in practice is anyone's guess. The government says, for example, that ``selling counterfeit handbags'' while carrying a gun wouldn't be a crime of violence under its approach. Id., at 9. But why not? Because the counterfeit-handbag trade is so inherently peaceful that there's no substantial risk of a violent confrontation with dissatisfied customers, territorial competitors, or dogged police officers? And how are jurors supposed to determine that? The defendant presumably knew the risks of his trade, and he chose to arm himself. See United States v. Simms, 914 F.3d 229, 247-248 (CA4 2019) (en banc) (refusing to ``condemn[n] jurors to such an ill-defined inquiry''). Even granting the government its handbag example, we suspect its approach would result in the vast majority of federal felonies becoming potential predicates for § 924(c) charges, contrary to the limitation Congress deliberately imposed when it restricted the statute's application to crimes of violence.

### D

With all this statutory evidence now arrayed against it, the government answers that it should prevail anyway because of the canon of constitutional avoidance. Maybe the case-specific approach doesn't represent the best reading of the statute-but, the government insists, it is our duty to adopt any `` 'fairly possible' '' reading of a statute to save it from being held unconstitutional. Brief for United States 45.[6]

We doubt, however, the canon could play a proper role in this case even if the government's reading were ``possible.'' True, when presented with two ``fair alternatives,'' this Court has sometimes adopted the narrower construction of a criminal statute to avoid having to hold it unconstitutional if it were construed more broadly. United States v. Rumely, 345 U.S. 41, 45, 47, 73 S. Ct. 543, 97 L. Ed. 770 (1953); see, e.g., Skilling v. United States, 561 U.S. 358, 405-406, and n. 40, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010); United States v. Lanier, 520 U.S. 259, 265-267, and n. 6, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997). But no one before us has identified a case in <*pg. 774> which this Court has invoked the canon to expand the reach of a criminal statute in order to save it. Yet that is exactly what the government seeks here. Its case-specific reading would cause § 924(c)(3)(B)'s penalties to apply to conduct they have not previously been understood to reach: categorically nonviolent felonies committed in violent ways. See Simms, 914 F.3d, at 256-257 (Wynn, J., concurring).[7]

Employing the avoidance canon to expand a criminal statute's scope would risk offending the

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

very same due process and separation-of-powers principles on which the vagueness doctrine itself rests. See supra, at ___ - ___, 204 L. Ed. 2d, at 766. Everyone agrees that Mr. Davis and Mr. Glover did many things that Congress had declared to be crimes; and no matter how we rule today, they will face substantial prison sentences for those offenses. But does § 924(c)(3)(B) require them to suffer additional punishment, on top of everything else? Even if you think it's possible to read the statute to impose such additional punishment, it's impossible to say that Congress surely intended that result, or that the law gave Mr. Davis and Mr. Glover fair warning that § 924(c)'s mandatory penalties would apply to their conduct. **[13]** Respect for due process and the separation of powers suggests a court may not, in order to save Congress the trouble of having to write a new law, construe a criminal statute to penalize conduct it does not clearly proscribe.

Employing the canon as the government wishes would also sit uneasily with **[14]** the rule of lenity's teaching that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor. That rule is ``perhaps not much less old than'' the task of statutory ``construction itself.'' United States v. Wiltberger, 5 Wheat. 76, 95, 5 L. Ed. 37 (1820) (Marshall, C. J.). And much like the vagueness doctrine, it is founded on ``the tenderness of the law for the rights of individuals'' to fair notice of the law ``and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.'' Ibid.; see Lanier, 520 U.S., at 265-266, and n. 5, 117 S. Ct. 1219, 137 L. Ed. 2d 432. Applying constitutional avoidance to narrow a criminal statute, as this Court has historically done, accords with the rule of lenity. By contrast, using the avoidance canon instead to adopt a more expansive reading of a criminal statute <*pg. 775> would place these traditionally sympathetic doctrines at war with one another.[8]

## IV

What does the dissent have to say about all this? It starts by emphasizing that § 924(c)(3)(B) has been used in ``tens of thousands of federal prosecutions'' since its enactment 33 years ago. Post, at ___, 204 L. Ed. 2d, at 779 (opinion of Kavanaugh, J.). And the dissent finds it ``surprising'' and ``extraordinary'' that, after all those prosecutions over all that time, the statute could ``suddenly'' be deemed unconstitutional. Post, at ___ - ___, 204 L. Ed. 2d, at 779-785. But the government concedes that § 924(c)(3)(B) is unconstitutional if it means what everyone has understood it to mean in nearly all of those prosecutions over all those years. So the only way the statute can be saved is if we were ``suddenly'' to give it a new meaning different from the one it has borne for the last three decades. And if we could do that, it would indeed be ``surprising'' and ``extraordinary.''

The dissent defends giving this old law a new meaning by appealing to intuition. It suggests

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

that a categorical reading of § 924(c)(3)(B) is ``unnatural'' because ``[i]f you were to ask John Q. Public whether a particular crime posed a substantial risk of violence, surely he would respond, 'Well, tell me how it went down-what happened?' '' Post, at ___, 204 L. Ed. 2d, at 786 (some internal quotation marks omitted). Maybe so. But the language in the statute before us isn't the language posited in the dissent's push poll. Section 924(c)(3)(B) doesn't ask about the risk that ``a particular crime posed'' but about the risk that an ``offense . . . by its nature, involves.'' And a categorical reading of this categorical language seemed anything but ``unnatural'' to the unanimous Court in Leocal or the plurality in Dimaya.[9] Nor did the government think the categorical reading of § 924(c)(3)(B) ``unnatural'' when it embraced that reading for decades. The dissent asks us to overlook the government's prior view, explaining that the government only defended a categorical reading of the statute ``when it did not matter for constitutional vagueness purposes''-that is, before Johnson and Dimaya identified constitutional problems with the categorical approach. Post, at ___, 204 L. Ed. 2d, at 799. But isn't that exactly the point? Isn't it at least a little revealing that, when the government had no motive to concoct an alternative reading, even it thought the best reading of § 924(c)(3)(B) demanded a categorical analysis?

If this line of attack won't work, the dissent tries another by telling us that we have ``not fully account[ed] for <*pg. 776> the long tradition of substantial-risk criminal statutes.'' Post, at ___, 204 L. Ed. 2d, at 799. The dissent proceeds to offer a lengthy bill of particulars, citing dozens of state and federal laws that do not use the categorical approach. Post, at ___ - ___, 204 L. Ed. 2d, at 782-784, and nn. 4-17. But what does this prove? Most of the statutes the dissent cites impose penalties on whoever ``creates,'' or ``engages in conduct that creates,'' or acts under ``circumstances that create'' a substantial risk of harm; others employ similar language. Not a single one imposes penalties for committing certain acts during ``an offense . . . that by its nature, involves'' a substantial risk, or anything similar. Marching through the dissent's own catalog thus only winds up confirming that **[15]** legislatures know how to write risk-based statutes that require a case-specific analysis-and that § 924(c)(3)(B) is not a statute like that.

When the dissent finally turns to address the words Congress actually wrote in § 924(c)(3)(B), its main argument seems to be that a categorical reading violates the canon against superfluity. On this account, reading ``offense'' generically in connection with the residual clause makes the residual clause ``duplicate'' the elements clause and leaves it with ``virtually nothing'' to do. Post, at ___, 204 L. Ed. 2d, at 790. But that is a surprising assertion coming from the dissent, which devotes several pages to describing the ``many'' offenders who have been convicted under the residual clause using the categorical approach but who ``might not'' be prosecutable under the elements clause. Post, at ___ - ___, 204 L. Ed. 2d, at 797-799. It is also wrong. As this Court has long understood, **[16]** the residual clause, read categorically, ``sweeps more broadly'' than the elements clause-potentially reaching offenses, like burglary, that do not have violence as an element but that arguably create a substantial risk of violence. Leocal, 543 U.S., at 10, 125 S. Ct.

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

377, 160 L. Ed. 2d 271. So even under the categorical reading, the residual clause is far from superfluous.

Without its misplaced reliance on the superfluity canon, there is little left of the dissent's textual analysis. The dissent asserts that the phrase ``by its nature'' must ``focu[s] on the defendant's actual conduct''-but only because this ``follows'' from the dissent's earlier (and mistaken) superfluity argument. Post, at ___, 204 L. Ed. 2d, at 791. Next, the dissent claims that ``the word 'involves' '' and ``the phrase 'in the course of committing the offense' '' both support a case-specific approach. Post, at ___, 204 L. Ed. 2d, at 791. But these words do not favor either reading: It is just as natural to ask whether the offense of robbery ordinarily ``involves'' a substantial risk that violence will be used ``in the course of committing the offense'' as it is to ask whether a particular robbery ``involved'' a substantial risk that violence would be used ``in the course of committing the offense.'' If anything, the statute's use of the present and not the past tense lends further support to the categorical reading.[10] The dissent thinks it significant, too, that the statute before us ``does not use the term 'convic-<*pg. 777> tion,' '' post, at ___, 204 L. Ed. 2d, at 792; but that word is hardly a prerequisite for the categorical approach, as Dimaya makes clear. Remarkably, the dissent has nothing at all to say about § 924(c)(3)'s history or its relationship with other criminal statutes; it just ignores those arguments. And when it comes to the constitutional avoidance canon, the dissent does not even try to explain how using that canon to criminalize conduct that isn't criminal under the fairest reading of a statute might be reconciled with traditional principles of fair notice and separation of powers. Instead, the dissent seems willing to consign `` 'thousands' '' of defendants to prison for ``years-potentially decades,'' not because it is certain or even likely that Congress ordained those penalties, but because it is merely ``possible'' Congress might have done so. Post, at ___, ___ - ___, 204 L. Ed. 2d, at 797, 798-799. In our republic, a speculative possibility that a man's conduct violated the law should never be enough to justify taking his liberty.

In the end, the dissent is forced to argue that holding § 924(c)(3)(B) unconstitutional would invite ``bad'' social policy consequences. Post, at ___, 204 L. Ed. 2d, at 799. In fact, the dissent's legal analysis only comes sandwiched between a lengthy paean to laws that impose severe punishments for gun crimes and a rogue's gallery of offenses that may now be punished somewhat less severely. See post, at ___ - ___, ___ - ___, 204 L. Ed. 2d, at 778-779, 797-800. The dissent acknowledges that ``the consequences cannot change our understanding of the law.'' Post, at ___, 204 L. Ed. 2d, at 799. But what's the point of all this talk of ``bad'' consequences if not to suggest that judges should be tempted into reading the law to satisfy their policy goals? Even taken on their own terms, too, the dissent's policy concerns are considerably overblown. While the dissent worries that our ruling may elicit challenges to past § 924(c) convictions, post, at ___, 204 L. Ed. 2d, at 798, the dissent's preferred approach-saving § 924(c)(3)(B) by changing its meaning-would also call into question countless convictions premised on the categorical reading. And defendants

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

whose § 924(c) convictions are overturned by virtue of today's ruling will not even necessarily receive lighter sentences: As this Court has noted, **[17]** when a defendant's § 924(c) conviction is invalidated, courts of appeals ``routinely'' vacate the defendant's entire sentence on all counts ``so that the district court may increase the sentences for any remaining counts'' if such an increase is warranted. Dean v. United States, 581 U.S. ___, ___, 137 S. Ct. 1170, 197 L. Ed. 2d 490 (2017).

Of course, too, Congress always remains free to adopt a case-specific approach to defining crimes of violence for purposes of § 924(c)(3)(B) going forward. As Mr. Davis and Mr. Glover point out, one easy way of <*pg. 778> achieving that goal would be to amend the statute so it covers any felony that, ``based on the facts underlying the offense, involved a substantial risk'' that physical force against the person or property of another would be used in the course of committing the offense. Brief for Respondents 46 (quoting H. R. 7113, 115th Cong., 2d Sess. (2018); emphasis deleted); see also Tr. of Oral Arg. 19 (government's counsel agreeing that this language would offer ``clearer'' support for the case-specific approach than the current version of the statute does). The dissent's catalog of case-specific, risk-based criminal statutes supplies plenty of other models Congress could follow. Alternatively still, Congress might choose to retain the categorical approach but avoid vagueness in other ways, such as by defining crimes of violence to include certain enumerated offenses or offenses that carry certain minimum penalties. All these options and more are on the table. But these are options that belong to Congress to consider; no matter how tempting, this Court is not in the business of writing new statutes to right every social wrong it may perceive.

*

We agree with the court of appeals' conclusion that **[18]** § 924(c)(3)(B) is unconstitutionally vague. At the same time, exactly what that holding means for Mr. Davis and Mr. Glover remains to be determined. After the Fifth Circuit vacated their convictions and sentences on one of the two § 924(c) counts at issue, both men sought rehearing and argued that the court should have vacated their sentences on all counts. In response, the government conceded that, if § 924(c)(3)(B) is held to be vague, then the defendants are entitled to a full resentencing, not just the more limited remedy the court had granted them. The Fifth Circuit has deferred ruling on the rehearing petitions pending our decision, so we remand the case to allow the court to address those petitions. The judgment below is affirmed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

## SEPARATE OPINION

2LED2D                                          23

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

Justice *Kavanaugh*, with whom Justice *Thomas* and Justice *Alito* join, and with whom The *Chief Justice* joins as to all but Part II-C, dissenting.

Crime and firearms form a dangerous mix. From the 1960s through the 1980s, violent gun crime was rampant in America. The wave of violence destroyed lives and devastated communities, particularly in America's cities. Between 1963 and 1968, annual murders with firearms rose by a staggering 87 percent, and annual aggravated assaults with firearms increased by more than 230 percent.

Faced with an onslaught of violent gun crime and its debilitating effects, the American people demanded action. In 1968, Congress passed and President Lyndon Johnson signed the Gun Control Act. That law made it a separate federal crime to use or carry a firearm during a federal felony. Despite that and other efforts, violent crime with firearms continued at ex-<*pg. 779> traordinarily dangerous levels. In 1984 and again in 1986, in legislation signed by President Reagan, Congress reenacted that provision of the 1968 Act, with amendments. The law now prohibits, among other things, using or carrying a firearm during and in relation to a federal ``crime of violence." 18 U.S.C. § 924(c)(1)(A). The law mandates substantial prison time for violators.

Over the last 33 years, tens of thousands of § 924(c) cases have been prosecuted in the federal courts. Meanwhile, violent crime with firearms has decreased significantly. Over the last 25 years, the annual rate of murders with firearms has dropped by about 50 percent, and the annual rate of nonfatal violent crimes (robberies, aggravated assaults, and sex crimes) with firearms has decreased by about 75 percent. Violent crime in general (committed with or without a firearm) has also declined. During that same time period, both the annual rate of overall violent crime and the annual rate of murders have dropped by almost 50 percent.

Although the level of violent crime in America is still very high, especially in certain cities, Americans under the age of 40 probably cannot fully appreciate how much safer most American cities and towns are now than they were in the 1960s, 1970s, and 1980s. Many factors have contributed to the decline of violent crime in America. But one cannot dismiss the effects of state and federal laws that impose steep punishments on those who commit violent crimes with firearms.

Yet today, after 33 years and tens of thousands of federal prosecutions, the Court suddenly finds a key provision of § 924(c) to be unconstitutional because it is supposedly too vague. That is a surprising conclusion for the Court to reach about a federal law that has been applied so often for so long with so little problem. The Court's decision today will make it harder to prosecute

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

violent gun crimes in the future. The Court's decision also will likely mean that thousands of inmates who committed violent gun crimes will be released far earlier than Congress specified when enacting § 924(c). The inmates who will be released early are not nonviolent offenders. They are not drug offenders. They are offenders who committed violent crimes with firearms, often brutally violent crimes.

A decision to strike down a 33-year-old, often-prosecuted federal criminal law because it is all of a sudden unconstitutionally vague is an extraordinary event in this Court. The Constitution's separation of powers authorizes this Court to declare Acts of Congress unconstitutional. That is an awesome power. We exercise that power of judicial review in justiciable cases to, among other things, ensure that Congress acts within constitutional limits and abides by the separation of powers. But when we overstep our role in the name of enforcing limits on Congress, we do not uphold the separation of powers, we transgress the separation of powers.

I fully understand how the Court has arrived at its conclusion given the Court's recent precedents in Johnson v. United States, 576 U.S. ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015), and Sessions v. Dimaya, 584 U.S. ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018). But this case presents an entirely different question. Those cases involved statutes that imposed <*pg. 780> additional penalties based on prior convictions. This case involves a statute that focuses on the defendant's current conduct during the charged crime. The statute here operates entirely in the present. Under our precedents, this statute therefore is not unconstitutionally vague. It is a serious mistake, in my respectful view, to follow Johnson and Dimaya off the constitutional cliff in this case. I respectfully dissent.[1]

# I

Section 924(c) prohibits using or carrying a firearm during and in relation to a federal ``crime of violence,'' or possessing a firearm in furtherance of a federal ``crime of violence.''[2] Section 924(c) is a substantive criminal offense, not a sentence enhancement. The Government therefore charges a § 924(c) offense in the indictment. Ordinarily, when charged under § 924(c), a defendant will be charged with both an underlying federal crime and then also a § 924(c) offense. For example, Davis was charged with both conspiracy to commit robbery and a § 924(c) offense. Glover was likewise charged with both conspiracy to commit robbery and a § 924(c) offense.

By any measure, Davis and Glover's conduct during the conspiracy was violent. Davis and Glover committed multiple armed robberies of convenience stores in the early morning hours. Those armed robberies followed a pattern: Davis and Glover (or Glover and a co-conspirator)-usually covering their faces-would arrive at a convenience store in the early morning hours in a car with no plates. One of them would point a short-barreled shotgun at a

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

female employee and order her around. Sometimes, he would point the short-barreled shotgun in her face. Sometimes, he would put the short-barreled shotgun in her side. While one of them was aiming the short-barreled shotgun at the store employee, another would take cigarettes and demand money. Davis and Glover's crime spree ended with still more dangerous behavior: a high-speed car chase in wet and dangerous driving conditions that culminated in a crash.

Section 924(c)(3) lays out the defi-<\*pg. 781> nition of ``crime of violence'' for purposes of § 924(c). That definition has two prongs, either of which can bring a defendant within the scope of § 924(c).[3]

The first prong of § 924(c)(3) is the elements prong. That prong, the Government concedes here, asks whether the underlying crime categorically fits within § 924(c) because of the elements of the crime. The judge makes that determination. If the answer is yes, then the judge instructs the jury on the § 924(c) offense to simply find whether the defendant used or carried a firearm during and in relation to that underlying crime, or possessed a firearm in furtherance of that underlying crime.

The Fifth Circuit concluded that Davis and Glover's conspiracy offenses did not fit within the elements prong of § 924(c)(3). So the question was whether Davis and Glover were covered by the second prong.

The second prong of § 924(c)(3) is the substantial-risk prong. That prong covers cases beyond those covered by the first prong, the elements prong. Congress sensibly wanted to cover defendants who committed crimes that are not necessarily violent by definition under the elements prong, but who committed crimes with firearms in a way that created a substantial risk that violent force would be used. To that end, the substantial-risk prong, properly read, focuses not on the elements of the underlying crime, but rather on the defendant's conduct during that crime. If a defendant used or carried a firearm during and in relation to the crime, and the defendant's conduct during the crime created a substantial risk that physical force may be used, then the defendant may be guilty of a § 924(c) offense. In that instance, the jury makes the finding: Did the defendant's conduct during the underlying crime create a substantial risk that violent force would be used?

In other words, as relevant here, a defendant can fall within the scope of § 924(c) either (1) because of the elements of the underlying crime or (2) because of the defendant's conduct in committing the underlying crime. Either (1) the judge finds that an element of the underlying crime entails the use of physical force or (2) the jury finds that the defendant's actual conduct involved a substantial risk that physical force may be used. Put another way, the underlying crime itself may automatically bring the defendant within the scope of § 924(c). Or if the underlying crime does not automatically qualify as a crime of violence, then the defendant's conduct during

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

the crime may still bring the defendant within the scope of § 924(c). Sensible enough.

The basic question in this case is whether the substantial-risk prong of § 924(c)(3)'s definition of ``crime of violence'' is unconstitutionally vague. It is not.

As this Court has explained multiple times, criminal laws that apply a risk standard to a defendant's con<*pg. 782> duct are not too vague, but instead are perfectly constitutional. Writing for the Court in Johnson, for example, Justice Scalia stated that ``we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct.'' 576 U.S., at ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569. The following year in Welch v. United States, Justice Kennedy confirmed that Johnson ``cast no doubt on the many laws that 'require gauging the riskiness of conduct in which an individual defendant engages on a particular occasion.' '' 578 U.S. ___, ___ - ___ 136 S. Ct. 1257, 194 L. Ed. 2d 387 (2016) (quoting Johnson, 576 U.S., at ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569). Two years later in Dimaya, Justice Kagan wrote for the Court and echoed Justice Scalia and Justice Kennedy: ``In Johnson's words, 'we do not doubt' the constitutionality of applying § 16(b)'s 'substantial risk [standard] to real-world conduct.' '' 584 U.S., at ___ - ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (quoting Johnson, 576 U.S., at ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569).

That kind of risk-based criminal statute is not only constitutional, it is very common. As the Court has recognized, ``dozens of federal and state criminal laws use terms like 'substantial risk,' 'grave risk,' and 'unreasonable risk,' '' and almost all of those statutes ``require gauging the riskiness of conduct in which an individual defendant engages on a particular occasion.'' Johnson, 576 U.S., at ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569. Indeed, the Government's brief in Johnson collected more than 200 state and federal statutes that imposed criminal penalties for conduct that created a risk of injury to others. App. to Supp. Brief for United States in Johnson v. United States, O. T. 2014, No. 13-7120, pp. 1a-99a.

Take a few examples from federal law: It is a federal crime to create ``a substantial risk of harm to human life'' while illegally ``manufacturing a controlled substance.'' 21 U.S.C. § 858 (emphasis added). Under certain circumstances, it is a federal crime to create ``a substantial risk of serious bodily injury to any other person by destroying or damaging any structure, conveyance, or other real or personal property within the United States or by attempting or conspiring to'' do so. 18 U.S.C. § 2332b(a)(1)(B) (emphasis added). And for purposes of the chapter of the federal criminal code dealing with sexual abuse crimes, ``serious bodily injury'' is defined as ``bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.'' § 2246(4) (emphasis added).

The States' criminal codes are similar. Among the crimes that the States define by using

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

qualitative risk standards are resisting arrest,[4]  kidnap-<\*pg. 783> ing,[5]  assault,[6]  battery,[7] criminal recklessness,[8]  endangerment,[9]  unlawful restraint,[10]  theft,[11]  hazing,[12]  abuse,[13] neglect,[14] arson,[15] homicide,[16] and weapons offenses.[17]

Consider a few specific examples: In Pennsylvania, a person resists arrest ``if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, <\*pg. 784> the person creates a substantial risk of bodily injury to the public servant or anyone else.'' 18 Pa. Cons. Stat. § 5104 (2015) (emphasis added). In Tennessee, kidnaping is defined as false imprisonment ``under circumstances exposing the other person to substantial risk of bodily injury.'' Tenn. Code Ann. § 39-13-303(a) (2018) (emphasis added). In New York, reckless endangerment occurs when a person ``recklessly engages in conduct which creates a substantial risk of serious physical injury to another person.'' N. Y. Penal Law Ann. § 120.20 (emphasis added). And in Maryland, neglect of a minor is defined as ``the intentional failure to provide necessary assistance and resources for the physical needs or mental health of a minor that creates a substantial risk of harm to the minor's physical health or a substantial risk of mental injury to the minor.'' Md. Crim. Law Code Ann. § 3-602.1(a)(5)(i) (2012) (emphasis added).

The above examples demonstrate that substantial-risk standards like the one in § 924(c)(3)(B) are a traditional and common feature of criminal statutes. As the Eleventh Circuit succinctly stated, there ``is nothing remarkable about asking jurors to make that sort of risk determination-and, if necessary, requiring judges to instruct jurors on the meaning of terms like 'substantial' and 'physical force.' '' Ovalles v. United States, 905 F.3d 1231, 1250, n. 8 (2018) (en banc). That is ``exactly how similar questions have been resolved for centuries and are resolved every day in courts throughout the country.'' Ibid.

A statute is unconstitutionally vague only if ``it fails to give ordinary people fair notice of the conduct it punishes,'' or is ``so standardless that it invites arbitrary enforcement.'' Johnson, 576 U.S., at ___ , 135 S. Ct. 2551, 192 L. Ed. 2d 569. Section 924(c)(3)(B) is not unconstitutionally vague. To reiterate, § 924(c)(3)(B) defines ``crime of violence'' as ``an offense that is a felony and . . . that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.'' Section 924(c)(3)(B) affords people of ordinary intelligence ample notice that they may be punished if they carry or use a gun while engaging in criminal conduct that presents a risk that physical force may be used. There ``is a whole range of conduct that anyone with at least a semblance of common sense would know'' is covered by § 924(c)(3)(B). Chicago v. Morales, 527 U.S. 41, 114, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) (Thomas, J., dissenting) (internal quotation marks omitted). And prosecutors, defense attorneys, judges, and juries are well equipped to enforce and defend § 924(c)(3)(B) prosecutions in a principled and predictable way-just as they have for decades with many other substantial-risk criminal statutes. As Judge Niemeyer wrote in his separate opinion in the Fourth

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

Circuit, ``the parties in <*pg. 785> those cases had little difficulty understanding, enforcing, or defending the § 924(c)(1) charges at issue." United States v. Simms, 914 F.3d 229, 264 (2019).[18]

In short, § 924(c)(3)(B) is a garden-variety, substantial-risk criminal law. Section 924(c)(3)(B) is not unconstitutionally vague.

## II

This case therefore should be straightforward. But the Court complicates things by engaging in a two-step dance that ends with the Court concluding that § 924(c)(3)(B) is unconstitutionally vague.

The Court's first step is to construe § 924(c)(3)'s substantial-risk prong to require an ordinary-case categorical approach rather than a conduct-specific approach. In other words, the Court says that a defendant's guilt or innocence under § 924(c)(3)'s substantial-risk prong hinges on a judge's assessment of how a hypothetical defendant would ordinarily commit the underlying crime. In the Court's view, a defendant's guilt or innocence under § 924(c)(3)'s substantial-risk prong does not depend on a jury's finding about how the actual defendant actually committed the underlying crime.

The Court's second step is based on the Court's decisions in Johnson and Dimaya. The Court says that the ordinary-case categorical approach makes § 924(c)(3)(B) unconstitutionally vague.

For purposes of this case, the Court's error is its first step-that is, in construing the substantial-risk prong of § 924(c)(3) to require an ordinary-case categorical approach. For three reasons, I disagree with the Court's analysis. First, the Court's justifications in Johnson and Dimaya for adopting the categorical approach do not apply in the context of § 924(c). Second, the text of § 924(c)(3)(B) is best read to focus on the actual defendant's actual conduct during the underlying crime, not on a hypothetical defendant's imagined conduct during an ordinary case of the underlying crime. Third, even if the text were ambiguous, the constitutional avoidance canon requires that we interpret the statute to focus on the actual defendant's actual conduct.

I will address those three points in Parts II-A, II-B, and II-C.

## A

According to the Court, if § 924(c)(3)(B) focused on the defendant's conduct during the underlying crime, then it would not be unconstitutionally vague. But § 924(c)(3)(B), as the Court reads it, focuses on a hypothetical defendant's conduct during an ordinary case of the underlying crime. As a result, the Court says that § 924(c)(3)(B) is unconstitutionally vague.

2LED2D                                      29

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

But it makes little sense, as I see it, to say that § 924(c)(3)(B)'s substantial-risk inquiry focuses on whether a hypothetical defendant's imagined conduct during an ordinary case of the crime creates a substantial risk that physical force may be used, rather than on whether the actual defendant's actual conduct during the actual crime created a substantial <\*pg. 786> risk that physical force may be used. Why would we interpret a federal law that criminalizes current-offense conduct to focus on a hypothetical defendant rather than on the actual defendant? As Judge Newsom cogently wrote for the Eleventh Circuit en banc majority, "If you were to ask John Q. Public whether a particular crime posed a substantial risk of violence, surely he would respond, 'Well, tell me how it went down-what happened?' " Ovalles, 905 F.3d, at 1241.[19]

Why does the Court read the substantial-risk prong in such an unnatural way? The Court explains that Johnson interpreted similar substantial-risk language to require the ordinary-case categorical approach. See 576 U.S., at ___ - ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569. A plurality of the Court did the same in Dimaya. See 584 U.S., at ___ - ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549. And the Court today casts this case as the third installment in a trilogy with a predictable ending, one that was supposedly foreordained by Johnson and Dimaya.

The gaping hole in the Court's analysis, in my view, is that Johnson and Dimaya addressed statutes that imposed penalties based on a defendant's prior criminal convictions.

In Johnson, the Court interpreted a definition of "violent felony" that was used in sentencing proceedings to classify prior convictions as predicates for stricter sentences. See §§ 924(e)(1), (e)(2)(B). In Dimaya, the Court interpreted a definition of "crime of violence" that was used in immigration proceedings to classify prior convictions as predicates for more severe immigration consequences. See § 16 (defining "crime of violence"); 8 U.S.C. § 1101(a)(43)(F) (incorporating 18 U.S.C. § 16); 8 U.S.C. § 1227(a)(2)(A)(iii) (deportation); §§ 1229b(a)(3), (b)(1)(C) (ineligibility for cancellation of removal and adjustment of status).

In interpreting those statutes, the Court employed the ordinary-case categorical approach to assess an individual's past convictions. And application of that categorical approach, the Court then said, rendered the statutes at issue in those cases unconstitutionally vague. See Dimaya, 584 U.S., at ___ - ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549; Johnson, 576 U.S., at ___ - ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569.[20]

Two important principles drove the Court's adoption of the categorical approach in the prior-conviction context in Johnson and Dimaya.

First, in the prior-conviction cases, the Court emphasized that the categorical approach avoids the difficulties and inequities of relitigating "past convictions in minitrials conducted long after the fact." Moncrieffe v. Holder, 569 U.S. 184, 200-201, 133 S. Ct. 1678, 185 L. Ed. 2d 727

2LED2D                                    30

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(2013). <*pg. **787**> Without the categorical approach, courts would have to determine the underlying conduct from years-old or even decades-old documents with varying levels of factual detail. See Taylor v. United States, 495 U.S. 575, 601-602, 110 S. Ct. 2143, 109 L. Ed. 2d 607 (1990). The factual statements that are contained in those documents are often ``prone to error.'' Mathis v. United States, 579 U.S. \_\_\_, \_\_\_, 136 S. Ct. 2243, 195 L. Ed. 2d 604 (2016). The categorical approach avoids the unfairness of allowing inaccuracies to ``come back to haunt the defendant many years down the road.'' Id., at \_\_\_, 136 S. Ct. 2243, 195 L. Ed. 2d 604. The Court has echoed that reasoning time and again. See, e.g., Dimaya, 584 U.S., at \_\_\_, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (plurality opinion); Johnson, 576 U.S., at \_\_\_, 135 S. Ct. 2551, 192 L. Ed. 2d 569; Descamps v. United States, 570 U.S. 254, 270, 133 S. Ct. 2276, 186 L. Ed. 2d 438 (2013); Chambers v. United States, 555 U.S. 122, 125, 129 S. Ct. 687, 172 L. Ed. 2d 484 (2009).

Second, in the prior-conviction cases, the Court insisted on the categorical approach to avoid ``Sixth Amendment concerns.'' Descamps, 570 U.S., at 269, 133 S. Ct. 2276, 186 L. Ed. 2d 438. The Sixth Amendment, as interpreted by this Court's precedents, does not allow a judge (rather than a jury) to make factual determinations that increase the maximum penalty. See Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The Court has read its Sixth Amendment precedents to require the categorical approach. Under the categorical approach, the judge looks only to the fact of conviction and the statutory definition of the prior offense. The Court has reiterated those Sixth Amendment concerns in countless categorical-approach cases. See, e.g., Dimaya, 584 U.S., at \_\_\_, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (plurality opinion); Mathis, 579 U.S., at \_\_\_, 136 S. Ct. 2243, 195 L. Ed. 2d 604; Shepard v. United States, 544 U.S. 13, 24-25, 125 S. Ct. 1254, 161 L. Ed. 2d 205 (2005) (plurality opinion); Taylor, 495 U.S., at 601, 110 S. Ct. 2143, 109 L. Ed. 2d 607.

In short, the Court in Johnson and Dimaya employed something akin to the constitutional avoidance doctrine to read the statutes at issue to avoid practical and Sixth Amendment problems. In the words of Justice Thomas, the ``categorical approach was never really about the best reading of the text.'' Dimaya, 584 U.S., at \_\_\_, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (dissenting opinion). As Judge Raggi has perceptively stated: ``[C]onstitutional avoidance informed the original categorical-approach mandate.'' United States v. Barrett, 903 F.3d 166, 179 (CA2 2018).

But neither of the two reasons identified in Johnson and Dimaya applies to 18 U.S.C. § 924(c)(3)(B)-not even a little.

First, § 924(c) does not require examination of old conduct underlying a prior conviction. Section 924(c) operates entirely in the present. In a § 924(c) prosecution, there are ordinarily two charged crimes: the underlying crime and the § 924(c) offense. Here, for example, the defendants were charged with conspiracy to commit robbery and with the § 924(c) offense. The defendant's conduct during the underlying crime is part of the § 924(c) offense. The conduct charged <*pg.

2LED2D                                    31

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

**788>** in the § 924(c) offense is in front of the jury (if the case goes to trial) or accepted by the defendant in the plea agreement (if the defendant pleads guilty). The indictment must allege specific offense conduct, and that conduct must be proved with real-world facts in order to obtain a conviction. There is no need to worry about stale evidence or unavailable witnesses. Nor is there any need to worry about inaccuracies in years-old or decades-old documents coming back to haunt the defendant.

Second, § 924(c) likewise raises no Sixth Amendment concerns. A jury will find the facts or, if the case ends in a guilty plea, the defendant will accept the facts in the plea agreement. For the § 924(c) charge, as relevant here, a jury must find that the defendant's conduct ``by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." The defendant has the opportunity to contest the relevant facts either at the trial or in plea negotiations. No Sixth Amendment issue arises in a § 924(c) prosecution.

No practical or Sixth Amendment problems exist with § 924(c)(3)(B). Indeed, the Court itself acknowledges that ``a case-specific approach wouldn't yield the same practical and Sixth Amendment complications" that arose in Johnson and Dimaya. Ante, at ___, 204 L. Ed. 2d, at 767.

We should recognize that Johnson and Dimaya dealt with an entirely different context: prior convictions. There is no need to follow Johnson and Dimaya off the cliff here. We should read § 924(c)(3)(B) like the dozens of other substantial-risk statutes in federal and state criminal law: to focus on the actual defendant's actual conduct during the actual underlying crime, not on a hypothetical defendant's imagined conduct during an ordinary case of that crime.

**B**

Now to the statutory text of § 924(c)(3)(B). Even though the context here is current-offense conduct, not past convictions, the Court says that the statutory language nonetheless compels a focus on a hypothetical defendant's imagined conduct, not on the actual defendant's actual conduct. I disagree. Criminal defendants are usually punished based on what they actually did, not based on what a hypothetical defendant might have done.

To begin with, the text of § 924(c)(3)(B) must be interpreted against the backdrop of traditional criminal-law practice. As described above, substantial-risk statutes are commonplace in federal and state criminal law. Those statutes ordinarily call for examination of the actual defendant's actual conduct during the actual crime. The Court does not identify a single self-contained federal or state law that defines the actus reus of the crime based on the imagination of the judge about a hypothetical defendant, rather than on the evidence before the jury about the

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

actual defendant.

This Court applied an exception in Johnson and Dimaya for substantial-risk statutes that impose sentencing and other penalties based on past convictions. But that is an exception for past convictions, not a rule for current-offense conduct. Section 924(c)(3)(B) must be read in line with <*pg. 789> the traditional, common practice of focusing on the actual defendant's actual conduct during the underlying crime.

With that background, I turn to the precise text of § 924(c)(3). To repeat, the text of § 924(c)(3) provides: A defendant may not use or carry a firearm during and in relation to, or possess a firearm in furtherance of, ``an offense that is a felony and" that either (A) ``has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or (B) ``by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

I will focus on four particular aspects of the statutory text of § 924(c)(3)(B).

First, start with the term ``offense." Section 924(c)(3) has two prongs under which a defendant might qualify for a § 924(c) conviction: first, if the underlying crime automatically qualifies as a crime of violence based on its elements; and, second, if the defendant's conduct during the underlying crime created a substantial risk that physical force may be used, even if the underlying crime by its elements does not constitute a crime of violence.

The term ``offense" applies to both prongs. In the elements prong, the term refers to the elements of the underlying crime. In the substantial-risk prong, the term refers to the defendant's conduct during the underlying crime. That is entirely commonplace and sensible.

Reading ``offense" in that commonsense way follows from the Court's precedents interpreting the term ``offense." As the Court has explained many times, the term ``offense" may ``sometimes refer to a generic crime" and may ``sometimes refer to the specific acts in which an offender engaged on a specific occasion." Nijhawan v. Holder, 557 U.S. 29, 33-34, 129 S. Ct. 2294, 174 L. Ed. 2d 22 (2009).[21] Indeed, the single term ``offense" can refer to both in the same statutory scheme. See, e.g., id., at 40, 129 S. Ct. 2294, 174 L. Ed. 2d 22; id., at 38, 129 S. Ct. 2294, 174 L. Ed. 2d 22 (listing other examples); United States v. Hayes, 555 U.S. 415, 421-422, 129 S. Ct. 1079, 172 L. Ed. 2d 816 (2009).

In United States v. Hayes, for example, the Court interpreted the term ``misdemeanor crime of domestic violence." That term was defined as ``an offense" that (1) ``has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon," and (2) was ``committed by" a person who has a particular relationship with the victim. § 921(a)(33)(A). The Court interpreted the ``offense that . . . has, as an element" language in that provision to focus on

2LED2D                                    33

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

the legal prohibition, and interpreted the ``offense . . . committed by'' language to focus on the defendant's conduct. See Hayes, 555 U.S., at 421-422, 129 S. Ct. 1079, 172 L. Ed. 2d 816. In other words, the term ``offense'' was used once but had two different meanings as applied to the two different parts of the statutory provision.

Another example is the Immigra-<*pg. 790> tion and Nationality Act. That statute defines ``aggravated felony'' in part as ``an offense'' (1) that ``involves fraud or deceit'' and (2) ``in which the loss to the victim or victims exceeds $10,000.'' 8 U.S.C. § 1101(a)(43)(M)(i). The Court interpreted the ``offense that . . . involves fraud or deceit'' language to focus on the legal prohibition. See Kawashima v. Holder, 565 U.S. 478, 483, 132 S. Ct. 1166, 182 L. Ed. 2d 1 (2012). And the Court interpreted the ``offense . . . in which the loss'' language to focus on the individual's conduct. See Nijhawan, 557 U.S., at 40, 129 S. Ct. 2294, 174 L. Ed. 2d 22. Again, the term ``offense'' was used once, but had two different meanings as applied to the two different parts of the statutory provision.

Section 924(c)(3) is the same kind of statutory provision. It likewise encompasses both the legal prohibition (in subpart (A)) and the defendant's actual conduct (in subpart (B)). The term ``offense'' was read in Hayes, Kawashima, and Nijhawan to encompass both the legal prohibition and the defendant's conduct. The term should be read that same way here.

Moreover, if the substantial-risk prong of § 924(c)(3) requires assessing a hypothetical defendant's conduct rather than the actual defendant's conduct, then there would be little daylight between the elements prong and the substantial-risk prong. After all, a crime is defined by its elements. The elements tell you what happens in an ordinary case of a crime. To imagine how a hypothetical defendant would have committed an ordinary case of the crime, you would presumably look back to the elements of the crime. But doing that under the substantial-risk prong-as the Court would do-would just duplicate the inquiry that already occurs under the elements prong. That would defeat Congress' purpose in adding the substantial-risk prong to § 924(c)(3)-namely, covering defendants who committed crimes that are not violent by definition but that are committed by particular defendants in ways that create a risk of violence. There is no reason to think that Congress meant to duplicate the elements prong in the substantial-risk prong.[22]

The Court usually tries to avoid an interpretation of a statutory provision that would make the provision redundant and accomplish virtually nothing. See, e.g., Republic of Sudan v. Harrison, 587 U.S. ___, ___, 139 S. Ct. 1048, 203 L. Ed. 2d 433 (2019); Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 35, 123 S. Ct. 2041, 156 L. Ed. 2d 18 (2003); Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825, 837, 108 S. Ct. 2182, 100 L. Ed. 2d 836 (1988); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174-179 (2012); W. Eskridge, Interpreting Law: A Primer on How to Read Statutes and the Constitution 112-114

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

(2016). We should heed that principle here, and recognize that the term ``offense'' in the substantial-risk prong refers to the actual defendant's conduct during the underlying crime.

In short, the term ``offense'' in § 924(c)(3), as applied to the substantial-risk prong, focuses on the <*pg. 791> actual defendant's actual conduct, not on a hypothetical defendant's imagined conduct.

Second, § 924(c)(3)(B) asks whether the defendant's offense ``by its nature'' involves a risk that physical force may be used. In a vacuum, the ``nature'' of an offense could be either ``the metaphysical 'nature' of the offense'' or ``the underlying facts of the offense.'' Dimaya, 584 U.S., at ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (Thomas, J., dissenting). But that is because the term ``offense'' could refer to a legal prohibition or to the defendant's actual conduct. As explained above, however, the term ``offense'' as applied to the substantial-risk prong refers to the actual defendant's conduct during the underlying crime. It follows that ``by its nature'' focuses on the nature of the actual defendant's conduct during the crime. The phrase ``by its nature'' is linked to the term ``offense.'' If the term ``offense'' refers to the defendant's actual conduct, then ``by its nature'' also focuses on the defendant's actual conduct.

Under the conduct-specific approach to the substantial-risk prong, the ``by its nature'' language simply means that the Government has to show more than a defendant's proclivity for crime and more than the mere fact that the defendant was carrying a gun. The Government has to show that the defendant's conduct by its nature during the crime created a substantial risk that physical force may be used.

In short, as Justice Thomas has pointed out, it ``is entirely natural to use words like 'nature' and 'offense' to refer to an offender's actual underlying conduct.'' Ibid. So it is here.

Third, § 924(c)(3)(B) asks whether the defendant's conduct ``involves'' a substantial risk that physical force may be used. In Taylor v. United States, a case involving a prior-conviction statutory provision, the Court pointed to the absence of the word ``involved'' in adopting a categorical approach. 495 U.S., at 600, 110 S. Ct. 2143, 109 L. Ed. 2d 607. And in Nijhawan v. Holder, another case involving a prior-conviction statutory provision, the Court explained that the word ``involves'' did not support a categorical approach. 557 U.S., at 36, 129 S. Ct. 2294, 174 L. Ed. 2d 22. Here, unlike in Taylor, the statute does use the word ``involves.'' Under Taylor's reasoning, the inclusion of the word ``involves'' in § 924(c)(3)(B) supports the conclusion that § 924(c)(3)(B) employs a conduct-specific approach rather than a categorical approach.

Fourth, § 924(c)(3)(B)'s use of the phrase ``in the course of committing the offense'' indicates that the proper focus is on the actual defendant's actual conduct, not on a hypothetical defendant's imagined conduct. After all, the underlying offense was committed by the actual defendant, not by

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

a hypothetical defendant. It strains common sense to think that the ``in the course of committing the offense'' language in § 924(c)(3)(B) contemplates an inquiry into a hypothetical defendant's conduct during an ordinary case of the crime.

Importantly, the law at issue in Johnson did not have the ``in the course of committing the offense'' language. § 924(e)(2)(B)(ii). That is a major textual difference between the law in Johnson on the one hand and § 924(c)(3)(B) on the other hand. And that textual distinction further shows <*pg. 792> that § 924(c)(3)(B) focuses on the actual defendant's actual conduct.

In short, those four textual indicators, while not all entirely one-sided, together strongly suggest that § 924(c)(3)(B) focuses on the actual defendant's actual conduct during the actual crime, not on a hypothetical defendant's imagined conduct during an ordinary case of the crime.

On top of all the language in the statute, § 924(c)(3)(B) does not contain the critical term that ordinarily marks a categorical approach.

Section 924(c)(3)(B) does not use the term ``conviction.'' This Court has historically recognized the term ``conviction'' as a key textual driver of the categorical approach. In cases such as Taylor and Johnson, the Court zeroed in on the word ``convictions.'' See Johnson, 576 U.S., at ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569; Taylor, 495 U.S., at 600, 110 S. Ct. 2143, 109 L. Ed. 2d 607; see also Mathis, 579 U.S., at ___, 136 S. Ct. 2243, 195 L. Ed. 2d 604; Moncrieffe, 569 U.S., at 191, 133 S. Ct. 1678, 185 L. Ed. 2d 727; Ovalles, 905 F.3d, at 1245. So too, the Court in Leocal v. Ashcroft emphasized that the text of the INA that incorporated § 16(b) used the term ``convicted.'' 543 U.S. 1, 4, 7, 125 S. Ct. 377, 160 L. Ed. 2d 271 (2004).[23]

The term ``conviction'' is nowhere to be found in the text of § 924(c)(3)(B). That should not come as a surprise, given that § 924(c)(3)(B) is a substantive criminal offense concerned with the defendant's current-offense conduct. The absence of the term ``conviction'' in § 924(c)(3)(B) strongly supports a conduct-specific approach.

Put simply, the textual clues-both the words that are used and the words that are not used-point strongly to the conclusion that § 924(c)(3)(B) requires a jury to assess the actual defendant's actual conduct during the underlying crime. The conclusion becomes overwhelming when considered against the general background of substantial-risk statutes. To be sure, a statute can always be written more clearly. But here, the textual toolkit leads decisively to that conclusion.

C

But after all of that, suppose that you are not convinced. Suppose that you think that this case

2LED2D                                    36

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

is still a close call on the text, even with the background of substantial-risk statutes and the Court's precedents. Indeed, suppose you ultimately disagree with the above analysis of the text. Even so, the Government still wins-unless it can be said that § 924(c)(3)(B) unambiguously requires a categorical approach. Under the constitutional avoidance canon, the precise question before us is not whether § 924(c)(3)(B) is best read to require a conduct-specific approach, but rather (as the Court's cases say) whether § 924(c)(3)(B) can reasonably, plausibly, or fairly possibly be interpreted to require a conduct-specific approach. <*pg. 793> The answer to that question is easy. Yes. See Hooper v. California, 155 U.S. 648, 657, 15 S. Ct. 207, 39 L. Ed. 297 (1895) (``reasonable''); Clark v. Martinez, 543 U.S. 371, 380, 125 S. Ct. 716, 160 L. Ed. 2d 734 (2005) (``plausible''); Skilling v. United States, 561 U.S. 358, 406, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010) (``fairly possible'' (internal quotation marks omitted)).

The Court says that if § 924(c)(3)(B) requires the categorical approach, then it is unconstitutionally vague. But the Court also says that if § 924(c)(3)(B) focuses on the defendant's actual conduct, then it is constitutionally permissible. As the Court puts it, ``a case-specific approach would avoid the vagueness problems that doomed the statutes in Johnson and Dimaya.'' Ante, at ___, 204 L. Ed. 2d, at 767. So the entire ball game is whether it is fairly possible to interpret § 924(c)(3)(B) to require a conduct-specific approach. It surely is at least fairly possible.

It is an elementary principle of statutory interpretation that an ambiguous statute must be interpreted, whenever possible, to avoid unconstitutionality. See generally Scalia, Reading Law: The Interpretation of Legal Texts, at 247-251; Eskridge, Interpreting Law: A Primer on How to Read Statutes and the Constitution, at 317-322. That uncontroversial principle of statutory interpretation dates back to the Founding era. See Mossman v. Higginson, 4 Dall. 12, 1 L. Ed. 720 (1800). As Justice Thomas has explained, the traditional doctrine of constitutional avoidance commands ``courts, when faced with two plausible constructions of a statute-one constitutional and the other unconstitutional-to choose the constitutional reading.'' Clark, 543 U.S., at 395 125 S. Ct. 716, 160 L. Ed. 2d 734 (dissenting opinion). This Court's duty is ``not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations.'' Civil Service Comm'n v. Letter Carriers, 413 U.S. 548, 571, 93 S. Ct. 2880, 37 L. Ed. 2d 796 (1973). In discharging that duty, ``every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'' Hooper, 155 U.S., at 657, 15 S. Ct. 207, 39 L. Ed. 297.

This Court's longstanding practice of saving ambiguous statutes from unconstitutionality where fairly possible affords proper respect for the representative branches of our Government. The Court has explained that ``a presumption never ought to be indulged, that congress meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the Court by language altogether unambiguous.'' United States v. Coombs, 12 Pet. 72, 76, 9 L. Ed. 1004

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

(1838).

In countless cases for more than 200 years, this Court has recognized the principle that courts should construe ambiguous laws to be consistent with the Constitution. See, e.g., McDonnell v. United States, 579 U.S. ___, ___ - ___, 136 S. Ct. 2355, 195 L. Ed. 2d 639 (2016); Skilling, 561 U.S., at 405-409, 130 S. Ct. 2896, 177 L. Ed. 2d 619; Clark, 543 U.S., at 380-382 125 S. Ct. 716, 160 L. Ed. 2d 734; Edmond v. United States, 520 U.S. 651, 658, 117 S. Ct. 1573, 137 L. Ed. 2d 917 (1997); Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal., 508 U.S. 602, 628-630, 113 S. Ct. 2264, 124 L. Ed. 2d 539 (1993); New <*pg. 794> York v. United States, 505 U.S. 144, 170, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992); Rust v. Sullivan, 500 U.S. 173, 190-191, 111 S. Ct. 1759, 114 L. Ed. 2d 233 (1991); Public Citizen v. Department of Justice, 491 U.S. 440, 465-467, 109 S. Ct. 2558, 105 L. Ed. 2d 377 (1989); Communications Workers v. Beck, 487 U.S. 735, 762, 108 S. Ct. 2641, 101 L. Ed. 2d 634 (1988); Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council, 485 U.S. 568, 575-578, 108 S. Ct. 1392, 99 L. Ed. 2d 645 (1988); St. Martin Evangelical Lutheran Church v. South Dakota, 451 U.S. 772, 780-781, 101 S. Ct. 2142, 68 L. Ed. 2d 612 (1981); Letter Carriers, 413 U.S., at 571, 93 S. Ct. 2880, 37 L. Ed. 2d 796; Machinists v. Street, 367 U.S. 740, 749-750, 81 S. Ct. 1784, 6 L. Ed. 2d 1141 (1961); Ashwander v. TVA, 297 U.S. 288, 348, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring); ICC v. Oregon-Washington R. & Nav. Co., 288 U.S. 14, 40-42, 53 S. Ct. 266, 77 L. Ed. 588 (1933); Crowell v. Benson, 285 U.S. 22, 62-63, 52 S. Ct. 285, 76 L. Ed. 598 (1932); Lucas v. Alexander, 279 U.S. 573, 577-578, 49 S. Ct. 426, 73 L. Ed. 851 (1929); Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 345-346, 48 S. Ct. 194, 72 L. Ed. 303 (1928); Blodgett v. Holden, 275 U.S. 142, 148-149, 48 S. Ct. 105, 72 L. Ed. 206 (1927) (opinion of Holmes, J.); Missouri Pacific R. Co. v. Boone, 270 U.S. 466, 471-472, 46 S. Ct. 341, 70 L. Ed. 688 (1926); Linder v. United States, 268 U.S. 5, 17-18, 45 S. Ct. 446, 69 L. Ed. 819 (1925); Panama R. Co. v. Johnson, 264 U.S. 375, 390, 44 S. Ct. 391, 68 L. Ed. 748 (1924); Texas v. Eastern Texas R. Co., 258 U.S. 204, 217, 42 S. Ct. 281, 66 L. Ed. 566 (1922); Baender v. Barnett, 255 U.S. 224, 225-226, 41 S. Ct. 271, 65 L. Ed. 597 (1921); United States v. Jin Fuey Moy, 241 U.S. 394, 401, 36 S. Ct. 658, 60 L. Ed. 1061 (1916); United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U.S. 366, 407-408, 29 S. Ct. 527, 53 L. Ed. 836 (1909); Hooper, 155 U.S., at 657, 15 S. Ct. 207, 39 L. Ed. 297; Grenada County Supervisors v. Brogden, 112 U.S. 261, 268-269, 5 S. Ct. 125, 28 L. Ed. 704 (1884); Coombs, 12. Pet., at 76, 9 L. Ed. 1004; Parsons v. Bedford, 3 Pet. 433, 448-449, 7 L. Ed. 732 (1830); Mossman, 4 Dall., at 14, 1 L. Ed. 720.

To be clear, the case before us is not a case of avoiding possible unconstitutionality. This is a case of avoiding actual unconstitutionality. There is a debate about the former practice. There is no real debate about the latter rule. And it is the latter rule of statutory interpretation at issue

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

here.

Section 924(c)(3)(B) is best read to focus on the defendant's actual conduct. But at a minimum-given the text, the background of substantial-risk laws, and the relevant precedents-it is fairly possible to interpret § 924(c)(3)(B) to focus on the defendant's actual conduct. Because that reasonable interpretation would save § 924(c)(3)(B) from unconstitutionality, this case should be very straightforward, as Judge Newsom explained in his thorough majority opinion in the Eleventh Circuit and as Judge Niemeyer and Judge Richardson explained in their persuasive separate opinions in the Fourth Circuit. Ovalles, 905 F.3d, at 1251; Simms, 914 F.3d, at 272 (opinion of Niemeyer, J.); id., at 272-277 (opinion of Richardson, J.). We should prefer the constitutional reading over the unconstitutional reading.

The Court did not apply constitu-<*pg. 795> tional avoidance in Johnson and Dimaya. Why not? In those two cases, the Court explained, the canon of constitutional avoidance was essentially rendered a nullity. That is because, as the Court described the situation, the Court was between a rock and a hard place. The categorical approach would have led to Fifth Amendment vagueness concerns, whereas applying the conduct-specific approach would have led to Sixth Amendment jury-trial concerns. See Dimaya, 584 U.S., at ___ - ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (plurality opinion).

Here, by contrast, the Court is not between a rock and a hard place. Applying the categorical approach to § 924(c)(3)(B) would lead to vagueness concerns, whereas applying the conduct-specific approach would lead to no constitutional concerns.

Faced with a choice between a rock and constitutionality, the Court chooses the rock. I do not understand that choice.

The Court offers two related reasons for its choice to run the statute into a rock. Neither reason holds up.

First, the Court concludes that the constitutional avoidance canon must yield to the rule of lenity. That argument disregards the Court's oft-repeated statements that the rule of lenity is a tool of last resort that applies ``only when, after consulting traditional canons of statutory construction,'' grievous ambiguity remains. Hayes, 555 U.S., at 429, 129 S. Ct. 1079, 172 L. Ed. 2d 816 (internal quotation marks omitted); see also, e.g., Ocasio v. United States, 578 U.S. ___, ___, n. 8, 136 S. Ct. 1423, 194 L. Ed. 2d 520 (2016) (``after seizing everything from which aid can be derived'' (internal quotation marks omitted)); Muscarello v. United States, 524 U.S. 125, 138, 118 S. Ct. 1911, 141 L. Ed. 2d 111 (1998) (same); United States v. Wells, 519 U.S. 482, 499, 117 S. Ct. 921, 137 L. Ed. 2d 107 (1997) (same); Reno v. Koray, 515 U.S. 50, 65, 115 S. Ct. 2021, 132 L. Ed. 2d 46 (1995) (same); United States v. Shabani, 513 U.S. 10, 17, 115 S. Ct.

2LED2D                                    39

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

382, 130 L. Ed. 2d 225 (1994) (``after consulting traditional canons of statutory construction''); Smith v. United States, 508 U.S. 223, 239, 113 S. Ct. 2050, 124 L. Ed. 2d 138 (1993) (``after seizing every thing from which aid can be derived'' (internal quotation marks and alterations omitted)); Moskal v. United States, 498 U.S. 103, 108, 111 S. Ct. 461, 112 L. Ed. 2d 449 (1990) (``after resort to the language and structure, legislative history, and motivating policies of the statute'' (internal quotation marks omitted)); Callanan v. United States, 364 U.S. 587, 596, 81 S. Ct. 321, 5 L. Ed. 2d 312 (1961) (``at the end of the process of construing what Congress has expressed'').

The constitutional avoidance canon is a traditional canon of statutory interpretation. The constitutional avoidance canon is employed to reach a reasonable interpretation of an ambiguous statute. Where, as here, that canon applies and yields such a reasonable interpretation, no grievous ambiguity remains. The rule of lenity has no role to play. Contrary to the Court's assertion, the canon of constitutional avoidance is not ``at war'' with the rule of lenity. Ante, at ___, 204 L. Ed. 2d, at 775. The canon of constitutional avoidance precedes the rule of lenity because the rule of lenity comes into play (this Court has said countless times) only ``after con-<*pg. 796> sulting traditional canons of statutory construction.'' Hayes, 555 U.S., at 429, 129 S. Ct. 1079, 172 L. Ed. 2d 816 (emphasis added; internal quotation marks omitted). The rule of lenity ``comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.'' Callanan, 364 U.S., at 596, 81 S. Ct. 321, 5 L. Ed. 2d 312.

In addition, the rule of lenity is triggered only in the face of ``grievous ambiguity.'' Muscarello, 524 U.S., at 139, 138, 118 S. Ct. 1911, 141 L. Ed. 2d 111 (internal quotation marks omitted). To reiterate, § 924(c)(3)(B) is best read to focus on the actual defendant's actual conduct. But to the extent that there is any ambiguity in § 924(c)(3)(B), that ambiguity is far from grievous.

Second, and relatedly, the Court claims that the canon of constitutional avoidance, as a general matter, cannot be relied upon to broaden the scope of a criminal statute, as opposed to narrowing the scope of a criminal statute. And the Court says that the canon cannot be used here because, in the Court's view, relying on the constitutional avoidance canon in this case would expand the scope of § 924(c)(3)(B). I disagree for two independent reasons.

To begin with, that theory seems to come out of nowhere. The Court's novel cabining of the constitutional avoidance canon is not reflected in this Court's precedents. On the contrary, it contradicts several precedents. This Court has applied the constitutional avoidance canon even when avoiding the constitutional problems would have broadened the statute's scope. For example, in United States v. Culbert, this Court rejected a narrowing construction of the Hobbs Act because that construction would have raised vagueness concerns. 435 U.S. 371, 374, 98 S. Ct. 1112, 55 L. Ed. 2d 349 (1978); see also United States v. Shreveport Grain & Elevator Co.,

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

287 U.S. 77, 82, 53 S. Ct. 42, 77 L. Ed. 175 (1932); cf. United States v. Grace, 461 U.S. 171, 176, 103 S. Ct. 1702, 75 L. Ed. 2d 736 (1983).

Moreover, the premise of this novel broadening/narrowing theory is flawed. A categorical approach to § 924(c)(3)(B) would not be inherently narrower than a conduct-specific approach. Each approach would sweep in some crimes that the other would not. On the one hand, some crimes that might be deemed categorically violent sometimes may be committed in nonviolent ways. Those crimes would be covered by the categorical approach but not by a conduct-specific approach. On the other hand, some categorically nonviolent crimes are committed in violent ways. Those crimes would not be covered by the categorical approach but would be covered by a conduct-specific approach. See Johnson, 576 U.S., at ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (Alito, J., dissenting).

In sum, the constitutional avoidance canon makes this an especially straightforward case. It is at least fairly possible to read § 924(c)(3)(B) to focus on the actual defendant's actual conduct during the actual crime. End of case.<*pg. 797>

### III

The consequences of the Court's decision today will be severe. By invalidating the substantial-risk prong of § 924(c)(3), the Court's decision will thwart Congress' law enforcement policies, destabilize the criminal justice system, and undermine safety in American communities. If the law required those results, we would have to swallow the consequences. But the law, in my respectful view, does no such thing.

The Court's decision means that people who in the future commit violent crimes with firearms may be able to escape conviction under § 924(c). In enacting § 924(c), Congress sought to keep firearms away from violent criminal situations. Today, the Court invalidates a critical provision designed to achieve that goal. To be sure, many violent crimes still might fall within § 924(c)(3)'s elements clause. But many others might not. When defendants use firearms during conspiracies to commit robbery, arsons, attempted carjackings, and kidnapings, to name just a few, they might no longer be subject to prosecution under § 924(c). See, e.g., Simms, 914 F.3d, at 233-234 (conspiracy to commit robbery); United States v. Salas, 889 F.3d 681, 683-684 (CA10 2018) (arson); United States v. Jenkins, 849 F.3d 390, 393 (CA7 2017) (kidnaping).

To get a flavor of the offenders who will now potentially avoid conviction under § 924(c), consider a sample of those offenders who have been convicted under § 924(c)(3)'s substantial-risk prong:

· One defendant committed assault with intent to commit murder. The defendant shot his wife

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

multiple times while the couple was camping in Buffalo River National Park. See United States v. Prickett, 839 F.3d 697, 698 (CA8 2016).

· One defendant committed arson. The defendant used a molotov cocktail to firebomb the Irish Ink Tattoo Shop. See Salas, 889 F.3d, at 683; United States v. Salazar, 2014 WL 12788997, *1 (NM, Aug. 14, 2014).

· One defendant and others kidnaped a man who they believed had stolen money and an Xbox from the defendant. They beat the man severely and threatened to kill him. See Pet. for Cert. in United States v. Jenkins, O. T. 2017, No. 17-97, p. 2.

· One defendant committed conspiracy to commit robbery. The defendant and his co-conspirators planned to steal Percocet and cash from a man they thought was a drug dealer. Armed with a pistol and a crowbar, they broke into the man's home by shattering a sliding glass door and found three men there. One of the defendant's co-conspirators attacked all three men with the crowbar, and the defendant threatened the men with a pistol multiple times. See United States v. Douglas, 907 F.3d 1, 4-5 (CA1 2018).

· One defendant committed attempted carjacking. Armed with guns and baseball bats, the defendant and her co-conspirators robbed a grocery store and carjacked two vehicles, pistol whipping the owner of one of the vehicles in the process. They then attempted to carjack a third vehicle. They approached a family getting out of a minivan and demanded the keys. One of the defendant's co-<*pg. 798> conspirators hit a 13-year-old girl in the mouth with a baseball bat. Another shot an AK-47 at the girl's family. See Ovalles, 905 F.3d, at 1235.

· One defendant operated multiple houses of prostitution in Annapolis. The defendant threatened perceived competitors with violence. He also beat and threatened women, sometimes to compel them to engage in prostitution. See United States v. Fuertes, 805 F.3d 485, 490-492 (CA4 2015).

· One defendant committed conspiracy to commit robbery. In the middle of the night, the defendant and a co-conspirator crawled into a McDonald's through the drive-through window. The defendant pointed a gun at the restaurant's manager and attempted to hit another employee. The defendant demanded money, and the manager complied. The defendant then removed money from the cash drawer, pistol whipped the manager, threw the cash drawer at the other employee, and fled the scene along with his co-conspirators and $1,100. See Simms, 914 F.3d, at 232.

· One defendant committed conspiracy to commit robbery. The defendant and his co-conspirators committed a string of armed robberies of small businesses. During the robberies, they wore masks and gloves. They were armed with guns, knives, and baseball bats. They injured

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

several people during the course of their robberies, breaking bones, drawing blood, and knocking people out. They also shot and killed one of their victims point blank. See Barrett, 903 F.3d, at 170, 184.

Those real-life stories highlight a second unfortunate consequence of the Court's decision. Many offenders who have already committed violent crimes with firearms-and who have already been convicted under § 924(c)-may be released early from prison. The Court's decision will apply to all defendants whose convictions are not yet final on direct review and who preserved the argument. With the benefit of this Court's decision, many dangerous offenders who received lengthy prison sentences as a result of their violent conduct might walk out of prison early. And who knows whether the ruling will be retroactive? Courts will be inundated with collateral-review petitions from some of the most dangerous federal offenders in America. As Judge Niemeyer wrote in his separate opinion in the Fourth Circuit, ``thousands of § 924(c)(1) convictions will unnecessarily be challenged as premised on what the majority today concludes is an unconstitutionally vague provision, even though the parties in those cases had little difficulty understanding, enforcing, or defending the § 924(c)(1) charges at issue.'' Simms, 914 F.3d, at 264.

Moreover, defendants who successfully challenge their § 924(c) convictions will not merely be resentenced. Rather, their § 924(c) convictions will be thrown out altogether. That is because, to restate an obvious point, § 924(c) defines a substantive criminal offense. To be sure, the § 924(c) defendants may also be serving other sentences for other convictions (for instance, if they were convicted of and <*pg. 799> sentenced for the underlying crime of violence). But with the benefit of the Court's decision, they may be able to get their § 924(c) convictions tossed and lop off years-potentially decades-from their total prison time.

All because the Court thinks that § 924(c)(3)(B) unambiguously compels a focus on the imagined conduct of a hypothetical defendant rather than on the actual conduct of the actual defendant. That analysis is not persuasive, especially in light of the constitutional avoidance doctrine. It is true that the Government once advocated for a categorical approach. But in the early years after Congress added a ``crime of violence'' definition to § 924(c), before courts settled on a categorical approach, the Government correctly argued for a conduct-specific approach to the substantial-risk prong. See, e.g., United States v. Cruz, 805 F.2d 1464, 1469 (CA11 1986). The Government later changed its tune only after the courts settled on a categorical approach-at a time when it did not matter for constitutional vagueness purposes, before Johnson and Dimaya. In any event, the question is what to do now after Johnson and Dimaya. The answer should not be hard. To quote Judge William Pryor, writing for five judges in the Eleventh Circuit, how ``did we ever reach the point where'' we ``must debate whether a carjacking in which an assailant struck a 13-year-old girl in the mouth with a baseball bat and a cohort fired an AK-47 at her family is a crime of violence? It's nuts.'' Ovalles, 905 F.3d, at 1253 (concurring opinion).

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

To be sure, the consequences cannot change our understanding of the law. But when the consequences are this bad, it is useful to double-check the work. And double-checking here, in my view, reveals several problems: relying on cases from the priorconviction context whose rationales do not apply in this current-offense context; not fully accounting for the long tradition of substantial-risk criminal statutes; not reading the words of the statute in context and consistent with precedents such as Hayes; and then, perhaps most problematically, misapplying the longstanding constitutional avoidance canon. After double-checking, it should be evident that the law does not compel those serious consequences. I am not persuaded that the Court can blame this decision on Congress. The Court has a way out, if it wants a way out.

\* \* \*

The Court usually reads statutes with a presumption of rationality and a presumption of constitutionality. Instead of reading § 924(c)(3)(B) to ensure that it is constitutional, the Court reads § 924(c)(3)(B) in a way that makes it unconstitutional. The bedrock principle that the Court interprets ambiguous statutes to avoid unconstitutionality is seemingly transformed into a principle of interpreting ambiguous statutes to lead to unconstitutionality.

I respect and entirely understand how the Court got here. Johnson and Dimaya were earth-rattling decisions. But we should not follow Johnson and Dimaya off the constitutional cliff in this different § 924(c) context. Unlike <\*pg. 800> the statutes at issue in Johnson and Dimaya, this statute is not a prior-conviction statute. This statute operates entirely in the present and is not remotely vague. I respectfully dissent.

### FOOTNOTES

[1] When this case was tried, a defendant convicted of two § 924(c) violations in a single prosecution faced a 25-year minimum for the second violation. See Deal v. United States, 508 U.S. 129, 132, 113 S. Ct. 1993, 124 L. Ed. 2d 44 (1993); § 1(a)(1), 112 Stat. 3469. In 2018, Congress changed the law so that, going forward, only a second § 924(c) violation committed ``after a prior [§ 924(c)] conviction . . . has become final'' will trigger the 25-year minimum. Pub. L. 115-391, § 403(a), 132 Stat. 5221.

[2] Compare United States v. Simms, 914 F.3d 229, 236-246 (CA4 2019) (en banc), United States v. Salas, 889 F.3d 681, 685-686 (CA10 2018), and United States v. Eshetu, 898 F.3d 36, 37-38 (CADC 2018) (holding that § 924(c)(3)(B) is vague), with United States v. Douglas, 907 F.3d 1, 11-16 (CA1 2018), Ovalles v. United States, 905 F.3d 1231, 1240-1252 (CA11 2018) (en banc), and United States v. Barrett, 903 F.3d 166, 178-184 (CA2 2018) (taking the opposite view).

[3] Section 16 provides that the term ``crime of violence'' means ``(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that

2LED2D                                    44

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

physical force against the person or property of another may be used in the course of committing the offense.''

4 See, e.g., United States v. Acosta, 470 F.3d 132, 134-135 (CA2 2006); United States v. Butler, 496 Fed. Appx. 158, 161 (CA3 2012); United States v. Fuertes, 805 F.3d 485, 498 (CA4 2015); United States v. Williams, 343 F.3d 423, 431 (CA5 2003); Evans v. Zych, 644 F.3d 447, 453 (CA6 2011); United States v. Jackson, 865 F.3d 946, 952 (CA7 2017), vacated and remanded, 584 U.S. ___, 138 S. Ct. 1983, 201 L. Ed. 2d 240 (2018); United States v. Moore, 38 F.3d 977, 979-980 (CA8 1994); United States v. Amparo, 68 F.3d 1222, 1225-1226 (CA9 1995); United States v. Munro, 394 F.3d 865, 870 (CA10 2005); United States v. McGuire, 706 F.3d 1333, 1336-1337 (CA11 2013); United States v. Kennedy, 133 F.3d 53, 56 (CADC 1998); see also Ovalles v. United States, 905 F.3d 1231, 1295 (CA11 2018) (en banc) (J. Pryor, J., dissenting) (``For years, and even after Johnson, the government consistently has urged that we apply a categorical approach to § 924(c)'').

5 The government's own regulations reflect this understanding of the ordinary meaning of ``by its nature.'' A Department of Justice regulation provides that an inmate is not eligible for early release if he was convicted of an offense ``that, by its nature or conduct, presents a serious potential risk of physical force.'' 28 CFR § 550.55(b)(5)(iii) (2017) (emphasis added); see Bush v. Pitzer, 133 F.3d 455, 458 (CA7 1997) (denying early release because ``[c]onspiracy does not by its 'nature' present a serious risk; but Bush's 'conduct' did so'').

6 There are at least two different canons of construction that sometimes go by the name ``constitutional avoidance.'' The one the government invokes here is perhaps better termed the presumption of constitutionality. Of long lineage, [12] it holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional, see, e.g., Parsons v. Bedford, 3 Pet. 433, 448-449, 7 L. Ed. 732 (1830) (Story, J.), and it is distinct from the more modern (and more debated) constitutional doubt canon, which suggests courts should construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality, see Rust v. Sullivan, 500 U.S. 173, 190-191, 111 S. Ct. 1759, 114 L. Ed. 2d 233 (1991).

7 The government claims to have found cases invoking the canon to expand a statute's reach, but none actually stands for that proposition. Each simply remarks in passing that a construction the Court arrived at for other reasons had the additional benefit of avoiding vagueness concerns; none suggests that a narrower construction was available. See United States v. Grace, 461 U.S. 171, 176, 103 S. Ct. 1702, 75 L. Ed. 2d 736 (1983) (accepting government's construction, which was ``not contested by appellees''); United States v. Culbert, 435 U.S. 371, 379, 98 S. Ct. 1112, 55 L. Ed. 2d 349 (1978) (finding statute clear and refusing to ``manufacture ambiguity where none exists''); United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 82-83, 53 S. Ct. 42, 77 L. Ed. 175 (1932) (finding statute unambiguous and construing it according to ``the natural import of its terms''). And the dissent, despite compiling a page-long list of constitutional avoidance cases spanning ``more than 200 years,'' post, at ___ - ___, 204 L. Ed. 2d, at 794-795, has been unable to find any better examples. See post, at ___ - ___, 204 L. Ed. 2d, at 795-797 (opinion of Kavanaugh, J.).

8 Admittedly, abandoning the categorical approach in favor of the case-specific approach would also have the effect of excluding from the statute's coverage defendants who commit categorically violent felonies in nonviolent ways, and in that respect would be more ``lenient'' for some defendants. Regardless, the constitutional principles underlying the rule of lenity counsel caution before invoking constitutional avoidance to construe the statute to punish conduct that it does not unambiguously

2LED2D                                            45

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

89280053

proscribe.

**9** To be sure, the dissent suggests that Leocal and Dimaya adopted a categorical reading simply to avoid practical and constitutional problems. Post, at ___ - ___, 204 L. Ed. 2d, at 787-788, 792, and n. 23. But, as we have seen, this too is mistaken. Leocal did not even mention those problems, and Dimaya held that the text demanded a categorical approach. See supra, at ___, 204 L. Ed. 2d, at 768.

**10** The dissent claims that Taylor v. United States, 495 U.S. 575, 110 S. Ct. 2143, 109 L. Ed. 2d 607 (1990), and Nijhawan v. Holder, 557 U.S. 29, 129 S. Ct. 2294, 174 L. Ed. 2d 22 (2009), pointed to ``the absence of the word 'involved' '' as one reason to adopt a categorical approach. Post, at ___, 204 L. Ed. 2d, at 791. Not true. Taylor explained that the ACCA's elements clause requires a categorical approach in part because it refers to a crime ``that 'has as an element'-not any crime that, in a particular case, involves-the use or threat of force.'' 495 U.S., at 600, 110 S. Ct. 2143, 109 L. Ed. 2d 607. All the work in that sentence was being done by the phrase ``in a particular case,'' not by the word ``involves.'' And Nijhawan noted that the Court had construed the ACCA's residual clause, which refers to crimes ``that 'involv[e] conduct that presents a serious potential risk of physical injury,'' to require the categorical approach. 557 U.S., at 36, 129 S. Ct. 2294, 174 L. Ed. 2d 22.

**1** The statistics contained in the introduction are drawn from: Dept. of Justice, Federal Bureau of Investigation, Uniform Crime Reports 6-7, 8-9 (1963) (rise in violent crime with firearms in the 1960s); id., at 1, 6-7, 9 (1968) (same); Pew Research Center, Gun Homicide Rate Down 49 - Since 1993 Peak; Public Unaware 6, n. 5, and 36, 50 (2013) (decrease in violent crime with firearms over about the past 25 years); N. James, Congressional Research Service, Recent Violent Crime Trends in the United States 25-26 (Rep. No. R45236) (June 20, 2018) (decrease in violent crime over about the past 25 years).

**2** Section 924(c)(1)(A) provides: ``Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime-(i) be sentenced to a term of imprisonment of not less than 5 years; (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.'' Section 924(c)(1)(B) imposes heightened penalties for certain types of firearms and firearm devices, and § 924(c)(1)(C) imposes heightened penalties for subsequent § 924(c) convictions.

**3** Section 924(c)(3) provides: ``For purposes of this subsection the term 'crime of violence' means an offense that is a felony and-(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.''

**4** See, e.g., Colo. Rev. Stat. § 18-8-103(1)(b) (2018) (``substantial risk of causing bodily injury''); Ind. Code § 35-44.1-3-1(b)(1)(B) (2019) (``substantial risk of bodily injury''); Mo. Rev. Stat. § 575.150 (2016) (``substantial risk of serious physical injury or death''); Neb. Rev. Stat. § 28-904(1)(b) (2016) (``substantial risk of causing physical injury''); Ore. Rev. Stat. § 162.315(2)(c) (2017) (``substantial risk of physical injury'').

2LED2D                                  46

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

[5] See, e.g., Alaska Stat. § 11.41.300(a)(2)(B) (2018) (``substantial risk of serious physical injury''); Ohio Rev. Code Ann. § 2905.01(B) (Lexis Supp. 2019) (``substantial risk of serious physical harm'').

[6] See, e.g., Ala. Code § 13A-6-20(a)(3) (2015) (``grave risk of death''); Del. Code Ann., Tit. 11, § 613(a)(3) (2015) (``substantial risk of death''); D.C. Code § 22-404.01(a)(2) (2018 Cum. Supp.) (``grave risk of serious bodily injury''); Mo. Rev. Stat. § 565.056(1)(4) (2016) (``substantial risk of death or serious physical injury''); Utah Code § 76-5-102(1)(b) (2017) (``substantial risk of bodily injury'').

[7] See, e.g., Ind. Code § 35-42-2-1.5 (Supp. 2018) (``substantial risk of death''); Wis. Stat. § 940.19(6) (2016) (``substantial risk of great bodily harm'').

[8] See, e.g., Me. Rev. Stat. Ann., Tit. 17-A, § 211(1) (2006) (``substantial risk of serious bodily injury''), § 213(1) (same); Okla. Stat., Tit. 21, § 1289.11 (2011) (``unreasonable risk and probability of death or great bodily harm''); Wis. Stat. Ann. § 939.24(1) (2016) (``unreasonable and substantial risk of death or great bodily harm'').

[9] See, e.g., Ariz. Rev. Stat. Ann. §§ 13-1201(A), (B) (2010) (``substantial risk of imminent death or physical injury'' and ``substantial risk of imminent death''); N. D. Cent. Code Ann. § 12.1-17-03 (2012) (``substantial risk of serious bodily injury or death''); Ore. Rev. Stat. § 163.195(1) (2017) (``substantial risk of serious physical injury''); Wash. Rev. Code § 9A.36.050(1) (2018) (``substantial risk of death or serious physical injury'').

[10] See, e.g., Ark. Code § 5-11-103(a) (2013) (``substantial risk of serious physical injury''); Conn. Gen. Stat. § 53a-95(a) (2017) (``substantial risk of physical injury''); Tex. Penal Code Ann. § 20.02(c)(2)(A) (2019) (``substantial risk of serious bodily injury'').

[11] See, e.g., Ind. Code § 35-43-4-2(a)(2)(B) (2018) (``substantial risk of bodily injury''); Minn. Stat. § 609.52(3a) (2016) (``reasonably foreseeable risk of bodily harm'').

[12] See, e.g., Ind. Code § 35-42-2-2.5(a) (2018) (``substantial risk of bodily injury''); Miss. Code. Ann. §§ 97-3-105(1), (3) (2014) (``substantial risk of physical injury''); Mo. Rev. Stat. §§ 578.365(1), (5) (2016) (``probable risk of the loss of life or probable bodily or psychological harm'' and ``substantial risk to the life of the student or prospective member''); Ohio Rev. Code Ann. § 2903.31(A) (Lexis 2014) (``substantial risk of causing mental or physical harm''); Ore. Rev. Stat. §§ 163.197(4)(a)(B), (C) (2017) (``unreasonable risk of harm'').

[13] See, e.g., Iowa Code § 709.3(1)(a) (2019) (``substantial risk of death or serious injury''); N. C. Gen. Stat. Ann. § 14-318.2(a) (2017) (``substantial risk of physical injury''); W. Va. Code Ann. §§ 61-8D-3(c), (d)(1) (2014) (``substantial risk of death or serious bodily injury'' and ``substantial risk of bodily injury''); Wis. Stat. §§ 948.03(1), (4)(a), (b) (2016) (``unreasonable risk of harm,'' ``unreasonable risk of great bodily harm,'' and ``unreasonable risk of bodily harm'').

[14] See, e.g., Fla. Stat. § 825.102(3)(a) (2018) (``substantial risk of death''), § 827.03(1)(e) (same); W. Va. Code Ann. §§ 61-8D-4(c), (d)(1) (2014) (``substantial risk of death or serious bodily injury'' and ``substantial risk of bodily injury'').

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

**15** See, e.g., Kan. Stat. Ann. §§ 21-5812(c)(2)(A)(i), (ii) (2018 Cum. Supp.) (``substantial risk of bodily harm''); R. I. Gen. Laws § 11-4-2 (2002) (``substantial risk of serious physical harm''); Wis. Stat. §§ 941.11(1), (2) (2016) (``unreasonable risk of death or great bodily harm'').

**16** See, e.g., Ala. Code § 13A-6-2(a)(2) (2015) (``grave risk of death''); Kan. Stat. Ann. § 21-5406(a) (2018 Cum. Supp.) (``unreasonable risk of injury''); N. Y. Penal Law Ann. § 125.20(4) (West 2009) (``grave risk of serious physical injury''), §§ 125.25(2), (4) (``grave risk of death'' and ``grave risk of serious physical injury or death'').

**17** See, e.g., Alaska Stat. § 11.61.190(a)(2) (2018) (``substantial and unjustifiable risk of physical injury''); Ark. Code Ann. § 5-74-107(b)(1) (Supp. 2017) (``substantial risk of physical injury''); Ohio Rev. Code Ann. § 2923.162(C)(2) (Lexis 2014) (``substantial risk of physical harm''); R. I. Gen. Laws § 11-47-61 (2002) (``substantial risk of death or serious injury''); Wash. Rev. Code § 9A.36.045(1) (2018) (``substantial risk of death or serious physical injury''); W. Va. Code Ann. § 61-7-12 (2014) (``substantial risk of death or serious bodily injury'').

**18** Judge Niemeyer's opinion was joined by Judges Wilkinson, Duncan, Agee, Keenan, and Quattlebaum.

**19** Judge Newsom's majority opinion was joined by Chief Judge Ed Carnes and Judges Tjoflat, Marcus, William Pryor, Rosenbaum, Branch, and Hull.

**20** Tellingly, the Government in Johnson and Dimaya did not dispute that the categorical approach was the proper method of interpreting the statutes at issue. See Sessions v. Dimaya, 584 U.S. ___, ___, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018) (plurality opinion) 138 S. Ct. 1204, 200 L. Ed. 2d 549; Johnson v. United States, 576 U.S. ___, ___, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). In this case, the Government strenuously disputes the applicability of the categorical approach precisely because the inquiry is not about past convictions.

**21** More generally, this Court has often said that ``identical language may convey varying content'' in the same statute, based on context. Yates v. United States, 574 U.S. 528, 537, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015) (plurality opinion); see also Utility Air Regulatory Group v. EPA, 573 U.S. 302, 319-320, 134 S. Ct. 2427, 189 L. Ed. 2d 372 (2014).

**22** This duplication point is icing on a textual cake already frosted. In other words, our interpretation of the term ``offense'' is informed by the text and by our precedents. Our interpretation stands with or without the duplication argument.

**23** In Leocal, the Court interpreted § 16(b) to require a categorical approach. But unlike § 924(c)(3)(B), that statutory provision applied in the context of past convictions. See 8 U.S. C. §§ 1101(a)(43)(F), 1227(a)(2)(A)(iii); Sentencing Reform Act of 1984, § 217(a), 98 Stat. 2021; Comprehensive Crime Control Act of 1984, § 1202, 98 Stat. 2151. To be sure, § 16(b) was once incorporated into § 924(c). But in 1986, Congress severed the two provisions and included a standalone ``crime of violence'' definition in § 924(c). For those two reasons, § 924(c)(3)(B) need not and should not be interpreted in the same way as § 16(b).

2LED2D                                     48

© 2022 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

AO 440 (Rev. 06/12) Summons in a Civil Action

COPY

# UNITED STATES DISTRICT COURT
for the
Eastern District of New York

| | |
|---|---|
| Bryan W. Henry | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) |
| | ) Civil Action No. 2:21-cv-5682 JMA-ARL |
| Brzeski et al | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Robert Brzeski
Nassau County
Police Department
1490 Franklin Ave
Mineola, NY 11501

Matthew Ross
Nassau County
Police Department
1490 Franklin Ave
Mineola, NY 11501

Michael Mullen
Nassau County
Police Department
1490 Franklin Ave
Mineola, NY 11501

*See Rider Attached

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Pro Se Plaintiff
Bryan W. Henry
39 Smith Street
Greenlawn, NY 11740

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER

CLERK OF COURT

Date: _____10/18/2021_____

_____
Signature of Clerk or Deputy Clerk

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  2:21-cv-5682 JMA-ARL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

&#9633; I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

&#9633; I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

&#9633; I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

&#9633; I returned the summons unexecuted because _____ ; or

&#9633; Other *(specify)*:



My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Robert Brzeski (Shield No. 518)
Nassau County Police Department
1490 Franklin Ave
Mineola, NY 11501


Matthew Ross (Shield No. 834)
Nassau County Police Department
1490 Franklin Ave
Mineola, NY 11501


Michael Mullen (Shield No. 1508)
Nassau County Police Department
1490 Franklin Ave
Mineola, NY 11501


Rafael Morales (Shield No. 1032)
Nassau County Police Department
1490 Franklin Ave
Mineola, NY 11501


Chris Stein (Shield No.     )
Nassau County Police Department
1490 Franklin Ave
Mineola, NY 11501

RECEIVED IN PRO SE OFFICE

UNITED STATES DISTRICT COURT          OCT 1 2 2021
EASTERN DISTRICT OF NEW YORK



---------------------------------------------------------X

BRYAN W. HENRY                                    **VERIFIED COMPLAINT**

                  Plaintiff,          Civil Action _____-cv-_____

                           (___)(___)

       -against-                     **CV 21 - 5682**

ROBERT BRZESKI, sued individually and in his        **JURY TRIAL DEMANDED**
Capacity as a Detective of the Nassau County Police
Department; MATTHEW ROSS, sued individually
and in his capacity as a Detective of the Nassau        **FEUERSTEIN, J.**
County Police Department; MICHAEL MULLEN,
sued individually and in his capacity as a Police Officer
of the Bureau of Special Operations of the Nassau
County Police Department; RAFAEL MORALES,            **LINDSAY, M.J.**
sued individually and in his capacity as a Police
Officer of the Bureau of Special Operations of the
Nassau County Police Department; CHRIS STEIN, sued
Individually and in his capacity as a Police Officer
Of the Bureau of Special Operations.

                  Defendants.

---------------------------------------------------------X

      Plaintiff, Bryan W. Henry, proceeding Pro Per, for this Verified Complaint against

Defendants Robert Brzeski; Matthew Ross; Michael Mullen; Rafael Morales; and Chris Stein,

hereby states, alleges and swears under the penalty of perjury as follows:


**PARTIES**

1.    Plaintiff, Bryan W. Henry (hereinafter referred to as "Bryan") is a natural person

residing in Suffolk County, New York, and at all relevant times to this lawsuit, Bryan's primary

place of residence is/were in the State of New York between Nassau and Suffolk County.

1

2.      Defendant Robert Brzeski (hereinafter referred to as "Brzeski") was employed by the Nassau County Police Department since 1986. At all times relevant to this Verified Complaint, Brzeski was a police officer of the Nassau County Police Department with the rank of Detective in the Homicide Division, while acting under color of state law, within the scope of his employment, and having the posers and duties imposed by law thereon.

3.      Defendant Matthew Ross (hereinafter referred to as "Ross") was employed by the Nassau County Police Department since 1989. At all times relevant to this Verified Complaint, Ross was a police officer of the Nassau County Police Department with the rank of Detective in the Homicide Division, while acting under color of state law, within the scope of his employment, and having the posers and duties imposed by law thereon.

4.      Defendant Michael Mullen (hereinafter referred to as "Mullen") was employed by the Nassau County Police Department since 1998. At all times relevant to this Verified Complaint, Mullen was a police officer of the Nassau County Police Department and assigned to the Bureau of Special Operations, while acting under color of state law, within the scope of his employment, and having the posers and duties imposed by law thereon.

5.      Defendant Rafael Morales (hereinafter referred to as "Morales") was employed by the Nassau County Police Department since 1993. At all times relevant to this Verified Complaint, Morales was a police officer of the Nassau County Police Department and assigned to the Bureau of Special Operations, while acting under color of state law, within the scope of his employment, and having the posers and duties imposed by law thereon.

6.      Defendant Chris Stein (hereinafter referred to as "Stein") was employed by the Nassau County Police Department. At all times relevant to this Verified Complaint, Stein was a police officer of the Nassau County Police Department and assigned to the Bureau of Special

Operations, while acting under color of state law, within the scope of his employment, and having the posers and duties imposed by law thereon.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

8.      Supplemental jurisdiction over Bryan's State Law claims exists pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b), because that is the judicial district in which the claims arose, and in which the defendants resided or conducted business in 2010.

## JURY DEMAND

10.     Pursuant to the Seventh Amendment of the United States Constitution, Bryan requests a jury trial on all issues and claims set forth in this Verified Complaint.

## PREAMBLE STATEMENT

11.     This case arises from a robbery that occurred on December 13, 2010, and a homicide that occurred on December 15, 2010 — both incidents unrelated to each other.

12.     Indeed, in both incidents, Bryan was neither identified by the victim(s), witnesses, nor by any other means. In fact, no one was identified as the perpetrator(s), but instead, the sole and only evidence tying anyone to either incident was surveillance footage of a car sharing a

3

similar likeness of Lisa Pippins ("Lisa") -- Bryan's sister -- at, near or leaving the respective scenes.

13.    On December 20, 2010, as Bryan and his friend (Gary Moseley) were sitting idled in Lisa's car. A vehicle with tinted windows pulled up slowly next to them, and the driver rolled down the window, extended his hand out, and gestured as if he was shooting a gun. Frightened, Bryan suddenly sped away, at which point that same vehicle made an immediate u-turn and gave chase. After about five minutes of trailing behind Bryan, the vehicle initiated its emergency lights signifying it's an unmarked police vehicle. Bryan immediately pulled over, to which Defendant Mullen (together with his then-partner, Detective Andrew Carbone) exited the vehicle with their guns drawn, barking at Bryan and Mr. Moseley to exit their vehicle. Both Bryan and Mr. Moseley was searched, marijuiana was discovered on Mr. Mosley's person, but Defendant Mullen and his partner arrested both Bryan and Mr. Moseley for marijuana possession.

14.    The following day, Bryan was arraigned, appointed counsel, and after bail was set, he posted bail and was released.

15.    On December 22, 2010, at or about 9:30pm, while visiting a friend's home (located at: 23 Union Place, Roosevelt, NY 11575), standing on the porch, Bryan noticed an unmarked car pull up behind the vehicle he was driving (a vehicle registered to Lisa). Jarred from the recent arrest, Bryan called his mother, Johnnie Pippins ("Ms. Pippins") and reported that the police converged onto Lisa's car, and he wanted her to come to his aid.

16.    Two plained clothed officers exited their vehicle and began inspecting the vehicle. With Bryan's uncle (Herman Patterson ("Mr. Patterson")) and friends (Melvin Jefferson and Hesekiah Mcconeghey) sitting in the passenger and rear seats, the officers asked, "where is the driver?" While approaching, Bryan announced he was the driver. The officer ordered all of the

4

occupants to exit the vehicle, and likewise directed Bryan to stand next to them. Without explanation, the officer demanded Bryan and the occupants identification, and they were all searched.

17.    Shortly thereafter, Ms. Pippins, Lisa and Jacqueline arrived at the scene, and witnessed the police arresting Mr. Mcconeghey for marijuana possession, and further directing Mr. Jefferson to walk away. As for Bryan and Mr. Patterson, they were ordered to drive away.

18.    However, as Bryan proceeded to drive away — per the officer's direction -- Defendant Morales together with Defendant Stein began trailing behind Bryan. Defendant Morales and Defendant Stein trailed Bryan for several street-blocks, until pulling him over, arresting him and then transported him to the First Precinct, not before advising Mr. Patterson that he was free to go.

19.    After transporting Bryan to the precinct, Defendant Morales and Defendant Stein turned Bryan over to Defendant Mullen at which point Bryan invoked his right to remain silent and the assistance of his attorney (Mr. Michael Biniakewitz, Esq.). Bryan was placed in a small room, handcuffed to a metal desk and held there for approximately seven hours until Defendants Brzeski and Defendant Ross arrived in the morning.

20.    When Defendant Brzeski and Defendant Ross arrived, Bryan again invoked his right to consult his attorney and to further asked speak with Ms. Pippins. His requests were denied, and for the next thirteen hours, Defendant Brezeski and Defendant Ross interrogated Bryan about the aforementioned robbery and murder. Through out the interrogation, Bryan repeatedly requested to speak to Mr. Biniakewitz Esq. or Ms. Pippins to no avail.

21.    On the thirteenth hour of interrogation, Defendants Brezski and Defendant Ross was able to coerce Bryan into signing an inculpatory statement that placed him at the scene of the robbery and homicide.

22.    Bryan was indicted and tried on the robbery and murder; and although Bryan was acquitted of the robbery and all other related offenses, he was however found guilty of murder, criminal possession of a weapon, and misdeamenor possesison of marijuana, and sentenced to an aggregate prison term of twenty years to life.

23.    However, on October 26, 2018, the conviction was vacated following a motion to vacate the conviction.

24.    It is Bryan's declaration that he was and is innocent of the crimes of which he was arrested, tried and convicted.

25.    Indeed it is Bryan's contention that his civil rights were violated when the Defendants knowingly and intentionally engaged in unlawful and unconstitutional acts that resulted in his incarceration for approximately eight years.


**FACTS**

26.    On December 13, 2010, Fitzpatrick Louis-Jean, Evan Grover, Mackensin Pierre and Robert Allie, were all allegedly robbed at gunpoint at a tattoo parlor the group were renovating. It was alleged that the robbers forcibly stole, among other things, money and cellular phones.

27.    On December 15, 2010, James McClenic (hereinafter referred to as "McClenic") was fatally shot at 711 Fulton Avenue, Hempstead, NY., while sitting inside of a vehicle at a local gas station.

6

28.     Outside of descriptions of masked gunmen perpetrating the respective crimes or sightings of a black Hyundai Sonata on or leaving the scenes of said crimes, Bryan was not identified as either the robber, shooter, driver, or in any other related manner.

## A.     DEFENDANT'S UNLAWFUL ARREST

29.     On December 20, 2010, while patrolling Roosevelt, Long Island, in an unmarked police vehicle, Mullen took notice of a black Hyundai Sonata, with tinted windows, sitting idled on Stevens Street. The driver of the vehicle was Bryan, however the registered owner of the vehicle was Lisa.

30.     When Bryan drove off, Defendant Mullen began trailing closely behind Bryan.

31.     Within minutes of trailing Bryan, Defendant Mullen initiated his emergency lights and pulled Bryan over. Without inquiry, Bryan and his Passenger were directed to exit the vehicle, where they were searched, marijuana was found on the Passenger's person, however both Bryan and the Passenger were arrested for possession of marijuana. While in custody, Defendant Mullen (along with his partner, Det. Andrew Carbone) searched the vehicle and discovered several cellular phones — of the phones, Bryan identified two of them, while rejecting ownership of the remaining phones.

32.     The following day, Bryan appeared for arraignment before the District Court, counsel was appointed, bail was set and Bryan was released on bond.

33.     On or about December 22, 2010, prior to Defendant Morales and Defendant Stein going on their tour, they were debriefed on Bryan's arrest for possession of marijuana and the unclaimed cellular phones recovered from the impounded vehicle.

34. Later that night, while Bryan was visiting a friend, several non-party officers from the Bureau of Special Operations converged on the vehicle Bryan was driving, as his uncle and friends sat in the vehicle waiting for Bryan.

35. Seeing the officers converge, Bryan called Ms. Pippins to come to his aid, in fear of being unduly accosted and arrested. (See, Exhibit A - Lisa Pippins' Declaration in Support of Bryan Henry's Verified Complaint)

36. After securing Bryan's driver license and the vehicle's registration and insurance, the Officers questioned Bryan and the other passengers about various crimes in the area, namely, gang activity, assaults and unsolved homicides.

37. After checking the validity of Bryan's driver license and the vehicle, the Officer permitted Bryan to proceed as he pleased together with Mr. Patterson, at which point, Ms. Pippins and Lisa, together with Jacqueline Pippins ("Jacqueline") -- Bryan's oldest sister -- arrived. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint)

38. Bryan exited his vehicle, and hurried to Ms. Pippins and his sisters to tell them what occurred.

39. To avoid any further issues, they advised Bryan to go home, and to ensure he heads straight home, they followed him. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint)

40. However, within seconds of driving to their residence, Defendant Morales and Defendant Stein careend behind Bryan and began to trail him. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop)[1]

---

[1] Please take notice that a DVD is attached to this Verified Complaint as Exhibit B, and therein the DVD is a 14 minute and 26 second video recording of the Traffic Stop described herein.

8

41.    Although Bryan obeyed all traffic laws (stopped at every stop sign or stop light, and adhered to the local speed limit), after trailing Bryan for several street blocks, Detective Morales and Detective Stein pulled Bryan over. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop)

42.    With Jacqueline trailing by the Defendant Morales and Defendant Stein, once they stopped, she stopped, and both Jacqueline and Lisa exited the vehicle not before Defendant Morales and Defendant Stein exited theirs. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop)

43.    Both Lisa and Jacqueline told Defendant Morales that the men they pulled over were their brother and uncle. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop)

44.    Defendant Morales ordered them to return to their vehicle and immediately asked Jacqueline for her drivers license, and the registration and insurance for the vehicle. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:02:41)

45.    Defendant Morales questions Ms. Pippins, Jacqualine and Lisa the identities of the men they pulled over. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop)

46.    After repeating who the men were, Ms. Pippins then asked, "what did you pull him over for? That's the question, what did he do?" (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:04:42)

9

47.     Morales responded, "you know why we're in Roosevelt?" (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:04:45)

48.     Ms. Pippins answers, "no, I don't." (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:4:46)

49.     Morales rhetorically continues, "I guess you don't hear the news of all the people getting shot and all the gang bangers running around huh?" (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:4:50)

50.     After assuring neither Bryan nor Mr. Patterson is involved in any crimes, let alone gang banging. Frustrated, Ms. Pippins relayed she doesn't want to argue, she just wants to go home. Defendant Morales responded, "There is no argument. I'm doing my job. It's 2 o'clock in the morning, I'm stopping people to see who's out in the streets. Ok!" (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:05:27)

51.     Ms. Pippins responded, "do you stop everyone that's out in the streets?" (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:05:36)

52.     Defendant Morales answered, "I'm stopping everybody I want to stop." (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:05:38)

53.     Ms. Pippins chimed in, "everybody black, or just black." (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:05:41)

54.     Defendant Morales averred, "well, I don't see too many white people in this neighborhood." (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:05:42)

55.     Approximately five minutes later, while Defendant Morales and Defendant Stein were tending to Bryan, Lisa went to Defendant Morales to ask whether he was finished with Jacqueline's license and other papers, because Ms. Pippins was beginning to have chest pains and they needed to leave to tend to her condition. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop)

56.     Defendant Morales handed Lisa, Jacqueline's documents, and assured that he's going to let Bryan go in a few minutes. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:10:58)

57.     Meanwhile, Bryan secretly called Lisa from his cell phone and advised her that Defendant Morales and Defendant Stein were questioning him about previous crimes, particularly previous unsolved homicides. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0) Bryan further advised that they wanted him to speak with certain homicide detectives to which Bryan declined. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:11:44)

58.     After radioing into dispatch that Bryan was in his custody at the behest of a traffic stop Defendant Stein received a call from Defendant Mullen who heard Bryan's name over the

radio waves; and thereto directed Defendant Morales and Defendant Stein to arrest Bryan and bring him into the precinct.

59.    Defendant Mullen advised Defendant Stein that Bryan was a suspect in the murder of McClenic, and Defendnat Ross and Defendant Brzeski wanted to talk to him.

60.    After relaying to Defendant Mullen that the reason why Bryan was pulled over was for no other reason than they wanted to see who was in the streets. Defendant Mullen advised Defendant Stein that they could arrest Bryan on the basis of the open Marijuana case Defendant Mullen arrested him earlier for. Defendant Mullen plotted, stolen phones were recovered from Bryan's vehicle when Bryan was arrested for possession of marijuana. Those stolen phones could be the reason used to arrest him and bring him so when Defendant Brzeski and Defendant Ross arrives the morning, they can question him.

61.    Defendant Stein confirmed that despite there being no outstanding warrants and the only reason Bryan was stopped in the first place was because it was "2:30am" and Defendant Morales 'wanted to see who was out here.' Defendant Mullen directed them to arrest Bryan, and bring him to the precinct, and on those reasons Defendant Morales and Defendant Stein arrested and transported Bryan into the First Precinct.

**B.    BRYAN HENRY'S UNLAWFUL INTERROGATION**

62.    During the transport, Bryan repeatedly asked why he was arrested, and other than being assured that "everything will be figured out when we get to the precinct," neither Defendant Morales nor Defendant Stein would answer him.

63.    Approximately 3:00am, Defendant Morales and Defendant Stein arrived at the Precinct with Bryan in their custody.

64.     They transferred Bryan into Defendant Mullen's custody, and although Bryan continued to ask why he was being arrested and demand to speak to Mr. Biniakewitz and Ms. Pippins, neither his questions were answered nor his requests provided.

65.     Sometime before Defendant Morales ends his tour, he writes Bryan a motor vehicle citation for an expired inspection and a speeding ticket. Defendant Morales also drafts and signs under the penalty of perjury, a criminal complaint charging Bryan with possession of stolen property. (See, Exhibit C - Unsigned District Court Information)

66.     Defendant Mullen escorted him into an interrogation room and handcuffed to a metal bench, leaving him there until the coming morning - approximately seven hours later - at about 10:00am, when Defendant Brzeski and Defendant Ross arrived.

67.     With Bryan dozing off in exhaustion, Defendant Brzeski and Defendant Ross entered the room and shoved him to awaken, and then commenced their interrogation. Bryan again requested to speak to his attorney or Ms. Pippins, and again his requests were ignored, however, Defendant Brzeski and Defendant Ross questioned Bryan about the aforementioned robbery and the murder of McClenic.

68.     Despite Bryan's repeated affirmations that he did not know anything about the robbery or homicide, and further pleas to speak with his attorney and Ms. Pippins, Defendant Brzeski and Defendant Ross interrogated Bryan for the next thirteen hours.

69.     Bryan was neither provided food, drink, or afforded the opportunity to use the restroom.

70.     Defendant Brzeski and Defendant Ross effected a variety of interrogation antics, from asking a string of questions stemming from irrelevant matters to the crimes at issue; to playing good-cop-bad-cop; shoving Bryan as he nodded off in slumber; to misrepresenting that

13

they had witnesses who swore they identified Bryan as the shooter. They even promised Bryan that "it will all be over" and he would be able to "go home," if he just admits to being present at the scene.

71.    Tired, exhausted, hungry, afraid, timid and alone, Bryan agreed, and through a written narration conjured up by Defendant Brzeski and Defendant Ross, Bryan signed a written statement alleging he was present at the scene of both the robbery and the murder of McClenic.

72.    With nothing more than Byran's coerced signed written statements, Bryan was arrested for the robbery and murder of McClenic.


C.    **BRYAN HENRY'S PROSECUTION & REVERSAL**

73.    On January 31, 2011, Bryan was indicted (People v. Henry, Case No. 00184N-2011) on 4 counts of Robbery in the 1st Degree (PL 160.15(4)); 2 counts of Attempted Robbery in the 1st Degree (PL 110/160.15(4)); 4 counts of Robbery in the 2nd Degree (PL 160.10(1)); 2 counts of Attempted Robbery in the 2nd Degree (PL 110/160.10(1)); 4 counts of Grand Larceny in the 4th Degree (PL 155.30(5)); 2 counts of Attempted Grand Larceny in the 4th Degree (PL 110/155.30(5)); 1 count of Criminal use of a Firearm in the 1st Degree (PL 265.09(1)(b)); 1 count of Murder in the 2nd Degree (PL 125.25(1)); 1 count of Criminal Possession of a Weapon in the 2nd Degree (PL 265.03(1)(b)); 1 count of Criminal Possession of a Weapon in the 2nd Degree (PL 265.03(3)); 1 count of Criminal Possession of Marijuana in the 5th Degree (PL 221.10(1)); 1 count of Criminal Possession of Stolen Property in the 5th Degree (PL 165.40); 1 count of VTL 1162; 2 counts of VTL 1172-a.

74.    On May 26, 2011, a suppression hearing ensued, and after the defendants and Bryan testified as to the lawfulness of his arrest and interrogation; and on June 7, 2011, the

14

Supreme Court suppressed all statements respective of the robbery, but however permitted the statements responsive to the homicide.

75.    On August 3, 2011, a trial ensued and after both the defense and the people rested their case, the people voluntarily moved to dismiss the four counts of grand larceny offense, one count of four robbery in the 1st degree counts, one count of the four robbery in the 2nd degree counts, and the two counts of attempted grand larceny in the 4th degree offenses; the Court dismissed the VTL infractions; and on August 19, 2011, the Jury acquitted Bryan of all the remaining offenses related to the robbery, but found him guilty of the murder offense, criminal possession of a weapon, and marijuana possession.

76.    On April 9, 2011, Bryan was sentenced to an aggregate term of twenty years to life. (See, Exhibit D - Sentencing Minutes)

77.    On November 16th, 2016, on appeal, the New York's Appellate Court, Second Department, reversed the conviction and remanded the case back to Nassau County Supreme Court for a new trial. People v. Bryan Henry, 144 A.D.3d 940 (2nd Dept. 2016)

78.    The Appellate Court concluded, in light of the determination that Bryan's right to counsel was violated when he was questioned with regard to the robbery charges, "we further find that his right to counsel was violated by questioning on the factually interwoven homicide matter." People v. Bryan Henry, 144 A.D.3d 940 (2nd Dept. 2016)

D.    **CONDITIONS OF BRYAN HENRY'S CONFINEMENT**

79.    Prior to Bryan's unlawful arrest, Bryan was a student at Nassau Community College pursuing a degree in Business Administration.

15

80.    For work, Bryan detailed cars with his uncle, Theodore Connor; and if he wasn't studying for class or detailing cars, he was working on honing a career in the music and entertainment industry as a music engineer and producer.

81.    However, that all came to a sudden and horrific halt, when Defendant Morales and Defendant Stein pretextually stopped Bryan to question him about unrelated and uncharged crimes. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop)

82.    The unlawful questioning during the unlawful traffic stop lasted approximately an hour, all while Ms. Pippins complained about having chest pains. (See, Exhibit A - Lisa Pippins' Declaration in Support of Verified Complaint); (See, Exhibit B - Video Recording of Traffic Stop at 0:06:12; 0:06:47; 0:09:36; 0:10:23; 0:12:30; and, 0:14:06)

83.    Indeed, the ordeal was so tolling on Ms. Pippins health that she later fell ill, and the following day, on December 24, 2010 she took her last breath and passed away.

84.    To add further impact to any already unfathomable loss of a parent and liberty, the violent death of McClenic, who news outlets featured as a local football star with a promising future brought Bryan a string of violent antagonists and combattants.

85.    In fact, the first day of Bryan's inception into Nassau County he was brutalized by gang members in retaliation to McClenic's death. In fact, such brutality was so severe that Bryan had no other choice but to seek the safety and security of protective custody.

86.    Bryan remained in either protective custody or administrative segregation for the entirety of his two year in Nassau County Jail awaiting the disposition of his indictment.

87.    Following Bryan's conviction, where he was sentenced to an aggregate term of twenty years to life.

16

88.     To add insult to an already horrific injury, the same year of Bryan was sentenced to spend the rest of his life in prison, Mr. Winston Henry, Bryan's father, also passed away.

### E.    THE DEAL

89.     On November 23, 2016, an order was issued to produce Bryan before the Supreme Court of Nassau County for a hearing, following the Appellate Court's decision to reverse Bryan's conviction.

90.     Within days of being transferred into Nassau County, Martin Geduldig Esq. visited Bryan and advised Bryan that he was indicted to one count of Murder in Aid of Racketeering Activity (18 U.S.C. Sec. 1959(a)(1)), which was the same murder he was convicted New York State Supreme Court that the Appellat Division reversed.

91.     Mr. Geduldig advised Bryan that the prosecutors knew he was not the murderer, and further advised Bryan that the actual murderer was an individual by the name of Eric Smith.

92.     Mr. Geduldig advised Bryan that he was being charged with the crime simply because an unknown witness informed the prosecutors that Bryan was the driver in the shooting.

93.     Mr. Geduldig advised Bryan that although the prosecutors believed he was  was the driver, they did not believe he was aware or otherwise involved in the murder.

94.     Mr. Geduldig advised Bryan that if he wanted to avoid prosecution, which carries a maximum sentence of life without parole, he should assist the prosecutors with convicting Mr. Smith.

95.     Bryan advised Mr. Geduldig, as he said to the Defendants, he did not know anything about the murder and so he could not help even if he wanted.

17

96.    Mr. Geduldig reiterated the same advice that if Bryan wanted to avoid serving the rest of his life in prison, he would "do whatever he has to do" to help the prosecutors secure Mr. Smith's conviction.

97.    Pressed with the pressure of serving the rest of his natural life in prison, and going through the same or similar tribulations as he did when Defendants arrested and prosecuted him, Bryan agreed to speak with the prosecutors, despite the fact not know anything about the murder to be a material witness.

98.    Over the next couple weeks, Bryan met with the prosecutors and agents, specifically Assistant United States Attorney, Nicole Boeckmann and Federal Agent Derrick Acker, together with Mr. Geduldig, among other prosecutors and defense attorneys. They collectively went over Bryan's role in the prosecution, and once Bryan's role was decided, on December 22, 2016, Bryan signed a proffer agreement with ADA Boeckmann and Agent Acker, where they curtailed Bryan statements and proposed trial testimony. In fact, while in preparation for trial testimony, whenever Bryan would depart from the narration ADA Boeckmann and Agent Acker created, Bryan would be immediately admonished and reminded that if he "fucks this up," they would not only do everything in their power to not only convict him, but they would also make sure the prison population knows he's an informant and would further ensure they he's housed in the same facility as Mr. Smith - "when we convict Mr. Smith."

99.    When ADA Boeckmann and Agent Acker was satisfied with Bryan's potential trial testimony, on March 16, 2017, Bryan plead gulty to the Murder in Aid of Racketeering charge under the condition that he cooperates with Mr. Smith's prosecution.

18

100.   In accordance with the conditions of his guilty plea, Bryan testified on behalf of the United States against Mr. Smith, and for his cooperation, on November 17, 2018 Bryan was sentenced to time-served on the charge.

F.    **BRYAN HENRY'S VACATED CONVICTION**

101.   On June 12, 2018, New York Court of Appeals reversed and remanded the Appellate Court's decision. People v. Bryan Henry, 31 N.Y.3d 364 (2018)

102.   On October 26, 2018, the People moved to Vacate and dismiss the indictment pursuant to CPL 440.10(1)(g) under CPL Sec. 210.20(e). (See, Exhibit E - Certificate of Disposition Dismissal)

## AS AND FOR A FIRST CAUSE OF ACTION:
## 42 U.S.C. § 1983 (DEFENDANT ROBERT BRZESKI)

103.   The allegations in paragraphs 1 through 102 of the Verified Complaint are repeated and realleged as if fully set forth herein.

104.   Defendant Brzeski knowingly and wilfully manufactured or caused the manufacturing of, a false written statement, which he prepared or had prepared and improperly compelled, induced or coerced Bryan to sign under "oath," inculpating Bryan as a participant in the aforemention robbery and murder of McClenic.

105.   Defendant Brzeski knowingly and intentionally had Bryan arrested without probable cause and further had Bryan incarcerated against his will or consent, where then Defendant Brzeski used deceptive, coercive and intimidating means to ascertain an inculpatory statement against Bryan's will or consent.

106.    Defendant Brzeski knew that the statement would and/or caused the statement to be relied upon as a basis to arrest Bryan, to formally initiate Bryan's prosecution, to indict Bryan on various criminal charges, to hold him for trial without bail, and to be used to convict Bryan where Bryan lost his liberty.

107.    Defendant Brzeski knowingly swore to a false criminal complaint, while knowing the falsity would be relied upon as a basis to arrest Bryan, to formally initiate Bryan's prosecution, to indict Bryan to charges associated thereof the statement, to hold him for trial without bail, and such statement was used to convict Bryan.

108.    Defendant Brzeski, with actual malice, initiated and continued, or caused the initiation and continuation of, criminal proceedings against Bryan for which Defendant Brzeski knew, or should have known, there was no probable cause, and for which in fact there was no probable cause, and thereby caused Bryan to be deprived of his liberty. Such proceedings ultimately were terminated in Bryan's favor.

109.    The aforesaid conduct, which Defendant Brzeski committed on his own, in concert with and in aid of others, and/or in concert or conspiracy with others named and unnamed, operated to deprive Bryan of his rights under the Constitution and the Laws of the United States:

       a.  Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," in violation of the Due Process and Fair Trial Clauses of the Fifth Sixth and Fourteenth Amendments to the United States Constitution; and,

20

b. Not to be deprived of one's liberty absent probable cause to believe that the accused committed a crime in violation of the accused's rights under the Fourth and Fourteenth Amendments of the United States Constitution.

110.    The foregoing violations of Bryan's federal constitutional rights by Defendant Brzeski and his co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Bryan's criminal prosecution, his loss of liberty and detention without bail, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages

111.    The foregoing violations of Bryan's rights amounted to Constitutional torts and were affected by actions taken under color of state law, and within the scope of Defendant Brzeski's employment and authority.

112.    Defendant Brzeski committed the foregoing violations of Bryan's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Bryan's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

113.    By reason of the foregoing, Defendant Brzeski is liable to Bryan, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.


### AS AND FOR A SECOND CAUSE OF ACTION: 42 U.S.C. § 1983 (DEFENDANT MATTHEW ROSS)

114.    The allegations in paragraphs 1 through 102 of the Verified Complaint are repeated and realleged as if fully set forth herein.

115.    Defendant Ross knowingly and wilfully manufactured or caused the manufacturing of, a false written statement, which he prepared or had prepared and improperly

compelled, induced or coerced Bryan to sign under "oath," inculpating Bryan as a participant in the aforemention robbery and murder of McClenic.

116.    Defendant Ross knowingly and intentionally had Bryan arrested without probable cause and further had Bryan incarcerated against his will or consent, where then Defendant Ross used deceptive, coercive and intimidating means to ascertain an inculpatory statement against Bryan's will or consent.

117.    Defendant Ross knew that the statement would and/or caused the statement to be relied upon as a basis to arrest Bryan, to formally initiate Bryan's prosecution, to indict Bryan on various criminal charges, to hold him for trial without bail, and to be used to convict Bryan where Bryan lost his liberty.

118.    Defendant Ross knowingly swore to a false criminal complaint, while knowing the falsity would be relied upon as a basis to arrest Bryan, to formally initiate Bryan's prosecution, to indict Bryan to charges associated thereof the statement, to hold him for trial without bail, and such statement was used to convict Bryan.

119.    Defendant Ross, with actual malice, initiated and continued, or caused the initiation and continuation of, criminal proceedings against Bryan for which Defendant Ross knew, or should have known, there was no probable cause, and for which in fact there was no probable cause, and thereby caused Bryan to be deprived of his liberty. Such proceedings ultimately were terminated in Bryan's favor.

120.    The aforesaid conduct, which Defendant Ross committed on his own, in concert with and in aid of others, and/or in concert or conspiracy with others named and unnamed, operated to deprive Bryan of his rights under the Constitution and the Laws of the United States:

22

a.  Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," in violation of the Due Process and Fair Trial Clauses of the Fifth Sixth and Fourteenth Amendments to the United States Constitution; and,

b.  Not to be deprived of one's liberty absent probable cause to believe that the accused committed a crime in violation of the accused's rights under the Fourth and Fourteenth Amendments of the United States Constitution.

121.    The foregoing violations of Bryan's federal constitutional rights by Defendant Ross and his co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Bryan's criminal prosecution, his loss of liberty and detention without bail, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages

122.    The foregoing violations of Bryan's rights amounted to Constitutional torts and were affected by actions taken under color of state law, and within the scope of Defendant Brzeski's employment and authority.

123.    Defendant Ross committed the foregoing violations of Bryan's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Bryan's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

124.    By reason of the foregoing, Defendant Brzeski is liable to Bryan, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

23

## AS AND FOR A THIRD CAUSE OF ACTION: 42 U.S.C. § 1983 (DEFENDANT MICHAEL MULLEN)

125.    The allegations in paragraphs 1 through 102 of the Verified Complaint are repeated and realleged as if fully set forth herein.

126.    Defendant Mullen knowingly and wilfully manufactured or caused the manufacturing of Bryan's unlawful arrest, which he perpetrated or had perpetrated through named and unnamed parties without just or probable cause so as to initiate or have initiated the prosecution of the aforemention robbery and murder of McClenic.

127.    Defendant Mullen knowingly and intentionally had Bryan arrested without probable cause and further had Bryan incarcerated against his will or consent.

128.    Defendant Mullen used deceptive, coercive and intimidating means to secure Bryan's unlawful arrest and incarceration without Bryan's will or consent.

129.    Defendant Mullen knew or should have known that Bryan's unlawful arrest and incarceration would result in named and unnamed parties unlawfully obtaining a statement that would and/or caused the statement to be relied upon as a basis to arrest Bryan, to formally initiate Bryan's prosecution, to indict Bryan on various criminal charges, to hold him for trial without bail, and to be used to convict Bryan where Bryan lost his liberty.

130.    Defendant Mullen knowingly swore to a false criminal complaint, while knowing the falsity would be relied upon as a basis to arrest Bryan, to formally initiate Bryan's prosecution, to indict Bryan to charges associated thereof the statement, to hold him for trial without bail, and such statement was used to convict Bryan.

131.    Defendant Mullen, with actual malice, initiated and continued, or caused the initiation and continuation of, criminal proceedings against Bryan for which Defendant Mullen

24

knew, or should have known, there was no probable cause, and for which in fact there was no probable cause, and thereby caused Bryan to be deprived of his liberty. Such proceedings ultimately were terminated in Bryan's favor.

132.    The aforesaid conduct, which Defendant Mullen committed on his own, in concert with and in aid of others, and/or in concert or conspiracy with others named and unnamed, operated to deprive Bryan of his rights under the Constitution and the Laws of the United States:

    a.  Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," in violation of the Due Process and Fair Trial Clauses of the Fifth Sixth and Fourteenth Amendments to the United States Constitution; and,

    b.  Not to be deprived of one's liberty absent probable cause to believe that the accused committed a crime in violation of the accused's rights under the Fourth and Fourteenth Amendments of the United States Constitution.

133.    The foregoing violations of Bryan's federal constitutional rights by Defendant Mullen and his co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Bryan's criminal prosecution, his loss of liberty and detention without bail, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages

134.    The foregoing violations of Bryan's rights amounted to Constitutional torts and were affected by actions taken under color of state law, and within the scope of Defendant Mullen's employment and authority.

135. Defendant Mullen committed the foregoing violations of Bryan's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Bryan's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

136. By reason of the foregoing, Defendant Mullen is liable to Bryan, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

### AS AND FOR A FOURTH CAUSE OF ACTION: 42 U.S.C. § 1983 (DEFENDANT RAFAEL MORALES)

137. The allegations in paragraphs 1 through 102 of the Verified Complaint are repeated and realleged as if fully set forth herein.

138. Defendant Morales knowingly and wilfully manufactured or caused the manufacturing of Bryan's unlawful arrest, which he perpeated or had perpetrated through named and unnamed parties without just or probable cause so as to initiate or have initiated the prosecution of the aforemention robbery and murder of McClenic.

139. Defendant Morales knowingly and intentionally arrested Bryan without probable cause and further had Bryan incarcerated against his will or consent.

140. Defendant Morales used deceptive, coercive and intimidating means to secure Bryan's unlawful arrest and incarceration without Bryan's will or consent.

141. Defendant Morales knew or should have known that Bryan's unlawful arrest and incarceration would result in named and unnamed parties unlawfully obtaining a statement that would and/or caused the statement to be relied upon as a basis to arrest Bryan, to formally initiate Bryan's prosecution, to indict Bryan on various criminal charges, to hold him for trial without bail, and to be used to convict Bryan where Bryan lost his liberty.

142.    Defendant Morales knowingly swore to a false criminal complaint, while knowing the falsity would be relied upon as a basis to arrest Bryan, to formally initiate Bryan's prosecution, to indict Bryan to charges associated thereof the statement, to hold him for trial without bail, and such statement was used to convict Bryan.

143.    Defendant Morales, with actual malice, initiated and continued, or caused the initiation and continuation of, criminal proceedings against Bryan for which Defendant Mullen knew, or should have known, there was no probable cause, and for which in fact there was no probable cause, and thereby caused Bryan to be deprived of his liberty. Such proceedings ultimately were terminated in Bryan's favor.

144.    The aforesaid conduct, which Defendant Morales committed on his own, in concert with and in aid of others, and/or in concert or conspiracy with others named and unnamed, operated to deprive Bryan of his rights under the Constitution and the Laws of the United States:

   a.   Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," in violation of the Due Process and Fair Trial Clauses of the Fifth Sixth and Fourteenth Amendments to the United States Constitution; and,

   b.   Not to be deprived of one's liberty absent probable cause to believe that the accused committed a crime in violation of the accused's rights under the Fourth and Fourteenth Amendments of the United States Constitution.

145.    The foregoing violations of Bryan's federal constitutional rights by Defendant Morales and his co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Bryan's criminal

27

prosecution, his loss of liberty and detention without bail, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages

146.    The foregoing violations of Bryan's rights amounted to Constitutional torts and were affected by actions taken under color of state law, and within the scope of Defendant Morales' employment and authority.

147.    Defendant Morales committed the foregoing violations of Bryan's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Bryan's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

148.    By reason of the foregoing, Defendant Morales is liable to Bryan, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.


## AS AND FOR A FOURTH CAUSE OF ACTION: 42 U.S.C. § 1983 (DEFENDANT CHRIS STEIN)

149.    The allegations in paragraphs 1 through 102 of the Verified Complaint are repeated and realleged as if fully set forth herein.

150.    Defendant Stein knowingly and wilfully manufactured or caused the manufacturing of Bryan's unlawful arrest, which he perpetrated or had perpetrated through named and unnamed parties without just or probable cause so as to initiate or have initiated the prosecution of the aforemention robbery and murder of McClenic.

151.    Defendant Stein knowingly and intentionally arrested Bryan without probable cause and further had Bryan incarcerated against his will or consent.

152.    Defendant Stein used deceptive, coercive and intimidating means to secure Bryan's unlawful arrest and incarceration without Bryan's will or consent.

28

153.    Defendant Stein knew or should have known that Bryan's unlawful arrest and incarceration would result in named and unnamed parties unlawfully obtaining a statement that would and/or caused the statement to be relied upon as a basis to arrest Bryan, to formally initiate Bryan's prosecution, to indict Bryan on various criminal charges, to hold him for trial without bail, and to be used to convict Bryan where Bryan lost his liberty.

154.    Defendant Stein knowingly swore to a false criminal complaint, while knowing the falsity would be relied upon as a basis to arrest Bryan, to formally initiate Bryan's prosecution, to indict Bryan to charges associated thereof the statement, to hold him for trial without bail, and such statement was used to convict Bryan.

155. ·   Defendant Stein, with actual malice, initiated and continued, or caused the initiation and continuation of, criminal proceedings against Bryan for which Defendant Mullen knew, or should have known, there was no probable cause, and for which in fact there was no probable cause, and thereby caused Bryan to be deprived of his liberty. Such proceedings ultimately were terminated in Bryan's favor.

156.    The aforesaid conduct, which Defendant Stein committed on his own, in concert with and in aid of others, and/or in concert or conspiracy with others named and unnamed, operated to deprive Bryan of his rights under the Constitution and the Laws of the United States:

   a.   Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," in violation of the Due Process and Fair Trial Clauses of the Fifth Sixth and Fourteenth Amendments to the United States Constitution; and,

29

b.  Not to be deprived of one's liberty absent probable cause to believe that the accused committed a crime in violation of the accused's rights under the Fourth and Fourteenth Amendments of the United States Constitution.

157.  The foregoing violations of Bryan's federal constitutional rights by Defendant Stein and his co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Bryan's criminal prosecution, his loss of liberty and detention without bail, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages

158.  The foregoing violations of Bryan's rights amounted to Constitutional torts and were affected by actions taken under color of state law, and within the scope of Defendant Stein's employment and authority.

159.  Defendant Stein committed the foregoing violations of Bryan's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Bryan's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

160.  By reason of the foregoing, Defendant Stein is liable to Bryan, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

**ATTORNEY FEES**

161.  Pursuant to 42 U.S.C. § 1988(b), in the event that Plaintiff prevails in this action, Plaintiff is entitled to attorneys' fees in an amount to be determined by this Court.

**WHEREFORE**, Bryan W. Henry prays as follows:

A.  That the Court award compensatory damages to him and against the defendants, jointly and severally in an amount to be determined at trial;

B.  That the Court award punitive damages to him, and against all individual defendants in an amount to be determined at trial that will deter such conduct by defendants in the future;

C.  For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and,

E.  For any and all other relief to which he may be entitled.

## I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT

Dated: October 4, 2021
       Suffolk County, New York

Respectfully submitted,

Bryan W. Henry
*Plaintiff, Pro Per*
39 Smith Street
Greenlawn, NY 11740

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

BRYAN W. HENRY

                             Plaintiff,

         -against-

ROBERT BRZESKI, sued individually and in his
Capacity as a Detective of the Nassau County Police
Department; MATTHEW ROSS, sued individually
and in his capacity as a Detective of the Nassau
County Police Department; MICHAEL MULLEN,
sued individually and in his capacity as a Police Officer
of the Bureau of Special Operations of the Nassau
County Police Department: RAFAEL MORALES,
sued individually and in his capacity as a Police
Officer of the Bureau of Special Operations of the
Nassau County Police Department; CHRIS STEIN, sued
Individually and in his capacity as a Police Officer
Of the Bureau of Special Operations.

                             Defendants.

------------------------------------------------------------X

LISA PIPPINS' DECLARATION
IN SUPPORT OF BRYAN
HENRY'S VERIFIED COMPLAINT

State of Pennsylvania )

County of Luzerne     ) ss.:

I, LISA PIPPINS, being duly sworn, deposes and says, under the penalty of perjury:

      1.     I am over 18 years of age and if called upon to testify, I could and would competently testify to the following facts as the same are personally known to me.

      2.     My date of birth is June 16, 1978, and I currently reside at 43 Carey Street, Ashley, PA 18706.

1

3.      In December of 2010, I resided with my mother (Johnnie Pippins), aunts (Annie Patterson and Penny Paterson), uncle (Herman Patterson) together with my brother, Bryan Henry at 314 Clinton Avenue, East Roosevelt, NY 11575

4.      On or about December 22, 2010, my mother received a phone call from Bryan at or around 9:30 at night.

5.      I remember hearing my mother screaming, saying she'll be there soon and hanging up the phone. I asked her what happened, and screamed, "they got Bryan!" When I asked "who has Bryan?" She said, "the police," she continued, "Bryan just called me, and said the police has him and he doesn't know what they're going to do to him he's scared."

6.      For the week prior, it seemed like Bryan was getting pulled over everyday. We all feared for his safety whenever he'd leave the house. Fearing the worst, when my mother and Jacqueline left the house to come to Bryan's aid, I made sure to bring my camera to record what the police were doing.

7.      We pulled up and saw several police, police vehicles and Bryan and several other guys standing on the sidewalk. I can't remember the guys there, buy my uncle, Hermand Patterson ("Mr. Patterson") was there with them.

8.      I believe they arrested one of the guys, I can't remember what they did with the other guy, however, they eventually let Bryan and Mr. Patterson go.

9.      When Bryan began to drive off, Jacqueline flashed her high beams and Bryan pulled over.

10.     He got out of the car and ran to us, and told us that the police questioned him and everyone in the car, searched them, arrested one of his friends and then let them go.

11.    I told Bryan to drive home. my mother agreed, and the three of us repeated, "go home."

12.    Bryan went back to the car and drove off, but within seconds of him pulling off, an unmarked car pulled up behind him and started following him.

13.    Assuming it was a police car because of the tinted windows and how close he was trailing behind Bryan, I began recording the car so I can document what happens.[1]

14.    The police followed Bryan for about a block and then turned on their emergency lights. Bryan pulled over and two police officers hopped out of their vehicle.

15.    My mother and Jacqueline got out of the car and told the officers that the driver and passenger were Bryan and Mr. Patterson.

16.    After telling them to return to the car, the officer. Defendant Morales came to us and asked for Jacqueline's license, registration and insurance.

17.    After giving him the documents. my mother asked Defendant Morales why was Bryan pulled over?

18.    Defendant Morales said it was a gang area where there's a lot of shootings, and it's "2 o'clock in the morning" so he wanted to see who's out here.

19.    Knowing that's no real reason to pull anyone over. I continued to record.

20.    The traffic stop took about thirty minutes, and during such time, my mother began to complain about her chest pains.

21.    As we waited, Bryan called me while still in the car, he told me that they were questioning him about previous crimes. and asked if he wanted to speak with a detective from the homicide unit. Just as Bryan made it clear he didn't know anything and didn't want to talk to anyone, the call ended.

---

[1] See Exhibit B of the Verified Complaint.

3

22.    Although Defendant Morales said he'll let Bryan go, he was arrested and taken away. They let Mr Patterson go. and allowed us to take the car to avoid it being impounded.

23.    On December 24, 2010, my mother died from heart complications, and I believe those complications were either triggered or exacerbated by the stress of Bryan's unlawful traffic stop and arrest.

I declare under the penalty of perjury in the State of New York and the United States that the foregoing is true and correct.

Executed on:    October 1, 2021
                Luzerne County, New York

By: _____
    Lisa Pippins

4

# EXHIBIT B



# EXHIBIT C

Citation# _____
Arrest# 210AR0024276
Date / Time of Arrest 12/23/2010 at 02:30

CR# 210CR0107521
Return Date 12/24/2010
Court Docket _____

DOB
12/30/1989
Age
20

Offense

165.40

CRIM
POSS STLN
PROP 5TH

MISDEM

...ctor
...00

...pared By
...65DUX K

FIRST DISTRICT

THE PEOPLE OF THE STATE OF NEW YORK AGAINST

BRYAN W HENRY
314 E CLINTON AV
ROOSEVELT NY 11575

IN THE STATE OF NEW YORK COUNTY OF NASSAU:  PO RAFAEL MORALES, SHIELD# \1032,
BEING A MEMBER OF THE NASSAU COUNTY POLICE DEPT DEPOSES AND SAYS THAT ON OR
ABOUT THE 21ST DAY OF DECEMBER, 2010, AT ABOUT 1:30 AM, AT 900 MERRICK RD
BALDWIN, THE DEFENDANT DID VIOLATE NEW YORK STATE PENAL LAWSECTION(s)
§165.40 .

§ 165.40  CRIMINAL POSSESSION OF STOLEN PROPERTY IN THE FIFTH DEGREE.  A PERSON IS
GUILTY OF CRIMINAL POSSESSION OF STOLEN PROPERTY IN THE FIFTH DEGREE WHEN HE
KNOWINGLY POSSESSES STOLEN PROPERTY, WITH INTENT TO BENEFIT HIMSELF OR A
PERSON OTHER THAN AN OWNER THEREOF OR TO IMPEDE THE RECOVERY BY AN OWNER
THEREOF.

TO WIT:    Your deponent states the defendant Bryan W. Henry was found to be in possession of a stolen
Blackberry cell phone 516-610-4724 that was recovered from a 2007 black Hyundaii, NY Reg. CKZ2058
that he was operating on 12/21/2010. The cell phone had been stolen during a gunpoint robbery on
12/13/2010 from Carle Place, New York.
The above is based upon information and belief, source being the investigation of the Detectives and Police
Officer Carbon's observations.

* ANY FALSE STATEMENT MADE HEREIN IS PUNISHABLE AS A CLASS A MISDEMEANOR,
PURSUANT TO SECTION 210.45 OF THE PENAL LAW.

SUBSCRIBED BEFORE ME THIS
23RD DAY OF DECEMBER 2010.

PO RAFAEL MORALES                                    LT JOHN PIZZIMENTI

116

# EXHIBIT D

```
 1  STATE OF NEW YORK : NASSAU COUNTY
    SUPREME COURT    : PART 40
 2  ----------------------------------------x
    THE PEOPLE OF THE STATE OF NEW YORK,
 3                                          :
                                            :
 4     - against -                          :
                                            :
 5  BRYAN HENRY,                            :
                                            :
 6                          Defendant.      :
    ----------------------------------------x
 7  INDICTMENT.#:  184N-11
    NYSID #: 2618690 Y
 8                              April 9, 2012
                                Old Country Road
 9                              Mineola, New York

10
    BEFORE:
11
            THE HONORABLE TAMMY S. ROBBINS
12          Acting Supreme Court Justice

13
            HON. KATHLEEN M. RICE
14          Nassau County District Attorney
                262 Old Country Road
15              Mineola, New York  11501
            BY:  JESSICA CEPRIANO, ESQ.
16               Assistant District Attorney

17

18          MICHAEL BINIAKOWITZ, ESQ.
                Attorney for the Defendant
19              225 Broadway
                New York, New York
20
                        oOo
21                      SENTENCE
                        oOo
22

23
                    GIGI WRIGHT, RPR
24               Official Court Reporter

25
```

Peo. v. Henry

1    (In open court.  Defendant present.)

2    THE CLERK:  On the sentence calendar,

3    Indictment 184N of 2011, Brian Henry.

4    MS. CEPRIANO:  For the People, Assistant

5    District Attorney Jessica Cepriano.

6    MR. BINIAKOWITZ:  Michael Biniakowitz, 225

7    Broadway, New York, New York for Mr. Henry.

8    Good morning.

9    THE CLERK:  You are Brian Henry?

10    THE DEFENDANT:  Yes.

11    THE CLERK:  You appear here with counsel for

12    sentence; is that correct?

13    THE DEFENDANT:  Yes.

14    THE CLERK:  Is your client ready for

15    sentence?

16    MR. BINIAKOWITZ:  Yes.

17    THE CLERK:  Do the People wish to be heard

18    before sentence is imposed?

19    MS. CEPRIANO:  Yes.

20    Your Honor, first I would just like to state

21    I believe that the deceased's mother and grandmother

22    has just parked their car and is on their way. It is

23    okay that we begin.  They should be here in just a

24    minute or so.

25    THE COURT:  Let's wait.



SMITH
3280-033
U.S.P. LEE COUNTY
P.O. BOX 305
JONESVILLE, VA 24263

U.S. POSTAGE PAID
PM JONESVILLE, VA
24263
FEB 23, 22
AMOUNT
$0.00
R2305K138595-22

7021 1970 0000 6449 4307

ATTENTION:
TO: THE CLERK OF COURTS
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
CENTRAL ISLIP, NY 11722

