NB:CCC
F. # 2014R006688

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - against -

ERIC SMITH,
      also known as "Esama" and "Esco"

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket Nos.  14–CR–264 (S-7) (JS), 15-428 (JS)

MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO SMITH'S MOTION PURSUANT TO 28 U.S.C. § 2255

BREON PEACE
United States Attorney
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

Nicole Boeckmann
Christopher C. Caffarone
Michael R. Maffei
Assistant U.S. Attorneys
      (Of Counsel)

## PRELIMINARY STATEMENT

Eric Smith moves to vacate his conviction from a judgment entered on June 15, 2018, convicting him, after a jury trial, of: (1) racketeering in violation of 18 U.S.C. § 1962(c) (Count One); (2) racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count Two); (3) Hobbs Act robbery conspiracy of Rohan Hill (the "Hill Robbery") in violation of 18 U.S.C. § 1951(a) (Count Three); (4) Hobbs Act robbery of Hill in violation of 18 U.S.C. § 1951(a) (Count Four); (5) brandishing firearms during crimes of violence, Hobbs Act conspiracy and robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Five); (6) Hobbs Act robbery conspiracy of a drug dealer in the Trackside section of Hempstead (the "Trackside Robbery") in violation of 18 U.S.C. § 1951(a) (Count Six); (7) Hobbs Act robbery in violation of 18 U.S.C. § 1951(a) (Count Seven); (8) brandishing a firearm during crimes of violence, Hobbs Act conspiracy and robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Eight); (9) murder of James McClenic in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1) (Count Nine); (10) firearm-related murder of McClenic in violation of 18 U.S.C. § 924(j) (Count Ten); and (11) conspiracy to murder and assault rival gang members in violation of 18 U.S.C. § 1959(a)(6) (Count Eleven).[1] (ECF Dkt. No. 553). The Court sentenced Smith principally to four consecutive life terms of imprisonment to be followed by 30 years' imprisonment. (Id.). The court also imposed a mandatory assessment of $1,100. (Id.).

In the present motion, Smith raises several claims. First, he contends that his Section 924(j) conviction was predicated on a RICO conspiracy. (Def. Mot. Ground Two). He is

---

[1] As the Court knows, the defendant was indicted on two different dockets. See 14-CR-264 and 15-CR-428. Rather than indicating the docket number associated with each count, the government will reference the Count number from the Trial Indictment (ECF Dkt. No. 462), which also mirrors the verdict sheet (ECF Dkt. No. 498).

wrong as a factual matter--it was based on the violent crime in aid of racketeering murder count charged in Count Nine.

Second, Smith argues that violent crimes in aid of racketeering are not crimes of violence and are thus invalid predicates for his Section 924(c) convictions. (Def. Mot. Ground One). As set forth below, he is wrong as a matter of law.

Third, he claims that his Section 924(c) convictions were improperly predicated on Hobbs Act robbery conspiracies, which after United States v. Davis, 139 S. Ct. 2319, no longer constitute valid predicate crimes of violence. (Def. Mot. Ground Three). Although, following Davis, Smith's Section 924(c) convictions cannot be predicated on robbery conspiracies, any error in either premising the Section 924(c) convictions partially on the robbery conspiracies was harmless, because they were also predicated on still-valid substantive robberies.

Finally, Smith argues that the recent supposed recantation of one of the government's cooperating witnesses (Bryan Henry) requires a reversal of his conviction and his immediate release. (Def. Mot. Ground Four). All of the credible evidence demonstrates that Henry testified truthfully at trial and his purported recantation, which was motivated by Henry's financial interest, is patently false. Also, because the evidence of Smith's guilt was overwhelming, the jury's verdict would have been the same.

For these reasons and the reasons set forth below, Smith's claims are without merit and the Court should deny his motion without a hearing.

## STATEMENT OF FACTS

I. <u>Overview</u>

Eric Smith's conviction arose out of his participation in the Roosevelt, New York "set" of the Rollin' 60s Crips, a nationwide street gang with members on Long Island, New York (also referred to herein as the "Rollin' 60s" or "the gang"). (T 320, 382-84, 1312, 1341-42, 1348, 1739, 1817-18, 2298, 2306-07).[2] Smith, whose gang name was "Esama," held a leadership position within the gang and was one of the gang's enforcers. (T 320-24, 1036, 1308-09, 1342-43, 1629-31, 1736, 1742, 1819, 2299, 2608). The charges against Smith involved racketeering, including the predicate acts of: (1) conspiracy to distribute controlled substances; (2) conspiracy to murder and assault rival gang members; (3) the attempted murder of Isiah Cust, a rival gang member;[3] (4) three armed robberies in late 2010; (5) numerous substantive narcotics offenses; and (6) the December 15, 2010 murder of James McClenic. (ECF Dkt. Nos. 462, 498).

II. <u>The Trial</u>

A. <u>The Government's Case</u>

At a five-week trial commencing on May 16, 2017, the government provided a multitude of evidence, including: (1) the testimony of six former members of the Rollin' 60s Crips (Aaron Halyard, Reynaldo Hernandez, Gary Mosley, Essix Robinson, Rohan Hill and Bryan Henry), some of whom participated in the crimes at issue; (2) the testimony of an inmate (Travis Walker), to whom Smith made several incriminatory admissions, including that he shot and killed McClenic; (3) the testimony of two civilian eyewitnesses (Nya Rampersad and Kenneth Jackson),

---

[2] Parenthetical references to "Def. Mot." are to Smith's motion. References to "T" and "GX" are to the trial transcript and government trial exhibits, respectively.

[3] The jury found that the government had not proven this racketeering act beyond a reasonable doubt. (<u>See</u> ECF Dkt. No. 498).

who were present for the murder of McClenic and corroborated details from the cooperating witnesses; (4) the testimony of various federal and local law enforcement officers; (5) copies of messages between Smith and McClenic whereby Smith threatened to kill McClenic; (6) social media postings and photographs; (7) audio recordings of gunfire; (8) surveillance footage from the vicinity of the murder scene showing Henry's car; (9) transcripts and certificate of conviction from Smith's guilty pleas where he pleaded guilty to six of the twelve racketeering acts charged in Counts One and Two of the indictment; and (10) the testimony of several expert witnesses.

          1.   <u>The Enterprise: The Rollin' 60s Crips</u>

The Rollin' 60s Crips originated in Los Angeles, California and is comprised of smaller sets located throughout the United States. (T 320, 382-84, 1312, 1341-42, 1348, 1739, 1817-18, 2298, 2306-07). Across the country, Rollin' 60s Crips members identify themselves, to other members as well as to rival gangs, by wearing the gang's colors — primarily the color blue — and by use of tattoos, hand signs and graffiti. (T 384-408, 412-49, 478-89, 1043-44, 1047-50, 1354-59, 1361-68, 1635-39, 1852-55, 1858-66, 1868-76, 2307-10, 2313).

The Rollin' 60s Crips set based in Roosevelt, New York was founded by Raphael Osborne ("Gusto"), along with Daquan Chambers ("Dulo") and Johnny Green ("J-Loc"), in or about 2003. (T 323-24). Among other practices, Roosevelt Rollin' 60s members conducted formal meetings known as "C-13s" (T 337-38, 1335-36, 1354, 1377-81, 1654, 1876-81), pooled resources to purchase firearms to be made available to the gang generally (T 342-52, 1382-84, 1391-93, 1395-1407, 1928-41, 2314-19), and contributed money to support incarcerated or recently released members (T 747, 1382-84, 1391-93, 1815-16, 1925-28). To enrich themselves and to maintain respect for the gang, Roosevelt Rollin' 60s members also engaged in criminal activity ("put in work"), including murder, robbery and narcotics trafficking. (T 326, 330-31, 333-34, 491-92, 928-

33, 1316, 1323-25, 1342-43, 1350-53, 1408-11, 1423-25, 1429-31, 1655, 1686-89, 1744-46, 1813, 1834-35, 2301). Indeed, participation in these types of crimes affected the degree of respect afforded members[4] (id.), who were assigned different ranks within the organization's hierarchy (T 357-82, 1050, 1339-42, 1380, 1632-33, 1817-21, 1812-13, 1831-33). The more "work" put in on behalf of the gang, the higher the rank. (T 326, 1316, 1323-25, 1342-43, 1647-48, 1744-46, 1834-35, 2301).

Rollin 60s members were obligated to: (1) refuse cooperation with law enforcement officials; (2) attack, injure and kill rival gang members on sight and by whatever means available (the "on sight rule"); (3) maintain respect for the gang and its territory; and (4) remain loyal to the gang above all else. (T 326, 333-34, 529-31, 1040-42, 1315-18, 1320-23, 1332, 1656, 1739-46, 1766-68, 1815-16, 2301-02). Gang members who violated the rules, or failed to follow instructions from leaders, were disciplined. The form of the discipline would vary depending on the nature of the infraction. Minor infractions of gang rules could result in a beating or expulsion from the gang.[5] More serious infractions, such as cooperating with law enforcement against the gang, were punishable by death. (T 334-37, 367-68, 1041, 1332-39, 1648-49, 1839-43, 2306).

---

[4] Involvement in these activities also could lead to the induction of new gang members. (T 325-27, 1037-39, 1348-53, 1646-47, 1812-15).

[5] When Rollin' 60s members "Rock" and "Melman" failed to attend a meeting called in December of 2010, both individuals were disciplined by the gang. Specifically, Rock was robbed, and Melman was expelled from the gang. (T 444, 748-49, 1334-37, 1841).

2.    The Charged Crimes

    a.    Conspiracy To Murder
       Rival Gang Members

        i.    The Gang's "On Sight Rule"

As noted above, persons joining the Roosevelt Rollin' 60s were made aware of the "on sight rule" that existed within the gang. (T 529-31, 1042, 1320-23, 1656, 1742-44). This rule required gang members to shoot, kill, stab or fight any members of the rival Bloods gang whenever and wherever encountered. (Id.). The "on sight rule" remained in effect the entire time Smith was a member of the Roosevelt Rollin' 60s. (Id.).

The results of this rule were staggering. For example, on October 21, 2006, Rollin' 60s member Devon Cabrera ("Sty") chased Bloods member Kail Ferro ("Beast") down Park Avenue in Roosevelt, and shot Ferro in the back, killing him, for no reason other than the lack of respect demonstrated by that Bloods member's decision to walk in enemy territory. (T 541-42, 1483-85, 1748-50, 1836-37, 2324-25).

Similarly, on June 22, 2008, 15-year-old Rollin' 60s member Cody Hernandez ("Monsta Cody") shot and killed Bloods member Lord Carter based on nothing other than Carter's gang affiliation. (T 535-36, 1055-56, 1325-26, 1486-87, 1759-61, 2324-25).

In addition to these senseless murders that were committed as part of the ongoing war between the Roosevelt Crips and Bloods, Smith's gang members committed numerous other attempted murders and assaults pursuant to the "on sight rule." (T 545-59, 561-71, 1327-31, 1372-74, 1419, 1483-87, 1667-75, 1680-86, 1750-56, 1759-60, 1836-39, 1846-51, 1856-58).

        ii.    Smith's Acts Of Violence

In addition to the murders and assaults committed by Smith's gang carried out pursuant to the edict to harm Bloods members whenever the opportunity presented itself, Smith,

himself, murdered, assaulted and attempted to assault and murder rival gang members in adherence to the "on sight rule" and in furtherance of the ongoing war between the Crips and Bloods in Roosevelt.

### 1. 2007 Attempt to Shoot Lord Carter

There was testimony of Smith's personal involvement in the ongoing war with the Bloods that dated back to 2007. Specifically, Smith was socializing with fellow gang members Aaron Halyard ("Slay") and Daquane Nunn ("Trap") on Park Avenue when they saw Bloods member Lord Carter driving down the street. (T 570-71). Smith ran to a location where the gang maintained an AK-47, retrieved the firearm, ran back to Park Avenue, and began started shooting at Lord Carter. (Id.).

### 2. August 26, 2007 Attempt to Shoot Alizeem Carter

Also, on August 26, 2007, Smith was with 15-year-old Gary Mosley on Grenada, a residential street in Roosevelt, when a Bloods member Alizeem Carter ("Z") drove down the street. (T 571-74, 1737, 1822-24). Smith saw Z, pulled out a firearm, and fired several shots at this Bloods member but missed his target. (Id.).

In addition to the testimony of Gary Mosley ("G Black") and Halyard, Nassau County Police Department ("NCPD") Detective Kevin Dux testified that the morning after this shooting, he was called to Grenada because one of the resident's cars had been shot. (T 955-68). He confirmed that a shooting had taken place, a car was damaged, and documented this by photographing the scene and the damaged vehicle. (T 955-68; GX 490)).

### 3. August 23, 2010 Attempt to Shoot Kemp

In 2010, Smith continued to participate in this ongoing murder and assault conspiracy. On August 23, 2010, Smith and Halyard were on Park Avenue when they met up with

a younger member of the Crips named Dwight Dobson ("EZ"). (T 622-30). Dobson was one of Smith's subordinates in the gang. (Id.). Dobson reported to Smith that he had a problem with a Bloods member named Patrick Kemp. (Id.). Smith, Halyard and Dobson drove to Kemp's house, armed with a .40 caliber firearm, for the purpose of shooting Kemp. (Id.). When they arrived, they knocked on the window and asked for Kemp. (Id.). A woman looked out of the window and responded that Kemp was not home. (Id.). In response, Smith's subordinate fired several shots at the home. (Id.).

Halyard's testimony regarding this shooing was corroborated by the 911 call from Kemp's mother, Shot Spotter technology that captured the audio of this shooting, a crime scene detective (Ken Mazzie), and a ballistics expert (Andrea Lester) who compared the shell casings from this shooting to the shooting of Bloods member Kevin Hewitt and the October 20, 2010 shooting on Pleasant both of which are discussed below and concluded that the same gun was used in each of those shootings. (T 2738-48, T 2982-83, 2985-3003; GX 492-93, 522).

#### 4. August 27, 2010 Shooting of Hewitt

Less than a week later on August 27, 2010, Smith shot Bloods member Kevin Hewitt ("Bee Bop") outside a club in Freeport. (T 630-35, 1737, 1844-46). Specifically, Smith and other Crips members were waiting to go inside a Freeport club. (Id.). A younger member of the Crips approached Hewitt who was wearing a necklace showing his allegiance to the Bloods. (Id.). That younger Crips member grabbed the necklace and an argument ensued between the two men. (Id.). The younger Crip feigned like he was retreating but what he was actually doing was luring Hewitt to Smith who was lying in wait with a firearm. (Id.). When Hewitt got close, Smith shot him with a .40 caliber firearm. (Id.).

Halyard's and Mosley's testimony regarding this shooting was corroborated the club's bouncer (David Ramon) who witnessed the shooting (T 2650-58); the crime scene evidence (T 2662-66, 2683-94; GX 494); Hewitt's medical records (GX 508); and the testimony of ballistic expert Lester who testified that the same .40 caliber firearm was used to shoot at Kemp's house three days earlier and during the October 20, 2010 shooting on Pleasant discussed below (T 2985-3003).

### 5. September 5, 2010 Shooting of Wajid

Less than two weeks later on September 5, 2010, Smith directed Rudy Montour ("Sus 1") to shoot Bloods member Mansur Wajid. Specifically, shortly after conducting an armed robbery of a drug dealer near the Family Dollar store discussed below, Smith and Henry were driving in Bryan Henry's ("C Ross") black Hyundai Sonata when they observed Bloods members Mansur Wajid and Isiah Cust ("Red Head") sitting on Wajid's porch. (T 2344-56). Smith directed Henry to drive to Montour. (Id.). Smith informed Montour that they had just observed Wajid so Montour retrieved a 9mm firearm, went through a back yard wearing a mask, chased Wajid and ultimately shot him. (Id.).

Henry provided details of what he observed, which were corroborated by other witnesses and physical evidence. For example, Henry testified that he and Smith were parked on Astor when he saw Wajid running from a backyard onto Astor and following him was Montour brandishing a gun. (Id.). Henry testified that once on Astor, Montour shot Wajid. (Id.). He further explained that Montour ran into the backyard of a house on Astor and fled the scene. (Id.). While Montour fled, Henry testified that he watched Wajid flag down a passing car, enter said car, and wait for an ambulance. (Id.).

Henry's testimony was corroborated by two civilian witnesses: William Rodriguez and Maria Iraheta. Mr. Rodriguez testified that he was in his backyard with his family when he heard two or three gunshots. (T 2676-82). After the gunshots, he saw a young black male jump over his neighbor's fence, which was on Astor Place, and run away. (Id.). And all of that testimony was corroborated by the 911 call (GX 415), the Shot Spotter Technology (GX 458), crime scene Detective Miller (T 2695-2706) and Wajid's medical records (GX 417).

### 6. October 20, 2010 Shooting on Pleasant

Although on October 20, 2010 Smith did not fire shots at the Bloods, he was involved in yet another gang shooting. Specifically, Smith, Nunn and Courtney Smith saw Halyard and informed him that they had seen several Bloods members walking on Pleasant. (T 711-14). Smith asked Halyard whether he had a firearm on him, to which Halyard responded affirmatively. (Id.). Armed with the same .40 caliber firearm that Smith used to shoot Hewitt and shoot at Kemp's house, Halyard got into the car with Smith and the other Crips. (Id.). As the car turned off Ellison onto Pleasant Avenue, Halyard saw two Bloods members and started shooting at them. (Id.).

Halyard's testimony was corroborated by the crime scene evidence (GX 2211-17); GX 495); Shot Spotter Technology (GX 497); and the testimony of ballistic expert Lester concluding that the same .40 caliber firearm was used to shoot Hewitt and at Kemp's house (T 2985-3003).

### b. Murder of James McClenic

Smith's involvement in the campaign of violence against rival Bloods members was not limited to the application of the "on sight rule." Smith also shot and killed Bloods member, James McClenic ("Bubbz").

In the Fall of 2010, Osborne called a gang meeting and learned that a younger Bloods member, McClenic, had been committing assaults against Crips members and disrespecting the Crips on social media. (T 673-76, 1487-90, 1764-66). In an effort to maintain control of the neighborhood, and to keep the Bloods in line, Osborne ordered that McClenic be "dealt with," i.e., killed. (Id.). Subsequently, on December 15, 2010, Smith shot and killed McClenic. The evidence of Smith's guilt was overwhelming.

First, Henry testified that on December 15, 2010, he drove to Derek Hernandez's ("D Nice") house and Smith asked him for a ride. (T 2297, 2421). Henry explained that Smith, armed with a semi-automatic gun, got in the front seat while Rommel Lobban ("Rah") got into the back of his black Hyundai Sonata. (T 2421-23, 2436). Smith directed Henry to drive to the Hempstead/ Uniondale area. (T 2423-25). Henry further testified that while driving around, Smith talked on the phone, and then directed him where to drive and told him they were looking for a green Mercedes Benz truck. (Id.). After driving around for approximately an hour or two, Smith got off the phone, was more energetic, and told Henry to drive to Hempstead. (T 2426-28).

Henry testified that when they arrived in Hempstead, Smith observed a green Mercedes Benz truck in a Citgo gas station. (T 2426-31). Henry parked and Smith asked Lobban what he should do. (T 2429-31). Lobban responded "do what you do." (Id.). Henry explained that Smith got out of the car, put his hood up, moved the gun to his front pocket and walked towards the gas station. (T 2431-33). Henry further testified that while he and Lobban waited for Smith to return, Lobban got into the front seat and told Henry to move his car, which Henry did. (T 2433-35). Henry testified that a few moments later, he heard gunshots and saw Smith running back to his car. (T 2435-37). Smith entered the car and demanded that they drive away. (Id.).

Henry testified that during the car ride, Smith told him that he dropped the "clip," referring to the magazine from the firearm that he used to kill McClenic.  (T 2437-40).  Henry drove Smith to Hernandez's home on East Fulton and Henry returned to his own home.  (T 2437, 2441).  Henry explained that Smith did not tell him any other details of the murder until days later.  (T 2440, 2447-48).  Days later, Smith told Henry that he walked up to McClenic's car, knocked on the window, that McClenic looked up, looked into his eyes, and he then shot McClenic.  (2447-49).

Henry also testified that at some point after he had been arrested for the McClenic murder, Smith told Henry that he considered having Henry killed.  (T 2471-72).

Second, Halyard testified that on the day that Smith killed McClenic, he received a phone call from Crips member Kwame Lake ("Paid").  (T 680, 683-85, 941-43).  Lake told Halyard that he caught McClenic slippin in Hempstead, meaning McClenic was unaware of his surroundings and was likely not armed.  (Id.).  After learning this, Halyard was going to drive to Hernandez's house to retrieve a gun to shoot McClenic.  (Id.).  Before he could do that, Halyard spoke to Lake again and learned that "Esama, Rah and C-Ross," referring to Smith, Lobban and Henry, respectively, were "on it already," meaning that Smith, Henry and Lobban were already watching McClenic and were going to shoot and kill McClenic.  (Id.).  Halyard testified that after learning this, he called Smith and Smith told him that they were just "camping on" McClenic, meaning they were watching him.  (Id.).

Halyard further explained that later that night, Henry dropped Smith off at Hernandez's house in his black Hyundai Sonata.  (T 685-86).  When Smith entered the house, he told his fellow Crips members that he had shot McClenic.  (T 686-87, 943-44).  Halyard also testified that Smith informed Halyard that he "dropped the clip," again referring to the magazine

from the firearm. (T 688-89). Smith also provided additional details, including that: (1) he, Henry and Lobban were parked in front of a bar; (2) he got out of Henry's car, walked to a gas station on Hempstead Turnpike, approached the car and saw McClenic sleeping in the car; (3) he knocked on the window, fired two shots from a .40 caliber firearm and dropped the clip; and (4) when he returned to the car, Lobban was occupying the seat that he previously occupied, namely, the front seat. (T 690, 741-42). Halyard also testified that Smith considered having Henry killed to prevent him from cooperating with law enforcement. (T 733-34, 737-39).

Third, Reynaldo Hernandez testified that several days after the murder, he was socializing with Smith at his house and Smith boasted about shooting and killing McClenic. (T 1310, 1497-98).

Fourth, another one of Smith's fellow gang members and close friends, Gary Mosley, testified that in June 2011, when he and Smith were in jail together, Smith admitted that he shot and killed McClenic. (T 1737, 1782-85, 1792-94, 1866). Specifically, Mosley and Smith were standing against a wall during recreation time, and Smith, who had been incarcerated for a period of time, asked Mosley for an update on the gang. (Id.). After Mosley updated Smith, Smith admitted that he had killed McClenic because McClenic was causing too many problems for the gang and the younger Crips members were not handling the problem appropriately. (Id.). Jail records corroborated that Mosley and Smith were incarcerated together in June 2011. (See GX 466, 525A).

Mosley also testified that on the night of the murder, he saw Henry, driving his black Hyundai Sonata, drop off Smith and Lobban at Hernandez's house. (T 1782-84, 2045-46).

Mosley further testified that Smith was concerned that Henry was going to cooperate with law enforcement, and that if he did, Smith intended to have Henry and his entire

family killed. (T 1799-1802). Smith asked Mosley to visit Henry in jail to ensure that Henry did not intend to cooperate, which Mosley did and reported back to Smith that it seemed unlikely. (Id.)

Fifth, Travis Walker also testified that Smith admitted to the murder. (T 2608, 260-11, 2616-21). Walker was incarcerated with Smith and befriended him. (Id.). While incarcerated, Walker protected Smith from being assaulted by members of the Bloods. (Id.). Walker asked Smith why the Bloods sought to harm him and Smith explained that he had killed one of their friends. (Id.). Smith told Walker that he followed a rival gang member named Bubbz, which was McClenic's alias, to a gas station, then he approached Bubbz's car and shot and killed Bubbz. (T 2620-21). Smith also told Walker that his man "C Ross," referring to Henry, drove him to the murder. (T 2621).

Sixth, the government introduced a series of Facebook messages between Smith and McClenic from 2010 where Smith threatened to shoot and kill McClenic and then directed McClenic to delete the messages because after he killed McClenic, he did not want to be caught for the murder. (See GX 457; T 1776-77, 1781-82, 1959-69, 2040-42).

Seventh, there was evidence that Smith often discussed his intention to kill McClenic (T 1492-93, 1769), and on at least two occasions, Smith even went looking for McClenic to kill him. For example, Reynaldo Hernandez and Gary Mosley testified that they were at a barbershop in Uniondale when McClenic entered wearing a mask. (T 1493-97, 1772-76). Neither Hernandez nor Mosely had a gun so Mosely called Smith. (Id.). By the time Smith arrived, armed with a firearm, McClenic had left the barbershop. (Id.). On another occasion in the Summer 2010, Smith, armed with a firearm, and Lobban drove around looking for McClenic. (T 1770-72).

And all of this testimony was corroborated by a multitude of evidence. For example, surveillance footage from vicinity of the murder scene showed Henry's black Hyundai Sonata. (See GX 498-500). Likewise, the crime scene evidence confirmed Halyard and Henry's testimony that Smith dropped the magazine, that McClenic was in the front passenger seat, and Halyard's testimony that Smith used a .40 caliber firearm to kill McClenic. (T 2257-77; GX 2-3, 300-01).

This testimony was further corroborated by the testimony of Nya Rampersad. Mr. Rampersad testified that he was sitting in the back seat of his friend's car while McClenic was in the front passenger's seat. (T 2219-30). They were both looking down at their phones when there was a knock on the window. (Id.). Mr. Rampersad looked up and saw a black man wearing a mask fire two or three shots at McClenic. (Id.).

The government also introduced social media postings from McClenic whereby he disrespected the Roosevelt Rollin 60s (see, e.g., GX 484A, 484E, 484M; see also T 1487, 1768-69, 1850-55) and rap lyrics from Smith where he sang about shooting someone for "wearing all red" (see GX 434).

c.      Retaliatory Shootings After McClenic's Murder

In the wake of McClenic's murder, members of the Bloods in Roosevelt retaliated against the Crips, shooting up Smith's home, shooting up Reynaldo Hernandez's home, and setting Osborne's mother's car on fire in the driveway of Osborne's home. (T 693-95, 1501-02, 1785-86 2446-53). In response, a furious Osborne called another meeting of the Rollin' 60s. (T 695-708, 711-14, 726-27, 1502-06, 1785-92). During the course of the meeting, Osborne and Smith told younger gang members that it was their time to "put in work," directing them to shoot up the home of a Bloods member (Justin Smith) believed to be involved in the retaliatory shootings and the

home of the deceased McClenic. (Id.). In response, these gang members shot dozens of bullets through these two homes in the middle of the night. (Id.; see also T 2456-59).

Halyard, Hernandez, Henry and Mosley all testified about these shootings, and their testimony was corroborated by the crime scene evidence (T 976-1004, 1019-30) and the ballistics evidence (GX 11, 14, 303-08, 310). Ballistics Expert Ronald Fazio testified that the shell casings from the Justin Smith house shooting and the McClenic house shooting came from the same gun, which was a gun law enforcement recovered from Montour on June 10, 2011 (GX 314; T 2056-71, 2180-85, 2187-2210). (T 2754-55, 2768-79, 2783-2808)

       d.       <u>Controlled Substances Offenses (Racketeering Acts 2-6, 12)</u>

As set forth above, the Roosevelt Rollin' 60s' drug business began with the gang was formed in Roosevelt in 2003. One of the primary ways that gang members aided each other in narcotics distribution was the commission of robberies of drug dealers to obtain cash and narcotics, the latter of which would be sold for profit. Some of those robberies are discussed in the next section.

In addition to obtaining narcotics through robberies, Smith and fellow gang members would assist one another in acquiring narcotics from various suppliers. In fact, gang rule required members to keep the business within the gang, unless the gang was without supply. Moreover, in supplying fellow gang members, discount prices were the rule.

In addition to supplying drugs, Rollin' 60s Crips members also covered transactions for one another by referring sales to other gang members when they did not have sufficient drug supply, and serviced other members' clients if those members were incarcerated. Further, gang members provided one another with security. Indeed, members knew that anyone seeking to interfere with their sales, by robbery or otherwise, would face severe repercussions..

Lastly, Rollin' 60s members often shared drug profits, by pooling proceeds to purchase firearms or to support gang members financially.

The testimony of the cooperating witnesses was corroborated by Smith's guilty plea in state court to five of the racketeering acts, namely, Racketeering Acts Two through Six. (See GX 122, 400 for Racketeering Acts Two through Four; GX 121, 402 for Racketeering Acts 5 and 6).

### e. Hobbs Act Robberies

As noted above, the Rollin' 60s Crips frequently robbed drug dealers as a means of obtaining money and narcotics to sell. In addition to the three charged robberies discussed below (Hill, Trackside and Tattoo Parlor), Smith also participated in at least three other armed robberies. Specifically, in the Fall of 2010, Smith and Henry robbed a marijuana dealer in the Trackside part of Hempstead (T 2363-65); Smith also robbed a heroin dealer near a Shamrock gas station with Henry and Halyard (T 662-665, 2365-71); and finally, Smith, along with Henry and Montour, robbed a marijuana dealer in the parking lot of the Family Dollar store on September 5, 2010 (T 2340-44).

### i. The Rohan Hill Robbery (RA #8, Counts 3-5)

On August 29, 2010, Rohan Hill was at his house in Roosevelt with Johnathan Bostic and two women when he received a phone call from Halyard. (T 609-22, 1093-1106, 1181-87, 1824-27; GX 3500-ROH-10). Halyard was looking to sell drugs that he claimed to have just stolen from a drug dealer and wanted to know whether Hill was interested in buying those drugs. (Id.). Hill responded that he was interested and invited Halyard to his house. (Id.). Halyard and Smith arrived at Hill's house and proceeded to rob Hill and Bostic at gunpoint stealing narcotics

and U.S. currency. (Id.). The testimony of cooperating witnesses Halyard, Hill and Mosley was corroborated by the 911 call (GX 414) and the testimony of Jonathan Bostic (T 237-54).

ii.     The "Trackside" Robbery (RA #9, Counts 6-8)

In the Fall of 2010, Osborne approached Halyard, who, like Osborne, had recently returned from prison and was in need of money, with a plan to rob a drug dealer. (T 636-49, 2356-63). Shortly thereafter, Osborne, Halyard, Smith, Henry, and the drug dealer's cousin (who had provided the target) drove to the Trackside neighborhood of Hempstead in Henry's car. (Id.). There, Halyard and Smith, armed with firearms, proceeded to the target's apartment, where they robbed the drug dealer of 15 grams of crack cocaine, five grams of cocaine and $1,000. (Id.). These proceeds later were divided among the participants. (Id.). Cooperating witnesses Halyard and Henry testified about this robbery.

iii.     The Tattoo Parlor Robbery (RA #10)

On December 13, 2010, Henry drove Smith and Lobban in his black Hyundai Sonata to do an armed robbery of a tattoo parlor. (T 2371, 2373-75). In addition to Henry's testimony, Smith pleaded guilty to this crime in state court. (GX 123, 428). Henry's testimony was further corroborated by video surveillance from outside the tattoo parlor showing Henry's black Hyundai Sonata (GX 426, 426A), testimony of three victims who were inside the tattoo parlor during the robbery (T 163-75, 182-88, 195-201), photographs of Smith wearing the same sweatshirt that he wore during the robbery, and the testimony of other cooperating witnesses (T 665-70, 1795, 1799, 2609-10).

B.    Verdict

On June 15, 2017, the jury convicted Smith of all counts of the indictment.[6]  (ECF Dkt. No. 498 (Verdict Sheet)).

III.    Sentencing

The parties appeared for sentencing on June 13, 2018.  (A copy of the Sentencing Transcript is attached hereto as Exhibit 1).  After reviewing the Section 3553(a) factors, including the "horrific, violent conduct," Smith's utter lack of remorse or rehabilitation, and the need to protect the public, the Court imposed four consecutive life sentences to be followed by 30 years' imprisonment.  (Id. at 16-19; ECF Dkt. No. 553 (Judgment)).

IV.    Bryan Henry's Statements Regarding the McClenic Murder

In light of the subject of the instant motion, reviewing Henry's prior sworn and unsworn statements about the McClenic seems germane.  On December 23, 2010, Henry was interviewed by NCPD detectives and signed several written statements.  (Copies of those statements are attached hereto as 3500-BH-10 through 3500-BH-13).  In those statements, Henry admitted to: driving Smith in his black Hyundai Sonata to a gas station in Hempstead, hearing gunshots, seeing Smith run back to his car, and then being ordered by Smith to flee the scene.  (See 3500-BH-10, 3500-BH-12).  Henry did not admit his full knowledge of (and role in) the McClenic murder at that time.  He was subsequently convicted of the McClenic murder in state court, which conviction was reversed on appeal.  While that was happening, Henry indicated a desire to

---

[6] The jury found that the government had not proven one racketeering act, namely, Racketeering Act Seven, which was the March 10, 2008 attempted murder of a rival gang member (Isiah Cust).  (Dkt. No. 498).  And at sentencing, the government agreed to dismiss one count that had not been submitted to the jury (Count 25 of the Seventh Superseding Indictment).  (Exh. 1 at 22).

cooperate in the federal government's prosecution of Smith, and subsequently met with federal prosecutors, agents and his attorneys.

On December 22, 2016, Henry met with federal prosecutors, federal agents, NCPD detectives, a federally-appointed attorney (Martin Geduldig)[7] and his state court attorney (Michael Biniakewitz). During that first meeting, Henry described in detail his role in the McClenic murder. (Copies of the report and handwritten notes from that interview are attached hereto as 3500-BH-2 and 3500-BH-4). Consistent with his trial testimony, Henry detailed picking up Smith and Lobban in his black Hyundai Sonata, driving them around until they located McClenic at which point Smith exited his car, armed with a .40 caliber firearm, to shoot and kill McClenic. (Id.). Henry further explained that he heard gunshots, then Smith returned to his car and ordered him to drive away. (Id.). Henry also told the government that Smith stated that he dropped the "clip." (Id.). Henry met again with the federal government on December 28, 2016. (Copies of a report and handwritten notes from that proffer session are attached hereto as 3500-BH-3 and 3500-BH-5). At no point during these proffer session, did anyone tell Henry what to say or create a "narrative" for him. (See Declarations of FBI Special Agent Derrick Acker ("Acker Decl."), NCPD Detective George Colby ("Colby Decl.") and Michael Biniakewitz, Esq. ("Biniakewitz Decl.")). Nor did Henry claim to be innocent of the murder. (Id.). Finally, no one threatened or coerced Henry into cooperating. (Id.). To the contrary, federal prosecutors treated Henry "commendably," "extremely fairly and respectfully" during these proffer sessions. (Biniakewitz Decl. ¶ 5).

On March 16, 2017, Henry waived indictment and pleaded guilty before Your Honor to murder in aid of racketeering pursuant to a cooperation agreement. (A copy of the transcript from Henry's guilty plea, dated March 16, 2017, is attached hereto as 3500-BH-19; a

---

[7] Since the conclusion of Henry's case, Mr. Geduldig has passed away.

copy of Henry's cooperation agreement is attached hereto as 3500-BH-16). At the outset of the plea proceeding, Henry was sworn in and advised that if failed to tell the truth during the proceeding, he would face a perjury charge and additional jail time. (3500-BH-19 at 2). After determining, among other things, that Henry was competent, that he had a clear mind, and that he understood his right not to plead guilty and to proceed to trial, the Court advised Henry of his Rule 11 rights and the statutory penalties associated with the crime to which he was pleading guilty. (Id. at 3-9). Next, Henry confirmed that he was satisfied with the services of his attorney. (Id. at 12). The Court then asked Henry whether anyone was "forcing [him] to plead guilty here or to cooperate," to which he responded negatively. (Id. at 14). Henry also declared that he was pleading guilty because he was guilty and "for no other reason." (Id.).

The Court asked Henry to explain in his own words what he did that made him guilty of the McClenic murder. (Id. at 15). Henry stated

> In December 2010, I was a member of the Crips Street Gang which had sets all over the United States, including on Long Island. Crips members here on Long Island sell guns, ammunition, commit robberies, sell drugs and commit acts of violence on behalf of the gang, including shootings, stabbings and murder. The Crips have problems with other rival street gangs, including the Bloods street gang.

> Members of the Crips and their associates use, and threaten to use, physical violence against various individuals, including members of rival criminal organizations and Crips members who violate the gang's rules. One of the best ways to earn respect with the Crips is by committing violent crimes against members of rival gangs or anyone who disrespects the Crips or its members.

> On December 15, 2010, I drove two members of the Crips to a gas station located in Hempstead, New York. One of the Crips, Eric Smith, was armed with a handgun. I knew that Eric Smith was getting out of the car to shoot someone. When we arrived near the gas station, Smith got out of the car, walked to the gas station, and shot and killed a rival gang member named James McClenic. Smith then ran back to my car and then drove away.

> I did this because that's what was expected of me because of
> my membership and position in the Crips.

(3500-BH-19 at 15-16). At the conclusion of the proceeding, the Court held that Henry's plea was knowingly and voluntarily entered and no one threatened or forced him to plead guilty. (Id. at 18).

After he pleaded guilty, Henry continued to meet with federal prosecutors and agents to prepare him to testify in Smith's trial. During those meetings, Henry never claimed to be innocent of the McClenic murder, nor did ever disavow knowledge of Smith's involvement in the murder. Rather, he continued to detail his role consistent with his proffers, his guilty plea and ultimately his trial testimony. Moreover, the government never instructed Henry what the substance of his testimony should be, nor did it ever threaten him.

As set forth above, Henry subsequently testified, pursuant to a cooperation agreement, that he drove Smith to and from McClenic's murder, consistent in all material respects with his post-arrest statements, statements he made during proffer meetings and his guilty plea. He also testified about numerous other uncharged crimes that he and Smith committed. (T. 2340-44 (robbery of a drug dealer near a Family Dollar); T 2344-56 (shooting of Mansur Wajid); T 2363-65 (robbery of a marijuana dealer); T 2365-71 (robbery of a drug dealer near a Shamrock gas station).

Before his sentencing, on October 25, 2018, Henry signed an affidavit as part of his condition to vacate his state court conviction. (A copy of Henry's affidavit, dated October 25, 2018, is attached hereto as Exhibit 2). In that affidavit, Henry averred that "I was the driver who transported defendant Smith to and from the murder scene. Defendant, Eric Smith shot and killed James McClenic, Jr. on 12/15/10." (Id.).

At the conclusion of his cooperation, on November 2, 2018, the Court sentenced Henry to time served. (ECF Dkt. Nos. 562, 565).

On October 21, 2021, Henry, acting *pro se*, initiated a civil action against several NCPD officers purportedly involved in his arrest. (A copy of Henry's civil complaint and affidavit is attached hereto as Exhibit 3). In a sworn declaration, Henry avers that he is innocent of the crimes to which he was convicted. (Exh. 3 ¶ 24). He further declared that that he knew nothing about the McClenic murder, but met with federal prosecutors and agents because he was facing life imprisonment. (Id. ¶ 97). During these initial meetings, Henry claims that "[his] role was decided" and prosecutors and agents "curtailed" his statements and proposed trial testimony." (Id. ¶ 98). He further stated that the AUSA and agent would threaten and admonish him if he "depart[ed] from the narration [they] created." (Id.).

On January 18, 2022, after the federal government was made aware of Henry's civil lawsuit and the aforementioned affidavit, it sent a copy of Henry's affidavit to Smith, pursuant to its obligations under Brady v. Maryland, 373 U.S. 83 (1963). (ECF Dkt. No. 721).

On February 28, 2022, Smith filed the instant motion. (ECF Dkt. No. 727).

While Smith's motion was pending, on June 15, 2022, Henry filed a motion for early termination of supervised release. (A copy of Henry's motion for supervised release is attached hereto as Exhibit 4). In that motion, Henry repeats none of the statements or allegations contained in his aforementioned declaration. He does not profess to be innocent of the murder, nor does he claim to have been coerced into pleading guilty and testifying against Smith. To the contrary, he noted that he agreed to cooperate with the federal investigation and pleaded guilty to the McClenic murder. (Exh. 4 ¶ 5). He went on to state "[u]ndoubtedly, the crime [he] was convicted of was certainly serious, as [he] was one of fifteen co-defendants in a superseding gang-

racketeering conspiracy indictment that included drugs and other violent offenses."  (<u>Id.</u> ¶ 44).

Henry further admitted that "[t]he role [he] was accused and convicted of playing was the driver

of the co-defendant who shot and killed a rival gang member."  (<u>Id.</u>).  Notably, Henry's motion is

devoid of any claims of innocence, coercion or that his testimony at Smith's trial was false.

ARGUMENT

I.     Smith's *Johnson* Claims Are Without Merit

In his motion, Smith raises several claims based on the Supreme Court's decision in Johnson v. United States, 135 S. Ct. 2551 (2015) ("Johnson II") and its progeny.  First, Smith argues that his Section 924(j) conviction—the firearm-related murder of James McClenic—was predicated on a RICO conspiracy.  (Def. Mot. Ground Two).  He is wrong as a factual matter.  His Section 924(j) conviction (Count Ten) was predicated on the violent crime in aid of racketeering ("VCAR") murder count charged in Count Nine, not the RICO conspiracy charged in Count Two.

Second, Smith claims his Section 924(c) convictions may not rest on VCAR crimes because VCAR crimes are not crimes of violence.  (Def. Mot. Ground One).  As set forth below, he is wrong as a matter of law.

Finally, Smith contends that his Section 924(c) convictions were improperly predicated on Hobbs Act robbery conspiracies, which after United States v. Davis, 139 S. Ct. 2319, no longer constitute valid predicate crimes of violence.  (Def. Mot. Ground Three).  Although, following Davis, Smith's Section 924(c) convictions cannot be predicated on robbery conspiracies, any error in either premising the Section 924(c) convictions partially on the robbery conspiracies was harmless.  See United States v. Smith, 813 F. App'x 662, 665 (2d Cir. 2020) (finding any error in eliciting admission that he participated in a violent assault where he was not required to make that admission in the plea agreement was harmless); cf. Skilling v. United States, 561 U.S. 358, 414 (2010) (constitutional error occurs if jury is instructed on alternative theories of guilt, one of which is legally invalid, but such error is subject to harmless-error analysis); Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (per curiam).  That is because the Section 924(c) convictions were predicated on the conspiracy as well as the substantive robberies.  Johnson v. United States, 779

F.3d 125, 129-30 (2d Cir. 2015) (conviction under § 924(c) may be predicated on an offense that the defendant was not convicted of so long as there is "legally sufficient proof of the underlying offense"); see also Smith, 813 F. App'x at 665. Here, the evidence overwhelming established that Smith participated in the armed robberies of two drug dealers. As explained below, substantive robbery falls squarely within Section 924(c)'s Elements Clause and thus remains a valid predicate crime of violence after Davis.

Accordingly, Smith's Johnson claims lack merit and should be denied.

A. *Johnson II* and its Progeny

In Johnson II, the Supreme Court ruled that the portion of the Armed Career Criminal Act defining the term "violent felony" to include any felony that "involves conduct that presents a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii), was unconstitutionally vague. 135 S. Ct. 2557-60. Thereafter, defendants sought to apply its reasoning to, among other criminal statutes, 18 U.S.C. § 924(c). That section imposes a mandatory consecutive term of imprisonment when a defendant uses or carries a firearm during, or possesses a firearm in furtherance of, a crime of violence or drug trafficking crime. A "crime of violence" is a federal felony that:

> (A)    has as an element the use, attempted use, or threatened use of physical force against the person or property of another (the "Elements Clause"), or
>
> (B)    that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense (the "Residual Clause").

18 U.S.C. § 924(c)(3). Because the language of subsection (B) resembles in some ways the "violent felony" definition struck down in Johnson II, defendants have argued that the Residual Clause is unconstitutional for the same reasons.

In <u>Sessions v. Dimaya</u>, 138 S. Ct. 1204 (2018), the Supreme Court ruled that the definition of "crime of violence" found in 18 U.S.C. § 16(b) suffered from the same vagueness problems that <u>Johnson II</u> had found to be fatal to section 924(e)(2)(B)(ii), rendering section 16(b) unconstitutional as well. The Court explained that section 16(b) both "calls for a court to identify a crime's 'ordinary case' in order to measure the crime's risk" and also creates "uncertainty about the level of risk that makes a crime 'violent.'" 138 S. Ct. at 1215. In the course of its ruling, the Court rejected the government's arguments attempting to distinguish section 16(b) from section 924(e)(2)(B)(ii). <u>Id.</u> at 1218-23.

The Second Circuit first addressed a <u>Johnson II</u>-based challenge to section 924(c) in <u>United States v. Hill</u>, 890 F.3d 51 (2d Cir. 2018) (amended opinion), which held that substantive Hobbs Act robbery, using the categorical approach, satisfies Section 924(c)(3)(A)'s Elements Clause. Because the Court was addressing a challenge to the Elements Clause, it applied the categorical approach. <u>Hill</u>, 890 F.3d at 55; <u>see also</u> <u>United States v. Ivezaj</u>, 568 F.3d 88, 95 (2d Cir. 2009); <u>United States v. Acosta</u>, 470 F.3d 132, 134-35 (2d Cir. 2006). "Under the categorical approach, courts identify the minimum criminal conduct necessary for conviction under a particular statute," examining only the statutory definitions of the offense, not the defendant's conduct in committing it. <u>Hill</u>, 890 F.3d at 55 (citation omitted). In applying the categorical approach, the Second Circuit is not guided by hypothetical arguments that a statue may not be construed in a way devoid from real-world application; rather "there must be 'a realistic probability, not a theoretical possibility,' that the statute at issue could be applied to conduct that does not constitute a crime of violence." <u>Hill</u>, 890 F.3d at 56 (quoting <u>Gonzalez v. Duenas-Alvarez</u>, 549 U.S. 183, 193 (2007)); <u>accord</u> <u>Moncrieffe v. Holder</u>, 569 U.S. 184, 191 (2013) (the "focus on the minimum conduct criminalized by the . . . statute is not an invitation to apply 'legal

imagination' to the . . . offense"). Smith therefore must show that the statute was applied in the "manner for which he argues" either in his own case or another's. Id.

In interpreting the Elements Clause of § 924(c)(3)(A), courts typically look to the Supreme Court's decision in Johnson v. United States, 559 U.S. 133, 139-40 (2010) ("Johnson I"), which interpreted the physical force component of ACCA's similarly-worded Elements Clause as meaning "simply 'violent force — that is, force capable of causing physical pain or injury to another person.'" Hill, 890 F.3d at 58 (quoting Johnson I, 559 U.S. at 140). As the Supreme Court recently found,

> the force necessary to overcome a victim's physical resistance is inherently 'violent' in the sense contemplated by Johnson [I] and 'suggest[s] a degree of power that would not be satisfied by the merest touching.' 559 U.S. at 139 . . . . The altercation [in a robbery] need not cause pain or injury or even be prolonged; it is the physical contest between the criminal and the victim that is itself 'capable of causing physical pain or injury.' Id., at 140.

Stokeling v. United States, 139 S. Ct. 544, 553 (2019).

The Second Circuit next addressed a Johnson-II-based challenge to section 924(c)(3)(B)'s Residual Clause in United States v. Barrett, 903 F.3d 166 (2d Cir. 2018) ("Barrett I"), rev'd in relevant part by United States v. Barrett, 937 F.3d 126 (2d Cir. 2019) ("Barrett II"), where it: (1) reaffirmed that, in light of Hill, a Hobbs act robbery is categorically a crime of violence under § 924(c)(3)(a); (2) held that a conspiracy to commit a Hobbs act robbery is categorically a crime of violence under section 924(c)(3)(b); and (3) held in the alternative that the logic in Dimaya and Johnson II demands that courts apply a conduct-specific approach, as opposed to a categorical approach, to section 924(c)'s residual clause, which avoids constitutional concerns and therefore saves the clause. Barrett I, 903 F.3d at 174-75, 177-79, 181-84.

On June 24, 2019, the Supreme Court decided <u>Davis</u> and held that section 924(c)'s residual clause was unconstitutionally vague in light of <u>Dimaya</u> and <u>Johnson II</u>. 139 S. Ct. at 2326-27. While the <u>Davis</u> Court agreed that the conduct-specific approach could avoid the constitutional concerns identified in <u>Johnson II</u> and <u>Dimaya</u>, it found that the statutory text did not support the use of the conduct-specific approach. <u>Id.</u> at 2328-29. The statute's text required the application of the categorical approach and, accordingly, the residual clause was unconstitutionally vague under <u>Johnson II</u> and <u>Dimaya</u>. <u>Id.</u> at 2329.

<u>Davis</u> has therefore abrogated the Second Circuit's holding in <u>Barrett I</u> that the conduct-specific approach applies to section 924(c)'s residual clause and implicitly abrogated the Second Circuit's alternative holding that, under a categorical approach, a conspiracy to commit a crime of violence is itself a crime of violence under the residual clause. <u>Barrett II</u>, 2019 WL 4121728, at *1-3. <u>Davis</u> did not impact the Second Circuit's holding in <u>Hill</u> or its interpretation of the Elements Clause. <u>Barrett II</u>, 937 F.3d at 128.

B. <u>Discussion</u>

1. <u>Smith's Section 924(j) Conviction Relating to the McClenic Murder Was Predicated on VCAR Murder, Which Remains a Valid Crime of Violence</u>

In Count Ten, the jury convicted Smith of discharging a firearm which caused the death of McClenic in connection with one crime of violence: the VCAR murder of McClenic (Count Nine). Murder in aid of racketeering unquestionably satisfies the Elements Clause and remains a valid predicate crime of violence.

Indeed, <u>Johnson II</u> and its progeny, including <u>Davis</u>, have not altered the status of murder as a crime of violence under the Elements Clause because it requires proof that the defendant used, attempted to use, or threatened to use physical force against another. The elements of murder in aid of racketeering are (i) murder (ii) "for the purpose of gaining entrance to or

maintaining or increasing position in" (iii) "an enterprise engaged in racketeering activity."[8] 18 U.S.C. § 1959(a)(1). Murder in aid of racketeering undoubtedly satisfies the Elements Clause:

> And murder, no matter the degree, entails a "use . . . . of physical force" sufficient to trigger the elements clause of § 924(c); this conclusion is compelled because the Supreme Court has defined "physical force," in this context, as "*violent* force — that is, force capable of causing physical pain or injury to another person," Johnson [I], 559 U.S. 133, 140 (2010)—and "[m]urder necessarily entails enough force to cause injury since there can be no greater injury than death." Bonilla v. United States, No. 07-CR-97, 2017 WL 8813076, at *1 (E.D.N.Y. Aug. 23, 2017).

United States v. Russell, No. 05-CR-401 (ILG), 2018 WL 3213274, at *3 (E.D.N.Y. Jun. 29, 2018); see also United States v. Sierra, 782 F. App'x 16, 20-21 (2d Cir. 2019) (attempted murder in aid of racketeering qualifies as a "crime of violence" pursuant to § 924(c)(3)(A)); United States v. Praddy, 729 F. App'x 21, 23 (2d Cir.), cert. denied sub nom. Jones v. United States, 139 S. Ct. 185 (2018) (attempted murder under New York law "is a crime 'unmistakably involving an "attempted use . . . of physical force."'") (quoting United States v. Scott, 681 F. App'x 89, 94-95 (2d Cir. 2017)), abrogated on other grounds by United States v. Capers, 20 F. 4th 105, 119 n.10 (2d Cir. 2021).

The Second Circuit has rejected an argument that murder cannot be sufficiently forceful since it may be committed by omission, noting that argument was foreclosed by Hill, which explained that the "use of physical force can encompass acts undertaken to cause physical harm, even when the harm occurs indirectly." Sierra, 782 F. App'x at 20 (quoting Hill, 890 F.3d at 60); see also United States v. Scott, 990 F.3d 94, 100-01 (2d Cir. 2021) (en banc) (rejecting the

---

[8]    The murder alleged as the underlying offense of the Section 1959(a)(1) violation was second-degree murder in violation of New York Penal Law § 125.25(1). Under New York law, a person is guilty of second-degree murder when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.25(1).

omission argument and concluding that New York State's first degree manslaughter, which is similar to New York State's second degree intentional murder, is a violent felony under the ACCA); <u>Villanueva v. United States</u>, 893 F.3d 123, 129 (2d Cir. 2018) ("the relevant force is the impact of the substance on the victim, not the impact of the user on the substance").

In sum, because Smith's Section 924(j) conviction (Count Ten) was predicated on murder in aid of racketeering (Count Nine), which remains a valid predicate crime of violence, Smith's <u>Johnson</u> claim fails.

2. <u>Smith's Section 924(c) Convictions Relating to the Hill and Trackside Robberies Were Predicated on Substantive Robbery, Which Remains a Valid Crime of Violence</u>

In Counts Five and Eight, the jury convicted Smith of brandishing firearms in connection with the robbery of Hill and the Trackside robbery. The associated crimes of violence were: (1) Hobbs Act robbery conspiracy (Counts Three and Six); and (2) substantive robbery (Counts Five and Seven). Although there was no special verdict sheet, the evidence adduced at trial overwhelmingly established that the government proved all of those crimes of violence. Indeed, the jury found Smith guilty of both the substantive robbery and the conspiracy counts for each of the two different robberies. Because the two Section 924(c) convictions were predicated on substantive robbery counts, which remain valid crimes of violence after <u>Davis</u>, Smith's motion fails.

The Hobbs Act provides, in relevant part that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery … or attempts or conspires so to do" shall be guilty of an offense. 18 U.S.C. § 1951(a). Robbery is defined as:

> The unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate

> or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

18 U.S.C. § 1951(b)(1).

As set forth above, following <u>Davis</u>, the Second Circuit held in <u>Barrett v. United States</u>, 937 F.3d at 129–30 (2d Cir. 2019), that conspiracy to commit Hobbs Act robbery did not qualify as a crime of violence under the Force Clause, which is the only remaining enforceable definition of "crime of violence" in Section 924(c).

By contrast, the Second Circuit has held that substantive Hobbs Act robbery is a crime of violence under the Elements Clause. <u>See</u> <u>Hill</u>, 890 F.3d at 53, 60. That ruling is unaffected by <u>Davis</u>. <u>See</u> <u>Barrett</u>, 937 F.3d at 128-29 (affirming Section 924(c) convictions predicated on substantive Hobbs Act robbery following <u>Davis</u> based upon <u>Hill</u>). As the Court in <u>Hill</u> explained, "[t]o determine whether an offense is a crime of violence [under Section 924(c)(3)(A)], courts employ what has come to be known as the categorical approach." <u>Hill</u>, 890 F.3d at 55 (citing, inter alia, <u>Taylor v. United States</u>, 495 U.S. 575, 600 (1990)). Under the categorical approach, "courts identify the minimum criminal conduct necessary for conviction under a particular statute. In doing so, courts look only to the statutory definitions — <u>i.e.</u>, the elements — of the offense, and not to the particular underlying facts." <u>Id.</u> (quoting, inter alia, <u>Descamps v. United States</u>, 570 U.S. 254, 257 (2013)). In other words, "[t]he reviewing court cannot go behind the offense as it was charged to reach its own determination as to whether the underlying facts qualify the offense as, in this case, a crime of violence." <u>Id.</u>

Applying these principles, the Second Circuit in <u>Hill</u> ruled that substantive Hobbs Act robbery is a crime of violence under the Force Clause. The Court noted that its conclusion was consistent with the unanimous view of other circuits and with the Second Circuit's precedent

holding that state law robbery satisfied the similarly-worded definition of a "violent felony" for purposes of the Armed Career Criminal Act ("ACCA")), 18 U.S.C. § 924(e)(2)(B)(i).  Id. at 56 (citing Stuckey v. United States, 878 F.3d 62, 70 (2d Cir. 2017) (finding New York First Degree Robbery a violent felony), cert. denied, 139 S. Ct. 161 (2018), and United States v. Bordeaux, 886 F.3d 189, 194 (2d Cir. 2018) (finding Connecticut First Degree Robbery a violent felony)).  In light of the plain language of the Hobbs Act, which requires proof of the use of "actual or threatened force, or violence, or fear of injury" to the person or property of another, the Hill Court could "discern no persuasive basis to depart from these ample authorities." Id.  The Court rejected the defendant's various hypothetical arguments as to how Hobbs Act robbery might be committed in a way that would "not include the element necessary to qualify such robberies as crimes of violence for the purpose of § 924(c)(3)(A)."  Id. at 57; see id. at 57-60.

This result is in accord with every other Circuit court to consider the issue since Johnson II.  See, e.g., United States v. Garcia-Ortiz, - F.3d -, 2018 WL 4403947, *3-5 (1st Cir. 2018); United States v. Greer, 734 F. App'x 125, 128-29 (3d Cir. 2018); United States v. Buck, 847 F.3d 267, 274-75 (5th Cir. 2017); United States v. Gooch, 850 F.3d 285, 290-92 (6th Cir. 2017); United States v. Ingram, 947 F.3d 1021, 1025–26 (7th Cir. 2020); United States v. Rivera, 847 F.3d 847, 848-49 (7th Cir. 2017); Diaz v. United States, 863 F.3d 781, 783-84 (8th Cir. 2017); United States v. Dominguez, 954 F.3d 1251 (9th Cir. 2020); United States v. Howard, 650 F. App'x 466, 467-68 (9th Cir. 2016); United States v. Moreno, 665 F. App'x 678, 680-81 (10th Cir. 2016); United States v. St. Hubert, 909 F.3d 335, 346 (11th Cir. 2018).

Because Smith failed to raise a vagueness challenge before trial or object to the jury charge in a way relevant to the Davis issue, his claim should be reviewed for plain error.  "Plain error" is error that is clear or obvious, which affected the defendant's substantial rights and

seriously impugns the "fairness, integrity, or public reputation of judicial proceedings." United States v. Marcus, 560 U.S. 258, 262 (2010) (internal quotation marks omitted). Had Smith raised a timely challenge, the Court could have easily required a special verdict form in relation to the Section 924(c) charges or the government could have elected to pursue the valid predicates in the indictment. Having failed to object, Smith should not reap a windfall now that the law has changed in his favor where his convictions indisputably involved violent crimes such as robbery; instead, Smith should prevail only if the error prejudiced him. See Skilling v. United States, 561 U.S. 358, 414 (2010) (constitutional error occurs if jury is instructed on alternative theories of guilt, one of which is legally invalid, but that error is subject to harmless-error analysis).

Any error in the Court's instruction permitting the jury to predicate the Section 924(c) convictions on the Hobbs Act robbery conspiracy was harmless because the jury necessarily also predicated the conviction on the robbery, which qualifies as a crime of violence under Section 924(c)'s Elements Clause. Specifically, as set forth above, there is no dispute that Smith and his coconspirators actually robbed the two victims.

One valid predicate offense is sufficient to uphold a Section 924(c) conviction, even if another predicate turns out to be invalid so long as the acts involved in that offense were intertwined with the valid predicate. See, e.g., Smith, 813 F. App'x at 665 (affirming Section 924(c) conviction predicated on both a conspiracy to assault and substantive assault in aid of racketeering); United States v. Vasquez, 672 F. App'x 56, 61 (2d Cir. 2016) (affirming Section 924(c) convictions predicated on both Hobbs Act robbery conspiracy and narcotics conspiracy, explaining that "[e]ven if Hobbs Act robbery were not a categorical crime of violence, Vasquez's § 924(c) convictions are clearly supported by a narcotics predicate presenting no legal concern"); Order, Cooper v. United States, No. 16-1925, DE:40 at 1 (2d Cir. Feb. 20, 2019)

("Although Petitioner's § 924(c) and (j) convictions were predicated on several crimes of violence, they also were predicated on drug trafficking crimes . . .," and, therefore, "[b]ecause Petitioner's drug trafficking crimes were not affected by Johnson [II] . . ., his convictions under § 924(c) and (j) remain valid.") (citing Harrington v. United States, 689 F.3d 124, 137 (2d Cir. 2012)); Order, Fuller v. United States, No. 16-1888, DE:51 at 1-2 (2d Cir. Feb. 20, 2019) (same); In re Navarro, 931 F.3d at 1302 (denying permission to file successive motion pursuant to 28 U.S.C. § 2255 raising a Davis challenge to a Section 924(c) conviction that was predicated both on a Hobbs Act robbery conspiracy and a narcotics offense). Here, the crimes were inextricably intertwined because they addressed the same robbery of the same victim.[9]

There is no rational basis upon which the jury could have predicated the Section 924(c) conviction on the conspiracy but not the substantive robbery. The Section 924(c) count alleged the use of a firearm during and in relation to the substantive robberies, and the only dangerous weapon used in connection with those crimes was a firearm. Because the jury convicted Smith of the substantive robberies, there can be no genuine dispute that the jury predicated the Section 924(c) convictions on the use of a firearm during those crimes. See Vasquez, 672 F. App'x at 61 (affirming Section 924(c) convictions where invalid robbery and valid narcotics conspiracy predicates were inextricably intertwined and jury found narcotics predicate proved, such that there

---

[9]       In Capers, the Second Circuit, applying the analysis in Vasquez and United States v. Eldridge, 2 F.4th 27, 39 (2d Cir. 2021), found that the defendant's § 924(j) conviction was invalid since there was a "reasonable probability" that the jury had relied solely on an invalid racketeering conspiracy, as in that case the jury had acquitted the defendant of drug-related murder, and "the government's theory at trial" did not show that the "RICO conspiracy [was] 'intertwined' with the narcotics conspiracy." 20 F.4th at 124-26. The Court explained that, unlike in Vasquez, the "RICO conspiracy was not 'presented as part of the proved narcotics scheme' . . . [i]nstead, it charged Capers with a broad conspiracy to violate the substantive RICO statute . . . ." Id. at 125. There is no such issue in this case. Here, each § 924(c) count was predicated on a robbery conspiracy and a substantive robbery relating to a single victim.

was no possibility verdict rested only on invalid robbery predicate). Accordingly, any error in instructing the jury that it could predicate the Section 924(c) conviction on the conspiracy count was harmless.

In sum, because Hobbs Act robbery is a crime of violence, Smith's Section 924(c) convictions relating to the Hill and Trackside robberies are properly predicated on a crime of violence under Section 924(c)(3)(A). Therefore, Smith's <u>Johnson</u> claim lacks merit and should be denied.

* * *

Because Smith's petition on its face "show[s] that the prisoner is entitled to no relief," this matter should be disposed of without an evidentiary hearing. 28 U.S.C. § 2255(b); <u>see also</u> <u>Garcia Montalvo v. United States</u>, 862 F.2d 425, 426-27 (2d Cir. 1988).

## II. <u>Henry's Purported Recantation Does Not Warrant a Hearing, Let Alone a New Trial</u>

Because Henry's affidavit is unsupported by any credible evidence, is motivated by a desire to obtain monetary damages in connection with a civil lawsuit, and is flatly contradicted by his repeated sworn and unsworn statements and the sworn declarations of law enforcement officers and his own attorney, Henry's trial testimony was not false—his recent affidavit is patently false. Furthermore, even if Henry's affidavit is accurate and he testified falsely at Smith's trial—which is not the case—Smith cannot establish that he "probably" would have been acquitted as the evidence of his guilt was overwhelming. Accordingly, the Court should deny Smith's motion for a new trial without a hearing.

### A. <u>Legal Standard</u>

It is axiomatic that a motion for a new trial based on witness recantation is granted "only with great caution in the most extraordinary circumstances." <u>United States v. DiPaolo</u>, 835 F.2d 46, 49 (2d Cir. 1987) (citations and internal quotation marks omitted). Such claims are to be

reviewed "with the utmost suspicion." Id. at 49; see also Haouari v. United States, 510 F.3d 350, 353 (2d Cir. 2007). The reason for this is because recantations "upset[ ] society's interest in the finality of convictions, [are] very often unreliable and given for suspect motives, and most often serve [ ] merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." Haouari, 510 F.3d at 353 (2d Cir. 2007) (quoting Dobbert v. Wainwright, 468 U.S. 1231, 1233-34 (1984) (Brennan, J., dissenting from denial of certiorari)). Courts must view recantations from co-conspirators with even greater caution and skepticism when "the recanting witness is one who was involved in the same criminal scheme and, having received the benefit of his cooperation agreement, now sits in jail with nothing to lose by recanting." Id. at 353. This is because co-conspirators "might from a variety of base motives, or importunities, be impelled, by recantation, to come to the aid of a person whose conviction has been brought about by their testimony." Id. (quoting Newman v. United States, 238 F.2d 861, 862 (5th Cir. 1956)).

"[B]efore granting a motion for a new trial on the ground that a witness recanted her trial testimony," there is a three-part test that the "defendant bears the burden of satisfying" in the eyes of the trial court. DiPaolo, 835 F.2d at 49. First, the defendant must prove "that the testimony recanted was false and material." Id. Second, the defendant must prove "that without the original testimony the jury probably would have acquitted the defendant." Id. Finally, the defendant must prove "that the party seeking the new trial was surprised when the false testimony was given or did not know of its falsity until after the trial and could not with due diligence have discovered it earlier." Id.

Where, as here, the court observed the witness's demeanor at trial and was positioned to weigh that witness's credibility, the need for a hearing is reduced. DiPaolo, 835

F.2d. at 51. In fact, the Second Circuit has held that "[w]hen a motion for a new trial is predicated entirely on an affidavit from a trial witness who recants her testimony, a trial judge can ordinarily deny it without a hearing." Id. at 51. Factors the court should consider when deciding whether to hold an evidentiary hearing include "the importance of the witness's testimony in the original proceeding; 'the existence of evidence corroborating either the conviction or the recantation; ... the temporal proximity of the trial testimony and the purported recantation; the consistency of the recantation with the witness's comments and behavior before, during, and after trial; and the existence of evidence of outside influence suggesting either coerced testimony or coerced recantation.'" United States v. Carthen, 681 F.3d 94, 102–03 (2d Cir. 2012) (quoting United States v. Rojas, 520 F.3d 876, 884 (8th Cir. 2008)).

      B.     Henry's Purported Recantation, Not His Trial Testimony, Is False

Smith cannot satisfy the first part of DiPaolo's three-part test, namely, that Henry's trial testimony was false. Contrary to his trial testimony, Henry's now claims that (1) he was innocent of the McClenic murder; (2) he had no knowledge of said murder; (3) he was told what his role was in the murder and what his testimony should be; and (4) he was threatened and coerced into cooperating and repeating the "narrative" that he was given. (Exh. 3 ¶¶ 24, 97-98). Those claims are incredible and overwhelmingly belied by the record.

First, Henry's purported recantation that he was innocent of the McClenic murder and that he had no knowledge of the murder is directly contradicted by his own prior repeated sworn statements. Not only did Henry provide a detailed account of his, and Smith's involvement, in, the McClenic murder at trial, Henry admitted the same under oath at his guilty plea proceeding. Indeed, he admitted that he drove Smith and another member of the Crips to a gas station in Hempstead where Smith shot and killed McClenic. (3500-BH-19 at 15-16).

Moreover, at the time of his sentencing, Henry signed a sworn document, averring that "I was the driver who transported defendant Smith to and from the murder scene. Defendant, Eric Smith shot and killed James McClenic, Jr. on 12/15/10." (Exh. 2).

Furthermore, at the time of his state arrest on December 23, 2010, although he did not provide a full account of the murder, Henry did sign yet another sworn statement admitting several critical facts, which are consistent with his trial testimony and completely contradict his recent affidavit. For example, Henry admitted that: (1) on the night of the murder, he drove Smith to a gas station in Hempstead; (2) he was driving his black Hyundai Sonata; (3) after Smith exited his car, he heard gunshots; (4) after hearing those gunshots, Smith ran back to his car; and (5) when Smith got back in his car, Smith ordered Henry to flee the scene. (See 3500-BH-10, 3500-BH-12).

Second, Henry's alleged recantation is also inconsistent with his prior repeated unsworn statements that he made in the presence of his attorneys and law enforcement officers. Before he pleaded guilty, Henry met with the federal government and his attorneys and described in detail his and Smith's role in the McClenic murder, which was consistent with his testimony and plea proceeding in all material respects. (3500-BH-2). Consistent with his trial testimony, Henry detailed picking up Smith and Lobban in his black Hyundai Sonata, driving them around until they located McClenic at which point Smith exited his car, armed with a .40 caliber firearm, to shoot and kill McClenic. (Id.). Henry further explained that he heard gunshots, then Smith returned to his car and ordered him to drive away. (Id.). Henry also told the government that Smith stated that he dropped the "clip." (Id.). All of this information was consistent with his trial testimony and was independently corroborated by other credible evidence adduced at trial.

In the face of this mountain of consistent and credible evidence, Henry baldly asserts that AUSA Nicole Boeckmann and FBI Special Derrick Acker told him what his role was in the murder, what his testimony should be, and threatened and coerced him into cooperating and repeating the "narrative" that they supplied him. (Exh. 3 ¶¶ 24, 97-98). That assertion is absurd. His former attorney, Mr. Biniakewitz, specifically and unequivocally rejected those claims. Indeed, Mr. Biniakewitz declared:

> During the course of the proffer meetings, Henry admitted to law enforcement what his role was in the McClenic murder and consistently identified Eric Smith as the individual who shot and killed McClenic. Specifically, Henry admitted to driving Eric Smith and Rommel Lobban to the murder scene, and being the getaway driver after Eric Smith shot and killed James McClenic at the gas station. Additionally, Henry described role he played in several other crimes committed by himself and other members of the Rollin' 60s, including multiple shootings and robberies, one of which was the tattoo parlor robbery. I found Mr. Henry to be candid, truthful and forthcoming during these sessions. I had no concerns about the veracity of his information and at no time was any information provided to him by myself or Martin Geduldig, nor did either of us instruct him on what to say.

> At no point in time during the course of the proffer meetings did Henry ever claim to be innocent of or deny his role in the McClenic murder. Furthermore, Henry was never provided a narrative, coached or instructed what to say or what his testimony should be by anyone. Henry was never coerced or threatened by Assistant United States Attorney Nicole Boeckmann, Special Agent Derrick Acker or anyone else present at the proffer meetings. I found AUSA Boeckmann's treatment of Mr. Henry to be commendable. All of the prosecutors and agents involved the case treated Mr. Henry extremely fairly and respectfully.

(Biniakewitz Decl. ¶¶ 4-5).

In addition to Henry's own attorney refuting his recent baseless claims, FBI Special Agent Acker denied every coercing Henry or providing him with a "narrative." Specifically, FBI Special Agent Acker declared:

> During the course of the proffer meetings, the April 20 trial prep and other meetings, Henry readily admitted his role in the McClenic murder and consistently identified Eric Smith as the individual who shot and killed McClenic. Additionally, Henry described the role he played in several other crimes committed by himself and other members of the Rollin' 60s, including shootings and robberies.

> At no point in time during the course of the proffer meetings, the April 20 trial prep or any other trial prep meetings that I attended did Henry ever claim to be innocent of or deny his role in the McClenic murder. Furthermore, Henry was never provided a narrative, coached or instructed what to say or what his testimony should be. Henry was never coerced or threatened by me, Assistant United States Attorney Nicole Boeckmann or anyone else present.

(Acker Decl. ¶¶ 4-5).

Nassau County Detective George Colby, who was present for the initial proffer session with Henry as well as subsequent meetings with Henry, further refutes Henry's recent affidavit. (Colby Decl. ¶¶ 5-6). And of course, those declarations are buttressed by Henry's sworn statements at his plea proceeding. At his plea, the Court asked Henry whether anyone was "forcing [him] to plead guilty here or to cooperate," to which he responded negatively. (3500-BH-19 at 14). Henry also confirmed that he was pleading guilty because he was guilty and "for no other reason." (Id.). In sum, Henry's affidavit is patently false.[10]

---

[10] A recent motion filed by Henry further evinces the that his affidavit is false. (Exh. 4). In that motion, Henry does not repeat any of the statements or allegations contained in his civil affidavit: he does not profess to be innocent of the murder, nor does he claim to have been coerced into pleading guilty and testifying against Smith. To the contrary, he noted that he agreed to cooperate with the federal investigation and pleaded guilty to the McClenic murder. (Exh. __ ¶ 5). He went on to state "[u]ndoubtedly, the crime [he] was convicted of was certainly serious, as [he] was one of fifteen co-defendants in a superseding gang-racketeering conspiracy indictment that included drugs and other violent offenses." (Id. ¶ 44). Henry further admitted that "[t]he role [he] was accused and convicted of playing was the driver of the co-defendant who shot and killed a rival gang member." (Id.). Notably, Henry's motion is devoid of any claims of innocence, coercion or that his testimony at Smith's trial was false.

Third, in addition to being flatly contradicted by his prior repeated sworn and unsworn statements, Henry's affidavit defies logic and common sense. Henry's testimony was detailed and corroborated. Specifically, Henry testified where he picked up Smith, what car he was driving, where Smith was sitting in the car, and where Lobban was sitting in the car. (T 2297, 2421-23, 2436). Henry then walked the jury through how they drove around for an hour or two while Smith talked on the phone and directed him where to drive. (T 2423-25). Henry explained that Smith said they were looking for a green Mercedes Benz truck—the same make and color of the car that McClenic was sitting in when he was murdered. (Id.; see GX 2) Henry also testified that they found the green Mercedes Benz truck at a Citgo gas station in Hempstead—the same type of gas station where McClenic was killed. (T 2426-31; GX 2).

Henry then testified that he parked and Smith asked Lobban what he should do. (T 2429-31). Lobban responded "do what you do." (Id.). Henry explained that Smith got out of the car, put his hood up, moved the gun to his front pocket and walked towards the gas station. (T 2431-33). Henry further testified that while he and Lobban waited for Smith to return, Lobban got into the front seat and told Henry to move his car, which Henry did. (T 2433-35). Henry testified that a few moments later, he heard gunshots and saw Smith running back to his car. (T 2435-37). Smith entered the car and demanded that they drive away. (Id.).

---

After reviewing this motion, which called into question whether Henry continues to stand behind his civil affidavit, the government spoke to Henry's former counsel (Mr. Biniakewitz). Due to the nature of Henry's allegations against AUSA Boeckmann and FBI Special Agent Acker, the government did not contact Henry directly. Mr. Biniakewitz indicated that he was going to contact Henry to discuss Henry's purported recantation, his trial testimony, and his motion for early termination of supervised release. Mr. Biniakewitz subsequently informed the government that he repeatedly attempted to speak to Henry but his communications went unanswered.

Henry further testified that during the car ride, Smith told him that he dropped the "clip." (T 2437-40). Henry explained that after the murder, he drove Smith to Hernandez's home on East Fulton and he returned to his home. (T 2437, 2441). Henry testified that days later, Smith told Henry that he walked up to McClenic's car, knocked on the window, that McClenic looked up, looked into his eyes, and he then shot McClenic. (2447-49).

It is simply absurd to believe that Henry would have been able to provide such detailed testimony, which was consistent with his prior statements and corroborated by other evidence, unless he actually lived those events and was recounting them for the jury.

Moreover, and significantly, Henry's testimony was corroborated by other credible evidence. For example, Henry's testimony that he drove Smith and Lobban to the murder in his black Hyundai Sonata was corroborated by the testimony of Halyard, Walker and Mosley.

Similarly, Henry's testimony that they were looking for a green Mercedes Benz truck was corroborated by civilian eyewitness Nya Rampersad, the crime scene detective and the crime scene photographs showing that McClenic was sitting in a green Mercedes Benz truck when he was shot and killed.

Henry's testimony that Smith told him that he dropped the "clip" was corroborated by Halyard's testimony, the testimony of the crime scene detective, and the ballistics evidence recovered at the murder scene.

Likewise, Henry's testimony that Smith knocked on the window before shooting McClenic was corroborated by the testimony of Halyard and civilian eyewitness Nya Rampersad, who was sitting in the car with McClenic when he was shot and killed.

Henry's testimony that Smith told him that when he knocked on the car window, McClenic was looking down was also corroborated by Mr. Rampersad.

And obviously, Henry's testimony that Smith killed McClenic was consistent with Halyard, Hernandez, Mosley and Walker's testimony that Smith admitted to killing McClenic.

Henry's role in and knowledge of the murder was also corroborated by Smith's concern that Henry would cooperate with law enforcement. As set forth above, after the murder, Smith considered having Henry killed because he was concerned that Henry was going to cooperate with law enforcement. (T 733-34, 737-39, 1799-1802, 2471-72). If Henry played no part in, and had no knowledge of Smith's involvement in, the McClenic murder, Smith would have had no reason to have Henry or his family killed.

It also bears emphasizing that Henry testified about numerous other charged and uncharged crimes that he and Smith committed, which were corroborated by other evidence.

Henry's motives for filing the recent affidavit also demonstrate the lack of truthfulness of his purported recantation. Henry is a co-conspirator, which, as noted above, courts look at with even more suspicion. Henry also has the motive of financial gain. Henry filed the recent affidavit in connection with a civil lawsuit against Nassau County police officers for his supposed wrongful arrest whereby he seeks to obtain monetary damages. To overcome the obvious impediment with establishing that his arrest was unlawful given that he admitted to the crimes for which he was arrested, Henry now claims to be innocent of those crimes, all in an effort to press his civil lawsuit. Henry's purported recantation is "implausible and in stark contrast to the witness' detailed and consistent testimony given under oath, as observed by the trial judge" and should be "looked upon with the utmost suspicion." United States v. DeFeo, No. 90 CR. 250 (MJL), 1997 WL 3259, at *8 (S.D.N.Y. Jan. 6, 1997), aff'd, 152 F.3d 921 (2d Cir. 1998). Because Henry's recent affidavit is patently false, the Court should reject Smith's claim and deny his motion without a hearing.

C.     <u>Even if Henry's Testimony Was False, the Verdict Would Have Been the Same</u>

Even if Smith met his burden of establishing that Henry's detailed trial testimony was false—which he cannot—he cannot demonstrate that absent Henry's testimony, "the jury probably would have acquitted [him]."  That is fatal to his motion.

As set forth above, the evidence of Smith's guilt was overwhelming and went well beyond Henry's testimony.  For the McClenic murder conviction, which is the only subject of Henry's purported recantation, four other witnesses (Halyard, Hernandez, Walker and Mosley), who were some of Smith's closest friends, separately testified that Smith admitted to each of them that he shot and killed McClenic.

In addition to corroborating each other, those witnesses also provided important details that were corroborated by civilian witnesses, crime scene and ballistics evidence, and documentary evidence demonstrating the credibility of their testimony.  For example, Halyard testified that Smith told him that he knocked on the McClenic's car window before shooting McClenic, which was corroborated by non-cooperating witness Nya Rampersad.  Also, Halyard testified that Smith told him that he used a .40 caliber firearm and that he dropped the magazine from the gun at the murder scene, key details that were corroborated by the crime scene and ballistic evidence.

Moreover, all of the cooperating witnesses explained that Smith's motive for the murder (<u>i.e.</u>, that McClenic was a member of the rival Bloods and was causing problems for the Crips), which was corroborated by McClenic's social media postings.

Finally, the messages between Smith and McClenic in which Smith threatened to kill McClenic was strong independent evidence of Smith's guilt.  But it is also worth emphasizing that it corroborates the cooperating witnesses' testimony.

In light of this overwhelming evidence, there is no doubt that even without Henry's testimony, the jury would have found Smith guilty of the McClenic murder, and Smith certainly cannot meet his burden of showing that the jury probably would have acquitted him. Accordingly, the Court should deny Smith's motion.

* * *

In sum, because the Court is well-positioned to assess the credibility of Henry's prior testimony against the current purported recantation having observed Henry's demeanor at his guilty plea proceeding and at trial, there is no need for a hearing. All of the credible evidence makes plain that Henry testified truthfully at trial, which is why the Court sentenced him to time served, and his civil affidavit is obviously false and motivated by financial interests. Also, because the evidence of Smith's guilt was overwhelming, the jury's verdict would have been the same. As a result, the Court should deny Smith's motion without a hearing.

## CONCLUSION

For the reasons stated above, the motion should be denied in all respects.

Dated: Central Islip, New York
June 24, 2022

Respectfully submitted,

BREON PEACE,
<u>United States Attorney</u>,
<u>Eastern District of New York</u>.

By: _____/s/_____
Nicole Boeckmann
Christopher C. Caffarone
Michael R. Maffei
Assistant U.S. Attorneys